ORIGINAL 2 tuc1

66

11/22/02
MA

FILED
HARRISBURG, PA

NOV 2 2 2002

MARY E. D'ANDREA, CLERK
Per _____
Deputy Clerk

# IN THE UNITED STATES DISTRICT COURT
# FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| JEFFERY D. ALBRIGHT, et al. ) | |
| ) | |
| **Plaintiffs** ) | |
| v. ) | **Case No. 1:CV-00-878** |
| ) | **Judge Sylvia H. Rambo** |
| DANIEL A. VIRTUE, et al. ) | |
| ) | |
| **Defendants** ) | |

## STATEMENT OF UNDISPUTED MATERIAL FACTS IN SUPPORT OF DEFENDANT ABF FREIGHT SYSTEM, INC.'S MOTION FOR SUMMARY JUDGMENT

Pursuant to Rule 56 of the Federal Rules of Civil Procedure and Local Rule 56.1, Defendant ABF Freight System, Inc. ("ABF") hereby submits this Statement of Undisputed Material Facts in support of its Motion for Summary Judgment.

1.      The Plaintiffs are currently employed as over-the-road drivers at Defendant ABF's facility in Carlisle, Pennsylvania.  Declaration of Gary Drake ("Drake Decl.") ¶8, attached hereto as Exhibit 1.  All of the Plaintiffs

1

had worked as over-the-road drivers for Carolina Freight Carriers Corp. ("Carolina") prior to September 1995. Declaration of John Dale ("Dale Decl.") ¶4, attached hereto as Exhibit 2.

2.    ABF is a national freight common carrier whose drivers and dock employees are represented by various local unions affiliated with the International Brotherhood of Teamsters ("IBT"), including Teamster Local 776 ("Local 776"), located in central Pennsylvania. Drake Decl. ¶2.

3.    ABF and Local 776 are parties to the National Master Freight Agreement ("NMFA") and its Central Pennsylvania Supplemental Agreement. Exhibit 3.[1] The NMFA is the national collective bargaining agreement between Trucking Management, Inc. ("TMI"), a multi-employer association which serves as the collective bargaining representative for the major less-than-truck load ("LTL") common carriers, including ABF, and the Teamsters National Freight Industry Negotiating Committee ("TNFINC"), which negotiates the agreement on behalf of over 100 Teamster Local Unions, including Teamsters Local 776. Dale Decl. ¶2.

---

[1]    Exhibit 3 is the 1994-1998 NMFA. The 1998-2003 NMFA is attached hereto as Exhibit 5.

4.     The NMFA, along with its area supplements, governs the terms and conditions of employment for all Teamster-represented employees in the trucking industry who work for NMFA-covered carriers.  Exhibit 3.

5.     On May 23, 1995, Carolina closed its Carlisle, Pennsylvania terminal.  Dale Decl. ¶4.  Prior to the facility's closure, Carolina employees at the Carlisle terminal were given the opportunity to transfer to other Carolina facilities or accept a layoff at Carlisle.  Id.

6.     Eight of the sixteen Plaintiffs transferred from Carlisle to another Carolina terminal prior to the closure of the Carlisle terminal on May 23, 1995.  The eight Plaintiffs and their transfer locations are: Gary Dietz-Kutztown; Ralph Harris-Baltimore; Allen Landis-Baltimore; Walter Minich-Baltimore; Raymond Nevins-Baltimore; Stanley Nye-Baltimore; Keith Sgrignoli-Kutztown; Lawrence Welker-Baltimore.  Id.

7.     The remaining eight Plaintiffs were laid off by Carolina in Carlisle when the terminal closed on May 23, 1995, or prior to that date.  The eight Plaintiffs are Jeffrey Albright, Norman Boire, William Erdman, Michael Fritz, Ronald Frombaugh, Lowell McGuire, Vincent Ramirez, Jr., and Ray Snyder, Jr.  Id.

8.     In July 1995, two months after the closure of Carolina's Carlisle, Pennsylvania terminal, Arkansas Best Corp., the parent company of

ABF, announced that it was acquiring WorldWay Corp., the parent company

of Carolina. As a result of this acquisition, ABF and Carolina were merged,

with ABF being the surviving carrier. Dale Decl. ¶5.

9.    Both ABF and Carolina were parties to the NMFA. The

NMFA contains several provisions that set forth the procedures to be

followed when there is a change in operations resulting from a combination

of terminals or over-the-road operations. Article 8, Section 6 of the NMFA

requires that a change of operations be approved by a Change of Operations

Committee, which is comprised of an equal number of Union and Employer

representatives. One of the Committee's primary tasks is to determine the

proper application of seniority for employees affected by the change of

operations, in compliance with the NMFA. Decisions of the Change of

Operations Committee are final and binding. Exhibit 3, Article 8, Section 6.

In addition, the Change of Operations Committee retains authority to hear

and decide future grievances that arise from the implementation of a

previous decision of the Committee. Exhibit 3, Article 8, Section 6.

10.    In late August 1995, a Change of Operations Committee

("Committee") was appointed to consider the proposed change of operations

plan submitted by ABF as a result of the ABF/Carolina acquisition and

merger. Among other issues, the Committee had the authority under the

4

NMFA to resolve and decide seniority issues arising from the change of operations. Exhibit 3, Article 8, Section 6. The Committee held hearings on September 14 and 15, 1995. At these hearings, each Teamster Local Union impacted by the change, including Local 776, had the opportunity to comment on ABF's proposed plan. In its presentation to the Committee, Local 776 specifically addressed ABF's position that the Carolina employees on layoff from Carlisle did not have recall rights with ABF. Exhibit 4 at 644-46. Local 776 argued that these individuals should have recall rights under the NMFA. Thus, the Committee had full knowledge of the status of laid off Carolina employees at Carlisle at the time that it rendered its decision.

11. The Committee issued a decision on September 19, 1995, in which it determined that ABF and Carolina seniority rosters should be dovetailed. Dale Decl. ¶6, Attachment A. Specifically, the Committee's decision directed that in accordance with Article 5, Section 2 of the NMFA, "the seniority lists at domiciles and terminals <u>affected by this change of operations</u> shall be grouped by dovetailing as reflected on the exhibits contained in the proposed change of operations. . . ." Dale Decl., Attachment A at ¶1A (emphasis added). The Committee further stated that

"every facility whose work has been merged with the work of another facility must be grouped with that facility." Id.

12.    Carolina closed its terminal in May 1995, several months prior to Arkansas Best Corp.'s announcement of its intention to acquire Carolina's parent, Worldway Corp., and five months prior to the ABF/Carolina merger. Exhibit A to the Proposed Seniority Application, attached to the Committee's September 19, 1995 decision, shows the number of active and inactive ABF and Carolina employees at the time of the ABF/Carolina merger. Dale Decl. ¶9, Attachment A. For Carlisle, there were 328 total ABF employees and zero total Carolina employees. Because Carolina's terminal was closed prior to the Carolina/ABF merger, there were no Carolina employees at Carlisle at the time of the merger. Carolina's Carlisle terminal was not acquired by ABF, and it was not merged with any ABF terminal. Id.

13.    The Committee's decision noted, however, that the laid off (inactive) Carolina employees and the employees laid off as a result of the acquisition had rights under Article 5, Section 5 of the NMFA. Id. Article 5, Section 5 of the NMFA provides for transfer opportunities for over-the-road drivers who are on layoff. Pursuant to the terms of the NMFA, laid off over-the-road drivers can be offered the opportunity to transfer to another

over-the-road domicile within the same regional area, provided that the employee notifies the company in writing of his interest in a transfer opportunity. Dale Decl. ¶11; Exhibit 3, Article 5, Section 5. If ABF receives numerous Article 5, Section 5 requests, offers of transfer are "made in the order of continuous over-the-road seniority." Exhibit 3, Article 5, Section 5. An employee who transfers under Article 5, Section 5, "shall be placed at the bottom of the seniority board for bidding and layoff purposes, but shall retain company seniority for fringe benefits only." Id.

14.    The Change of Operations Committee's September 19, 1995 decision expanded Article 5, Section 5 rights for the ABF and former Carolina employees affected by the change. The Committee determined that the Carolina employees who were already on layoff at the time of the merger (and any Carolina or ABF employee laid off as a result of the merger), would have transfer rights under Article 5, Section 5 to ABF terminals in the Central, Eastern and Southern regions, not just within the laid off employee's own region, for the life of the 1994-1998 NMFA. Dale Decl. ¶12, Attachment A at ¶ 7A.

15.    The ABF/Carolina merger was completed on September 25, 1995. Dale Decl. ¶6. The eight Plaintiffs who had transferred from Carlisle

7

to other Carolina facilities were laid off on September 25, 1995, as a result of the merger. Dale Decl. ¶7.

16.    In October 1995, Local 776 sent a letter to all former Carolina Carlisle employees laid off in Carlisle specifically informing them that pursuant to the Committee's decision, they had transfer rights under Article 5, Section 5 of the NMFA. Dale Decl. ¶14, Attachment B.

17.    ABF had an extremely limited need for additional over-the-road drivers from the time of the merger in September 1995 through the expiration of the 1994-1998 NMFA on March 31, 1998. No transfer opportunities became available for any of the Plaintiffs under Article 5, Section 5 during this time frame. Dale Decl. ¶15.

18.    The expanded Article 5, Section 5 rights under the Change of Operations Committee decision expired when the NMFA expired on March 31, 1998. As of April 1, 1998, the Plaintiffs transfer rights were governed strictly by the language in Article 5, Section 5 of the 1998-2003 NMFA. Dale Decl. ¶16, Attachment A at ¶ 7A; Exhibit 5, Article 5, Section 5.

19.    In late 1998 and early 1999, ABF had a need to hire over-the-road drivers at a number of domiciles, including Carlisle. John Dale, Vice President of Industrial Relations at ABF, had instructed Carlisle

management not to hire anyone because there were employees with Article 5, Section 5 rights under the NMFA. Dale Decl. ¶17.

20.    Between October 30, 1998 and February 22, 1999, the ABF Industrial Relations Department received Article 5, Section 5 transfer requests from each of the sixteen Plaintiffs. Dale Decl. ¶18. The following provides the specifics of each Plaintiff's request:

a)    On December 4, 1998, ABF received a letter from Plaintiff Albright requesting that the company "add his name for recall under Article 5, Section 5." On December 7, 1998, he was contacted by ABF and offered the opportunity to transfer to Carlisle, among other options. Plaintiff Albright accepted the Carlisle transfer opportunity. On December 9, 1998, ABF sent Plaintiff Albright a letter confirming that he had accepted a job offer at Carlisle "[i]n accordance with Article 5, Section 5 of the [NMFA]." Dale Decl. ¶¶ 19, 21, Attachments C and D.

b)    On December 9, 1998, ABF received a letter from Plaintiff Boire requesting "recall under Article 5, Section 5." On December 9, 1998, he was contacted by ABF and offered the opportunity to transfer to Carlisle, among other options. Plaintiff Boire accepted the Carlisle transfer opportunity. On December 9, 1998, ABF sent Plaintiff Albright a letter confirming that he had accepted a job offer at Carlisle "[i]n accordance with

Article 5, Section 5 of the [NMFA]." Dale Decl. ¶¶ 19, 21, Attachments C
and D.

        c)     On November 16, 1998, ABF received a letter from
Plaintiff Dietz requesting "work opportunities under Article 5.5 of the
NMFA." On November 16, 1998, he was contacted by ABF and offered the
opportunity to transfer to Carlisle, among other options. Plaintiff Dietz
accepted the transfer opportunity. On November 19, 1998, ABF sent
Plaintiff Albright a letter confirming that he had accepted a job offer at
Carlisle "[i]n accordance with Article 5, Section 5 of the [NMFA]." Dale
Decl. ¶¶ 19, 21, Attachments C and D.

        d)     On December 15, 1998, ABF received a letter from
Plaintiff Erdman requesting "that [he] be considered for re-hire under
NMFA Article 5, Section 5." On February 1, 1999, he was contacted by
ABF and offered the opportunity to transfer to Carlisle, among other options.
Plaintiff Erdman accepted the transfer opportunity. On February 8, 1999,
ABF sent Plaintiff Erdman a letter confirming that he had accepted a job
offer at Carlisle "[i]n accordance with Article 5, Section 5 of the [NMFA]."
Dale Decl. ¶¶ 19, 21, Attachments C and D.

        e)     On November 4, 1998, ABF received a letter from
Plaintiff Fritz requesting "to be put on [ABF's] road driver work list under

Article 5, Section 5." On November 13, 1998, he was contacted by ABF and offered the opportunity to transfer to Carlisle, among other options. Plaintiff Fritz accepted the transfer opportunity. On November 19, 1998, ABF sent Plaintiff Fritz a letter confirming that he had accepted a job offer at Carlisle "[i]n accordance with Article 5, Section 5 of the [NMFA]." Dale Decl. ¶¶ 19, 21, Attachments C and D.

        f)     On November 3, 1998, ABF received a letter from Plaintiff Frombaugh stating that it is his "desire to work for ABF at the Carlisle, Pa. facility as described in the NMFA, Section V, Article V." On November 4, 1998, he was contacted by ABF and offered the opportunity to transfer to Carlisle, among other options. Plaintiff Frombaugh accepted the transfer opportunity. On November 19, 1998, ABF sent Plaintiff Frombaugh a letter confirming that he had accepted a job offer at Carlisle "[i]n accordance with Article 5, Section 5 of the [NMFA]." Dale Decl. ¶¶ 19, 21, Attachments C and D.

        g)     On November 16, 1998, ABF received a letter from Plaintiff Harris requesting that ABF "place him on the Article 5 list." On November 23, 1998, he was contacted by ABF and offered the opportunity to transfer to Carlisle, among other options. Plaintiff Harris accepted the transfer opportunity. On November 24, 1998, ABF sent Plaintiff Harris a

letter confirming that he had accepted a job offer at Carlisle "[i]n accordance with Article 5, Section 5 of the [NMFA]." Dale Decl. ¶¶ 19, 21, Attachments C and D.

  h)  On December 3, 1998, ABF received a letter from Plaintiff Landis requesting to be "put back on the call back board, under Article 5-Section 5." On December 3, 1998, he was contacted by ABF and offered the opportunity to transfer to Carlisle, among other options. Plaintiff Landis accepted the transfer opportunity. On December 9, 1998, ABF sent Plaintiff Landis a letter confirming that he had accepted a job offer at Carlisle "[i]n accordance with Article 5, Section 5 of the [NMFA]." Dale Decl. ¶¶ 19, 21, Attachments C and D.

  i)  On January 8, 1999, ABF received a letter from Plaintiff McGuire requesting "to be considered for rehire under the 5 & 5 rule." On February 2, 1999, he was contacted by ABF and offered the opportunity to transfer to Carlisle, among other options. Plaintiff McGuire accepted the transfer opportunity. On February 8, 1999, ABF sent Plaintiff McGuire a letter confirming that he had accepted a job offer at Carlisle "[i]n accordance with Article 5, Section 5 of the [NMFA]." Dale Decl. ¶¶ 19, 21, Attachments C and D.

j)     On November 30, 1998, ABF received a letter from Plaintiff Minich requesting 'to be put back on the list of Article 5, Section 5." On December 3, 1998, he was contacted by ABF and offered the opportunity to transfer to Carlisle, among other options.  Plaintiff Minich accepted the transfer opportunity.  On December 9, 1998, ABF sent Plaintiff Minich a letter confirming that he had accepted a job offer at Carlisle "[i]n accordance with Article 5, Section 5 of the [NMFA]."  Dale Decl. ¶¶ 19, 21, Attachments C and D.

k)     On January 11, 1999, ABF received a letter from Plaintiff Nevins requesting that his name be "placed on the Article 5 Section 5 list[.]" On February 1, 1999, he was contacted by ABF and offered the opportunity to transfer to Carlisle, among other options.  Plaintiff Nevins accepted the transfer opportunity.  On February 8, 1999, ABF sent Plaintiff Nevins a letter confirming that he had accepted a job offer at Carlisle "[i]n accordance with Article 5, Section 5 of the [NMFA]."  Dale Decl. ¶¶ 19, 21, Attachments C and D.

l)     On February 22, 1999, ABF received a letter from Plaintiff Nye notifying ABF of his "desire to transfer and invoke my right to transfer under Article 5, Section 5 of the National Master Freight Agreement."  On February 22, 1999, he was contacted by ABF and offered

13

the opportunity to transfer to Carlisle, among other options. Plaintiff Nye accepted the transfer opportunity. On February 25, 1999, ABF sent Plaintiff Nye a letter confirming that he had accepted a job offer at Carlisle "[i]n accordance with Article 5, Section 5 of the [NMFA]." Dale Decl. ¶¶ 19, 21, Attachments C and D.

       m)    On November 4, 1998, ABF received a letter from Plaintiff Ramirez requesting "that [he] be placed on the list for road drivers under article #5, section #5." On November 16, 1998, he was contacted by ABF and offered the opportunity to transfer to Carlisle, among other options. Plaintiff Ramirez accepted the transfer opportunity. On November 19, 1998, ABF sent Plaintiff Ramirez a letter confirming that he had accepted a job offer at Carlisle "[i]n accordance with Article 5, Section 5 of the [NMFA]." Dale Decl. ¶¶ 19, 21, Attachments C and D.

       n)    On November 18, 1999, ABF received a letter from Plaintiff Sgrignoli requesting that he "be considered for employment under Article 5 . . ." On November 20, 1998, he was contacted by ABF and offered the opportunity to transfer to Carlisle, among other options. Plaintiff Sgrignoli accepted the transfer opportunity. On November 24, 1998, ABF sent Plaintiff Sgrignoli a letter confirming that he had accepted a job offer at

Carlisle "[i]n accordance with Article 5, Section 5 of the [NMFA]." Dale

Decl. ¶¶ 19, 21, Attachments C and D.

     o)     On November 3, 1998, ABF received a letter from

Plaintiff Snyder indicating his interest in "being placed on the drivers board

in conjunction with article #5, section #5." On November 16, 1998, he was

contacted by ABF and offered the opportunity to transfer to Carlisle, among

other options. Plaintiff Snyder accepted the transfer opportunity. On

November 19, 1998, ABF sent Plaintiff Snyder a letter confirming that he

had accepted a job offer at Carlisle "[i]n accordance with Article 5, Section

5 of the [NMFA]." Dale Decl. ¶¶ 19, 21, Attachments C and D.

     p)     On October 30, 1998, ABF received a letter from

Plaintiff Welker requesting that he "be put back on the Article 5, Section 5

list." On October 30, 1998, he was contacted by ABF and offered the

opportunity to transfer to Carlisle, among other options. Plaintiff Welker

accepted the transfer opportunity. On October 30, 1998, ABF sent Plaintiff

Welker a letter confirming that he had accepted a job offer at Carlisle "[i]n

accordance with Article 5, Section 5 of the [NMFA]." Dale Decl. ¶¶ 19, 21,

Attachments C and D.

     21.     The sixteen Plaintiffs reported for work at ABF between

November 12, 1998 and February 27, 1999. Drake Decl. ¶8. Leon Edenbo,

Line Driver Supervisor for ABF, was responsible for driver orientation during that time frame. Edenbo Trans. at 142.[2] Mr. Edenbo met with each one of the sixteen plaintiffs on the day they reported to the ABF Carlisle facility. Id. Mr. Edenbo explained to the Plaintiffs—on the day they reported to ABF—that under Article 5, Section 5, "they would go to the bottom . . . of the seniority list." Id.

  22. The following identifies the report dates and initial grievance dates for each of the sixteen Plaintiffs:

    a) Albright reported for work at ABF's Carlisle facility on December 14, 1998. ABF has no record that he ever filed a grievance regarding his placement on the ABF Carlisle seniority board. Drake Decl. ¶8a.

    b) Plaintiff Boire reported for work at ABF's Carlisle facility on January 8, 1999. He filed a grievance (No. 90651) regarding his placement on the ABF Carlisle seniority board on March 17, 1999. Drake Decl. ¶8b, Attachment A.

---

[2] "Edenbo Trans." refers to the transcript from the deposition of Leon Edenbo taken on October 4, 2002. The relevant pages of the transcript are attached as Exhibit 6.

c)      Plaintiff Dietz reported for work at ABF's Carlisle facility on November 20, 1998. He filed a grievance (No. 89076) regarding his placement on the ABF Carlisle seniority board on December 31, 1998. Drake Decl. ¶8c, Attachment A.

d)      Plaintiff Erdman reported for work at ABF's Carlisle facility on February 11, 1999. He filed a grievance (No. 90652) regarding his placement on the ABF Carlisle seniority board on March 11, 1999. Drake Decl. ¶8d, Attachment A.

e)      Plaintiff Fritz reported for work at ABF's Carlisle facility on November 21, 1998. He filed a grievance (No. 89093) regarding his placement on the ABF Carlisle seniority board on December 20, 1998. Drake Decl. ¶8e, Attachment A.

f)      Plaintiff Frombaugh reported for work at ABF's Carlisle facility on November 12, 1998. ABF has no record that he ever filed a grievance regarding his placement on the ABF Carlisle seniority board. Drake Decl. ¶8f.

g)      Plaintiff Harris reported for work at ABF's Carlisle facility on December 7, 1998. He filed a grievance (No. 89835) regarding his placement on the ABF Carlisle seniority board on December 27, 1998. Drake Decl. ¶8g, Attachment A.

h)      Plaintiff Landis reported for work at ABF's Carlisle facility on January 15, 1999.  He filed a grievance (No. 85060) regarding his placement on the ABF Carlisle seniority board on March 4, 1999.  Drake Decl. ¶8h, Attachment A.

i)      Plaintiff McGuire reported for work at ABF's Carlisle facility on February 11, 1999.  He filed a grievance (No. 90657) regarding his placement on the ABF Carlisle seniority board on March 18, 1999.  Drake Decl. ¶8i, Attachment A.

j)      Plaintiff Minich reported for work at ABF's Carlisle facility on December 13, 1998.  He filed a grievance (No. 89098) regarding his placement on the ABF Carlisle seniority board on December 30, 1998.  Drake Decl. ¶8j, Attachment A.

k)      Plaintiff Nevins reported for work at ABF's Carlisle facility on February 10, 1999.  He filed a grievance (No. 90680) regarding his placement on the ABF Carlisle seniority board on March 28, 1999.  Drake Decl. ¶8k, Attachment A.

l)      Plaintiff Nye reported for work at ABF's Carlisle facility on February 27, 1999.  He filed a grievance (No. 89012) regarding his placement on the ABF Carlisle seniority board on March 9, 1999.  Drake Decl. ¶8l, Attachment A.

m)     Plaintiff Ramirez reported for work at ABF's Carlisle facility on November 27, 1998. He filed a grievance (No. 89077) regarding his placement on the ABF Carlisle seniority board on December 20, 1998. Drake Decl. ¶8m, Attachment A.

n)     Plaintiff Sgrignoli reported for work at ABF's Carlisle facility on December 5, 1998. He filed a grievance (No. 57610) regarding his placement on the ABF Carlisle seniority board on December 17, 1998. Drake Decl. ¶8n, Attachment A.

o)     Plaintiff Snyder reported for work at ABF's Carlisle facility on November 27, 1998. He filed a grievance (No. 89095) regarding his placement on the ABF Carlisle seniority board on December 17, 1998. Drake Decl. ¶8o, Attachment A.

p)     Plaintiff Welker reported for work at ABF's Carlisle facility on November 27, 1998. He filed a grievance (No. 89096) regarding his placement on the ABF Carlisle seniority board on December 16, 1998. Drake Decl. ¶8p, Attachment A.

23.     Article 43, Section 1(c) of the Central Pennsylvania Over-the-Road and Local Cartage Supplemental Agreement to the NMFA states, in part, that:

> Employees initiating grievances shall set forth
> their claim, in writing, to the Employer with a

duplicate copy to the steward and/or Union
Representative within seven (7) calendar days after
he/she returns to his/her home terminal or seven
(7) calendar days from the occurrence of the
matter. In the event the employee fails to comply
with these provisions of paragraph (c) the
grievance shall be considered untimely.

Exhibit 5, Central Pennsylvania Supplement, Article 43, Section 1(c).

24.     None of the sixteen Plaintiffs filed a grievance contesting their
seniority within seven days of reporting to work at ABF. Drake Decl. ¶9.

25.     In late 1998 and early 1999, ABF received a total of nineteen
grievances[3] from former Carolina employees regarding their placement on
the ABF seniority board. Drake Decl. ¶9. ABF and Local 776 held terminal
level hearings to address the seniority grievances. Drake Decl. ¶10. During
these terminal level hearings, ABF took the position that the grievances were
untimely under the contract because the grievants knew their seniority on the
date they reported to work at ABF and did not file their grievances within
seven days of reporting to work. Id. Local 776 did not agree with ABF's
position, but rather argued on behalf of the grievants that the grievances
were timely filed. Quidort Trans. at 116.[4] Because ABF and the Local 776

---

[3]     Three of the grievants did not join in this lawsuit.

[4]     "Quidort Trans." refers to the transcript from the deposition of David
        Quidort taken October 25, 2002. The relevant pages of the transcript
        are attached hereto as Exhibit 7.

could not resolve the grievances at the terminal level, the grievances were referred to the Eastern Region Joint Area Committee ("ERJAC") for hearing on their timeliness. Drake Decl. ¶12.

26.    The ERJAC is comprised of an equal number of Union and Employer representatives. Exhibit 8.[5] A majority decision of the ERJAC is "final, conclusive and binding with no appeal." Exhibit 9.

27.    On April 13, 1999, Daniel Virtue, then Business Agent for Local 776, notified the Plaintiffs that their grievances would be heard by the ERJAC on April 27, 1999. Exhibit 10. Mr. Virtue informed the Plaintiffs that the only issue before the ERJAC "is whether the grievance is timely or untimely. If the claim of the Union is upheld, the case [on the merits] will be heard in July 1999 . . . ." Id.

28.    The nineteen seniority grievances were divided into two groups. One group (piloted under the Runk grievance[6]) was made up of the grievants who had taken a lay-off from Carolina in Carlisle in 1995 and had not transferred to another Carolina facility. Exhibit 11. The other group (piloted under the Nye grievance) was made up of the grievants who

---

[5]    Exhibits 8, 9, 10, and 11 were introduced as exhibits during the deposition of Plaintiff Ray Snyder, Jr.

[6]    Runk did not join in this lawsuit.

transferred to other Carolina facilities prior to the ABF/Carolina merger in September 1995. Exhibit 12.[7]

29.    At the ERJAC hearings on the Runk and Nye pilot grievances, ABF raised a Point of Order claiming that all of the grievances piloted under Runk and Nye were untimely because they were not filed within seven days of the grievants' reporting to work at ABF, as required by Article 43, Section 1(c) of the Central Pennsylvania Over-the-Road and Local Cartage Supplemental Agreement to the NMFA. Exhibit 8; Exhibit 13.

30.    Local 776, in contrast, took the position that all of the grievances were timely because they were covered by Article 5, Section 4(d) of the NMFA, which provided that "[p]rotest of any employee's seniority date or position on such list must be made in writing to the Employer within thirty (30) days after such seniority date first appears . . . ." Local 776 submitted a brief in support of its position. Exhibits 8, 11, 12, and 13.

31.    At the ERJAC hearing regarding the Runk pilot grievances, Daniel Virtue, the Business Agent for Local 776, argued on behalf of the

---

[7]    Exhibits 12, 13, and 14 were introduced as exhibits during the deposition of Plaintiff Keith Sgrignoli.

grievants (which included Plaintiffs Boire, Erdman, Fritz, McGuire, Ramirez, and Snyder[8]).  Exhibit 8.  Mr. Virtue said:

> It's very clear, it's the [NMFA] language, and Mr. Runk has thirty days from the posting of the seniority list, which he did file.  As soon as the seniority list was posted, he filed a grievance within thirty days.
>
> Every person sitting in this room that has a grievance here did exactly the same thing.  They filed a grievance within thirty days of the posting of the seniority list.  Each person sitting in this room also did send a letter so they can get a job opportunity and get to work.  That's what they did.  As soon as they got there, when the seniority list went up, they filed a timely grievance.

Id.  In addition to Mr. Virtue, Plaintiffs Erdman, Fritz, Ramirez, and Snyder spoke at the hearing.  Id.

32.    At the ERJAC hearing regarding the Nye pilot grievances Mr. Virtue also represented, and argued on behalf of, the grievants (which included Plaintiffs Dietz, Harris, Landis, Minich, Nevins, Nye, Sgrignoli, and Welker).  Exhibit 13.  Mr. Virtue stated:

> [The grievants] contacted the Company with a letter, stating they wanted to go on 5.5.  At that time, they didn't realize what 5.5 was.  Then, they took the job opportunity, came to Carlisle, PA, and at that time, went to work and then each one filed a grievance after the seniority list was posted.  If you

---

[8]    As noted above, ABF has no record that Plaintiffs Albright or Frombaugh ever filed grievances regarding their ABF seniority date.

> look at my brief, Exhibit 1 is Article 5, Section
> 4(d), Posting Seniority List . . . . This is [NMFA]
> language and each grievant filed a grievance
> timely under the [NMFA] language which says
> they have thirty days from the posting of the
> seniority list. They did that timely and feel the
> case is timely and should be referred back to the
> parties on the merits. Their position is it was all
> done timely under the [NMFA] under Article 5,
> Section 4(d), Posting Seniority List.

Id. In addition to Mr. Virtue, Plaintiffs Sgrignoli and Welker, spoke at the

hearing. Id.

33.    After hearing the positions presented by ABF and Local 776 at

the Runk and Nye hearings, the ERJAC panel, in executive session, found in

both cases that "since the grievants knew their seniority positions on the day

they reported, the Company's point of order is upheld"—meaning that the

grievances were denied as untimely because they were not filed within seven

days of reporting, as required by Article 43, Section 1(c) of the Central

Pennsylvania Over-the-Road and Local Cartage Supplemental Agreement to

the NMFA. Exhibit 9; Exhibit 14.

34.    Local 776 notified Plaintiffs Albright, Boire, Erdman, Fritz,

Frombaugh, McGuire, Ramirez, and Snyder, in writing, of the ERJAC

decision on the Runk pilot grievance, on May 11, 1999, and enclosed a copy

24

of the decision with the written notification.  Exhibit 15 at ¶¶ 26, 48, 92,

114, 197, 285, and 329.[2]

35.    Local 776 notified Plaintiffs Dietz, Harris, Landis, Minich,

Nevins, Nye, Sgrignoli, and Welker, in writing, of the ERJAC decision on

the Nye pilot grievance, on May 11, 1999, and enclosed a copy of the

decision with the written notification.  Exhibit 15 at ¶¶ 70, 153, 175, 219,

241, 263, 307, and 351.

36.    Plaintiffs filed this Complaint on May 16, 2000.

Date: November 21, 2002              Respectfully submitted,

_Robyn B. Weiss_
Joseph E. Santucci, Jr. (*pro hac vice*)
Robyn B. Weiss (*pro hac vice*)
MORGAN, LEWIS & BOCKIUS LLP
1111 Pennsylvania Avenue, N.W.
Washington, DC 20004
(202)739-5398

Vincent Candiello
MORGAN, LEWIS & BOCKIUS LLP
One Commerce Square
417 Walnut Street
Harrisburg, PA 17101-1904
(717) 237-4000

Attorneys for Defendant
ABF Freight System, Inc.

---

[2]    Exhibit 14 is Daniel Virtue's Affidavit submitted in support of Local
776's Motion to Dismiss on August 18, 2000.