



FILED
HARRISBURG, PA

NOV 2 2 2002

MARY E. D'ANDREA, CLERK
Per _____ Dep. Clerk

# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

JEFFERY D. ALBRIGHT, et al.                )
                                           )
                        Plaintiffs         )
                                           )
            v.                             )       **Case No. 1:CV-00-878**
                                           )       **Judge Sylvia H. Rambo**
DANIEL A. VIRTUE, et al.                   )
                                           )
                        Defendants         )
                                           )

## EXHIBITS IN SUPPORT OF DEFENDANT ABF FREIGHT SYSTEM, INC.'S MOTION FOR SUMMARY JUDGMENT

Respectfully submitted,

*Robyn B. Weiss*
_____

Vincent Candiello                 Joseph F. Santucci, Jr. (*pro hac vice*)
MORGAN, LEWIS &                   Robyn B. Weiss (*pro hac vice*)
BOCKIUS LLP                       MORGAN, LEWIS & BOCKIUS LLP
One Commerce Square               1111 Pennsylvania Avenue, N.W.
417 Walnut Street                 Washington, DC 20004
Harrisburg, PA 17101-1904         (202) 739-5398
(717) 237-4000


Dated: November 22, 2002          Attorneys for Defendant
                                  ABF Freight System, Inc.

# INDEX TO EXHIBITS

| DESCRIPTION | EXHIBIT |
|---|---|
| Declaration of Gary Drake and Attached Exhibits | 1 |
| Declaration of John Dale and Attached Exhibits | 2 |
| Articles 5, 8 and 43 of the 1994-1998 National Master Freight Agreement and Central Pennsylvania Supplemental Agreement | 3 |
| Excerpt from Transcript of September 14, 1995 Change of Operations Committee Hearings | 4 |
| Articles 5, 8 and 43 of the 1998-2003 National Master Freight Agreement and Central Pennsylvania Supplemental Agreement | 5 |
| Excerpt from Deposition of Leon Edenbo | 6 |
| Excerpt from Deposition of David Quidort | 7 |
| Transcript from Eastern Region Joint Area Committee Hearing on April 27, 1999 re: Runk Pilot Grievance | 8 |
| Eastern Region Joint Area Committee Decision re: Runk Pilot Grievance | 9 |
| April 13, 1999 Letter from Daniel Virtue | 10 |
| Local 776's Brief to Eastern Region Joint Area Committee re: Runk Pilot Grievance | 11 |
| Local 776's Brief to Eastern Region Joint Area Committee re: Nye Pilot Grievance | 12 |

| DESCRIPTION | EXHIBIT |
|---|---|
| Transcript from Eastern Region Joint Area Committee Hearing on April 27, 1999 re: Nye Pilot Grievance | 13 |
| Eastern Region Joint Area Committee Decision re: Nye Pilot Grievance | 14 |
| Affidavit of Daniel Virtue Submitted in Support of Union's Motion to Dismiss | 15 |

Ex. 1

# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| JEFFERY D. ALBRIGHT, NORMAN T. BOIRE, GARY M. DIETZ, WILLIAM H. ERDMAN, MICHAEL W. FRITZ, A. RONALD FROMBAUGH, RALPH A. HARRIS, ALLEN W. LANDIS, LOWELL MCGUIRE, WALTER R. MINICH, RAYMOND C. NEVINS, STANLEY L. NYE, VINCENT RAMIREZ, JR., KEITH E. SGRIGNOLI, RAY G. SNYDER, JR., and LAWRENCE D. WELKER,<br><br>Plaintiffs<br><br>v.<br><br>DANIEL A. VIRTUE, Business Agent of the International Brotherhood of Teamsters; INTERNATIONAL BROTHERHOOD OF TEAMSTERS; LOCAL 776, INTERNATIONAL BROTHERHOOD OF TEAMSTERS; ABF FREIGHT SYSTEM, INCORPORATED,<br><br>Defendants | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) )<br><br>Case No. 1:CV-00-878<br>Judge Sylvia H. Rambo |

## DECLARATION OF GARY DRAKE

1

1.    I am currently employed as the Line Haul Manager at ABF Freight System, Inc. ("ABF") in Carlisle, Pennsylvania. I have held this position since 1989. As the Line Haul Manager, I am responsible for the entire operation of the line haul department, including overall supervision of the over-the-road drivers.

2.    ABF is a national freight common carrier whose drivers and dock employees are represented by various local unions affiliated with the International Brotherhood of Teamsters ("IBT"), including Teamster Local 776 ("Local 776"), located in central Pennsylvania.

3.    ABF and Local 776 are parties to the National Master Freight Agreement ("NMFA") and its Central Pennsylvania Supplemental Agreement.

4.    In September 1995, ABF's parent company, Arkansas Best Corp., acquired WorldWay Corp., the parent company of Carolina Freight Carriers Corp. As a result of this acquisition, ABF and Carolina were merged, with ABF being the surviving carrier.

5.    ABF did not have a need for additional over-the-road drivers in Carlisle from the time of the merger in September 1995 until late 1998 (after the expiration of the 1994-1998 NMFA).

2

6.    When ABF had a need for additional over-the-road drivers in Carlisle in late 1998, I (or one of my direct reports) notified the ABF Industrial Relations department in Fort Smith, Arkansas.  We were instructed not to hire any new drivers because there were drivers who had transfer rights under Article 5, Section 5 of the NMFA.

7.    During late 1998 and early 1999, ABF's Industrial Relations department would contact either Lee Edenbo, the Driver Supervisor, or me, and provide us with the names of drivers who had accepted Article 5, Section 5 transfers to ABF's facility in Carlisle.  In addition, the drivers would contact either Mr. Edenbo or me to schedule their paperwork, physical and orientation.

8.    The sixteen Plaintiffs reported for work at ABF between November 12, 1998 and February 27, 1999.  The following identifies the report dates and initial grievance dates for each of the sixteen Plaintiffs (copies of Plaintiffs' grievances are attached hereto as Attachment A):

a)    Albright reported for work at ABF's Carlisle facility on December 14, 1998.  ABF has no record that he ever filed a grievance regarding his placement on the ABF Carlisle seniority board.

b)    Plaintiff Boire reported for work at ABF's Carlisle facility on January 8, 1999.  He filed a grievance (No. 90651) regarding his placement on the ABF Carlisle seniority board on March 17, 1999.

c)    Plaintiff Dietz reported for work at ABF's Carlisle facility on November 20, 1998.  He filed a grievance (No. 89076) regarding his placement on the ABF Carlisle seniority board on December 31, 1998.

d)    Plaintiff Erdman reported for work at ABF's Carlisle facility on February 11, 1999.  He filed a grievance (No. 90652) regarding his placement on the ABF Carlisle seniority board on March 11, 1999.

e)    Plaintiff Fritz reported for work at ABF's Carlisle facility on November 21, 1998.  He filed a grievance (No. 89093) regarding his placement on the ABF Carlisle seniority board on December 20, 1998.

f)    Plaintiff Frombaugh reported for work at ABF's Carlisle facility on November 12, 1998.  ABF has no record that he ever filed a grievance regarding his placement on the ABF Carlisle seniority board.

g)    Plaintiff Harris reported for work at ABF's Carlisle facility on December 7, 1998.  He filed a grievance (No. 89835) regarding his placement on the ABF Carlisle seniority board on December 27, 1998.

4

h)    Plaintiff Landis reported for work at ABF's Carlisle facility on January 15, 1999.  He filed a grievance (No. 85060) regarding his placement on the ABF Carlisle seniority board on March 4, 1999.

i)    Plaintiff McGuire reported for work at ABF's Carlisle facility on February 11, 1999.  He filed a grievance (No. 90657) regarding his placement on the ABF Carlisle seniority board on March 18, 1999.

j)    Plaintiff Minich reported for work at ABF's Carlisle facility on December 13, 1998.  He filed a grievance (No. 89098) regarding his placement on the ABF Carlisle seniority board on December 30, 1998.

k)    Plaintiff Nevins reported for work at ABF's Carlisle facility on February 10, 1999.  He filed a grievance (No. 90680) regarding his placement on the ABF Carlisle seniority board on March 28, 1999.

l)    Plaintiff Nye reported for work at ABF's Carlisle facility on February 27, 1999.  He filed a grievance (No. 89012) regarding his placement on the ABF Carlisle seniority board on March 9, 1999.

m)    Plaintiff Ramirez reported for work at ABF's Carlisle facility on November 27, 1998.  He filed a grievance (No. 89077) regarding his placement on the ABF Carlisle seniority board on December 20, 1998.

n)    Plaintiff Sgrignoli reported for work at ABF's Carlisle facility on December 5, 1998. He filed a grievance (No. 57610) regarding his placement on the ABF Carlisle seniority board on December 17, 1998.

o)    Plaintiff Snyder reported for work at ABF's Carlisle facility on November 27, 1998. He filed a grievance (No. 89095) regarding his placement on the ABF Carlisle seniority board on December 17, 1998.

p)    Plaintiff Welker reported for work at ABF's Carlisle facility on November 27, 1998. He filed a grievance (No. 89096) regarding his placement on the ABF Carlisle seniority board on December 16, 1998.

9.    None of the sixteen Plaintiffs filed a grievance contesting their seniority within seven days of reporting to work at ABF.

10.    In late 1998 and early 1999, ABF and Local 776 held terminal level meetings to hear the seniority grievances. During these terminal level meetings, ABF took the position that the grievances were untimely because the grievants knew their seniority on the date they reported to work at ABF and did not file their grievances within seven days of reporting to work.

11.    Article 43, Section 1(c) of the Central Pennsylvania Over-the-Road and Local Cartage Supplemental Agreement to the NMFA states, in part, that "[e]mployees initiating grievances shall set forth their claim, in writing, to the employer with a duplicate copy to the steward and/or union

6

representative within seven (7) calendar days after he/she returns to his/her home terminal or seven (7) calendar days from the occurrence of the matter."

12.    Local 776 did not agree with ABF's position, but rather argued on behalf of the grievants that the grievances were timely filed.  Because ABF and Local 776 could not reach agreement, the grievances were referred to the Eastern Region Joint Area Committee ("ERJAC") for hearing on the timeliness of the grievances.

I declare under penalty of perjury that the foregoing is true and correct.  Executed on November _19th_, 2002.

Gary Drake

# NMFA GRIEVANCE — Teamsters Local 776

Ex. 1A

9065

Name _Norman T. Boire_      Home Phone _717·901·8505_ Date of Hire _1·8·_

Address _710 Charles Rd_      City _Dauphin_      State _Pa_    Zip _170_

Employer _ABF Freight_

Employer's Address _New Kingston, Pa._

Road ■    Dock ☐    Jockey ☐    City ☐    Iron and Steel ☐    Mechanic-Office ☐    Miscellaneous

**IMPORTANT:** It is the responsibility of the member filing this grievance to issue the proper copies to all parties in a timely manner, as per your contract.

Date: _11 Mar 99_

**NATURE OF GRIEVANCE:** _Reference Seniority Roster Dated 2·17·99 — (Posted Mar 9th 99)    Article 5, Section 2 & Section 4 — Posting Seniority List_

_I request that my terminal seniority of 1·8·99 be amended to 25 Aug 85 under the provision of Article 5, Section 2 of the N MFA._

**STEWARD'S COMMENTS:** _____

In accordance with the Grievant's Bill of Rights, I am requesting, in writing, copies of all disciplinary letters, photos, and any other documentation pertaining to this grievance.

_Norman T. Boire_                        _Robt T. Fisher_
Signature of Member Filing Grievance            Shop Steward

■ **YOU must check this box if you want to attend the grievance hearings. If you request to be in attendance, YOU WILL NOT be paid for this time.**

**ACTION TAKEN BY BUSINESS AGENT** _____

Date: _____        _____
                                Signature of Business Agent

1—WHITE—UNION COPY
2—PINK—EMPLOYER
3—BLUE—EMPLOYEE REPORTING GRIEVANCE
4—YELLOW—STEWARD

## INSTRUCTIONS ON BACK OF YELLOW SHEET

# NMFA GRIEVANCE — Teamsters Local 776 = 89076

Name _GARY M DIETZ_                    Home Phone _____    Date of Hire _11-20-88_

Address _Box 297 RD#2_          City _LANDISBURG_    State _PA_    Zip _17040_

Employer _ABF_

Employer's Address _CARLISLE PA_

Road ☒    Dock ☐    Jockey ☐    City ☐    Iron and Steel ☐    Mechanic-Office ☐    Miscellaneous ☐

**IMPORTANT:** It is the responsibility of the member filing this grievance to issue the proper copies to all parties in a timely manner, as per your contract.

Date: _12/23/98_

2 3?

NATURE OF GRIEVANCE: _I WAS EMPLOYED BY CAROLINA FREIGHT IN ALLENTOWN (KUTZTOWN) PA, UNTIL THE CAROLINA - ABF MERGER. I WAS PUT INTO A MULTIPLE LAY OFF POOL FOR 5 YEARS. THE COMPANY (ABF) ABUSED THE MULTIPLE POOL & RESTRICTED MY SENIORITY_

_I'AM FILING FOR MY PROPER SENIORITY POSITION + ALL MONETARY CLAIMS DUE ME_

STEWARD'S COMMENTS: _____

In accordance with the Grievant's Bill of Rights, I am requesting, in writing, copies of all disciplinary letters, photos and any other documentation pertaining to this grievance.

_Gary M Dietz_

Signature of Member Filing Grievance                    Shop Steward

☒ **YOU must check this box if you want to attend the grievance hearings. If you request to be in attendance, YOU WILL NOT be paid for this time.**

ACTION TAKEN BY BUSINESS AGENT _____

_____

Date: _____              _____

                               Signature of Business Agent

1—WHITE—UNION COPY
2—PINK—EMPLOYER
3—BLUE—EMPLOYEE REPORTING GRIEVANCE
4—YELLOW—STEWARD

## INSTRUCTIONS ON BACK OF YELLOW SHEET

ABF 003214

# NMFA GRIEVANCE — Teamsters Local 776

90652

Name _William H. Erdman_  Home Phone _717-938-8560_ Date of Hire _04/04/_

Address _690 Miller Road_  City _York Haven_  State _PA_  Zip _173_

Employer _ABF Freight System Inc, Fort Smith, Ark._

Employer's Address _Carlisle, Pa. (042)_

Road ☒  Dock ☐  Jockey ☐  City ☐  Iron and Steel ☐  Mechanic-Office ☐  Miscellaneous ☐

**IMPORTANT:** It is the responsibility of the member filing this grievance to issue the proper copies to all parties in a timely manner, as per your contract.

Date: _March 11, 1999_

12

NATURE OF GRIEVANCE: _I William H. Erdman A Layed off Carolina Freight Carriers Road driver at the Carlisle, Pa. Facility now Employed By ABF Freight Systems at Carlisle, Pa. Am Filing for my Terminal Seniority and All Back Pay and Back Benifits due me since the Carolina Freight Carriers and ABF Freight System merger, of 1995._

STEWARD'S COMMENTS: _____

In accordance with the Grievant's Bill of Rights, I am requesting, in writing, copies of all disciplinary letters, photos and any other documentation pertaining to this grievance.

_W.H. Erdman_ _3-11-99_

Signature of Member Filing Grievance            Shop Steward

12

☒ **YOU** must check this box if you want to attend the grievance hearings. If you request to be in attendance, **YOU WILL NOT** be paid for this time.

ACTION TAKEN BY BUSINESS AGENT _____

Date: _____            Signature of Business Agent

1—WHITE—UNION COPY
2—PINK—EMPLOYER
3—BLUE—EMPLOYEE REPORTING GRIEVANCE
4—YELLOW—STEWARD

ABF 003165

**INSTRUCTIONS ON BACK OF YELLOW SHEET**

# NMFA GRIEVANCE — Teamsters Local 776                89093

Name _MICHAEL W FRITZ_        Home Phone _245-2721_  Date of Hire _5/84_

Address _99 BUCKTHORN DRIVE_        City _CARLISLE_        State _PA_  Zip _1701_

Employer _ABF_

Employer's Address _____CARLISLE , PA_____

Road ☒    Dock ☐    Jockey ☐    City ☐    Iron and Steel ☐    Mechanic-Office ☐    Miscellaneous ☐

**IMPORTANT:** It is the responsibility of the member filing this grievance to issue the proper copies to all parties in a timely manner, as per your contract.

Date:_____ 19

NATURE OF GRIEVANCE: _I AM A ROAD DRIVER FOR ABF. I WAS EMPLOY_
_AT CFCC. ON 5/95 WAS LAYED OFF AT CARLISLE, PA_
_TERMINAL. DIDNT RE DOMICILE. I SHOULD HAVE FULL_
_TERMINAL SENIORITY NOT BE PLACED AT BOTTOM OF_
_EXTRA BOARD. I ALSO SHOULD BE GIVEN ALL MONEY_
_OWED SINCE I HAVE BEEN REINSTATED AT ABF_
_(DOVE TAILED INTO MY SENIORIETY SLOT)_

STEWARD'S COMMENTS: _____

In accordance with the Grievant's Bill of Rights, I am requesting, in writing, copies of all disciplinary letters, photos and any other documentation pertaining to this grievance.

_Michael W Fritz_
Signature of Member Filing Grievance

Shop Steward

☒ **YOU must check this box if you want to attend the grievance hearings. If you request to be in attendance, YOU WILL NOT be paid for this time.**

ACTION TAKEN BY BUSINESS AGENT _____

Date: _____

Signature of Business Agent

1—WHITE—UNION COPY
2—PINK—EMPLOYER
3—BLUE—EMPLOYEE REPORTING GRIEVANCE
4—YELLOW—STEWARD

ABF 003169

## INSTRUCTIONS ON BACK OF YELLOW SHEET



# NMFA GRIEVANCE — Teamsters Local 776       8983

Name **Ralph A Harris**         Home Phone **717-692-4401**   Date of Hire **9-9-8**

Address **185 Bridge Road**    City **Millersburg**    State **PA**   Zip **170**

Employer **ABF**

Employer's Address **Carlisle PA**

Road ☑    Dock ☐    Jockey ☐    City ☐    Iron and Steel ☐    Mechanic-Office ☐    Miscellaneous ☐

**IMPORTANT:** It is the responsibility of the member filing this grievance to issue the proper copies to all parties in a timely manner, as per your contract.

Date: **DEC 21 1998**

**NATURE OF GRIEVANCE:** I Ralph A Harris was a road driver for CFCC in Carlisle PA. I did not redomicile to other terminal. I am reinstated at ABF Carlisle PA. I want my terminal seniority and all money owed.

**STEWARD'S COMMENTS:** _____

In accordance with the Grievant's Bill of Rights, I am requesting, in writing, copies of all disciplinary letters, photos and any other documentation pertaining to this grievance.

_Ralph G. Harris_
Signature of Member Filing Grievance                Shop Steward

☐ **YOU must check this box if you want to attend the grievance hearings. If you request to be in attendance, YOU WILL NOT be paid for this time.**

ACTION TAKEN BY BUSINESS AGENT _____

Date: _____        _____
                                Signature of Business Agent

1—WHITE—UNION COPY
2—PINK—EMPLOYER
3—BLUE—EMPLOYEE REPORTING GRIEVANCE
4—YELLOW—STEWARD

## INSTRUCTIONS ON BACK OF YELLOW SHEET



ABF 003172

# NMFA GRIEVANCE — Teamsters Local 776     85060

Name _ALLEN W LANDIS_     Home Phone _258-3886_ Date of Hire _11-3-7_

Address _506 CRISWELL DR._     City _BOILING SPRINGS_ State _PA_ Zip _1700_

Employer _ABF FREIGHT_

Employer's Address _CARLISLE, PA._

Road ☒     Dock ☐     Jockey ☐     City ☐     Iron and Steel ☐     Mechanic-Office ☐     Miscellaneous ☐

Date: _____ 19.0

**IMPORTANT:** It is the responsibility of the member filing this grievance to issue the proper copies to all parties in a timely manner, as per your contract.

NATURE OF GRIEVANCE: I WAS LAYED OFF AT BALTIMORE, MD. BY ABF. DUE TO THE CAROLINA — ABF MERGER. NOW I AM BACK TO WORK FOR ABF AT CARLISLE, PA.. I WAS GIVEN ALL MY COMPANTY SENIORITY, BUT NOT MY TERMINAL SENIORITY. I WANT ALL MY SENIOR

STEWARD'S COMMENTS: _____

_____

_____

In accordance with the Grievant's Bill of Rights, I am requesting, in writing, copies of all disciplinary letters, photos and any other documentation pertaining to this grievance.

_Allen W Landis_
Signature of Member Filing Grievance                    Shop Steward

☒ **YOU must check this box if you want to attend the grievance hearings. If you request to be in attendance, YOU WILL NOT be paid for this time.**

ACTION TAKEN BY BUSINESS AGENT _____

_____

_____

_____

Date: _____          _____
                                Signature of Business Agent

1—WHITE—UNION COPY
2—PINK—EMPLOYER
3—BLUE—EMPLOYEE REPORTING GRIEVANCE
4—YELLOW—STEWARD

**INSTRUCTIONS ON BACK OF YELLOW SHEET**

ABF 003211

# NMFA GRIEVANCE — Teamsters Local 776          9065

Name _Lowell C McGuire_          Home Phone (_717_) _957-3653_ Date of Hire _Feb-11-9_

Address _13 Dieren Dr_          City _Marysville_          State _PA_          Zip _120_

Employer _ABF_

Employer's Address _Carlisle, Pennsylvania_

Road ☒    Dock ☐    Jockey ☐    City ☐    Iron and Steel ☐          Mechanic-Office ☐          Miscellaneous

**IMPORTANT:** It is the responsibility of the member filing this grievance to issue the proper copies to all parties in a timely manner, as per your contract.          Date:_____          13

20

NATURE OF GRIEVANCE: _I was on The Lay Off list, For Terminal_          CS
_Closing in Carlisle, Pennsylvania_

_On February 11, 1999 I was Called back To work And Not put in my proper seniority Slot on The board._

_I request That I be done Tailed Into my Correct spot, And be paid All money due me._

STEWARD'S COMMENTS: _____

In accordance with the Grievant's Bill of Rights, I am requesting, in writing, copies of all dis-
ciplinary letters, photos and any other documentation pertaining to this grievance.

_Lowell C McGuire_
Signature of Member Filing Grievance          _____
                                               Shop Steward

☐   **YOU** must check this box if you want to attend the grievance hearings. If you request to
be in attendance, **YOU WILL NOT** be paid for this time.

ACTION TAKEN BY BUSINESS AGENT _____

_Ants_

Date: _____          _____
                               Signature of Business Agent

1—WHITE—UNION COPY
2—PINK—EMPLOYER
3—BLUE—EMPLOYEE REPORTING GRIEVANCE
4—YELLOW—STEWARD

**INSTRUCTIONS ON BACK OF YELLOW SHEET**



# NMFA GRIEVANCE — Teamsters Local 776

89098

Name WALTER R MINICH    Home Phone 717-582-4060 Date of Hire 7/7/75

Address 23 Pleasant Rd RD, Box 303    City Shermans Dale State PA Zip 17090

Employer ABF

Employer's Address Carlesle, Pa

Road ☑    Dock ☐    Jockey ☐    City ☐    Iron and Steel ☐    Mechanic-Office ☐    Miscellaneous ☐

Date: _____

7 46

**IMPORTANT:** It is the responsibility of the member filing this grievance to issue the proper copies to all parties in a timely manner, as per your contract.

NATURE OF GRIEVANCE: I WALTER R. MINICH AM FILING THIS GRIEVANCE TO HAVE MY COMPANY SENIORITY REINSTATED AT THE TERMINAL LEVEL AND ANY MONETARY CLAIMS THAT MAY BE DUE TO ME. I WAS LAYED OFF IN SEPTEMBER 1995 WHEN THE MERGER BETWEEN CAROLINA FREIGHT AND ABF WAS IMPLEMENTED. DURING THIS TIME TILL I WAS REINSTATED FROM LAYOFF I WAS NEVER OFFERED ANY TYPE EMPLOYMENT IN THE ABF SYSTEM. I WAS PLACED IN A COMPANY POOL AND NOW THAT I AM BACK TO WORK I HAVE NO TERMINAL SENIORITY. I FEEL MY RIGHTS FOR TERMINAL SENIORITY HAVE BEEN DESCRIMINATED AGAINST

STEWARD'S COMMENTS: _____    10 08

_____

In accordance with the Grievant's Bill of Rights, I am requesting, in writing, copies of all disciplinary letters, photos and any other documentation pertaining to this grievance.

_____    _____
Signature of Member Filing Grievance    Shop Steward

☐ **YOU must check this box if you want to attend the grievance hearings. If you request to be in attendance, YOU WILL NOT be paid for this time.**

ACTION TAKEN BY BUSINESS AGENT _____

_____

_____

_____

Date: _____    _____
Signature of Business Agent

1—WHITE—UNION COPY
2—PINK—EMPLOYER
3—BLUE—EMPLOYEE REPORTING GRIEVANCE
4—YELLOW—STEWARD

## INSTRUCTIONS ON BACK OF YELLOW SHEET

ABF 003216

# NMFA GRIEVANCE — Teamsters Local 776

90680

Name _Raymond c Nevins_    Home Phone _359 8143_    Date of Hire _Nov 2, 8_

Address _94 Study Rd_    City _Littlestown_    State _Pa_    Zip _1734_

Employer _A.B.F._

Employer's Address _Carlisle Pa_

Road ☒    Dock ☐    Jockey ☐    City ☐    Iron and Steel ☐    Mechanic-Office ☐    Miscellaneous ☐

**IMPORTANT:** It is the responsibility of the member filing this grievance to issue the proper copies to all parties in a timely manner, as per your contract.

Date: _March 27 -99_

NATURE OF GRIEVANCE: _I was Laid off Do to the Mergen Between Caroline Fst. & ABF_
_Now I am back working for ABF In Carlisle Pa. I would Like full seniority and back monies And Benefits Do to Me._

STEWARD'S COMMENTS: _____

In accordance with the Grievant's Bill of Rights, I am requesting, in writing, copies of all disciplinary letters, photos and any other documentation pertaining to this grievance.

_Raymond c Nevins_    _____
Signature of Member Filing Grievance            Shop Steward

☑ **YOU must check this box if you want to attend the grievance hearings. If you request to be in attendance, YOU WILL NOT be paid for this time.**

ACTION TAKEN BY BUSINESS AGENT _____

_____

_____

_____

Date: _____    _____
                                        Signature of Business Agent

1—WHITE—UNION COPY
2—PINK—EMPLOYER
3—BLUE—EMPLOYEE REPORTING GRIEVANCE
4—YELLOW—STEWARD

## INSTRUCTIONS ON BACK OF YELLOW SHEET



ABF 003215

# NMFA GRIEVANCE — Teamsters Local 776                89012

Name _Stanley L. Nye_                Home Phone _(717) 486-0223_ Date of Hire _02/27/99_

Address _740 Torway Road_            City _Gardners_        State _Pa_   Zip _17324_

Employer _ABF_

Employer's Address _Carlisle, PA_

Road ☒   Dock ☐   Jockey ☐   City ☐   Iron and Steel ☐   Mechanic-Office ☐   Miscellaneous ☐

**IMPORTANT:** It is the responsibility of the member filing this grievance to issue the proper copies to all parties in a timely manner, as per your contract.        Date: _March 5, 1999_

**NATURE OF GRIEVANCE:** _Because of the decision in the ABF/Carolina/Red Arrow change of operations Case Number MR-CO-38 9/95 on 09/22/95, I was laid off and had no offer to follow work that left the Baltimore Maryland Road Operation._

_On 02/27/99 I was called back to work and placed on the bottom of the Carlisle, PA road board not in my proper seniority spot._

_I request that I be dovetailed into my correct spot on this board and be paid all money due to me._

**STEWARD'S COMMENTS:** _____

**In accordance with the Grievant's Bill of Rights, I am requesting, in writing, copies of all disciplinary letters, photos and any other documentation pertaining to this grievance.**

_Stan L. Nye_          _3/8/99_          _____
Signature of Member Filing Grievance                    Shop Steward

☐   **YOU must check this box if you want to attend the grievance hearings. If you request to be in attendance, YOU WILL NOT be paid for this time.**

**ACTION TAKEN BY BUSINESS AGENT** _____

_____

Date: _____          _____
                                Signature of Business Agent

1—WHITE—UNION COPY
2—PINK—EMPLOYER
3—BLUE—EMPLOYEE REPORTING GRIEVANCE
4—YELLOW—STEWARD

## INSTRUCTIONS ON BACK OF YELLOW SHEET



ABF 003210

# NMFA GRIEVANCE — Teamsters Local 776

8907

Name _VINCENT RAMIREZ JR_    Home Phone _717-530-5329_ Date of Hire _5-24-_

Address _86 LANWOOD PARK_    City _ShiPPensBurg_ State _PA_ Zip _1725_

Employer _ABF Freight system inc    carlisle PA_

Employer's Address _carlisle Pike carlisle PA_

Road ☑    Dock ☐    Jockey ☐    City ☐    Iron and Steel ☐    Mechanic-Office ☐    Miscellaneous ☐

**IMPORTANT:** It is the responsibility of the member filing this grievance to issue the proper copies to all parties in a timely manner, as per your contract.    Date:_____

**NATURE OF GRIEVANCE:** _In 1995 I was placed on lay-off status by carolina Freight, carlisle PA. I was recalled from lay-off status ABF Freight callisle PA. Im filing this Grievance due to being placed on other board with out rightful terminl seniority. Im asking to be reinstated with full seniority with all lost time benefits or money due me._

**STEWARD'S COMMENTS:** _____

In accordance with the Grievant's Bill of Rights, I am requesting, in writing, copies of all disciplinary letters, photos and any other documentation pertaining to this grievance.

_Vincent Ramirez Jr_
Signature of Member Filing Grievance            Shop Steward

☑ **YOU must check this box if you want to attend the grievance hearings. If you request to be in attendance, YOU WILL NOT be paid for this time.**

**ACTION TAKEN BY BUSINESS AGENT** _____

_____

_____

Date: _____            Signature of Business Agent

1—WHITE—UNION COPY
2—PINK—EMPLOYER
3—BLUE—EMPLOYEE REPORTING GRIEVANCE
4—YELLOW—STEWARD

ABF 003167

## INSTRUCTIONS ON BACK OF YELLOW SHEET



# REPORT OF GRIEVANCE — Teamsters Local 776    № 57610

Name _Keith E Scrignoli_    Home Phone _432-8795_    Date of Hire _4-3-7_

Address _109 Saint George Dr_    City _Dillsburg_    State _Pa_    Zip _170_

Employer _A B F_

Employer's Address _Carlisle Pa_

Road ☑    Dock ☐    Jockey ☐    City ☐    Iron and Steel ☐    Mechanic - Office ☐    Miscellaneous ☐

**IMPORTANT:** It is the responsibility of the member filing this grievance to issue the proper copies to all parties in a timely manner, as per your contract.    Date: _____

**NATURE OF GRIEVANCE:** I Keith Scrignoli was employer By Carolina Frt in Allentown Pa ABF took over Carolina And I was Put into A Multiple Pool for 5 years.
The Company Abused The Multipl Pool And Restricted My Seniority. I Am Filing for All Monitary Claims due Me And My Seniority

**STEWARD'S COMMENTS:** _____

_Keith E Scrignoli_
Signature of Member Filing Grievance                                    Shop Steward

☐ **YOU must check this box if you want to attend the grievance hearings. If you request to be in attendance, YOU WILL NOT be paid for this time.**

**ACTION TAKEN BY BUSINESS AGENT** _____

Date: _____    Signature of Business Agent

**INSTRUCTIONS ON BACK OF YELLOW SHEET**

ABF 003213

# NMFA GRIEVANCE — Teamsters Local 776          8909

Name __RAY G SNYDER, JR__          Home Phone __717-697-2447__ Date of Hire __9-5-8__

Address __138 LINDA DRIVE__          City __MECHANICSBURG__, State __PA__    Zip __170__

Employer __A.B.F.__

Employer's Address __CARLISLE, PA  17013__

Road ☑    Dock ☐    Jockey ☐    City ☐    Iron and Steel ☐    Mechanic-Office ☐    Miscellaneous ☐

**IMPORTANT:** It is the responsibility of the member filing this grievance to issue the proper copies to all parties in a timely manner, as per your contract.

Date: _____

NATURE OF GRIEVANCE: __I AM A ROAD DRIVER AT A.B.F. IN__
__CARLISLE, PA. I WAS CALLED BACK TO WORK ON 11-27-98 FROM__
__A LAYOFF STATUS FROM CAROLINA FREIGHT IN CARLISLE, PA IN__
__1995. I WAS PUT BACK TO WORK WITH ALL MY COMPANY__
__SENIORITY BUT WITH NO TERMINAL SENIORITY. I FEEL__
__THAT THIS BEING A RECALL FROM LAYOFF I SHOULD__
__BE DOVETAILED INTO MY ORIGINAL SENIORITY SPOT, SO__
__I AM FILING THIS GRIEVANCE TO REGAIN ALL MY SENIORITY__
__AND ANY LOST WAGES DUE TO NOT HOLDING MY__
__FULL SENIORITY SPOT.__

STEWARD'S COMMENTS: _____

In accordance with the Grievant's Bill of Rights, I am requesting, in writing, copies of all disciplinary letters, photos and any other documentation pertaining to this grievance.

__Ray G Snyder__
Signature of Member Filing Grievance                    Shop Steward

☞ **YOU must check this box if you want to attend the grievance hearings. If you request to be in attendance, YOU WILL NOT be paid for this time.**

ACTION TAKEN BY BUSINESS AGENT _____

Date: _____                    Signature of Business Agent

1—WHITE—UNION COPY
2—PINK—EMPLOYER
3—BLUE—EMPLOYEE REPORTING GRIEVANCE
4—YELLOW—STEWARD

ABF 003168

**INSTRUCTIONS ON BACK OF YELLOW SHEET**

# NMFA GRIEVANCE — Teamsters Local 776                    89096

Name _LAWRENCE D. WELKER_  Home Phone _717-243-8363_ Date of Hire _9-30-7__

Address _48 W. MAIN ST_  City _Plainfield_  State _Pa._  Zip _1708_

Employer _A.B.F._

Employer's Address _CARLISLE  Pa._

Road ☑  Dock ☐  Jockey ☐  City ☐  Iron and Steel ☐  Mechanic-Office ☐  Miscellaneous ☐

**IMPORTANT:** It is the responsibility of the member filing this grievance to issue the proper copies to all parties in a timely manner, as per your contract.

Date: _____  5 3

C⁴

**NATURE OF GRIEVANCE:** _I WAS LAID OFF DURING THE MERGER BETWEEN Carolina FET + A.B.F. NOW THAT I AM BACK WORKING FOR A.B.F. I WANT TERINAL SENIORTY AND BACK MONIES AND BENEFIT'S DO TO ME._

_____

_____

_____

_____

_____

_____

_____

**STEWARD'S COMMENTS:** _____

_____

**In accordance with the Grievant's Bill of Rights, I am requesting, in writing, copies of all disciplinary letters, photos and any other documentation pertaining to this grievance.**

_Lawrence D. Welker_
Signature of Member Filing Grievance                    Shop Steward

☑  **YOU must check this box if you want to attend the grievance hearings. If you request to be in attendance, YOU WILL NOT be paid for this time.**

**ACTION TAKEN BY BUSINESS AGENT** _____

_____

_____

_____

Date: _____        _____
                                    Signature of Business Agent

1—WHITE—UNION COPY
2—PINK—EMPLOYER
3—BLUE—EMPLOYEE REPORTING GRIEVANCE
4—YELLOW—STEWARD

## INSTRUCTIONS ON BACK OF YELLOW SHEET

ABF 003212

Ex. 2

# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| JEFFERY D. ALBRIGHT, NORMAN T. BOIRE, GARY M. DIETZ, WILLIAM H. ERDMAN, MICHAEL W. FRITZ, A. RONALD FROMBAUGH, RALPH A. HARRIS, ALLEN W. LANDIS, LOWELL MCGUIRE, WALTER R. MINICH, RAYMOND C. NEVINS, STANLEY L. NYE, VINCENT RAMIREZ, JR., KEITH E. SGRIGNOLI, RAY G. SNYDER, JR., and LAWRENCE D. WELKER, | ) ) ) ) ) ) ) ) ) ) ) ) ) |
| Plaintiffs | ) |
| v. | ) |
| DANIEL A. VIRTUE, Business Agent of the International Brotherhood of Teamsters; INTERNATIONAL BROTHERHOOD OF TEAMSTERS; LOCAL 776, INTERNATIONAL BROTHERHOOD OF TEAMSTERS; ABF FREIGHT SYSTEM, INCORPORATED, | ) ) ) ) ) ) ) |
| Defendants | ) ) |

Case No. 1:CV-00-878
Judge Sylvia H. Rambo

## DECLARATION OF JOHN DALE

1.      I have worked at ABF Freight System, Inc. ("ABF") for more than thirty years.  From May 1994 to January 2002, I served as the Vice President of Industrial Relations.  As the Vice President of Industrial Relations, I had responsibility for the development of ABF's overall labor relations strategy and for its implementation.  As such, I participated in the negotiation of the National Master Freight Agreement ("NMFA"), and in numerous grievance hearing and change of operations hearings arising from the NMFA's administration.

2.      As the former Vice President of Industrial Relations, I am thoroughly familiar with the terms and provisions of the NMFA.  The NMFA is the national collective bargaining agreement between Trucking Management, Inc. ("TMI"), a multi-employer association, which serves as the collective bargaining representative for the major less-than-truck load ("LTL") common carriers, and the Teamsters National Freight Industry Negotiating Committee ("TNFINC"), which negotiates the agreement on behalf of over 100 Teamster Local Unions, including Teamsters Local 776.  The NMFA, along with its area supplements, governs the terms and conditions of employment for all Teamster-represented employees in the trucking industry who work for NMFA-covered carriers.

2

3.    The NMFA contains several provisions that set forth the procedures to be followed when there is a change in operations resulting from a combination of terminals or over-the-road operations.    Article 8, Section 6 of the NMFA requires that a change of operations be approved by a Change of Operations Committee.    The Change of Operations Committee is comprised of an equal number of Union and Employer representatives. One of the Committee's primary tasks is to determine the proper application of seniority for employees affected by the change of operations, in compliance with the NMFA.    Decisions of the Change of Operations Committee are final and binding.    In addition, the Change of Operations Committee retains authority to hear and decide future grievances that arise from the implementation of a previous decision of the Committee.

4.    In May 1995, Carolina Freight Carriers Corp. ("Carolina") closed its Carlisle, PA terminal.    Employees at this facility were given the opportunity to transfer to other Carolina facilities or accept a layoff. Plaintiffs Albright, Boire, Erdman, Fritz, Frombaugh, Landis, McGuire, Ramirez and Snyder accepted a layoff.    Plaintiffs Dietz, Harris, Landis, Minnich, Nevins, Nye, Sgrignoli, and Welker transferred to other Carolina facilities.

5.    In July 1995, two months after Carolina's Carlisle, PA terminal closed, Arkansas Best Corp., the parent company of ABF, announced that it was acquiring WorldWay Corp., the parent company of Carolina. As a result of this acquisition, ABF and Carolina were merged, with ABF being the surviving carrier.

6.    In late August 1995, a Change of Operations Committee ("Committee") was appointed to consider the proposed change of operations plan submitted by ABF as a result of the ABF/Carolina merger. Among other issues, the Committee had the authority under the NMFA to resolve and decide seniority issues arising from the change of operations. The Committee held hearings on September 14 and 15, 1995. The Committee issued a decision on September 19, 1995, in which it determined that the ABF and Carolina seniority rosters should be dovetailed. Attachment A is a copy of this decision. The ABF/Carolina merger was completed on September 25, 1995.

7.    As a result of the merger, the Plaintiffs who transferred to other Carolina facilities were laid off from those respective facilities on September 25, 1995.

8.    Article 5, Section 2 of the NMFA applies to the ABF/Carolina merger. Specifically, this section applies when terminals or operations of

4

two or more companies are combined.   In accordance with Article 5,
Section 2, the Change of Operations Committee, which considered ABF's
proposed change of operations, required that, "every facility whose work has
been merged with the work of another facility must be grouped with that
facility."

9.    There was no combination of terminals or merger of facilities in
Carlisle, PA.  Carolina closed its terminal in May 1995, several months prior
to Arkansas Best Corp.'s announcement of its intention to acquire Carolina's
parent, Worldway Corp., and five months prior to the actual ABF/Carolina
merger.   This fact is clearly demonstrated in Exhibit A to the Proposed
Seniority Application, attached to the Committee's September 19, 1995
decision.  (Attachment A).  This document shows the number of active and
inactive ABF and Carolina employees at the time of the ABF/Carolina
merger.  For Carlisle, PA, there were 328 total ABF employees and 0 total
Carolina employees.   Because Carolina's Carlisle facility did not exist at the
time of the acquisition of Carolina, it was not part of the merger, and
employees laid off from Carolina's Carlisle facility had no rights under
Article 5, Section 2 of the NMFA.  Thus, the Plaintiffs who accepted a lay-
off in Carlisle had no recall rights under Article 5, Section 2 of the NMFA.

10.    The Plaintiffs who transferred to other Carolina facilities were on lay-off from those facilities, not Carlisle, and thus had no recall rights to Carlisle under Article 5, Section 2 of the NMFA.

11.    Article 5, Section 5 of the NMFA provides for transfer opportunities for over-the-road drivers who are on layoff.  Pursuant to the terms of the NMFA, laid off over-the-road drivers can be offered the opportunity to transfer to another over-the-road domicile within the same regional area, provided that the employee notifies the company in writing of his interest in a transfer opportunity.

12.    The Change of Operations Committee's September 19, 1995 decision expanded Article 5, Section 5 rights for the ABF and former Carolina employees affected by the change.  The Committee determined that the Carolina employees who were already on lay-off at the time of the merger (and any Carolina or ABF employee laid off as a result of the merger) would have transfer rights under Article 5, Section 5 to ABF terminals in the Central, Eastern and Southern regions, not just within the laid off employee's own region, for the life of the 1994-1998 NMFA. (Attachment A, Paragraph 7A).  This opportunity was extended to the Plaintiffs who were laid off from Carolina's Carlisle terminal when the

closed in May 1995, and to the Plaintiffs who were laid off in September 1995 as a result of the merger.

13.    After the merger, Carolina's computerized personnel data systems were merged with ABF's data systems.  As a result, ABF had personnel information, including the Carolina seniority date, for all active and inactive Carolina employees at the time of the merger in September 1995.  In addition, as part of its preparation for submitting its proposed change of operations plan, ABF had obtained seniority lists for all Carolina terminals, including the closed terminal in Carlisle.

14.    In October 1995, Teamsters Local 776 ("Local 776" or "the Union") sent a letter to all former Carolina Carlisle employees who were laid off in Carlisle specifically informing them that pursuant to the Committee's decision, they had transfer rights under Article 5, Section 5 of the NMFA.  This letter is attached as Attachment B.

15.    ABF had an extremely limited need for additional over-the-road drivers from the time of the merger in September 1995 through the expiration of the 1994-1998 NMFA on March 31, 1998.  The sixteen Plaintiffs were not eligible for any transfer opportunities under Article 5, Section 5 during this time frame.

16.    The expanded Article 5, Section 5 rights under the Change of Operations Committee decision expired on March 31, 1998, the expiration date for the 1994-1998 NMFA.  As of April 1, 1998, the Plaintiffs transfer rights were governed strictly by the language in Article 5, Section 5 of the 1998-2003 NMFA.

17.    In late 1998 and early 1999, ABF had a need to hire over-the-road drivers at a number of domiciles, including Carlisle.  I instructed Carlisle management not to hire any new employees because there were employees with Article 5, Section 5 rights under the NMFA.

18.    Between October 30, 1998 and February 22, 1999, the ABF Industrial Relations department received transfer requests under Article 5, Section 5 of the NMFA from each of the sixteen Plaintiffs.  My assistant, Connie Vaughn (now Chambers), created an excel spreadsheet to track all Article 5, Section 5 requests for the 1998-2003 NMFA contract term.

19.    According to ABF's records, ABF received the Plaintiffs' Article 5, Section 5 requests on the following dates (copies of Plaintiffs' requests are attached hereto as Attachment C):

a)    Albright – December 4, 1998
b)    Boire – December 9, 1998
c)    Dietz – November 16, 1998
d)    Erdman – December 15, 1998
e)    Fritz – November 4, 1998
f)    Frombaugh – November 3, 1998

g)    Harris – November 16, 1998
h)    Landis – December 3, 1998
i)    McGuire – January 8, 1999
j)    Minich – November 30, 1998
k)    Nevins – January 11, 1999
l)    Nye – February 22, 1999
m)    Ramirez – November 4, 1998
n)    Sgrignoli – November 18, 1998
o)    Snyder – November 3, 1998
p)    Welker – October 30, 1998

20.    I instructed Gordon Ringberg, an ABF Director of Industrial

Relations, to contact the laid-off employees who sent in Article 5, Section 5

requests, including the sixteen Plaintiffs, via telephone to offer them

available transfer opportunities under Article 5, Section 5. Mr. Ringberg

would report the results of these calls (i.e., whether the laid-off employee

accepted a transfer opportunity and to where) to Ms. Vaughn, who would

then update the excel spreadsheet accordingly. In some instances, Ms.

Vaughn would make the phone calls herself.

21.    Either Mr. Ringberg or Ms. Vaughn contacted each of the

sixteen Plaintiffs to offer them transfer opportunities in late 1998 through

early 1999. Each Plaintiff accepted an opportunity to transfer to ABF's

Carlisle facility. ABF sent each of the sixteen Plaintiffs a letter confirming

that he had accepted a transfer to Carlisle "in accordance with Article 5,

Section 5 of the National Master Freight Agreement." The letters were sent

to the Plaintiffs on the following dates (copies of ABF's letters are attached

hereto as Attachment D):

a)  Albright – December 9, 1998
b)  Boire – December 9, 1998
c)  Dietz – November 19, 1998
d)  Erdman – February 8, 1999
e)  Fritz – November 19, 1998
f)  Frombaugh – November 19, 1998
g)  Harris – November 24, 1998
h)  Landis – December 9, 1998
i)  McGuire – February 8, 1999
j)  Minich – December 9, 1998
k)  Nevins – February 8, 1999
l)  Nye – February 25, 1999
m)  Ramirez – November 19, 1998
n)  Sgrignoli – November 24, 1998
o)  Snyder – November 19, 1998
p)  Welker – October 30, 1998

22.    The Plaintiffs reported to the Carlisle facility between

November 12, 1998 and February 27, 1999.  In accordance with Article 5,

Section 5, they were "placed at the bottom of the seniority board for bidding

and layoff purposes," but retained their Carolina "seniority for fringe

benefits only."

I declare under penalty of perjury that the foregoing is true and

correct.  Executed on November _15_, 2002.

_John Dale_
John Dale

10

 

Ex. 2A

```
              TI__  ELECTRONIC MAIL
DATE. 09/19/95
TIME. 15.37 EST
TO.   LCL/TERM-ID 373
FROM. LCL/TERM-ID TPI            TPI1
FOR.  PRINCIPAL OFFICER
PAGE  001    MSG NMBR 431
```

TO:  THE PRINCIPAL OFFICERS OF THE FOLLOWING LOCAL UNIONS:

    7, 20, 24, 26, 40, 41, 43, 50, 75, 89, 92, 100, 116, 120, 135,
    147, 160, 164, 200, 215, 236  238, 245, 279, 299, 301, 325, 332,
    339, 346, 364, 371, 377, 406, 407, 413, 414, 460, 534, 544, 554, 563,
    574, 580, 600, 614, 627, 637, 651, 662, 673, 688, 695, 696, 697, 705,
    710, 722, 749, 795, 823, 833, 908, 916, & 957 OF THE CENTRAL REGION

    22, 25, 28, 29, 30, 42, 59, 61, 71, 107, 110, 118, 170, 171,
    175, 182, 191, 229, 249, 251, 294, 312, 317, 340, 355, 375,
    384, 391, 397, 401, 404, 429, 430, 437, 443, 445, 449, 470,
    493, 500, 509, 529, 538, 557, 560, 592, 597, 633, 639, 649,
    653, 671, 676, 677, 687, 693, 701, 707, 764, 771, 773, 776,
    789, 822, & 992 OF THE EASTERN REGION

    5, 79, 217, 270, 373, 385, 390, 402, 480, 512, 515, 519, 523,
    528, 549, 568, 577, 612, 657, 667, 728, 745, 878, 886, 891,
    920, 969, 988, & 991 OF THE SOUTHERN REGION

    961 OF THE WESTERN REGION

RE:  ABF FREIGHT SYSTEM, INC. — MULTI-REGION CHANGE OF OPERATIONS
     DECISION IN CASE NO. MR-CO-38-9/95

DEAR SISTERS AND BROTHERS:

     FOLLOWING IS THE DECISION RENDERED BY THE MULTI-REGION CHANGE OF
OPERATIONS COMMITTEE IN THE ABOVE REFERENCED CASE.  UPON RECEIPT OF THIS
DECISION PLEASE COPY AND DISTRIBUTE TO ALL ABF AND CAROLINA FREIGHT
WORK SITES FOR IMMEDIATE POSTING:

THE MULTI-REGION CHANGE OF OPERATIONS COMMITTEE ADOPTED A MOTION THAT
THE COMPANY'S PROPOSED CHANGE OF OPERATIONS BE APPROVED AS MODIFIED
AND CLARIFIED BY THE COMPANY ON THE RECORD WITH THE FOLLOWING PROVISOS:

1.    THIS CHANGE OF OPERATIONS INVOLVES A TRANSACTION WITHIN THE
      MEANING OF ARTICLE 5, SECTION 2(A)-(C) OF THE NMFA:

      A.   THE COMMITTEE DIRECTS THAT, IN ACCORDANCE WITH THE PROVISIONS
           OF ARTICLE 5, SECTION 2(A)-(C), ARTICLE 5, SECTION 3, AND
           ARTICLE 8, SECTION 6(G) OF THE NMFA, THE SENIORITY LISTS AT
           DOMICILES AND TERMINALS AFFECTED BY THIS CHANGE OF OPERATIONS
           SHALL BE GROUPED FOR DOVETAILING AS REFLECTED ON THE EXHIBITS
           CONTAINED IN THE PROPOSED CHANGE OF OPERATIONS, (AS CLARIFIED
           OR CORRECTED ON THE RECORD), AND AS PROVIDED IN ARTICLE 5,
           SECTION 2(C) OF THE NMFA.  DOVETAILING APPLIES TO ALL
           BARGAINING UNIT EMPLOYEES AFFECTED BY COMBINING OR ELIMINATING

ABF 004076

 ELECTRONIC MAIL

DATE. 09/19/95
TIME. 15.37 EST
TO.   LCL/TERM-ID 373
FROM. LCL/TERM-ID TFI                    TFI1
FOR.  PRINCIPAL OFFICER
PAGE  002    MSG NMBR 431

ABF AND CAROLINA FREIGHT CARRIERS/RED ARROW FACILITIES AND
INCLUDES ALL MAINTENANCE AND OFFICE EMPLOYEES. EVERY FACILITY
WHOSE WORK HAS BEEN MERGED WITH THE WORK OF ANOTHER FACILITY
MUST BE GROUPED WITH THAT FACILITY. THIS PARAGRAPH DOES NOT
APPLY TO LOCAL UNIONS 673. 705 AND 710 (DOCK AND OFFICE),
WHICH ARE NOT SIGNATORY TO THE NMFA.

B.  DOVETAILING SHALL BE ACTIVE TO ACTIVE. INACTIVE TO INACTIVE, BY
    CLASSIFICATION. THOSE EMPLOYEES WHO WERE ON LETTER OF LAYOFF
    (OR THE EQUIVALENT THEREOF UNDER THOSE SUPPLEMENTS WHERE
    LETTERS OF LAYOFF ARE NOT UTILIZED) ON AUGUST 11, 1995, SHALL
    BE CONSIDERED AS INACTIVE FOR THE PURPOSES OF THIS DECISION.
    EVEN IF THEY HAVE BEEN USED FOR TEMPORARY WORK OR RECALLED
    PRIOR TO THE EFFECTIVE DATE OF THE CHANGE OF OPERATIONS. ANY
    EMPLOYEES LAID OFF AFTER AUGUST 11. 1995, BUT BEFORE THE
    EFFECTIVE DATE OF THE CHANGE OF OPERATIONS SHALL BE CONSIDERED
    TO BE ACTIVE AND SHALL RETAIN THEIR RESPECTIVE POSITIONS ON
    THE DOVETAILED ACTIVE LISTS. ANY EMPLOYEE ON LONG TERM
    DISABILITY SHALL BE CONSIDERED AS ACTIVE IF HIS SENIORITY
    DATE WOULD HAVE PUT HIM/HER ON THE ACTIVE LIST.

C.  A MASTER ACTIVE/LAID OFF POOL SHALL BE CREATED AND SHALL
    CONSIST OF THOSE OVER-THE-ROAD DRIVERS WHO WERE ACTIVE ON
    AUGUST 11. 1995. AT EITHER ABF. CAROLINA OR RED ARROW AND
    WHO WERE LAID OFF AS A DIRECT RESULT OF IMPLEMENTATION OF
    THIS CHANGE OF OPERATIONS.

    A MASTER INACTIVE/LAID OFF POOL SHALL BE CREATED AND SHALL
    CONSIST OF THOSE OVER-THE-ROAD DRIVERS WHO WERE IN LAYOFF
    STATUS ON AUGUST 11, 1995. AT EITHER ABF. CAROLINA OR RED
    ARROW. REGARDLESS OF WHY THEY WERE LAID OFF.

    AFTER IMPLEMENTATION. ANY ADDITIONAL JOB OPENINGS AT A ROAD
    DOMICILE WHERE EMPLOYEES IN EITHER POOL ARE ON LAYOFF SHALL
    BE OFFERED IN LINE OF SENIORITY TO SUCH EMPLOYEES FROM THAT
    DOMICILE. FIRST TO EMPLOYEES ON THE MASTER ACTIVE/LAID OFF
    POOL AND THEM TO EMPLOYEES ON THE MASTER INACTIVE/LAID OFF
    POOL.

    JOB OPENINGS AT ANY DOMICILE OTHER THAN WHERE EMPLOYEES ARE
    PRESENTLY LAID OFF SHALL BE OFFERED FIRST, DURING THE WINDOW
    PERIOD, IN LINE OF SENIORITY TO THOSE EMPLOYEES ON THE MASTER
    ACTIVE/LAID OFF POOL AND THEN, IF NOT FILLED, IN LINE OF
    SENIORITY TO THOSE EMPLOYEES ON THE MASTER INACTIVE/LAID OFF
    POOL.

    SUCCESSFUL BIDDERS SHALL RELINQUISH THEIR SENIORITY AT THEIR
    PRESENT ROAD DOMICILE UNDER THIS PROVISION AND SHALL BE
    DOVETAILED WITH THEIR CURRENT BIDDING SENIORITY DATE AT THE
    ROAD DOMICILE THEY BID. ALL OF THE PROVISIONS OF ARTICLE 8,

ABF 004077

TIT    ELECTRONIC MAIL

DATE. 09/19/95
TIME. 15.37 EST
TO.   LCL/TERM-ID 373
FROM. LCL/TERM-ID TPI                    TPI1
FOR.  PRINCIPAL OFFICER
PAGE   003     MSG NMBR 431

SECTION 6 SHALL APPLY TO SUCH TRANSFER.

ANY EMPLOYEE IN EITHER POOL WHO REFUSES THE OFFER OF A WORK
OPPORTUNITY UNDER THIS PROVISION SHALL NOT BE OFFERED A SECOND
OPPORTUNITY TO TRANSFER BUT SHALL REMAIN ON THE LIST ONLY FOR
RECALL TO HIS PRESENT ROAD DOMICILE.

2.   THE WINDOW PERIOD SHALL BE FOR ONE (1) YEAR.  THE COMMITTEE SHALL
     RETAIN JURISDICTION TO EXTEND THE WINDOW PERIOD IF CIRCUMSTANCES
     WARRANT.  AS STATED BY ABF ON THE RECORD, THE WINDOW PERIOD SHALL
     ALSO APPLY TO FULL LOCAL CARTAGE POSITIONS THAT BECOME AVAILABLE
     AT LOCATIONS WHERE INSUFFICIENT WORK FOR A FULL POSITION WAS
     ORIGINALLY TRANSFERRED AT THE TIME OF IMPLEMENTATION OF THIS
     DECISION.  ONLY LOCAL CARTAGE EMPLOYEES FROM THE LOCATION FROM
     WHICH THE WORK WAS ORIGINALLY TRANSFERRED SHALL BE ELIGIBLE TO FILL
     SUCH POSITIONS.  THE PROVISIONS OF ARTICLE 8, SECTION 6 SHALL
     APPLY.

3.   PENSION AND HEALTH & WELFARE CONTRIBUTIONS PAID ON BEHALF OF
     AN EMPLOYEE TRANSFERRING UNDER THIS DECISION SHALL BE PAID TO THE
     FUNDS TO WHICH THE CONTRIBUTIONS WERE MADE PRIOR TO THE
     EMPLOYEE'S CHANGE OF DOMICILE.

4.   ANY REBIDDING SHALL BE HANDLED BY THE LOCAL UNION AND ABF.

5.   SOUTHERN MODIFIED SENIORITY SHALL BE EXCERCISED UPON IMPLEMENTATION
     OF THE CHANGE OF OPERATIONS.

6.   AN EMPLOYEE REDOMICILING TO AN EASTERN REGION AREA DOMICILE POINT
     THAT MAINTAINS A SINGLE SENIORITY BOARD (I.E. COMBINATION ROAD
     AND LOCAL) SHALL REMAIN IN THAT JOB CLASSIFICATION WITH WHICH
     HE REDOMICILED FOR A PERIOD OF (1) ONE YEAR, UNLESS THE ANNUAL
     JOB BID AT THAT DOMICILE TAKES PLACE AT LEAST NINE (9) MONTHS
     AFTER REDOMICILE.

7.   THE FOLLOWING PROVISIONS WILL APPLY TO ANY EMPLOYEE LAID-OFF AS
     A RESULT OF THIS CHANGE OF OPERATIONS AND TO ANY OTHER EMPLOYEE
     CURRENTLY LAID-OFF, AND TO ANY EMPLOYEE LAID OFF AFTER THIS CHANGE
     OF OPERATIONS, FOR THE LIFE OF THE 1994-1998 NMFA:

     A.   ABF AGREES TO EXTEND THE PROVISIONS OF ARTICLE 5, SECTION 5
          OF THE NMFA TO ANY BARGAINING UNIT EMPLOYEE.  ABF ALSO AGREES
          TO EXTEND THE RIGHT TO TRANSFER UNDER ARTICLE 5, SECTION 5
          OF THE NMFA TO ANY ABF LOCATION IN THE CENTRAL, EASTERN AND
          SOUTHERN REGIONS, AS OPPOSED TO WITHIN THE REGIONAL AREA.
          TRANSFERS SHALL BE OFFERED ON THE BASIS OF BIDDING SENIORITY,
          BY CLASSIFICATION.  THE COMMITTEE APPROVES THESE EXTENSIONS
          OF THE PROVISIONS OF ARTICLE 5, SECTION 5, AND AGREES THAT
          SUCH EXTENSIONS ARE LIMITED SOLELY TO THIS CHANGE OF
          OPERATIONS AND HAVE NO PRECEDENTIAL EFFECT.

ABF 004078

TAN ELECTRONIC MAIL

```
DATE.  09/19/95
TIME.  15.37 EST
TO.    LCL/TERM-ID 373
FROM.  LCL/TERM-ID TPI              TPI1
FOR.   PRINCIPAL OFFICER
PAGE   004    MSG NMBR 431
```

  B. PENSION AND HEALTH & WELFARE CONTRIBUTIONS PAID ON BEHALF
    OF AN EMPLOYEE TRANSFERRING UNDER THIS PARAGRAPH SHALL BE
    PAID TO THE FUNDS TO WHICH THE CONTRIBUTIONS WERE MADE PRIOR
    TO THE EMPLOYEE'S CHANGE OF DOMICILE.

8. QUALIFIED BIDDERS ON LONG TERM DISABILITY (LTD) AT THE TIME OF ANY
  BID SHALL BE ALLOWED TO BID.  IF SUCCESSFUL LTD BIDDERS ARE UNABLE
  TO CLAIM THEIR BID ON THE DATE OF IMPLEMENTATION, A HOLD-DOWN BID
  WILL BE ALLOWED.  THIS HOLD-DOWN BID WILL BE OFFERED TO THE
  REMAINING ACTIVE EMPLOYEES AT THE LTD'S CURRENT LOCATION AND
  CLASSIFICATION.  THE SUCCESSFUL HOLD-DOWN BIDDER SHALL BE
  DOVETAILED.  WHEN THE LTD RETURNS TO WORK AND CLAIMS HIS BID,
  THE "HOLD-DOWN" EMPLOYEE MAY EITHER REMAIN AT THE HOLD-DOWN
  LOCATION UNDER PROVISIONS OF ARTICLE 5, SECTION 5 WITH A BIDDING
  SENIORITY DATE CONSISTENT WITH THE DATE OF IMPLEMENTATION OF THIS
  CHANGE OF OPERATIONS OR RETURN TO HIS ORIGINAL LOCATION WITH HIS
  ORIGINAL BIDDING SENIORITY DATE.  THE "HOLD-DOWN" EMPLOYEE MAY
  NOT RETURN TO A LOCATION WHERE THE CLASSIFICATION FROM WHICH HE
  BID HAS BEEN ELIMINATED.

  ABF SHALL NOT BE RESPONSIBLE FOR THE MOVING EXPENSES OF THE
  EMPLOYEE FILLING THE HOLD-DOWN BID UNLESS AND UNTIL SUCH TIME
  AS IT IS DETERMINED THAT THE EMPLOYEE ON LTD WILL NEVER BE ABLE
  TO CLAIM HIS BID AND THE HOLD-DOWN BIDDER BECOMES A REGULAR
  PERMANENT EMPLOYEE AT THE HOLD-DOWN LOCATION.

9. IN RESPONSE TO THE QUESTION RAISED BY LOCAL UNION 41 ON THE
  RECORD, THE COMMITTEE SPECIFICALLY FINDS THAT ARTICLE 43, SECTION 1
  OF THE CENTRAL STATES OVER-THE-ROAD AND LOCAL CARTAGE SUPPLEMENTS
  SHALL APPLY IN DETERMINING THE RECALL RIGHTS OF LAID-OFF EMPLOYEES.

10. INTERLINING SHALL BE HANDLED AS FOLLOWS:

  A. WHERE BOTH ABF AND CAROLINA FREIGHT CARRIERS/RED ARROW ARE
    INTERLINING TO SERVICE AN AREA, ABF MAY CONTINUE TO INTERLINE.

  B. WHERE ABF IS PRESENTLY SERVICING AN AREA WITH ITS OWN
    EMPLOYEES AND CAROLINA FREIGHT CARRIERS/RED ARROW ARE
    INTERLINING INTO THAT AREA, ABF SHALL CONTINUE TO SERVICE
    THE AREA WITH ITS OWN EMPLOYEES.

  C. WHERE ABF IS PRESENTLY INTERLINING TO SERVICE AN AREA, AND
    CAROLINA FREIGHT CARRIERS/RED ARROW ARE SERVICING THAT AREA
    WITH THEIR OWN EMPLOYEES, ABF SHALL SERVICE THE AREA WITH
    ITS OWN EMPLOYEES.

  D. ABF AND THE LOCAL UNIONS SHALL MEET TO RESOLVE ANY DISPUTES
    ABOUT WHETHER INTERLINING IS JUSTIFIED IN THE SITUATIONS
    OUTLINED ABOVE.  IF THE PARTIES FAIL TO RESOLVE THEIR
    DIFFERENCES, THE DISPUTE WILL BE RESOLVED THROUGH THE
    GRIEVANCE PROCEDURE.  UNTIL THERE IS A FINAL DISPOSITION OF

 AN ELECTRONIC MAIL

```
DATE.  09/19/95
TIME.  15.37 EST
TO.    LCL/TERM-ID 373
FROM.  LCL/TERM-ID TPI              TPI1
FOR.   PRINCIPAL OFFICER
PAGE   005    MSG NMBR 431
```

THE GRIEVANCE, INTERLINING SHALL CONTINUE IN SITUATIONS OUTLINED IN SUB-PARAGRAPH A, ABOVE, AND SHALL BE PROHIBITED IN SITUATIONS OUTLINED IN SUBPARAGRAPHS B AND C, ABOVE.

E.   WHERE ABF PROVIDED LOCAL CARTAGE SERVICE WITHIN A CITY WITH LOCAL CARTAGE/DRAYAGE SUBCONTRACTORS, AND CAROLINA FREIGHT CARRIERS/RED ARROW SERVICED THAT CITY WITH THEIR OWN EMPLOYEES, ABF SHALL SERVICE THE AREA SOLELY WITH ITS OWN EMPLOYEES, INCLUDING BUT NOT LIMITED TO THE AREA CURRENTLY SERVICED BY LOCAL UNION 707.

11.   THE COMMITTEE FINDS WITH REGARD TO THE CINCINNATI, FLORENCE, AND DAYTON TERMINALS, THE FOLLOWING SHALL APPLY:

THE CAROLINA, FLORENCE, AND CINCINNATI TERMINAL SENIORITY LISTS SHALL BE DOVETAILED IN ACCORDANCE WITH CURRENT BIDDING SENIORITY.

DURING THE WINDOW PERIOD, THE FIRST THIRTEEN (13) POSITIONS ADDED TO THE DAYTON SENIORITY LIST SHALL BE OFFERED IN LINE OF SENIORITY TO THE CINCINNATI TERMINAL SENIORITY LIST AND THE SUCCESSFUL BIDDERS SHALL BE DOVETAILED.

12.   THE COMMITTEE FINDS THAT THE ABF INTERMODAL DECISION IN CASE NO. MR-ICO-1-6/95 WAS BASED ON ABF'S PRESENT AND PROPOSED INTERMODAL OPERATIONS AT THE TIME OF THE INTERMODAL HEARING, WHICH OCCURRED BEFORE THE MERGER INVOLVED IN THIS CHANGE OF OPERATIONS.   THEREFORE, THE COMMITTEE REFERS TO THE NATIONAL INTERMODAL COMMITTEE THE QUESTION OF WHETHER THE CHANGE OF OPERATIONS APPROVED BY THE COMMITTEE IN THIS DECISION AFFECTS THE TERMS OF THE INTERMODAL DECISION IN CASE NO. MR-ICO-1-6/95, AND IF SO, WHAT MODIFICATIONS SHOULD BE MADE.

AS LONG AS ANY DISPLACED ROAD DRIVER IS ON INVOLUNTARY LAYOFF STATUS AT DALLAS, TX, THE RESTRICTIONS OF ARTICLE 29, SECTION 1 OF THE NMFA (CLEAN AND DIRTY RULE) SHALL REPLACE THE RAILING AUTHORITY OF ARTICLE 29, SECTION 3 OF THE NMFA.

THE PROVISIONS OF ARTICLE 29, SECTION 1 SHALL APPLY TO ABF'S NEW CHICAGO ROAD DOMICILE.

13.   THE COMMITTEE EXPRESSLY DISAPPROVES ABF'S PROPOSAL TO USE VENDORS TO PERFORM MAINTENANCE WORK WITH MAINTENANCE BARGAINING UNIT EMPLOYEES ON INVOLUNTARY LAYOFF STATUS.   THE APPLICABLE COLLECTIVE BARGAINING AGREEMENT OPERATIVE AT THE TIME OF THE CHANGE OF OPERATIONS SHALL CONTINUE IN EFFECT, INCLUDING THE CONTRACT'S SUBCONTRACTING PROVISIONS.

14.   ABF SHALL PROTECT THE CAROTRANS WORK OPPORTUNITY PRESENTLY PERFORMED BY CAROLINA AT JACKSONVILLE, MIAMI, AND HOUSTON WITH ABF BARGAINING UNIT EMPLOYEES.

* 15.   AS LONG AS ANY DISPLACED OVER-THE-ROAD DRIVER IS ON INVOLUNTARY

ABF 004080

TITAN ELECTRONIC MAIL

```
DATE. 09/19/95
TIME. 15.37 EST
TO.   LCL/TERM-ID 373
FROM. LCL/TERM-ID TPI              TPI1
FOR.  PRINCIPAL OFFICER
PAGE  006    MSG NMBR 431
```

LAYOFF STATUS AS A RESULT OF THIS CHANGE OF OPERATIONS, THE COMPANY, ONLY TO THE EXTENT ALLOWED BY AN APPLICABLE SUPPLEMENTAL AGREEMENT, MAY USE CITY DRIVERS TO RUN THE ROAD, BUT ONLY AT ESTABLISHED ROAD DOMICILES. THIS PRACTICE SHALL NOT VIOLATE THE ESTABLISHED ORDER OF CALL AT THE APPLICABLE ROAD DOMICILE.

16.  EMPLOYEES WHO HAVE BEEN DISCHARGED, AND WHOSE DISCHARGE IS PENDING ADJUDICATION UNDER THE GRIEVANCE PROCEDURE, SHALL BE OFFERED THE OPPORTUNITY TO BID.

* 17.  UNION AND NON-UNION OFFICE EMPLOYEES SHALL BE DOVETAILED AS SET OUT IN PARAGRAPH 1 OF THIS DECISION. THE UNION EMPLOYEES SHALL CONTINUE TO BE COVERED BY ALL PROVISIONS OF THEIR RESPECTIVE COLLECTIVE BARGAINING AGREEMENTS, INCLUDING BUT NOT LIMITED TO, WAGES AND BENEFITS. IN ANY CASE WHERE A FUND WILL NOT ACCEPT CONTRIBUTIONS FROM ABF FOR UNION EMPLOYEES, THE COMMITTEE WILL DETERMINE THE STEPS NECESSARY TO ASSURE THAT ABF PROVIDES BENEFITS EQUIVALENT TO THOSE PROVIDED TO SUCH EMPLOYEES BEFORE TRANSFER.

* 18.  DOCK EMPLOYEES WHO ARE ADVERSELY AFFECTED BY THIS CHANGE OF OPERATIONS AND MUST BE CDL QUALIFIED IN ORDER TO TRANSFER AND ELECT TO BID, SHALL BE PROVIDED A 60-DAY PERIOD, COMMENCING SEPTEMBER 19, 1995, DURING WHICH PERIOD SUCH EMPLOYEES WILL EITHER BECOME CDL QUALIFIED OR FORFEIT ANY RIGHTS TO FILL THE BID UNDER THIS DECISION. DURING THIS PERIOD, ABF IS INSTRUCTED TO PROVIDE ADEQUATE EQUIPMENT AND TRAINING PERSONNEL TO COMPLY WITH THIS PARAGRAPH.

19.  AS A RESULT OF LOCAL 25'S HAVING ATTAINED BARGAINING UNIT JURISDICTION AT THE BURLINGTON, MASSACHUSETTS FACILITY, WHICH RESULTS IN TWO FACILITIES BEING UNDER LOCAL UNION 25'S JURISDICTION, THE PROVISIONS OF ARTICLE 43, SECTION 1(A) OF THE CURRENT NEW ENGLAND SUPPLEMENTAL FREIGHT AGREEMENT SHALL APPLY.

20.  THE COMMITTEE DIRECTS ABF TO GIVE THE LOCAL UNIONS FULL DETAILS CONCERNING ANY 401(K) PLAN COVERING CAROLINA FREIGHT CARRIERS OR RED ARROW EMPLOYEES AND TO KEEP IN EFFECT ANY SUCH PLAN, UNTIL ABF ESTABLISHES AN EQUIVALENT PLAN. THE COMMITTEE ALSO DIRECTS ABF TO PROVIDE THE LOCAL UNIONS FULL DETAILS REGARDING THE PRIOR PENSION PLAN FOR RED ARROW EMPLOYEES.

21.  THE REQUEST OF LOCAL UNION 200 TO ALLOW A MEMBER TO EXERCISE COMPANY SENIORITY IS DENIED.

22.  THE ISSUED RAISED BY LOCAL UNION 61 REGARDING THE APPLICABLE PEDDLE RADIUS FOR CITY DRIVERS (50 OR 75 MILES) IS REFERRED TO THE PARTIES FOR RESOLUTION. ANY DIFFERENCES WILL BE RESOLVED THROUGH THE GRIEVANCE PROCEDURE.

23.  ABF'S REQUEST FOR A TRIAL PERIOD TO DETERMINE FREIGHT FLOW FOR BIDDING PURPOSES IS REFERRED BACK TO THE LOCAL UNIONS AND ABF

ABF 004081



TITAN ELECTRONIC MAIL

DATE. 09/19/95
TIME. 15.37 EST
TO.   LCL/TERM-ID 373
FROM. LCL/TERM-ID TPI                    TPI1
FOR.  PRINCIPAL OFFICER
PAGE  007     MSG NMBR 431

        FOR RESOLUTION, WITH BIDS TO BE POSTED WITHIN 60 DAYS OF
        IMPLEMENTATION, OR SOONER WHEREVER POSSIBLE.

24.     THE COMMITTEE FINDS THAT THERE ARE NO CIRCUMSTANCES THAT WOULD
        ALLOW ANY EMPLOYEE WHO HAD RELOCATED UNDER A PREVIOUS CHANGE OF
        OPERATIONS DECISION OR UNDER THE PROVISIONS OF ARTICLE 5,
        SECTION 5 OF THE NMFA TO RETREAT TO THE EMPLOYEE'S FORMER
        TERMINAL/DOMICILE.  ACCORDINGLY, THE REQUESTS BY THE VARIOUS
        LOCAL UNIONS TO ALLOW EMPLOYEES TO RETREAT ARE SPECIFICALLY
        DENIED.
25.     THIS CHANGE OF OPERATIONS MAY BE IMPLEMENTED NO SOONER THAN
        SEPTEMBER 25, 1995.

26.     THIS MULTI-REGION CHANGE OF OPERATIONS COMMITTEE SHALL RETAIN
        JURISDICTION ON ALL ISSUES THAT MAY ARISE UNDER THIS DECISION
        DURING THE TERM OF THE CONTRACT.  ALL GRIEVANCES SHALL BE FILED
        WITH THE APPROPRIATE REGIONAL JOINT AREA COMMITTEE, TO BE HEARD
        BY THE MULTI-REGION CHANGE OF OPERATIONS COMMITTEE.


PLEASE SEND ACKNOWLEDGMENT OF THIS MESSAGE BY TITAN (TITAN TERMINAL
ADDRESS:  IUFD) OR FACSIMILE (TEL. 202/624-8722).



FRATERNALLY,



DENNIS C. SKELTON, DIRECTOR
NATIONAL FREIGHT DIVISION
CC: - RON CAREY, CHAIRMAN, TNFINC
    - CHUCK PISCITELLO, ASSISTANT DIRECTOR, NATIONAL FREIGHT DIVISION
    - FRANK BUSALACCHI, ACTING REGIONAL FREIGHT COORDINATOR
      CENTRAL REGION OF TEAMSTERS, C/O TEAMSTERS LOCAL UNION NO. 200
    - DANIEL W. SCHMIDT, REPRESENTATIVE, EASTERN REGION OF TEAMSTERS
    - FRANK HOPKINS, REGIONAL FREIGHT DIVISION COORDINATOR,
      SOUTHERN REGION OF TEAMSTERS, C/O ANNIE HOPKINS, SECRETARY, LOCAL
      UNION NO. 519
    - JIM ROBERTS, REGIONAL FREIGHT DIVISION COORDINATOR
      WESTERN REGION OF TEAMSTERS
    - BOB KNOX, THE GENERAL PRESIDENT'S PERSONAL REPRESENTATIVE
      CENTRAL REGION OF TEAMSTERS
    - JAMES A. MCCALL, IBT LEGAL DEPT.
    - RICK BANK, SPECIAL COUNSEL TO THE GENERAL PRESIDENT


ABF 004082

PROPOSED SENIORITY APPLICATION

The following proposal is based on the general principle that employees who are dovetailed on the date of implementation are those who are bringing work load to follow, so that the list into which they dovetail should not be adversely affected based on the current economic levels.

At common terminal points for local cartage operations, the company will ascertain the work load that ABF can reasonably expect to retain at the time of combining employees. ABF will prepare a Master Active List of its employees and will then prepare a Master Active List of the Carolina employees and the Red Arrow employees, and all three lists will be based on the date this change is implemented. The Company will then offer job opportunity at ABF in numbers equivalent to the work load coming to ABF, by seniority, to the applicable Carolina or Red Arrow Master Active List and they shall be dovetailed into the ABF Master Active List. Those employees on the Carolina or Red Arrow Master Active List who are not offered job opportunity due to insufficient work load to transfer shall remain on such Master Active Seniority List and shall be offered work opportunity as it arises and when permanent job opportunity arises they shall be recalled and dovetailed.

The Company will also establish a Master Inactive List comprised of all employees on lay-off at ABF and Carolina or ABF and Red Arrow on the date this change is implemented. After the Master Active List set forth above has been exhausted, all future job opportunities shall be offered, in line of seniority, to the employees on the Master Inactive List and, upon proper recall, they shall be dovetailed into the Master Active List.

At all other ABF locations which involve Carolina or Red Arrow employees, the same general principle shall apply, i.e., only the number of Carolina or Red Arrow employees equivalent to actual work load transferred will be offered to the Carolina or Red Arrow Master Active List on the first day of the combined operations.

The same principle as outlined above shall apply to combining over-the-road seniority lists, office and/or maintenance groups, where appropriate, as well as to transfer opportunity involving any of those respective classifications.

Therefore, **as a general rule**:

> Where only one (1) of the three (3) companies has a terminal location, the employees at that location will remain as they are. (See Exhibit "A" in the section on local cartage operations.)

> Where there are dual facilities in any one location or area, the aforementioned seniority application will prevail. (See Exhibit "B" in the section on local cartage operations.)

> Where there are apparent exceptions to the general rule, these will be resolved in Exhibit "C" in the section on local cartage operations.

v

ABF 004090



Concerning this proposal, ABF does understand that all contractual provisions of the National Master Freight Agreement, and supplements/addenda thereto, do apply; however, because of the multifarious contradictions and necessity for interpretation, we recognize that the final responsibility for seniority determination rests with the Change of Operations Committee, as provided in the National Master Freight Agreement, specifically, Article 5, Section 3 (a) and (b), and Article 8, Section 6 (d) and (g), relative to the complexity of this particular combination of companies.

vi

ABF 004091

EMPLOYEE ANALYSIS
Designated Domiciles Over-the-Road
8-24-95

| DOMICILE | ABF | CAROLINA/ RED ARROW ACTIVE | L/O | INITIAL COMPLEMENT | DISPLACEMENT |
|---|---|---|---|---|---|
| Appleton, WI | 0 | 2 | 0 | 2 | 0 |
| Asheville, NC | 155 | 0 | 0 | 155 | 0 |
| Boston, MA | 0 | 2 | 0 | 2 | 0 |
| Buffalo, NY | 0 | 3 | 0 | 3 | 0 |
| Burlington, VT | 0 | 1 | 0 | 1 | 0 |
| Cape Girardeau, MO | 49 | 0 | 0 | 49 | 0 |
| Carlisle, PA | 384 | 0 | 0 | 384 | 0 |
| Chicago, IL | 0 | 121 | 0 | 88 | 33 |
| Cincinnati, OH | 49 | 109 | 5 | 82 | 76 |
| Columbia, SC | 0 | 2 | 0 | 2 | 0 |
| * Dallas, TX | 64 | 55 | 0 | 94 | 25 |
| Dayton, OH | 338 | 0 | 0 | 338 | 0 |
| Detroit, MI | 0 | 7 | 0 | 6 | 1 |
| Ellenwood, GA | 107 | 156 | 14 | 199 | 64 |
| Enfield, CT | 0 | 42 33 | 5 0 | 10 | 32 ±3 |
| Erie, PA | 10 | 0 | 0 | 10 | 0 |
| Flint, MI | 0 | 3 | 0 | 2 | 1 |
| Indianapolis, IN | 17 | 0 | 0 | 17 | 0 |
| Jackson, MS | 21 | 2 | 0 | 23 | 0 |
| Jackson, TN | 32 | 0 | 0 | 32 | 0 |
| Kansas City, MO | 101 | 0 | 0 | 101 | 0 |
| Little Rock, AR | 258 | 8 | 3 | 266 | 0 |
| Memphis, TN | 0 | 4 | 0 | 4 | 0 |
| Minneapolis, MN | 5 | 0 | 0 | 5 | 0 |
| Nashville, TN | 0 | 88 | 19 | 28 | 60 |
| Omaha, NE | 35 | 0 | 0 | 35 | 0 |
| Orlando, FL | 6 | 40 | 0 | 40 | 6 |
| Philadelphia, PA | 0 | 90 | 0 | 41 | 49 |
| Rocky Mount, NC | 0 | 5 | 2 | 3 | 2 |
| St. Louis, MO | 56 | 7 | 0 | 63 | 0 |
| Springfield, IL | 314 | 0 | 0 | 314 | 0 |
| Wausau, WI | 0 | 1 | 0 | 1 | 0 |
| Winston-Salem, NC | 0 | 75 | 0 | 75 | 0 |
| Wytheville, VA | 73 | 0 | 0 | 73 | 0 |
| Youngstown, OH | 0 | 75 | 0 | 59 | 16 |
| | | | | | |
| TOTALS | 2,074 | 898 | 48 | 2,607 | 365 |

-22-

ABF 004113

Ex. 2B



**CHAUFFEURS, TEAMSTERS AND HELPERS**
Local Union No. 776

AFFILIATED WITH THE
International Brotherhood of Teamsters
2552 JEFFERSON STREET
HARRISBURG, PA 17110-2505

THOMAS B. GRIFFITH
PRESIDENT AND BUSINESS AGENT

DALE H. CRUM
SECRETARY TREASURER AND BUSINESS AGENT

THOMAS VINSON
VICE PRESIDENT

ANDREW C. REILEY
RECORDING SECRETARY

MELVIN HARRIS
TRUSTEE

TERRY L. KING
TRUSTEE

JEANETTE WATERS
TRUSTEE

BUSINESS AGENTS

JOHN L. FOGLE
CARLOS N. RAMOS, II
CHARLES SHUGHART
GEORGE F. SMART, SR.
RUSSELL A. STEPP
DANIEL A. VIRTUE



**EXHIBIT**

October 12, 1995

Dear Carolina Employee:

This letter is important.  Please take the time to read it.

Surely you're aware that ABF and Carolina Freight recently merged their operations.  Because of that merger, a change of operations was held on September 14/15, 1995.

As a result of the decision from the change of operations committee, the Carolina employees who are laid off at Carlisle, Pa will have certain rights to future work opportunities with ABF.  Article 5, Section 5 of the NMFA addresses those rights.  Those work opportunities will be offered to laid off Carolina employees in seniority order.  However, it is necessary that you notify ABF in writing of your desire to be offered available work.

Enclosed is a form letter and an envelope.  If you desire to be offered available work, you must complete the letter and mail it to ABF **as soon as possible.**  If you desire, you may also draft your own letter instead of using the form letter.  It is your choice to send the letter via regular mail or certified mail.   In either case, I suggest that you keep a copy of the letter as your file copy.

You should <u>mail the letter to ABF</u> today.  On October 16, 1995, the Company will begin compiling the list of employees who desire available work.

If you have any questions, please feel welcome to contact us.

Sincerely,

Charles Shughart
Business Agent

TELEPHONE (717) 233-8766
(800) 692-6280




Ex. 2C

18:02 AM DIP PRINTING

FAX  501 - 785  0517

To  ABF
CoNNIE Vaughan

From
Jeffrey D. Albright
5226 Woodlawn Dr
Harrisburg  Pa  17109

Please  Add my Name For Recall
under Article 5 Section 5.
Former employe of Carolina Freight at
Carlisle Pa

Home Phone (717) 652-3212
Cell Phone (717) 576-0355

Thank you
Jeffry D Albright

ABF 003025

501-285-C317

I Norman T Boire REQUEST

2RCALL ORDER Art 5 Sec 5 OF

THE NHPA

Norman T. Boire
710 Charles Rd
Dupant, PA 17018
717·921·8505

ABF 003019



TO:            ABF, Fort Smith, Arkansas
ATTENTION:     Connie Smith
SUBJECT:       Gary Marlyn Dietz, Article 5.5 list

DATE:          November 14, 1998
FAX NO:        501-785-6317

Dear Connie

Pursuant to our telephone conversation on Friday 13, 1998,
please be advised that I am requesting work opportunities under
Article 5.5 of the NMFA. I was a former Carolina driver, and
was laid off from the Kutztown, PA terminal at the time of
the ABF buy-out.

Please notify me of any work opportunities at the Carlisle, PA
terminal at your earliest convenience at the following address
and telephone numbers.

**Gary Marlyn Dietz**
**RD#2 Box 297**
**Landisburg, PA 17040**

**(717) 789-3386**

**If no answer, call (717) 691-5539 and leave a message.**

**Thank you.**

**Sincerely,**

*Gary Marlyn Dietz*
**Gary Marlyn Dietz**

ABF 003016



12/15/98          ***** ATTN: MS.CONNIE VAUGN *****

ABF FREIGHT CORP.    FAX#:(501)-785-6317/PH#:(501)-785-8704

ATTN: MS.CONNIE VAUGN

FROM: MR.WILLIAM H.ERDMAN
SSN : 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

SUBJECT: CONSIDERATION FOR EMPLOYMENT AT ABF UNDER
         ARTICAL 5,SECTION 5 OF NMFA

DEAR CONNIE: 1 WILLIAM H.ERDMAN AN EX-CAROLINA ROAD DRIVER
LAYED-OFF FROM CARLISLE,PA TERMINAL AM REQUESTING THAT I BE
CONSIDERED FOR RE-HIRE UNDER NMFA ARTICAL 5,SECTION 5 OF SAID
CONTRACT., I AM NOT PRESENTLY EMPLOYED BY A CARRIER UNDER NMFA,
BELOW IS CONTACT NUMBERS AND ADDRESSES BY WHICH YOU CAN CONTACT
ME.

                    THANK YOU                  12-15-98
                    WILLIAM H.ERDMAN

WILLIAM H.ERDMAN
690 MILLER ROAD
YORK HAVEN,PA. 17370

PHONE#: (717)-938-8560   HOME
        (570)-339-1600   BUS.

ABF 003031



Michael W. Fritz
99 Buckthorn Drive
Carlisle, PA 17013
(717) 245-2721

RECEIVED

NOV 04 1998

ABF IND. REL DEPT.

November 4, 1998

Attention: Connie Vaughn

To whom it may concern:

As per your request, I, Michael W. Fritz, am requesting to be put on your road driver work list under Article 5, Section 5. I am currently on lay off status from Carolina Freight in Carlisle, PA.

Sincerely,

Michael W Fritz

Michael W. Fritz

P.S. If you cannot reach me, you may contact my wife, Karen, at (717) 240-6855 (work) or (717) 245-2721 (home)

ABF 003040

 LANDS DETECTIVE AGENCY            -776-4540            P.01

A. Ronald Frombaugh
255 Mt. Rock Road
Newville, Pa. 17241
Phone Number. (717) 776-7593

Connie Vaughn
Industrial Relations
Fort Smith, Ark.

RECEIVED

NOV 03 1998

ABF IND. REL. DEPT.

ATTN: Connie Vaughn:

I. A. Ronald Frombaugh, a former employee of Carolina Freight Carriers. (Road Driver) It is my desire to work for A. B. F. at the Carlisle, Pa. facility as described in the N.M.F.A.. Section V  Article V.

Respectfully submitted

A. Ronald Frombaugh

ABF 003022



Ralph A. Harris
185 Bridge Road
Millersburg PA 17061
717-692-
place me on the wait list
Thanks you

NOV 18
ABF IND REL DE

ABF 003035

A.B.F. TRUCKING
FORT SMITH, AK.
FAX: 501-785-6317


ATT: CONNIE

I AM LAYED OFF FROM
BALTIMORE, MD. PLEASE
PUT ME BACK ON THE
CALL BACK BORD, UNDER
ARTICAL 5 - SECTION 5
FOR CARLISLE, PA. ONLEY
                    PLEASE.

                 SINCERLY
SS# 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      [signature]
ALLEN W. LANDIS      ALLEN W LANDS
506 CRISWELL DR.
BOILING SPRINGS, PA. 17007
717-258-3886

ABF 003007

RECEIVED

JAN 0 8 1999

ABF IND. REL. DEPT

January 4, 1999

ABF
P. O. Box 10048
Fort Smith, AK 72917-0048

Attention: Connie Vaughn

Dear Ms. Vaughn:

   I am a former employee of Carolina Freight and would like to be considered for rehire under the 5 & 5 rule as a road driver at the Carlisle, PA terminal.

                        Sincerely,

                        Lowell C. McGuire

                        Lowell C. McGuire
                        13 Dicken Drive
                        Marysville, PA 17053
                        (717) 957-3653

ABF 003034

NOVEMBER 30, 1998

ABF
ATTN: CONNIE VAUGH
FAX # (501) 785-6317


I WALTER MINNICH AM REQUESTING TO BE PUT BACK ON THE LIST OF

ARTICLE 5, SECTION 5.


WALTER MINNICH
23 BISGAH STATE ROAD
P.O. BOX 303
SHERMANSDALE, PA 17090
(717) 582-4080

ABF 003010



February 22, 1999

Connie Vaghn
Box 10048
Forth Smith, Arkansas 72917
Fax: 501-785-6317


Stanley L. Nye
740 Torway Road
Gardners, PA 17324
SSN# 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
Telephone: (717) 486-0223


*RE: Road Driver, laid off from ABF, request for consideration of the Right to Transfer to any ABF.*


Pursuant to the provisions of the Decisions in Case Number MR-CO-38-9/95, I, Stanley L. Nye, road driver, laid off from Arkansas Best Freight in Baltimore, Maryland, hereby notify you in writing of my desire to transfer and to invoke my right to transfer under Article 5, Section 5 of the National Master Freight Agreement, as extended in the above captioned case.

ABF 002998



Raymond C. Nevins                          January 10, 1999
94 Study Road
Littlestown, PA    17340
(717) 359-8143


Industrial Relations

To Whom It May Concern;
    I would like my name to placed on the Article 5
Section 5 LIST for Carlisle, PA.


                      Sincerely,


                      Raymond C. Nevins

ABF 003013



**Vincent Ramirez, Jr**
66 Lanwood Park
Shippensburg , Pa 17257
Franklin
Home Phone (717) 530-6329

RECEIVED

NOV 04 1998

November 04, 1998

ABF IND. REL DEPT.

A.B.F. Freight Systems
Fort Smith, Ar ( Attn. Connie Vaughn )

Dear Connie,

       I am sending you this letter that you said to send to you requesting that I be placed on the list for road drivers under article #5 section #5. I was layed off from Carolina freight in 1995. Any future information on this matter please contact me, Thank - You.

Sincerely,


      Vincent Ramirez, Jr


ABF 003028

ABF FREIGHT

Personnel Office

I wish to be considered for employment under Article 5 at the Carlisle Pa. terminal.

I am a former employee of Carolina Freight. I was with Carolina approximately 18 years. I am now on layoff status.

Keith Sgrignoli

109 Saint George Dr.

Dillsburg, Penna. 17019

717-432-8795

TOTAL P.01

**Ray Snyder**
138 Linda Drive
Mechanicsburg, Pennsylvania 17055
Cumberland
Fax (717) 697-2447
Home Phone (717) 697-2447



NOV 03 1998

ABF IND. REL. DEPT.

November 02, 1998

A.B.F.
Fort Smith , Ak ( Attn. Connie Vaughn )

Dear Connie,,

      I am sending you this letter upon your request since I am an employee of Carolina Freight which was placed in a layoff status in Carlisle,Pa in 1995. My wife had contacted you by phone on November 02,1998 about being placed on the drivers board at A.B.F. I am interested in being placed on the drivers board in conjunction with article#5, section # 5. Please let me know of any future development, Than k-You
Sincerely,

Ray G. Snyder,Jr     *Ray G. Snyder Jr.*
717-697-2447

OCTOBER 30, 1998

ATTN: MRS. CONNIE VAUGHN
      ABF


I LARRY WELKER AM REQUESTING TO BE PUT BACK ON THE ARTICLE 5,

SECTION 5 LIST.

LARRY WELKER
48 W. MAIN STREET
PLAINFIELD, PA 17013

PHONE # (717) 243-8263

Ex. 2D



ABF FREIGHT SYSTEM, INC.
P O. Box 10048
Fort Smith, AR 72917-0048
(501) 785-8700

December 9, 1998

Certified Mail No. P 433 236 207
Return Receipt Requested

Mr. Jeffrey Albright
5226 Woodlawn Drive
Harrisburg, PA 17109

Dear Mr. Albright:

In accordance with Article 5, Section 5 of the National Master Freight Agreement, on December 7, 1998, you were contacted and offered an opportunity to transfer to permanent employment in your classification at Erie, Pennsylvania; Carlisle, Pennsylvania; or Winston-Salem, North Carolina. This letter is to confirm that you elected to accept the job offer at Carlisle, PA. Please contact the line driver supervisor at that location to determine your reporting date if you have not done so.

Very truly yours,


Gordon Ringberg, Director
Industrial Relations

cc: John Dale, Vice President - Transportation/Industrial Relations
    Gary Drake, Manager Linehaul Operations - Carlisle, PA
    Teamsters Local Union No. 776
    Teamsters Local Union No. 557

 **ABF** FREIGHT SYSTEM, INC.
P O Box 10048
Fort Smith, AR 72917-0048
(501) 785-8700

December 9, 1998

Certified Mail No. P 433 236 211
Return Receipt Requested

Mr. Norman Boire
710 Charles Road
Dauphin, PA 17018

Dear Mr. Boire:

In accordance with Article 5, Section 5 of the National Master Freight Agreement, on December 9, 1998, you were contacted and offered an opportunity to transfer to permanent employment in your classification at Erie, Pennsylvania; Carlisle, Pennsylvania; or Winston-Salem, North Carolina. This letter is to confirm that you elected to accept the job offer at Carlisle, PA. Please contact the line driver supervisor at that location to determine your reporting date if you have not done so.

Very truly yours,

Gordon Ringberg, Director
Industrial Relations

cc:  John Dale, Vice President - Transportation/Industrial Relations
     Gary Drake, Manager Linehaul Operations - Carlisle, PA
     Teamsters Local Union No. 776

ABF 003017



FREIGHT SYSTEM, INC.
PO Box 10048
Fort Smith, AR 72917-0048
(501) 785-8700

November 19, 1999

Certified Mail No. P 433 236 885
Return Receipt Requested

Mr. Gary M. Dietz
RD #2, Box 297
Landisburg, PA  17040

Dear Mr. Dietz:

In accordance with Article 5, Section 5 of the National Master Freight Agreement,
on November 16, 1998, you were contacted and offered an opportunity to
transfer to permanent employment in your classification at Erie, Pennsylvania or
Carlisle, Pennsylvania.  This letter is to confirm that you elected to accept the job
offer at Carlisle, PA.  Please contact the line driver supervisor at that location to
determine your reporting date if you have not done so.

Very truly yours,

Gordon Ringberg, Director
Industrial Relations

cc:  John Dale, Vice President - Transportation/Industrial Relations
     Gary Drake, Line Driver Supervisor - Carlisle, PA
     Teamsters Local Union No. 773

3801 Old Greenwood Road • Fort Smith, Arkansas 72903
A Subsidiary of Arkansas Best Corporation

ABF 003014



**ABF** FREIGHT SYSTEM, INC.
P O Box 10048
Fort Smith, AR 72917-0048
(501) 785-8700

February 8, 1999

Certified Mail No. P 433 236 899
Return Receipt Requested

Mr. William Erdman
690 Miller Road
York Haven, PA 17370

Dear Mr. Erdman:

In accordance with Article 5, Section 5 of the National Master Freight Agreement, on February 1, 1999, you were contacted and offered an opportunity to transfer to permanent employment in your classification at Erie, PA; Carlisle, PA; or Winston-Salem, NC. This letter is to confirm that you elected to accept the job offer at Carlisle, PA. Please contact the line driver supervisor at that location to determine your reporting date if you have not done so.

Very truly yours,

Gordon Ringberg, Director
Industrial Relations

cc:  John Dale, Vice President - Transportation/Industrial Relations
     Gary Drake, Carlisle Linehaul
     Teamsters Local Union No. 776

ABF 003029



ABF FREIGHT SYSTEM, INC.
P O Box 10048
Fort Smith, AR 72917-0048
(501) 785-8700

November 19, 1998

Certified Mail No. P 433 236 881
Return Receipt Requested

Mr. Michael Fritz
99 Buckthorn Drive
Carlisle, PA 17013

Dear Mr. Fritz:

In accordance with Article 5, Section 5 of the National Master Freight Agreement, on November 13, 1998, you were contacted and offered an opportunity to transfer to permanent employment in your classification at Erie, Pennsylvania or Carlisle, Pennsylvania. This letter is to confirm that you elected to accept the job offer at Carlisle, PA. Please contact the line driver supervisor at that location to determine your reporting date if you have not done so.

Very truly yours,

Gordon Ringberg, Director
Industrial Relations

cc: John Dale, Vice President - Transportation/Industrial Relations
    Gary Drake, Line Driver Supervisor - Carlisle, PA
    Teamsters Local Union No. 776



 ABF FREIGHT SYSTEM, INC.
P O Box 10048
Fort Smith, AR 72917-0048
(501) 785-8700

November 19, 1998

Certified Mail No. P 433 236 883
Return Receipt Requested

Mr. A. Ronald Frombaugh
255 Mt. Rock Road
Newville, PA 17241

Dear Mr. Frombaugh:

In accordance with Article 5, Section 5 of the National Master Freight Agreement,
on November 4, 1998, you were contacted and offered an opportunity to transfer
to permanent employment in your classification at Erie, Pennsylvania or Carlisle,
Pennsylvania. This letter is to confirm that you elected to accept the job offer at
Carlisle, PA. Please contact the line driver supervisor at that location to
determine your reporting date if you have not done so.

Very truly yours,


Gordon Ringberg, Director
Industrial Relations

cc: John Dale, Vice President - Transportation/Industrial Relations
    Gary Drake, Line Driver Supervisor - Carlisle, PA
    Teamsters Local Union No. 776



 ABF FREIGHT SYSTEM, INC.
P O Box 10048
Fort Smith, AR 72917-0048
(501) 785-8700

November 24, 1998


Certified Mail No. P 433 236 197
Return Receipt Requested


Mr. Ralph Harris
185 Bridge Road
Millersburg, PA 17061

Dear Mr. Harris:

In accordance with Article 5, Section 5 of the National Master Freight Agreement,
on November 23, 1998, you were contacted and offered an opportunity to
transfer to permanent employment in your classification at Erie, Pennsylvania;
Carlisle, Pennsylvania; or Winston-Salem, North Carolina. This letter is to
confirm that you elected to accept the job offer at Carlisle, PA. Please contact
the line driver supervisor at that location to determine your reporting date if you
have not done so.

Very truly yours,



Gordon Ringberg, Director
Industrial Relations

cc: John Dale, Vice President - Transportation/Industrial Relations
    Gary Drake, Line Driver Supervisor - Carlisle, PA
    Teamsters Local Union No. 776
    Teamsters Local Union No. 557

3801 Old Greenwood Road • Fort Smith, Arkansas 72903
A Subsidiary of Arkansas Best Corporation

ABF 003036



ABF FREIGHT SYSTEM, INC.
P O Box 10048
Fort Smith, AR 72917-0048
(501) 785-8700

December 9, 1998

Certified Mail No. P 433 236 205
Return Receipt Requested

Mr. Allen Landis
506 Criswell Drive
Boiling Springs, PA 17007

Dear Mr. Landis:

In accordance with Article 5, Section 5 of the National Master Freight Agreement, on December 3, 1998, you were contacted and offered an opportunity to transfer to permanent employment in your classification at Erie, Pennsylvania; Carlisle, Pennsylvania; or Winston-Salem, North Carolina. This letter is to confirm that you elected to accept the job offer at Carlisle, PA. Please contact the line driver supervisor at that location to determine your reporting date if you have not done so.

Very truly yours,

Gordon Ringberg, Director
Industrial Relations

cc: John Dale, Vice President - Transportation/Industrial Relations
    Gary Drake, Manager Linehaul Operations - Carlisle, PA
    Teamsters Local Union No. 776
    Teamsters Local Union No. 557



ABF FREIGHT SYSTEM, INC.
P. O. Box 10048
Fort Smith, AR 72917-0048
(501) 785-8700

February 8, 1999

Certified Mail No. P 433 236 897
Return Receipt Requested

Mr. Lowell McGuire
13 Dicken Drive
Marysville, PA 17053

Dear Mr. McGuire

In accordance with Article 5, Section 5 of the National Master Freight Agreement, on February 2, 1999, you were contacted and offered an opportunity to transfer to permanent employment in your classification at Erie, PA; Carlisle, PA; or Winston-Salem, NC. This letter is to confirm that you elected to accept the job offer at Carlisle, PA. Please contact the line driver supervisor at that location to determine your reporting date if you have not done so.

Very truly yours,

Gordon Ringberg, Director
Industrial Relations

cc: John Dale, Vice President - Transportation/Industrial Relations
    Gary Drake, Carlisle Linehaul
    Teamsters Local Union No. 776

3801 Old Greenwood Road • Fort Smith, Arkansas 72903
☎ A Subsidiary of Arkansas Best Corporation

ABF 003032



**ABF FREIGHT SYSTEM, INC.**
P. O. Box 10048
Fort Smith, AR 72917-0048
(501) 785-8700

December 9, 1998

Certified Mail No. P 433 236 206
Return Receipt Requested

Mr. Walter Minnich
P. O. Box 303
Shermansdale, PA 17090

Dear Mr. Minnich:

In accordance with Article 5, Section 5 of the National Master Freight Agreement, on December 3, 1998, you were contacted and offered an opportunity to transfer to permanent employment in your classification at Erie, Pennsylvania; Carlisle, Pennsylvania; or Winston-Salem, North Carolina. This letter is to confirm that you elected to accept the job offer at Carlisle, PA. Please contact the line driver supervisor at that location to determine your reporting date if you have not done so.

Very truly yours,

Gordon Ringberg, Director
Industrial Relations

cc: John Dale, Vice President - Transportation/Industrial Relations
Gary Drake, Manager Linehaul Operations - Carlisle, PA
Teamsters Local Union No. 776
Teamsters Local Union No. 557




ABF FREIGHT SYSTEM, INC.
P O Box 10048
Fort Smith, AR 72917-0048
(501) 785-8700

February 8, 1999


Certified Mail No. P 433 236 901
Return Receipt Requested


Mr. Raymond C. Nevins
94 Study Road
Littlestown, PA 17340

Dear Mr. Nevins:

In accordance with Article 5, Section 5 of the National Master Freight Agreement, on February 1, 1999, you were contacted and offered an opportunity to transfer to permanent employment in your classification at Erie, PA; Carlisle, PA; or Winston-Salem, NC. This letter is to confirm that you elected to accept the job offer at Carlisle, PA. Please contact the line driver supervisor at that location to determine your reporting date if you have not done so.

Very truly yours,


Gordon Ringberg, Director
Industrial Relations

cc: John Dale, Vice President - Transportation/Industrial Relations
    Gary Drake, Carlisle Linehaul
    Teamsters Local Union No. 776
    Teamsters Local Union No. 557


3801 Old Greenwood Road • Fort Smith, Arkansas 72903
A Subsidiary of Arkansas Best Corporation

ABF 003011



**ABF FREIGHT SYSTEM, INC.**
P. O. Box 10048
Fort Smith, AR 72917-0048
(501) 785-8700

February 25, 1999

Certified Mail No. Z 093 697 089
Return Receipt Requested

Mr. Stanley Nye
740 Torway Road
Gardners, PA 17324

Dear Mr. Nye:

In accordance with Article 5, Section 5 of the National Master Freight Agreement, on February 22, 1999, you were contacted and offered an opportunity to transfer to permanent employment in your classification at Erie, PA; Carlisle, PA; or Winston-Salem, NC. This letter is to confirm that you elected to accept the job offer at Carlisle, PA. Please contact the line driver supervisor at that location to determine your reporting date if you have not done so.

Very truly yours,

Gordon Ringberg, Director
Industrial Relations

cc: John Dale, Vice President - Transportation/Industrial Relations
    Gary Drake, Carlisle Linehaul
    Teamsters Local Union No. 776
    Teamsters Local Union No. 557

3801 Old Greenwood Road • Fort Smith Arkansas 72903
🚂 A Subsidiary of Arkansas Best Corporation

ABF 002996

 **ABF** ABF FREIGHT SYSTEM, INC.
P.O. Box 10048
Fort Smith, AR 72917-0048
(501) 785-8700

November 19, 1998

Certified Mail No. P 433 236 880
Return Receipt Requested

Mr. Vincent Ramirez, Jr.
86 Lenwood Park
Shippensburg, PA 17257

Dear Mr. Ramirez:

In accordance with Article 5, Section 5 of the National Master Freight Agreement,
on November 16, 1998, you were contacted and offered an opportunity to
transfer to permanent employment in your classification at Erie, Pennsylvania or
Carlisle, Pennsylvania. This letter is to confirm that you elected to accept the job
offer at Carlisle, PA. Please contact the line driver supervisor at that location to
determine your reporting date if you have not done so.

Very truly yours,

Gordon Ringberg, Director
Industrial Relations

cc:  John Dale, Vice President - Transportation/Industrial Relations
     Gary Drake, Line Driver Supervisor - Carlisle, PA
     Teamsters Local Union No. 776



ABF FREIGHT SYSTEM, INC.
P. O. Box 10048
Fort Smith, AR 72917-0048
(501) 785-8700

November 24, 1998

Certified Mail No. P 433 236 202
Return Receipt Requested

Mr. Keith Sgrignoli
109 Saint George Drive
Dillsburg, PA 17019

Dear Mr. Sgrignoli:

In accordance with Article 5, Section 5 of the National Master Freight Agreement,
on November 20, 1998, you were contacted and offered an opportunity to
transfer to permanent employment in your classification at Erie, Pennsylvania or
Carlisle, Pennsylvania. This letter is to confirm that you elected to accept the job
offer at Carlisle, PA. Please contact the line driver supervisor at that location to
determine your reporting date if you have not done so.

Very truly yours,



Gordon Ringberg, Director
Industrial Relations

cc: John Dale, Vice President - Transportation/Industrial Relations
    Gary Drake, Line Driver Supervisor - Carlisle, PA
    Teamsters Local Union No. 776
    Teamsters Local Union No. 773



 ABF FREIGHT SYSTEM, INC.
P O Box 10048
Fort Smith, AR 72917-0048
(501) 785-8700

November 19, 1998

Certified Mail No. P 433 236 879
Return Receipt Requested

Mr. Ray Snyder, Jr.
138 Linda Drive
Mechanicsburg, PA 17055

Dear Mr. Snyder:

In accordance with Article 5, Section 5 of the National Master Freight Agreement,
on November 16, 1998, you were contacted and offered an opportunity to
transfer to permanent employment in your classification at Erie, Pennsylvania or
Carlisle, Pennsylvania.  This letter is to confirm that you elected to accept the job
offer at Carlisle, PA.  Please contact the line driver supervisor at that location to
determine your reporting date if you have not done so.

Very truly yours,

Gordon Ringberg, Director
Industrial Relations

cc:  John Dale, Vice President - Transportation/Industrial Relations
     Gary Drake, Line Driver Supervisor - Carlisle, PA
     Teamsters Local Union No. 776



ABF FREIGHT SYSTEM, INC.
P.O. Box 10048
Fort Smith, AR 72917-0048
(501) 785-8700

October 30, 1998

Certified Mail No. P 433 236 875
Return Receipt Requested

Mr. Larry Welker
48 West Main Street
Plainfield, PA 17013

Dear Mr. Welker:

In accordance with Article 5, Section 5 of the National Master Freight Agreement, on October 30, 1998, you were contacted and offered an opportunity to transfer to permanent employment in your classification at Winston-Salem, North Carolina; Erie, Pennsylvania; or, Carlisle, Pennsylvania. This letter is to confirm that you elected to accept the job offer at Carlisle, PA. Please contact the line driver supervisor at that location to determine your reporting date if you have not done so.

Very truly yours,

Gordon Ringberg, Director
Industrial Relations

cc: John Dale, Vice President - Transportation/Industrial Relations
    Gary Drake, Line Driver Supervisor - Carlisle, PA
    Teamsters Local Union No. 557
    Teamsters Local Union No. 776

Ex. 3

ABF 003915



# NATIONAL MASTER FREIGHT AGREEMENT

Covering
OVER-THE-ROAD
and
LOCAL CARTAGE
EMPLOYEES OF PRIVATE,
COMMON, CONTRACT AND
LOCAL CARTAGE CARRIERS

For the Period of
APRIL 1, 1994
through
MARCH 31, 1998

**Article 4**

Union shall be limited to, and shall not exceed, the following duties and activities:

(a) The investigation and presentation of grievances with his/her Employer or the designated company representative in accordance with the provisions of the collective bargaining agreement;

(b) The collection of dues when authorized by appropriate Local Union action;

(c) The transmission of such messages and information, which shall originate with and are authorized by the Local Union or its officers, provided such message and information;

(1) have been reduced to writing; or,

(2) if not reduced to writing, are of a routine nature and do not involve work stoppages, slowdowns, refusal to handle goods, or any other interference with the Employer's business.

When requested by the Union or the employee, there shall be a steward present whenever the Employer meets with the employee about grievances or discipline or to conduct investigatory interviews. If a steward is unavailable, the employee may designate a bargaining unit member who is available at the terminal at the time of the meeting to represent him/her. Meetings or interviews shall not begin until the steward or designated bargaining unit member is present. An employee who does not want a Union steward or available bargaining unit member present at any meeting or interview where the employee has a right to Union representation must waive Union representation in writing. If the Union requests a copy of the waiver, the Employer shall promptly furnish it.

Job stewards and alternates have no authority to take strike action, or any other action interrupting the Employer's business, except as authorized by official action of the Local Union. The Employer recognizes these limitations upon the authority of job stewards and their alternates, and shall not hold the Local Union liable for any unauthorized acts. The Employer in so recognizing such limitations shall have the authority to impose proper discipline, including discharge, in the event the job steward or his/her designated alternate has taken unauthorized strike action, slowdown or work stoppage in violation of this Agreement.

18

**Article 4**

The job steward, or his/her designated alternate, shall be permitted reasonable time to investigate, present and process grievances on the company property without loss of time or pay during his/her regular working hours without interruption of the Employer's operation by calling group meetings; and where mutually agreed to by the Local Union and the Employer, off the property or other than during his/her regular schedule without loss of time or pay. Such time spent in handling grievances during the job steward's or his/her designated alternate's regular working hours shall be considered working hours in computing daily and/or weekly overtime if within the regular schedule of the "job steward."

The job steward, or his/her designated alternate, shall be permitted reasonable time off without pay to attend Union meetings called by the Local Union. The Employer shall be given twenty-four (24) hours' prior notice by the Local Union.

## ARTICLE 5.

### Section 1.  Seniority Rights

(a) The application of seniority which has been accrued herein shall be established in the Supplemental Agreements.

(b) Seniority shall be broken only by discharge, voluntary quit, retirement, or more than a five (5)- year layoff.

(c) This Section shall apply to all Supplemental Agreements.

### Section 2.  Mergers of Companies-General

(a) In the event the Employer is a party to a merger of lines, seniority of the employees who are affected thereby shall be determined by mutual agreement between the Employer and the Local Unions involved.

In the application of this Section, it is immaterial whether the transaction is called a merger, purchase, acquisition, sale, etc. Further, it is also immaterial whether the transaction involves merely the purchase of stock of one (1) corporation by another, with two (2) separate corporations continuing in existence.

19

ABF 003929

## Article 5, Section 2

(b) If such merger of companies results in the combination of terminals or over-the-road operations, a change of operation shall be submitted to the Co-Chairmen of the National Grievance Committee for assignment to an appropriate Change of Operations Committee established pursuant to Article 8, Section 6. The Change of Operations Committee shall retain jurisdiction for one (1) year after the effective date of the Committee decision and shall have the authority to amend its decision in the event of a substantial change in the amount of work to be performed at the terminals or over-the-road operations which were combined.

## Combining of Terminals or Operations as a Result of Merger of Companies

(c) In the application of this Section, when terminals or operations of two (2) or more companies are combined, as referred to above, the following general rules shall be applied by the Employer and the Local Unions, which general rules are subject to modification pursuant to the provisions of Section 4 of this Article:

## Active Seniority List

(1) The active employee seniority rosters (excluding those employees on letter of layoff) shall be "dovetailed" by appropriate classification (i.e., road or city) in the order of each employee's full continuous classification (road or city) seniority date that the employee is currently exercising. (The term "continuous classification seniority" as used herein is defined as that seniority which the employee is currently exercising and has not been broken in the manner provided in Section 1 of this Article or by voluntary changes in domicile not directed, approved or ordered by a Change of Operations Committee.) The active "dovetailed" seniority roster shall be utilized first and until exhausted to provide employment at such combined terminal or operational location.

## Layoff Seniority List

(2) In addition, the inactive seniority rosters (employees who are on letter of layoff) shall be similarly "dovetailed" by appropriate classification. If additional employees are required after the active list is exhausted, they shall be recalled from such inactive

## Article 5, Section 2

...nority roster and after recall such employees shall be "dovetailed" into the active seniority roster with their continuous classification (road or city) seniority dates they are currently exercising which shall then be exercised for all purposes. Seniority rosters previously combining job classifications shall be continued unless otherwise agreed.

## Temporary Authority

(d) Where only temporary authority is granted in connection with any of the transactions described above, then separate seniority lists shall continue only when terminals or operations are not merged, unless otherwise agreed. The Employer which is to survive will assume the obligations of both collective bargaining agreements during the period of the temporary authority.

In the event of temporary merger of operations which are contingent upon approval by regulatory agencies or on other stated conditions, the seniority of the involved employees shall continue to accrue with their original Employer during the period of temporary merger, so that if there is no final consummation of the merger, the seniority of such employees shall be continued with their respective employers. However, if, on the failure of final consummation and dissolution of the merger, one of the parties to the proposed merger discontinues the operations which were subject to such merger, the employees of such Employer shall be granted seniority rights for all purposes with the other Employer only for the period of time they were employed in such temporary merged operations.

## Purchase of Rights

(e) If a merger, purchase, acquisition, sale, etc., constitutes merely the acquisition of permits or rights, without the purchase or acquisition of equipment or terminals, and/or without the consolidation of terminals or operations, or in the event of the purchase of rights during bankruptcy proceedings, the following shall apply:

Where the purchasing company has a terminal operation at the domicile of the employees of the seller, the employees of the selling company shall be placed on a master seniority list, and the purchasing company or companies shall hire, after recall of the purchasing company's employees from layoff, such employees as needed

ABF 003930

**Article 5, Section 2**

for regular employment within the first twelve (12)-calendar months after purchase or acquisition of permits and/or rights, and they shall be dovetailed with full seniority. If an employee refuses a bona fide offer of regular work opportunity with any of the purchasing companies, his/her name shall be removed from the list. No employee hired under this provision shall be required to serve a probationary period. After the expiration of the aforementioned twelve (12)-calendar month period, the purchaser shall have no further obligation to the employees of the seller.

However, if the purchasing or acquiring company does not have and/or continue a terminal or operation at the domicile of the employees of the seller, resulting in their layoff, such Employer shall place the laid-off employees on a master seniority list and such Employer shall, if and when additional regular employees are required, within a twelve (12)-calendar month period after purchase or acquisition, and providing its employees on layoff have been recalled, offer employment to such laid-off employees at the terminal locations or operations to which the work has been transferred. Any such laid-off employees accepting transfer shall be dovetailed in accordance with their terminal seniority for work purposes, including layoff, and holding company seniority for all fringes. If an employee refuses a bona fide offer of regular work opportunity with any of the purchasing companies, his/her name shall be removed from the list. No employee hired under this provision shall be required to serve a probationary period. After the expiration date of the aforementioned twelve (12)-calendar month period, the purchaser shall have no further obligation to the employees of the seller. The transferring employee shall be responsible for lodging and moving expenses.

**Exclusive Cartage Operations**

(f) If in connection with the transactions described in these rules the successor Employer determines to discontinue the use of a local cartage company, the employees of that local cartage company who have worked exclusively on the pickup and delivery service which is retained by the successor Employer shall be given the opportunity to continue to perform such service as an employee of such successor Employer, and shall have their seniority "dovetailed" as described in the above rules.

22

**Article 5, Section 2**

**Committee Authority**

(g) Area and/or State Committees created pursuant to Local Supplements which have previously established rules of seniority, not contrary to the provisions of such Supplements, and approved by the Joint Area Committee, may continue to apply such rules if such rules are reduced to writing.

**Section 3.  Intent of Parties**

(a) The parties acknowledge that the above rules are intended solely as general standards and further that many factual situations will be presented which necessitate different application, modification or amendment. Accordingly, the parties acknowledge that questions of the application of seniority rights may arise which require different treatment and it is anticipated and understood that the Employers and Unions jointly involved and/or the respective grievance committees may mutually agree to such disposition of questions of seniority which in their judgment is appropriate under the circumstances.

(b) In all instances, the disposition of questions involving the application of seniority rights made by the parties pursuant to this Section may be presented to the appropriate grievance committees provided herein whose decisions shall be final and binding.

**Section 4.  Equipment Purchases**

(a) The Employer shall not require as a condition of continued employment, that an employee purchase truck, tractor and/or tractor and trailer or other vehicular equipment, or that any employees purchase or assume any proprietary interest or other obligation in the business, except as referred to in Article 6, Section 2. The requirements of this provision shall be maintained during the renegotiation of this Agreement unless either party has terminated the Agreement in the manner provided.

**Highest Rates Prevail**

(b) If the minimum wage, hours and working conditions in the Company absorbed differ from those minimums set forth in this

23

ABF 003931

ABF 003932

## Article 5, Section 4

Agreement and Supplements thereto, the higher of the two shall remain in effect for the employees so absorbed.

### Cutting Seniority Board

(c) The Union reserves the right to cut the road seniority board when the average weekly earnings fall to seven hundred dollars ($700.00) or less. This is not to be construed as imposing a limitation on earnings. After the Union notifies the Employer to cut the board and in the event that Employer refuses, the Union shall immediately submit the matter to the grievance procedure. In determining whether average weekly earnings will fall to seven hundred dollars ($700.00) or less, only the earnings of the lower twenty-five percent (25%) of the drivers on the seniority board, counting from the bottom up, shall be considered. The average shall be calculated for the thirty (30) day period preceding the Union's original request. After such calculation is made, the average earnings of the drivers for the top seventy-five percent (75%) of the seniority board must also average more than seven hundred dollars ($700.00) per week, or layoff shall be made in accordance with seniority. The above provisions shall also apply to extra board for sleeper drivers exclusively.

### Posting Seniority List

(d) The Employer shall give the Local Union a seniority list at least every six (6) months. The Employer shall also post a seniority list at least once every six (6) months and shall maintain a current seniority roster at the terminal. Protest of any employee's seniority date or position on such list must be made in writing to the Employer within thirty (30) days after such seniority date or position first appears, and if no protests are timely made the dates and positions posted shall be deemed correct. Any such protest which is timely made may be submitted to the grievance procedure.

### Section 5.  Work Opportunity

Over-the-road employees, who are on letter of layoff, shall be given an opportunity to transfer to permanent over-the-road employment (prior to the employment of new hires) occurring at other over-the-road domiciles of the Employer located within the Conference area provided they notify the Employer in writing of their interest in a

24

## Article 5, Section 5

transfer opportunity. The offer of transfer will be made in the order of continuous over-the-road seniority of the laid-off drivers domiciled within the Conference area. The Employer shall be required to make additional offers of transfer to an employee who has previously rejected a transfer opportunity provided the employee again notifies the Employer in writing of his/her continued interest in additional transfer opportunities. However, the Employer will only be required to make one transfer offer in any six (6) calendar month period. Any employee accepting such offer shall be employed as a "new hire" and shall be placed at the bottom of the seniority board for bidding and layoff purposes, but shall retain company seniority for fringe benefits only. A transferring employee shall pay his/her own moving expenses and shall, upon reporting to such new domicile, be deemed to have relinquished his/her right to return with seniority to the domicile from which he/she transferred.

### Section 6.  Dock Operations

The Rule of Forty (40) and Out shall apply to PURE DOCK WORK ONLY for the life of the contract and shall operate as follows:

(a) The employer's obligation to each full-time regular employee ("regular employee") is to satisfy the daily and/or weekly guarantee as set forth in a bid under the applicable Supplemental Agreement. It is understood that a weekly guarantee under a supplement may call for four (4) or five (5) punches depending upon whether the daily guarantee is eight (8) or ten (10) hours.

(b) A regular employee who is assigned to or elects work on the dock for forty (40) straight-time hours during a work week, other than through a bid, is also subject to the Rule of Forty (40) and Out.

(c) No casual may work on the dock unless each regular employee who was on the seniority list as of March 31, 1994, and unless each regular employee added to the seniority list thereafter, has been offered an opportunity to work that day at the straight time rate of pay.

(d) The Employer is not obligated to offer any overtime work on the dock to any regular employee whose daily guarantee has been satisfied. If the Employer does offer daily overtime to regular employees, overtime must be offered in seniority order in accordance with the applicable Supplement.

25

## Article 5, Section 6

(e) Overtime offered to a regular employee after the guaranteed day shall not count toward the weekly guarantee. Example: An employee has a five (5) day regular workweek. At the close of the fourth (4th) day, the employee has thirty-two (32) hours of regular time and four (4) hours of overtime. The employee is guaranteed his/her fifth (5th) regular punch and at least forty-four (44) hours for the week. Example: An employee has a four (4) day regular workweek. At the close of the third (3rd) day, the employee has thirty (30) hours of regular time and ten (10) hours of overtime. The employee is guaranteed his/her fourth (4th) regular punch and at least fifty (50) hours for the week.

(f) The Employer is not obligated to offer a premium day punch for pure dock work to any regular employee after the weekly guarantee has been satisfied. The Employer's obligation, if any, to provide premium day work other than pure dock work is governed by the applicable Supplement. Example: An employee has a five (5) day regular workweek. At the close of the fifth (5th) day, the employee has earned the weekly guarantee. The Employer is not obligated to offer the employee a sixth (6th) or seventh (7th) day premium punch for pure dock work.

(g) If all regular employees on the seniority list have worked at least forty (40) hours in a given work week, and if the Employer offers premium day work on the dock to regular employees, premium day work shall be offered on the basis of seniority as defined in the applicable Supplement.

(h) A regular employee who has broken his/her daily or weekly guarantee shall not be entitled to claim any work occurring outside of the employee's regularly scheduled work week, except as may be provided by the applicable Supplement.

## ARTICLE 6

### Section 1. Maintenance of Standards

The Employer agrees, subject to the following provisions, that all conditions of employment in his/her individual operation relating to wages, hours of work, overtime differentials and general working conditions shall be maintained at not less than the highest stan-

26

## Article 6, Section 1

dards in effect at the time of the signing of this Agreement, and the conditions of employment shall be improved whenever specific provisions for improvement are made elsewhere in this Agreement.

**Local Standards**

(a) The Local Unions and the Employer shall, within one hundred eighty (180) days following ratification of this Agreement, identify and reduce to writing, and submit to the appropriate Conference Joint Area Committee, those local standards and conditions practiced under this Article. Those local standards and conditions previously practiced hereunder which are not so submitted shall be deemed to have expired.

The appropriate Conference Joint Area Committee shall, not later than ninety (90) days following ratification, adopt a procedure to consider the disposition of the local standards and conditions submitted including the right to appoint a subcommittee to make recommendations. The Conference Joint Area Committee shall provide to the parties the opportunity to present their views. The Conference Joint Area Committee shall have the sole discretion to determine the disposition of the submitted local standards and conditions which determination shall be final and binding. However, if deadlocked, the matter shall be referred to the National Grievance Committee for decision which shall be final and binding.

**Individual Employer Standards**

(b) Individual Employers may during the life of this Agreement file with the appropriate Conference Joint Area Committee and request review of those individual standards and conditions claimed or practiced under this Article which exceed the provisions of this Agreement and Supplemental Agreements.

The Conference Joint Area Committee shall develop a procedure to review the filing including the right to appoint a subcommittee to make recommendations. The Committee shall make every effort to adjust the matter. If the Committee reaches agreement concerning the disposition of the individual standards or conditions, the decision of the Committee shall be final and binding. However, if deadlocked, the matter shall be referred to the National Grievance Committee for decision which shall be final and binding.

27

ABF 003933

## Article 7, Section 2

thirty (30) days after the date the Local Union receives the grievance.

10. A copy of the grievance committee Rules of Procedure, including the Grievant's Bill of Rights, must be provided, upon request, to the grievant prior to the commencement of the grievance hearing.

## Section 3.

All Local, State and Area Grievance Committees established under Supplemental Agreements shall revise their Rules of Procedure to include the "Grievant's Bill of Rights" set forth in Section 2 above and shall submit their revised Rules of Procedure to the National Grievance Committee for approval no more than ninety (90) days after the effective date of this Agreement. The National Grievance Committee may revise, delete or add to the Rules of Procedure for a Supplemental Grievance Committee in any manner necessary to ensure conformity with the purposes and objectives of the Grievant's Bill of Rights. The decisions of the National Grievance Committee in this regard shall be final and binding.

## Section 4.

Except in cases involving "cardinal" infractions under the applicable Supplemental Agreement, an employee to be discharged or suspended shall be allowed to remain on the job until the discharge or suspension is sustained under the grievance procedure.

## ARTICLE 8.
## NATIONAL GRIEVANCE PROCEDURE

## Section 1.

All grievances or questions of interpretations arising under this National Master Freight Agreement or Supplemental Agreements thereto shall be processed as set forth below. If such Supplemental Agreements provide for arbitration of discharges, such procedure shall be continued.

(a) All factual grievances or questions of interpretation arising under the provisions of the Supplemental Agreement (or factual

## Article 8, Section 1

grievances arising under the National Master Freight Agreement), shall be processed in accordance with the grievance procedure of the applicable Supplemental Agreement.

If upon the completion of the grievance procedure of the Supplemental Agreement the matter is deadlocked, the case shall be immediately forwarded to both the Employer and Union secretaries of the National Grievance Committee, together with all pertinent files, evidence, records and committee transcripts.

Any request for interpretation of the National Master Freight Agreement shall be submitted directly to the Conference Joint Area Committee for the making of a record on the matter, after which it shall be immediately referred to the National Grievance Committee. Such request shall be filed with both the Union and Employer secretaries of the National Grievance Committee with a complete statement of the matter.

All grievances arising under the provisions of the Master Agreement (Articles 1-39) shall be filed directly with the appropriate Conference Joint Area Committee. The Conference Joint Area Committee shall have the authority to render a final and binding decision or direct the grievance to the appropriate lower level committee for hearing if the grievance is not properly claimed under the provisions of the Master Agreement. The Conference Joint Area Committee must hear and decide such cases within ninety (90) days of the filing of the grievance. In the event of a deadlock, the case shall be referred to and heard by the National Grievance Committee. Grievances arising under Article 9-Protection of Rights, Article 29-Substitute Service and Article 32-Subcontracting shall be expeditiously processed and may be heard at either regularly scheduled or specially called hearings. A grievance may be filed by any Area Conference whose members are adversely affected by an alleged violation of Article 32, Section 4(b) occurring within its jurisdiction.

(b) Any matter which has been referred pursuant to Section 1(a) above, or any question concerning the interpretation of the provisions contained in the National Master Freight Agreement, shall be submitted to a permanent National Grievance Committee which shall be composed of an equal number of employer and union representatives. The National Grievance Committee shall meet, on a regular basis, for the disposition of grievances referred to it, or may

ABF 003936

## Article 8, Section 1

meet, at more frequent internals, upon call of the chairman of either the Employer or Union representatives on the National Grievance Committee. The National Grievance Committee shall adopt rules of procedure which may include the reference of disputed matters to subcommittees for investigation and report, with the final decision or approval, however, to be made by the National Grievance Committee. If the National Grievance Committee resolves the dispute by a majority vote of those present and voting, such decisions shall be final and binding upon all parties.

Cases deadlocked by the National Grievance Committee shall be referred to an arbitration panel, as provided in Section 2(b) below. Procedures relating to such referrals shall be included in the Rules of Procedure of the National Grievance Committee.

The Employer may request the co-chairmen of the National Grievance Committee to appoint and convene a joint Employer and Union Committee which shall have the authority to approve uniform dispatch procedures and rules which shall apply to the individual company's over-the-road operations.

No Employer signatory to this Agreement shall be permitted to have its own grievance procedure.

## Section 2.

(a) The National Grievance Committee by majority vote may consider and review all questions of interpretation which may arise under the provisions contained in the National Master Freight Agreement which are submitted by either the National Freight Director or the designated employer representative; and shall have the authority to reverse and set aside the majority interpretation of any area, regional, or local grievance committee or arbitration panel established within the Supplemental Agreements if, in its opinion, such interpretation is contrary to the provisions set forth in the National Master Freight Agreement, in which case the decision of the National Grievance Committee shall be final and binding. A failure by the National Grievance Committee to reach a majority decision on a question concerning interpretation or on a review of a decision by a lower level grievance committee or arbitration panel shall not be considered a deadlock and will not be referred to arbitration. In case of a failure to reach a majority decision in review-

**34**

## Article 8, Section 2

ing the decision of a lower level grievance committee or arbitration panel, the decision of the lower level grievance committee or arbitration panel shall stand as final and binding.

(b) All grievances deadlocked at the Conference Joint Area Committee and the National Grievance Committee shall be subject to arbitration and processed as set forth below.

1. All grievances involving the provisions of the Supplemental Agreements, including discharges or suspensions, which have been deadlocked by the Conference Joint Area Committee, shall be automatically referred to a Conference Arbitration Panel, whose decision shall be final and binding on all parties.

2. The Conference Arbitration Panel shall consist of the Union and Employer co-chairmen of the Conference Joint Area Committee, or their designees, and an impartial arbitrator selected by the co-chairmen. The procedures for the selection of the arbitrator for the Conference Arbitration Panel and the cost of arbitration shall be determined by the Rules of Procedure of the Conference Joint Area Committee.

3. At the arbitration hearing before the Conference Arbitration Panel, the Employer's case will be presented by a full-time employee of the Employer and the Union's case by a full-time employee of the Local Union, and the Rules of Procedure of the Conference Joint Area Committee shall apply.

4. The Conference Arbitration Panel shall issue a "bench decision" at the conclusion of the grievance hearing, unless the Committee's Rules of Procedure provides otherwise in discharge cases. Either party, however, may request a clarification or further explanation of a previous decision rendered by the Conference Arbitration Panel.

5. All grievances involving the Master Agreement (Articles 1-39), which have been deadlocked by the National Grievance Committee, shall be automatically referred to the National Arbitration Panel, whose decision shall be final and binding on all parties.

6. The National Arbitration Panel shall consist of the Union and Employer co-chairmen of the National Grievance Committee, or their designees, and an impartial arbitrator selected by the co-chairmen. The procedures for the selection of the arbitrator for the

**35**

ABF 003937

## Article 8, Section 2

National Arbitration Panel and the cost of arbitration shall be determined by the Rules of Procedure of the National Grievance Committee.

7. At the arbitration hearing before the National Arbitration Panel, the Employer's case will be presented by a full-time employee of the Employer and/or Employer representative on the National Grievance Committee and the Union's case by a designee of the National Freight Director and the Rules of Procedure of the National Grievance Committee shall apply.

8. The National Arbitration Panel shall issue a "bench decision" at the conclusion of the grievance hearing. Either party, however, may request a clarification or further explanation of a previous decision rendered by the National Arbitration Panel.

9. No lawyers will be permitted to present cases at any step of the grievance procedure.

10. The decision of any arbitration panel shall be specifically limited to the matters submitted to it and the panel shall have no authority in any manner to amend, alter or change any provision of the Agreement.

11. If the Employer or Union challenges in court a decision issued by any arbitration panel provided for in this Section, the cost of the challenge, including the court costs and attorneys' fees, shall be paid by the losing party.

12. Where Supplements under the 1991-94 NMPFA provided for arbitration in discharge cases, the procedures for such arbitration shall be maintained under the 1994-98 Agreement.

## Section 3. Work Stoppages

(a) The parties agree that all grievances and questions of interpretation arising from the provisions of this Agreement shall be submitted to the grievance procedure for determination. Accordingly, no work stoppage, slowdown, walkout or lockout shall be deemed to be permitted or authorized by this Agreement except as provided in Section 3(b) below.

A "representation dispute" in circumstances under which the Employer is not required to recognize the Union under this Agreement

## Article 8, Section 3

is not subject to the grievance procedure herein and the provisions of this Article do not apply to such dispute.

(b) In the event an Employer is delinquent in its health & welfare or pension payments in the manner required by the applicable Supplemental Agreement, the Local Union shall have the right to take whatever action it deems necessary until such delinquent payments are made. The Local Union shall give the Employer a seventy-two (72) hour, (excluding Saturdays, Sundays, and holidays), prior written notice of the Local Union's authorization of strike action which notice shall specify the failure to make health & welfare or pension payments providing the basis for such strike authorization. In no event shall the Union have the right to strike over a dispute concerning the eligibility and/or payment of health & welfare or pension contributions by an Employer on behalf of specific individuals, and such disputes shall be subject to the grievance procedure.

## Section 4.

(a) It is mutually agreed that the Local Union will, within two (2) weeks of the date of the signing of this Agreement, serve upon the Employer a written notice listing the Union's authorized representatives who will deal with the Employer, make commitments for the Local Union generally and, in particular, those individuals having the sole authority to act for the Local Union in calling or instituting strikes or any stoppages of work which are not in violation of this Agreement. The Local Union may from time to time amend its listing of authorized representatives by certified mail. The Local Union shall not authorize any work stoppages, slowdown, walkout, or cessation of work in violation of this Agreement. It is further agreed that in all cases of an unauthorized strike, slowdown, walkout, or any unauthorized cessation of work which is in violation of this Agreement the Union shall not be liable for damages resulting from such unauthorized acts of its members.

In the event of a work stoppage, slowdown, walkout or cessation of work, not permitted by the provisions of Article 8, Section 3(a), alleged to be in violation of this Agreement, the Employer shall immediately send a wire to the appropriate Area Conference to determine if such strike, etc., is authorized.

ABF 003938

ABF 003939

## Article 8, Section 4

No strike, slowdown, walkout or cessation of work alleged to be in violation of this Agreement shall be deemed to be authorized unless notification thereof by telegram has been received by the Employer and the Local Union from such Area Conference. If no response is received by the Employer within twenty-four (24) hours after request, excluding Saturdays, Sundays, and holidays, such strike, etc., shall be deemed to be unauthorized by the Area Conference for the purpose of this Agreement.

In the event of such unauthorized work stoppage or picket line, etc., in violation of this Agreement, the Local Union shall immediately make every effort to persuade the employees to commence the full performance of their duties and shall immediately inform the employees that the work stoppage and/or picket line is unauthorized and in violation of this Agreement. The question of whether employees who refuse to work during such unauthorized work stoppages, in violation of this Agreement, or who fail to cross unauthorized picket lines at their Employer's premises, shall be considered as participating in an unauthorized work stoppage in violation of this Agreement may be submitted to the grievance procedure, but not the amount of suspension herein referred to.

It is specifically understood and agreed that the Employer during the first twenty-four (24)-hour period of such unauthorized work stoppage in violation of this Agreement, shall have the sole and complete right of reasonable discipline, including suspension from employment, up to and including thirty (30) days, but short of discharge, and such employees shall not be entitled to or have any recourse to the grievance procedure. In addition, it is agreed between the parties that if any employee repeats any such unauthorized strike, etc., in violation of this Agreement, during the term of this Agreement, the Employer shall have the right to further discipline or discharge such employee without recourse for such repetition. After the first twenty-four (24)-hour period of an unauthorized stoppage in violation of this Agreement, and if such stoppage continues, the Employer shall have the sole and complete right to immediately further discipline or discharge any employee participating in any unauthorized strike, slowdown, walkout, or any other cessation of work in violation of this Agreement, and such employees shall not be entitled to or have any recourse to the grievance procedure. The suspension or discharge herein referred to shall be uniformly applied

## Article 8, Section 4

to all employees participating in such unauthorized activity. The Employer shall have the sole right to schedule the employee's period of suspension.

The International Brotherhood of Teamsters, the Teamsters National Freight Industry Negotiating Committee, Area Conferences, Joint Councils and Local Unions shall make immediate efforts to terminate any strike or stoppage of work as aforesaid which is not authorized by such organizations, without assuming liability therefor. For and in consideration of the agreement of the International Brotherhood of Teamsters, Teamsters National Freight Industry Negotiating Committee, Area Conferences, Joint Councils and Local Unions affiliated with the International Brotherhood of Teamsters to make the aforesaid efforts to require Local Unions and their members to comply with the law or the provisions of this Agreement, including the provisions limiting strikes or work stoppages, as aforesaid, the Associations and Employers who are parties hereto agree that they will not hold the International Brotherhood of Teamsters, the Teamsters National Freight Industry Negotiating Committee, Area Conferences, Joint Councils and Local Unions liable or sue them in any court or before any administrative tribunal for undertaking such efforts to terminate unauthorized strikes or stoppages of work as aforesaid or for undertaking such efforts to require Local Unions and their members to comply with the law or the provisions of this Agreement, or for taking no further steps to require them to do so. It is further agreed that signator Associations and Employers will not hold the International Brotherhood of Teamsters, Teamsters National Freight Industry Negotiating Committee, Area Conferences, Joint Councils or Local Unions liable or sue them in any court or before any administrative tribunal for such unauthorized work stoppages alleging condonation, ratification or assumption of liability for undertaking such efforts to terminate strikes or stoppages of work, or requiring Local Unions and their members to comply with the law or the provisions of this Agreement.

The provisions of this Article shall continue to apply during that period of time between the expiration of this Agreement and the conclusion of the negotiations or the effective date of the successor Agreement, whichever occurs later, except as provided in Article 39. It is understood and agreed that failure by the International Brotherhood of Teamsters, Teamsters National Freight Industry

# Article 8, Section 4

Negotiating Committee, Area Conferences and/or Joint Councils to authorize a strike by a Local Union shall not relieve such Local Union of liability for a strike authorized by it and which is in violation of this Agreement.

(b) The question of whether the International Union, Teamsters National Freight Industry Negotiating Committee, an Area Conference, Joint Council or Local Union have met its obligation set forth in the immediately preceding paragraphs, or the question of whether the International Union, Teamsters National Freight Industry Negotiating Committee, an Area Conference, Joint Council or the Local Union, separately or jointly, participated in an unauthorized work stoppage, slowdown, walkout or cessation of work in violation of this Agreement by calling, encouraging, assisting or aiding such work stoppage, etc., in violation of this Agreement, or the question of whether an authorized strike provided by Article 8, Section 3(b) is in violation of this Agreement, or whether an Employer engaged in a lockout in violation of this Agreement, shall be submitted to the grievance procedure at the national level, prior to the institution of any damage suit action. When requested, the co-chairmen of the National Grievance Committee shall immediately appoint a subcommittee to develop a record by collecting evidence and hearing testimony, if any, on the questions of whether the International Union, Teamsters National Freight Industry Negotiating Committee, an Area Conference, Joint Council or Local Union have met its obligations as aforesaid, or of Union participation or Employer lockout in violation of this Agreement. The record shall be immediately forwarded to the National Grievance Committee for decision. If a decision is not rendered within thirty (30) days after the co-chairmen have convened the National Grievance Committee, the matter shall be considered deadlocked.

A majority decision of the National Grievance Committee on the questions presented as aforesaid shall be final and binding on all parties. If such majority decision is rendered in favor of one (1) or more of the Union entities, or the Employer, in the case of lockout, no damage suit proceedings on the issues set forth in this Article shall be instituted against such Union entity or such Employer. If, however, the National Grievance Committee is deadlocked on the issues referred to in this subsection 4(b), the issues must be referred to the National Arbitration Panel for resolution prior to either party

# Article 8, Section 4

instituting damage suit proceedings. If the National Arbitration Panel decides that a strike was unlawful, it shall not have the authority to assess damages. Except as provided in this subsection 4(b), agreement to utilize this procedure shall not thereafter in any way limit or constitute a waiver of the right of the Employer or Union to commence damage suit action. However, the use of evidence in this procedure shall not waive the right of the Employer or Union to use such evidence in any litigation relating to the strike or lockout, etc., in violation of this Agreement. There shall not be any strike, slowdown, walkout, cessation of work or lockout as a result of a deadlock of the National Grievance Committee on the questions referred to under this subsection 4(b) and any such activity shall be considered a violation of this Agreement.

(c) In the event that an Employer, party to this Agreement, commences legal proceedings against the Union after the Union's compliance with the provisions of Article 8, Section 3(b), the Employer Associations will cooperate in the presentation to the court of the applicable majority grievance committee decision.

(d) Nothing herein shall prevent the Employer or Union from securing remedies granted by law except as specifically set forth in subsection 4(b).

## Section 5.

(a) In the event of strikes, work stoppages, or other activities authorized by Article 8, Section 3(b) of this Agreement, no interpretation of this Agreement or any Supplement thereto relating to the Employer's obligation to make health & welfare and/or pension contributions by any tribunal shall be binding upon the Union or affect the legality or lawfulness of the strikes unless the Union stipulates to be bound by such interpretation, it being the intention of the parties to resolve all questions of interpretation by mutual agreement.

(b) It is the intention of the parties to resolve all grievances and requests for interpretation arising under this Agreement through the grievance procedure. However, it is understood and agreed that nothing herein shall prevent the Employer or Union from securing remedies in those circumstances where the application of this Agreement is contrary to law.

ABF 003940

# Article 8, Section 6

## Section 6.   Change of Operations

## Change of Operations Committee

(a) Present terminals, breaking points or domiciles shall not be transferred, changed or modified without the approval of an appropriate Change of Operations Committee. Such Committee shall be appointed in each of the Conference Areas, equally composed of Employer and Union representatives. The Change of Operations Committee shall have the authority to determine the seniority of the employees affected and such determination shall be final and binding.

In the event a proposed change of operations includes the establishment of either a new or satellite terminal as a "combination" facility with a common city driver and dock seniority roster, when such change of operations results in the relocation or movement of city drivers and dock employees from an existing terminal recognizing separate (split) seniority rosters for city drivers and dock employees, the Change of Operations Committee shall have the authority to determine the conditions under which such a combination facility may be established, including but not limited to, the number of city drivers and dock employees who qualify, be allowed to follow the work to the new or satellite combination terminal, the implementation of training programs to qualify dock employees as city drivers and the seniority right of affected employees to either return to the "mother" terminal and/or claim additional driving positions at the satellite terminal within reasonable time periods following the establishment of such combination terminal, as determined by the Committee. Existing terminals that recognize separate city driver and dock seniority rosters (split terminals) shall not be a majority of those affected employees agree to such conversion, in which case the Change of Operations Committee shall have the authority to determine the conditions under which such conversion shall be implemented.

Such Committee, however, shall observe the Employer's right to designate domiciles and the operational requirements of the business. Where the Union raises the question as to whether or not certain proposed runs of excessive length can be made, the Employer must be prepared to submit objective evidence including DOT certifica-

42

# Article 8, Section 6

tion or logs and tapes that such runs have been tested and were made within the DOT hours of service regulations. Individual employees shall not be redomiciled more than once during the term of this Agreement as the result of an approved change of operations unless a merger, purchase, sale, acquisition or consolidation of employers is involved, or unless there is proven economic need as determined by the Change of Operations Committee based on factual evidence presented.

Pension and health & welfare contributions paid on behalf of a redomiciled employee shall be paid to the Funds to which the contributions were made prior to the employee's change of domicile, and the decisions of the Change of Operations Committee shall so specify. This Section does not apply to employees who voluntarily transfer to new domiciles, unless such transfer is a result of a Change of Operations Committee decision. Any dispute concerning the appropriate fund for an Employer's contribution on behalf of a redomiciled employee, pursuant to a Change of Operations Committee decision, shall be referred to the National Grievance Committee. The decision of the National Grievance Committee shall to the extent permitted by law, be final and binding on all affected parties, including the Trust Funds.

The Change of Operations Committee shall also have jurisdiction for a period of twelve (12) months following the opening of a new terminal to consider the redomicile of employees who are laid off as a direct result of such opening of a terminal. The Committee shall also have jurisdiction over the closing of a terminal in regard to seniority, as well as to determine the conditions under which freight may or may not be interlined into the area of a vacated operations when necessary to retain major customers, including mandating the use of union carriers where available. In no event will the Employer be granted the authority to vacate a facility and interline the freight on a non-union subsidiary of the parent company.

The above shall not apply within a twenty-five (25)-mile radius.

## Change of Operations Committee Procedure

(b) The National Grievance Committee shall adopt Rules of Procedure concerning the application and administration of this Article.

43

ABF 003941

## Article 8, Section 6

The Employer shall notify all affected Local Unions of the proposed change of operations at least twenty (20) calendar days prior to the hearing at the Conference Joint Area Committee, and the Employer and the Local Unions involved shall have a mutual responsibility to inform the employees subject to redomicile prior to such hearing in accordance with the practice and procedures agreed to in the respective Area Committee. Any exception or waiver of the afore-said twenty (20) day period shall be mutually agreed to between the Employer and the Local Unions involved and approved by the Conference Area Change of Operations Committee.

## Moving Expenses

(c) Where an employee is required to transfer to another domicile in order to follow employment as a result of a change of operations, the Employer shall move the employee and assume the responsibility for proven loss or damage to household goods due to such move, including insurance against loss or damage. Should any employee possess household items of unusual or extraordinary value which will be included in the move, such items shall be declared and an appraised value determined prior to the move. The Employer shall provide packing materials for the employee's household goods when requested or at the employee's request, pay all costs and expenses of moving such household goods, including packing.

The Employer shall pay reasonable expenses to demount and remount an employee's mobile home, if used as his/her residence and in such instance shall pay normal expenses to move such mobile home, including the use of other modes of transportation where required by law.

An employee shall have a maximum of one (1) year to move in accordance with the provisions of an approved change of operations unless, prior to the expiration of such year, he/she requests, in writing, an extension for a reasonable period of time due to an unusual or special problem. The Employer shall provide lodging for the employee at the point of redomicile, not to exceed ninety (90) calendar days, and in addition, shall reimburse the employee twenty-nine cents (29¢) per mile to transport one (1) personal automobile to the new location.

44

## Article 8, Section 6

The Employer shall not be responsible for moving expenses if the employee changes his/her residence as a result of voluntary transfer.

None of the Employer obligations set forth in this Subsection (c)-Moving Expenses shall apply to transfers of domiciles within a fifty (50)-mile radius.

## Change of Operations Seniority

(d) The Change of Operations Committee established herein shall have the sole authority to determine questions of the application of seniority in those situations presented to it and in connection therewith the following general rules shall apply, subject, however, to modification as provided by Section 6(g) below:

## Closing, Partial Closing of Terminals-Transfer of Work

(1)a. When branches, terminals, divisions or operations (hereinafter "terminal(s)") are closed or partially closed and the work of such terminal(s) is transferred, in whole or in part, to another terminal(s), the active employees (excluding those employees on letter of layoff) at the closed or partially closed terminal(s) shall have the right to bid into a master seniority roster (road or city) comprised of bidders from the active seniority rosters of closed or partially closed terminal(s) in the order of their continuous classification (road or city) seniority. Continuous classification seniority shall be defined as that seniority which the employee is currently exercising and has not been broken in the manner provided by Article 5, Section 1, or by voluntary changes in domicile not directed, approved or ordered by a Change of Operations Committee. Employees shall bid from the combined master seniority roster into openings at the terminal(s) into which work is being transferred. Employees so transferring shall be "dovetailed" into the appropriate active seniority roster at the new terminal(s) in the order of their continuous classification seniority. Such transfers shall be permitted prior to the recall of laid-off employees at such gaining terminal(s). If and when additional employees are required in excess of those who formed the combined active roster at the point of redomicile, employees on letter of layoff at that location shall be

45

ABF 003942

## Article 8, Section 6

recalled. If recalled, such employees shall be "dovetailed" with their continuous classification seniority.

In addition, the inactive seniority rosters (employees who are on letter of layoff) at the terminal(s) from which employees are being redomiciled shall be "dovetailed" into a master "laid off" seniority roster and such employees shall have the same opportunities to transfer to terminal(s) within the area of the Supplemental Agreement which are afforded to employees covered by the provisions of subparagraph 2(b) below.

b. The following seniority bidding procedures are to be applied in all change of operations cases that involve master pool bidding.

1. The Change of Operations Committee shall have the authority to establish a date for purposes of determining active and inactive (on letter of layoff or the equivalent thereof) employees at both gaining and losing locations.

2. Affected employees at losing locations shall be allowed to bid onto an active master pool seniority list on a dovetailed seniority basis.

3. At the time of the original bid, an employee on the active master pool seniority list shall be afforded the opportunity to bid any available position for which he/she is qualified at a gaining location in accordance with his/her seniority on the master pool seniority list. In the event the active employees at any given location elect not to bid the number of positions being lost at that particular location, inactive employees at that location, in accordance with their seniority, shall then be afforded the opportunity to bid as an active employee until the number of positions being lost at that particular location are filled. An employee who elects to "hold" as set forth in paragraph 4 below shall not be considered as filling a losing position. A successful bidder shall be dovetailed on the seniority list at the location he/she bids into. The number of successful bidders from any losing location shall not exceed, at the time of the original bid, the number of positions lost at that location as approved by the Change of Operations Committee.

4. An employee on the active master pool seniority list who does not have seniority to bid the location he/she desires in the initial bid may remain at his/her present domicile in such status as his/her

## Article 8, Section 6

bidding seniority will allow. Should an opening occur during the window period at the location to which he/she desired to transfer, he/she shall be afforded transfer opportunity in line with his/her bidding seniority. A successful bidder under this provision shall be dovetailed on the applicable seniority list at the location into which he/she bids and his/her moving expenses shall be paid in accordance with other transferring employees. The transfer provisions of this Section shall apply only during the window period.

5. An employee who elects to hold as set forth in Paragraph 4 above may hold for only one (1) location and must designate that location at the time of the original bid and may hold only for a position within the classification the employee has seniority to bid. If an employee refuses to accept an opportunity to claim a position he/she is holding for, the employee shall have no further claim to a position that may become available during the window period.

6. An employee who elects to hold, shall also be entitled to exercise seniority to claim a voluntary move under the provisions of Article 5, Section 5 herein, and in the event the employee accepts such a voluntary move, he/she shall retain his/her hold position at his/her home domicile during the remainder of the window period but shall forfeit any other seniority rights at his/her home domicile. Should a position become available at the location such employee is holding for and which the employee has seniority to successfully claim, moving expenses set forth in Article 8, Section 6(c) shall be computed from the employees original home domicile.

7. There shall not be less than a one hundred and twenty (120) day window period in all change of operations involving master pool bidding; provided, however, the Change of Operations Committee may extend the window period beyond one hundred and twenty (120) days when the circumstances involved justify a longer period of time.

## Closing of Terminals-Elimination of Work

(2)a. When a terminal(s) is closed and the work of such terminal(s) is eliminated, an employee who was formerly employed at another terminal shall have the right to return to such former terminal and exercise his/her continuous classification (road or city)

47

46

ABF 003943

seniority, provided he/she has not been away from such former terminal for more than a five (5)-year period.

## Layoff

b. When a terminal(s) is closed and the work of such terminal(s) is eliminated, employees who are laid-off thereby shall be given first (1st) opportunity for available regular employment at any other terminal(s) of the Employer within the area of the Supplemental Agreement where such employee was employed. The obligation to offer such employment shall continue for a period of five (5) years from the date of closing. However, the Employer shall not be required to make more than one (1) offer during this period. Any employee accepting such offer shall pay his/her own moving expenses. If hired, he/she shall go to the bottom of the seniority board for bidding and layoff purposes, but shall retain company seniority for fringe benefits only.

## Opening of Terminals

(3) When a new terminal(s) is opened (except as a replacement for existing operations or a new division in a locality where there are existing operations), the Employer shall offer to those employees, if any, affected thereby the opportunity to transfer to regular positions in the new terminal(s) in the order of such employee's continuous classification (road or city) seniority date as defined herein. Upon arrival at such new location, such employees shall be "dovetailed" with their continuous classification (road or city) seniority date together with other employees so transferring.

This provision is not intended to cover situations where there is replacement of an existing operation or where a new division is opened in a locality where there is an existing terminal. In these latter situations, those employees laid off at the existing facilities shall have first (1st) opportunity for employment at the new operation in accordance with their continuous classification (road or city) seniority date, and upon arrival shall be similarly "dovetailed." If all regular full-time positions are not filled in this manner, then the provisions of the preceding paragraph shall apply.

(4) When a Company which has an established Local Cartage Operation, which has been cleared by system OTR drivers, seeks to

establish a new OTR domicile there, the Company shall first file for a Change of Operations giving transfer opportunity, with regard to the initial complement, to OTR drivers from those system OTR domiciles that previously serviced such Local Cartage Operation with reasonable regularity. Such transfer opportunity shall remain in effect for any additions to the initial complement for a period of not less than 120 calendar days, after which further additions to such complement shall be hired at the locality where such new OTR domicile was established.

(5) Any employee redomiciled by an approved change of operations or voluntary transfer to another domicile shall upon reporting to such new domicile be deemed to have relinquished his/her right to return, with seniority, to the domicile from which he/she was transferred, except under another approved change of operations. Employees who avail themselves of the transfer privileges because they are on layoff at their original terminal may exercise their seniority rights if work becomes available at their original terminal during the five (5)-year layoff period allowed them at their original terminal.

## Definition of Terms

(e) The term "continuous classification seniority" as used in this Agreement is defined as that seniority which the employee is currently exercising and has not been broken in the manner provided in Article 5, Section 1, or by voluntary changes in domicile not directed, approved or ordered by a Change of Operations Committee.

## Qualifications

(f) In all transfers referred to in this Section, the employee must be qualified to perform the job by experience in the classification. If a driver test is required, such test shall be given by a qualified driver-supervisor or driver.

## Intent of Parties

(g) The parties acknowledge that the above rules are intended solely as general standards and further that many factual situations will be presented which necessitate different application, modification or amendment. Accordingly, the parties acknowledge that

49

ABF 003944

## Article 8, Section 6

questions of the application of seniority rights may arise which require different treatment and it is anticipated and understood that the Employers and Unions jointly involved and/or the respective grievance committees may mutually agree to such disposition of questions of seniority which in their judgment is appropriate under the circumstances.

The Change of Operations Committees, as provided herein or in the Supplemental Agreements, shall have the authority to determine the application of seniority in those situations presented to them. In all cases, the seniority decisions of the Joint Committees, including the Change of Operations Committees and subcommittees established by the National Master Freight Agreement and the respective Supplemental Agreements, shall be final and binding.

## Section 7.

All local, area and national grievance committees as constituted under this Agreement shall have the jurisdiction and power to decide grievances which arose under the preceding agreements and supplements thereto, applying, however, the contract under the grievance arose.

## ARTICLE 9.
## PROTECTION OF RIGHTS

### Section 1.  Picket Lines: Sympathetic Action

It shall not be a violation of this Agreement, and it shall not be cause for discharge, disciplinary action or permanent replacement in the event an employee refuses to enter upon any property involved in a primary labor dispute, or refuses to go through or work behind any primary picket line, including the primary picket line of Unions party to this Agreement, and including primary picket lines at the Employer's places of business.

### Section 2.  Struck Goods

It shall not be a violation of this Agreement and it shall not be cause for discharge, disciplinary action or permanent replacement if any employee refuses to perform any service which his/her Employer

50

## Article 9, Section 2

undertakes to perform as an ally of an Employer or person whose employees are on strike and which service, but for such strikes, would be performed by the employees of the Employer or person on strike.

### Section 3.

Subject to Article 32. Subcontracting, hereof, the Employer agrees that it will not cease or refrain from handling, using, transporting, or otherwise dealing in any of the products of any other Employer or cease doing business with any other person, or fail in any obligation imposed by the Motor Carriers Act or other applicable law, as a result of individual employees exercising their rights under this Agreement or under law, but the Employer shall, notwithstanding any other provision in this Agreement, when necessary, continue doing such business, including pickup or delivery to or from the Employer's terminal and to or from the premises of a shipper or consignee.

### Section 4.

The layover provision of the applicable Supplemental Agreement shall apply when the Employer knowingly dispatches a road driver to a terminal at which a primary picket line has been posted as a result of the exhaustion of the grievance procedure, or after proper notification of a picket line permitted by the collective bargaining agreement, or economic strikes occurring after the expiration of collective bargaining agreements, or to achieve a collective bargaining agreement. In such event and upon his/her request, a driver shall be provided first class public transportation to his/her home terminal, plus be paid a minimum of eight (8) hours or actual time spent while returning, whichever is greater.  The Employer shall determine the mode of transportation to be utilized.

51

ABF 003945

## Article 42, Section 4

against layoff to the most senior employee by classification (not shift), designated a steward by the Local Union.

When an employee has not been offered work opportunity for a period of three (3) consecutive weeks he/she shall be considered as laid off.

When laid off employees are used three (3) days per week for four (4) consecutive weeks, the senior laid off employee shall be recalled.

In the event of recall, the employees shall be given notice of recall by telegram, registered or certified mail, sent to the address last given the Employer by the employee. Within three (3) calendar days after tender of delivery of the Employer's notice, the employee must notify the Employer by telephone, telegram, registered letter, certified mail, of his/her intent to return to work and must actually report to work within seven (7) calendar days. In the event an employee is unable to report within the seven (7) calendar days, but notified the Company of his/her intent to return to work and gives them a reasonable time that he/she will report, said employees will not lose their seniority status. In the event the employee fails to comply with the above provisions, he/she shall lose all seniority rights under this Agreement and shall be considered as a voluntary quit.

## Section 5.

The Local Union Representative and the Employer shall mutually agree, in writing, on circumstances under which persons who leave the classification of work covered by this Agreement, but remain in the employ of the Employer in some other capacity, may retain seniority rights upon their return to their original unit. In the absence of such written agreement, such employee shall lose all seniority rights upon leaving.

144

## ARTICLE 43 - GRIEVANCE PROCEDURE

NOTE: The Local Union may waive the Joint Local City Grievance Committee, as hereafter described, for the life of this Agreement by submitting written request to the Secretary of the Joint Area Grievance Committee. Local Unions who waive the Joint Local City Grievance procedure may have cases of continuing liability submitted to the Secretary for scheduling between the regular meetings of the Joint Area Grievance Committee. The panel for the special hearings will consist of three (3) representatives for the Employer and/or Employer Association, where applicable and three (3) representatives for the Local Unions.

## Section 1. - Joint Local City Grievance Committee

(a) For the purpose of settling grievances and disputes which may arise under this Agreement between the parties hereto, each Local Union shall establish a Grievance Committee, consisting of two (2) persons; and the Employer and/or Employer Association, where applicable, operating within the jurisdiction of each Local Union, shall also establish a Grievance Committee consisting of two (2) persons. The Grievance Committees of the Union and of the Employer and/or Employer Association, where applicable shall be constituted as the Joint Local City Grievance Committee and shall conduct their meetings within the framework of the "Rules of Procedure" as adopted by the Joint Area Grievance Committee. If the Joint Local City Grievance Committee demonstrates an inability to act within the framework of the Joint Area Grievance Committee "Rules of Procedure", such Joint Local Grievance Committee shall be subject to specific rules of procedure as adopted by the Joint Area Grievance Committee. The expenses incurred by the Joint Local City Grievance Committee shall be borne equally by the Union and Employer and/or Employer Association, where applicable.

145

ABF 003992

## Article 43, Section 1

(b) It is agreed that in the handling of grievances before a Joint Local City Grievance Committee, the parties to the grievances in issue, including the employee filing the grievance, another employee of the same Employer or a representative of the Employer, are prohibited from serving as Committee members.

(c) Employees initiating grievances shall set forth their claim, in writing, to the Employer with a duplicate copy to the steward and/or the Union Representative within seven (7) calendar days after he/she returns to his/her home terminal or seven (7) calendar days from the occurrence of the matter. In the event the employee fails to comply with these provisions of paragraph (c) the grievance shall be considered untimely, thereby waiving his/her rights under the provisions of Article 43. The Union shall, in it's sole discretion and judgment, determine whether grievances initiated by employees have sufficient merit to justify their submission through the grievance procedure established herein. The Union Representative or steward shall first endeavor to settle the matter by direct negotiations with the Employer, failure to resolve the matter, the grievance shall be submitted to the Joint Local City Grievance Committee within thirty (30) days of the date of the grievance.

In the event more than one employee initiates a grievance, all employees shall be named in the grievance. In cases of monetary claims, each named employee shall set forth his/her specific claim in the grievance.

(d) The Union may initiate grievances by setting forth its claim in writing, signed by a Union representative and filing the same with the Employer within ten (10) calendar days from the date of the occurrence of the matter. In the event the Union fails to comply with these provisions of paragraph (d) the grievance shall be considered untimely, thereby waiving their rights under the provisions of Article 43. The Union shall have the right to file and

## Article 43, Section 1

obtain adjustment of a grievance, notwithstanding the fact that it was or could have been the subject of an employee's grievance which was not filed by an employee.

(e) The Employer may initiate grievances by setting forth his/her claim, in writing, signed by an authorized representative and filing the same with the Union within ten (10) calendar days from the date of the occurrence of the matter.

In the event the Employer fails to comply with those provisions of paragraph (e) the grievance shall be considered untimely, thereby waiving their rights under the provisions of Article 43. The rights and privileges of the Employer under this paragraph shall be the same as the rights and privileges of the Union under paragraph (d) hereof.

(f) The parties shall attempt to meet and settle a grievance within a period of seven (7) days from the date of filing of the grievance. Should the parties to any grievance be unable to settle, resolve or adjust the matter within the period prescribed above, or any extended period, which shall have been agreed upon between the Union and the Employer, then either the Union or the Employer shall have the right to submit the grievance to the Joint Local City Grievance Committee.

A Joint Local City Grievance Committee shall have the jurisdiction of all grievances referred to it, except as set forth in paragraph (g) hereof. The majority decision of the Committee shall be final and binding on all parties, with no further appeal.

(g) The Joint Local City Grievance Committees shall not have jurisdiction over or authority to decide any grievance which,

    (i) involves a discharge, the uniform construction, application, operation or interpretation of this Agreement,

ABF 003993

Article 43, Section 1

(ii) pertains to a matter, the decision as to which would involve more than one Local Union, a party to this Agreement

(iii) involves claims for delinquent contributions to Health and Welfare Funds (Article 49) and/or Pension Fund (Article 50). Such claims shall be heard and resolved as provided in Section 5.

Grievances which are within the scope of (i), (ii) or (iii) above shall be referred to and decided by the Joint Area Grievance Committee. A decision and an award by a Joint Local City Grievance Committee which is within the scope of (i), (ii) or (iii) above shall be null and void.

The Joint Area Grievance Committee shall hear and decide a grievance when any party hereto contends:

1. the Joint Local City Grievance Committee has no jurisdiction or authority to hear and decide a matter because it is within the scope of (i), (ii) or (iii) above;

2. a decision and an award of a Joint Local City Grievance Committee is null and void because the issue decided is within the scope of (i), (ii) and (iii) above.

(h) When a majority of a Joint Local City Grievance Committee fails to reach a decision or agree upon a settlement the matter shall be submitted to the Secretary of the Joint Area Grievance Committee.

### Section 2. - Joint Area Grievance Committee

(a) The Joint Area Grievance Committee shall be composed of the representatives of the Employer and/or Employer Association, where applicable and the representative or alternate from each of the Local Union Nos. 229, 401, 429, 430, 764, 771, 773, 776. The expenses incurred by the Joint Area Grievance Committee shall be borne equally by all the Local Union, Employer and/or

148

Article 43, Section 2

Employer Association, where applicable, members who are parties to this Agreement. This Section may be modified by the Committee's Rules of Procedure.

(b) The efficient operation of the Committee including those matters related to but not limited to the selection and duties of the Secretary, the preparation of the agenda, the scheduling and hearing of cases and the expenses of the Committee shall be governed by the Committee "Rules of Procedure".

The Secretary, if not a member of the Joint Area Grievance Committee, shall have no voice in making decisions and shall perform only the duties assigned to him/her by the Joint Area Grievance Committee.

The Secretary shall attend the meetings to prepare and keep the minutes and provide copies of the minutes to the members of the Committee and shall also provide copies of the decisions of the Joint Area Grievance Committee to all Employer and/or Employer Association, where applicable, members and Local Unions who are party to cases heard.

(c) A grievance to be heard by the Joint Area Grievance Committee must be in writing and submitted to the Secretary on the agreed-to-submission forms seven (7) days prior to the meeting of the Joint Area Grievance Committee. It is agreed there shall always be equal representatives of the Local Unions and Employer and/or Employer Association, where applicable, members on the Joint Area Grievance Committee and the decision of the majority of the Committee members present at the meeting shall be final and binding on all parties with no further appeal.

(d) It is understood and agreed the Employer and the Local Union involved in a proceeding before the Committee will be ineligible to act as a member of the Joint Area Grievance Committee during that proceeding.

149

ABF 003994

**Article 43, Section 2**

(e) When the Joint Area Grievance Committee fails to reach a majority decision, the case shall be considered deadlocked and referred to the Eastern Conference Joint Area Committee.

Discharge cases which have been deadlocked by the Eastern Conference Joint Area Committee, shall be referred back to the Central Pennsylvania Negotiating Committee for resolution. Failure of the Central Pennsylvania Negotiating Committee to resolve the issue, it shall be submitted to final and binding arbitration as set forth in the Central Pennsylvania Joint Area Grievance Committee Rules of Procedure.

(f) A pay award of the Grievance Committee referred to above, or a pay claim resolved between the Local Union and the Employer, shall be paid no later than the 2nd regular pay day after the Employer has received notice of the decision and award from the Grievance Committee, or agreed to such pay claim settlement in writing. Consistent abuse of this provision may subject the Employer to penalty pay.

The term "regular pay day" means the next regular pay day for the week in which the Employer receives notice of the decision and award from the Committee.

(g) Questions involving interpretations of this Agreement will be referred to the Negotiating Committee for a decision.

(h) Changes of Operation involving Local Unions bound by the terms and provisions of this Agreement will be filed directly with the Central Pennsylvania Joint Area Grievance Committee.

**Section 3. – Examination of Records**

The Local Union, Joint Local City Grievance Committee or Joint Area Grievance Committee shall have the right to examine time sheets and any other records pertaining to the computation of

150

**Article 43, Section 3**

compensation of any individual or individuals whose pay is in dispute or records pertaining to a specific grievance.

**Section 4. – Right to Institute Legal Proceedings**

Nothing herein shall prohibit legal proceedings by any party hereto for a breach of the provisions of Article 53, Strikes and Lockouts.

**Section 5. – Claim for Delinquent Contributions to Health and Welfare and Pension Funds**

It is agreed that in the event any Employer is delinquent at the end of a period in the payment of his/her contribution to the Health and Welfare Fund and/or Pension Fund, created under this Agreement, in accordance with the rules and regulations of the Trustees of such Funds, and after the proper official of the Local Union has given seventy-two (72) hours' notice, excluding Saturday, Sunday, and holidays, to the Employer of such delinquency in Health and Welfare or Pension Fund payments, the employees or their representatives shall have the right to take such action as may be necessary until such delinquent payments are made, and it is further agreed that in the event such action is taken, the Employer shall be responsible to the employees for losses resulting therefrom. Action for delinquent contributions may be instituted by either the Local Union, or the Conference.

Any delinquent Employer must also pay all attorney's fees and costs of collection.

**Section 6. – National Grievance Committee**

All questions of interpretation involving any Article in the National Master Agreement not specifically covered in this Agreement shall be promptly referred to the National Grievance Committee by the Joint Area Grievance Committee.

151

ABF 003995

Ex. 4

## In The Matter Of:

*ABF FREIGHT SYSTEM-MULTI-CHANGE OF OPERATIONS*
*CAROLINA FREIGHT AND RED ARROW FREIGHT*

---

*September 14, 1995*

---

*Cochran Pudlo & Kozlowski, Ltd.*
*312 W. Randolph Street*
*Suite 444*
*Chicago, IL  60606*
*(312) 236-8461*

*Original File abf1.asc, 340 Pages*
*Min-U-Script® File ID: 0041758563*

## Word Index available for this Min-U-Script®

Page 648

[1] terminal if and when future job opportunities become
[2] available. It is our position that these Carlisle
[3] employees should be offered work before any other
[4] Carolina employee at any other terminal active or
[5] inactive and us other employees are following work
[6] to Carlisle, which is not the case. These laid off
[7] Carolina and Carlisle employees should maintain
[8] seniority for rate of pay and fringe benefits, and I
[9] said earlier they should be endtailed.
[10]    CHAIRMAN BUSALACCHI: Yes, you did.
[11]    MR. SHUGHART: And I heard some discussion
[12] earlier about the Carolina employees whether they
[13] had the opportunity to follow work somewhere. in my
[14] opinion I don't think that's really relevant. They
[15] were laid off. Whether they had an opportunity to
[16] follow work under a prior Carolina change isn't an
[17] issue. They had the right to take the layoff if
[18] they show chose for whatever reason. I talked with
[19] one gentlemen who had a crippled son and he had his
[20] house all redone to accommodate his handicap, and he
[21] was just in no position to move so he took the
[22] layoff. And these people should have the recall
[23] rights for five years regardless of whether or not
[24] they had an opportunity to follow work.

Page 649

[1]    So to go back and recap a little bit, we
[2] think that the ABF, Carlisle, and Camp Hill
[3] employees are entitled to follow work. Secondly, we
[4] think that any Carolina employee offered work as a
[5] result of this change and/or a future change of
[6] operations should be merged into the Carolina
[7] seniority, should merged onto a list by Carlisle
[8] seniority date and placed at the bottom of the ABF
[9] Carlisle seniority list after current ABF employees.
[10] Thirdly, we think that the five-year recall rights
[11] of the laid off Carolina employees should be
[12] respected. The laid off Carolina employees at
[13] Carlisle should have the first opportunity to select
[14] work opportunity at the ABF Carlisle and Camp Hill
[15] terminals for five years from the date of layoff as
[16] provided by Article 8,6(b) and that seniority would
[17] be entailed after current ABF employees.
[18]    We also have some office employees who
[19] previously worked at Carolina who were laid off and,
[20] I would like to ask the company what their position
[21] would be on them.
[22]    CHAIRMAN BUSALACCHI: Company?
[23]    MR. LITTLE: The company's office force in
[24] Carlisle at present is sufficient to meet he meet

Page 650

[1] the needs of the office in Carlisle based on the
[2] reduction of the numbers that we have in employees
[3] there. certainly the offices force is sufficient.
[4]    MR. SHUGHART: Will there be any offer of
[5] future work?
[6]    MR. LITTLE: The employees who you refer to
[7] certainly would have equal opportunity with other
[8] applicants at ABF.
[9]    CHAIRMAN BUSALACCHI: Well, wait a minute
[10] now. Are you telling me that there's laid off
[11] Carolina office people?
[12]    MR. SHUGHART: That's correct, from a prior
[13] Carolina change.
[14]    CHAIRMAN BUSALACCHI: But they're laid off,
[15] and now if you have office work becomes available,
[16] your question is will you offer it to those Carolina
[17] people?
[18]    MR. SHUGHART: That's correct.
[19]    MR. LITTLE: And I think I answered the
[20] question.
[21]    CHAIRMAN BUSALACCHI: Well, you did, but
[22] you said you would consider them along with new
[23] hires.
[24]    MR. LITTLE: In line of their – and first

Page 651

[1] of all, Mr. Chairman, he's talking about office
[2] employees, I presume, and I don't even know what
[3] contract because they were laid off previously.
[4]    CHAIRMAN BUSALACCHI: I don't either. I
[5] don't know.
[6]    MR. SHUGHART: Central Pennsylvania.
[7]    MR. LITTLE: All right. And, of course,
[8] that issue would be that if we need additional
[9] office personnel in line with that we would offer
[10] them in line of seniority and qualifications
[11] opportunity to come over to ABF's office in that
[12] environment.
[13]    MR. SHUGHART: We would ask them to give
[14] them job preference for the first opportunity to
[15] work.
[16]    CHAIRMAN BUSALACCHI: Well, I think that's
[17] basically what he's saying.
[18]    MR. SHUGHART: We might also point out to
[19] the committee that we have the shop, ABF shop in our
[20] contract. It's a white paper contract with a
[21] vendor.
[22]    CHAIRMAN BUSALACCHI: Supplement to the
[23] National?
[24]    MR. SHUGHART: It's not a supplement, no.

Page 644

[1] instance, let's say you have two employees in
[2] Baltimore and you have one with 20 years and one
[3] with two years. The employee with 20 years accepts
[4] work somewhere what endtails. The employee with
[5] two years accepts work somewhere where he dovetails.
[6] Now you have a change of operations that brings both
[7] of those employees to Carlisle. Your men with two
[8] years is going to be senior to the man with 20
[9] years, and that has going to be a problem. It's
[10] bonds to happen somewhere.
[11]   CHAIRMAN BUSALACCHI: It's happened before
[12] and the Change Committee would rule at that time.
[13] It would be up to local unions to raise that point,
[14] but it's happened before.
[15]   MR. FRANKE: Many times.
[16]   MR. SHUGHART: With respect to the 323
[17] Carolina employees on layoff from the Carlisle, PA
[18] terminal, the company has stated that they have no
[19] obligation to these employees as if they don't
[20] exist. In the proposed change they are referred to
[21] as inactive, laid off employees. These employees
[22] have seniority that ranges from 36 years do eight
[23] months with the company. Most of them were laid off
[24] in May 1995, two months before the merger between

Page 64

[1] contractual obligations that Carolina employees were
[2] entitled to receive.
[3]   With that I would like to submit to you,
[4] this is a copy of information provided by WorldWay
[5] Corporation/Carolina Freight. It was sent out to
[6] the shareholders, and you can see in here if you
[7] look on page 4 where references are made that they
[8] started to discuss this merger back in early 1994,
[9] and they had several meetings in '94 and '95 until
[10] they finally consummated the merger in July. Now,
[11] what I find very, very interesting is on page 7 you
[12] will see where at the top on June 2nd – now, if
[13] these people didn't know this merger was coming
[14] about on June 2, eight of the top officers of
[15] company exercised the stock options, and in excess
[16] of 480,000 shares just prior to the merger. And if
[17] you go on back, you want to compare that, for
[18] instance, to what they exercised the year prior –
[19] you will find that back on page I-9 – it's a
[20] considerably lesser amount. So I mean I think this
[21] helps to prove that they knew that a merger was on
[22] its way.
[23]   CHAIRMAN BUSALACCHI: Well, I don't think
[24] there's a doubt in anybody's mind.

Page 645

[1] Carolina and ABF was announced. By Carolina's own
[2] admission, the plans to merge with ABF were well
[3] under way at that time.
[4]   Under these circumstances it would be
[5] horrendously unfair to exclude these employees the
[6] right to exercise their seniority under this change.
[7] Under the terms of the National Master Freight
[8] Agreement these employees have recall rights for
[9] five years. Carolina has contractual obligations to
[10] the laid off Carolina employees at Carlisle and
[11] elsewhere. One of those contractual obligations is
[12] to provide the recall rights for five years. ABF is
[13] merging with Carolina, thereby assuming Carolina's
[14] debts, liabilities, and contractual obligations.
[15] Included among those contractual obligations is the
[16] requirement to offer the five-year recall rights to
[17] Carolina employees who were previously laid off.
[18]   Carolina Freight did not vanish from the
[19] face of the earth. They exist. They may be
[20] headquartered in a different city, they may operate
[21] under a different company logo, management, and
[22] color scheme, but they do exist. The contractual
[23] obligations to Carolina employees also exist. The
[24] merged company has an obligation to provide the

Page 6

[1]   MR. LITTLE: Just a minute, if I may. He's
[2] reading from page 7?
[3]   CHAIRMAN BUSALACCHI: That's what he said,
[4] page 7.
[5]   MR. LITTLE: On page 7 he read item 6 I
[6] believe, referring to June 2nd, a list of names of
[7] apparently shareholder participants. I don't see
[8] any Arkansas Best employees in there.
[9]   MR. SHUGHART: No, they're not. They're
[10] all Carolina employees, the top officers of Carolina
[11] exercising their stock options.
[12]   CHAIRMAN BUSALACCHI: I mean what he's
[13] saying, Don, is that they knew that the sale was
[14] coming, all right? Let's not get into a big,
[15] dragged out argument.
[16]   MR. SHUGHART: I don't want to argue. I
[17] just want to point that out.
[18]   MR. LITTLE: They knew sale was coming –
[19]   CHAIRMAN BUSALACCHI: Let him go on.
[20]   MR. SHUGHART: In the case of Carlisle, the
[21] merged Carolina/ABF company has a terminal within
[22] the jurisdiction of Local 776 also in Carlisle.
[23] Carolina employees who were laid off should have the
[24] first opportunity to elect work at the Carlisle, PA

ABF 004213

Ex. 5



# NATIONAL MASTER FREIGHT AGREEMENT

**Covering**
**OVER-THE-ROAD**
**and**
**LOCAL CARTAGE**
**EMPLOYEES OF PRIVATE,**
**COMMON, CONTRACT AND**
**LOCAL CARTAGE CARRIERS**

**For the Period of**
**APRIL 1, 1998**
**through**
**MARCH 31, 2003**

ABF 003685

# ARTICLE 5.

## Section 1. Seniority Rights

(a) The application of seniority which has been accrued herein shall be established in the Supplemental Agreements.

(b) Seniority shall be broken only by discharge, voluntary quit, retirement, or more than a five (5) - year layoff.

(c) This Section shall apply to all Supplemental Agreements.

## Section 2. Mergers of Companies-General

(a) In the event the Employer is a party to a merger of lines, seniority of the employees who are affected thereby shall be determined by mutual agreement between the Employer and the Local Unions involved.

In the application of this Section, it is immaterial whether the transaction is called a merger, purchase, acquisition, sale, etc. Further, it is also immaterial whether the transaction involves merely the purchase of stock of one (1) corporation by another, with two (2) separate corporations continuing in existence.

(b) If such merger of companies results in the combination of terminals or over-the-road operations, a change of operations shall be submitted to the Co-Chairmen of the National Grievance Committee for assignment to an appropriate Change of Operations Committee established pursuant to Article 8, Section 6. The Change of Operations Committee shall retain jurisdiction for one (1) year after the effective date of the Committee decision and shall have the authority to amend its decision in the event of a substantial change in the amount of work to be performed at the terminals or over-the-road operations which were combined.

## Combining of Terminals or Operations as a Result of Merger of Companies

(c) In the application of this Section, when terminals or operations of two (2) or more companies are combined, as referred to above, the following general rules shall be applied by the Employer and the Local Unions, which general rules are subject to modification pursuant to the provisions of Section 4 of this Article:

ABF 003711

## Article 5, Section 2

### Active Seniority List

(1) The active employee seniority rosters (excluding those employees on letter of layoff) shall be "dovetailed" by appropriate classification (i.e., road or city) in the order of each employee's full continuous classification (road or city) seniority date that the employee is currently exercising. (The term "continuous classification seniority" as used herein is defined as that seniority which the employee is currently exercising and has not been broken in the manner provided in Section 1 of this Article or by voluntary changes in domicile not directed, approved or ordered by a Change of Operations Committee.) The active "dovetailed" seniority roster shall be utilized first and until exhausted to provide employment at such combined terminal or operational location.

### Layoff Seniority list

(2) In addition, the inactive seniority rosters (employees who are on letter of layoff) shall be similarly "dovetailed" by appropriate classification. If additional employees are required after the active list is exhausted, they shall be recalled from such inactive seniority roster and after recall such employees shall be "dovetailed" into the active seniority roster with their continuous classification (road or city) seniority dates they are currently exercising which shall then be exercised for all purposes. Seniority rosters previously combining job classifications shall be continued unless otherwise agreed.

### Temporary Authority

(d) Where only temporary authority is granted in connection with any of the transactions described above, then separate seniority lists shall continue only when terminals or operations are not merged, unless otherwise agreed. The Employer which is to survive will assume the obligations of both collective bargaining agreements during the period of the temporary authority.

In the event of temporary merger of operations which are contingent upon approval by regulatory agencies or on other stated conditions, the seniority of the involved employees shall continue to accrue with their original Employer during the period of temporary merger, so that if there is no final consummation of the merger, the seniority of such employees shall be continued with their respec-

22

tive employers.  However, if, on the failure of final consummation and dissolution of the merger, one of the parties to the proposed merger discontinues the operations which were subject to such merger, the employees of such Employer shall be granted seniority rights for all purposes with the other Employer only for the period of time they were employed in such temporary merged operations.

## Purchase of Rights

(e) If a merger, purchase, acquisition, sale, etc., constitutes merely the acquisition of permits or rights, without the purchase or acquisition of equipment or terminals, and/or without the consolidation of terminals or operations, or in the event of the purchase of rights during bankruptcy proceedings, the following shall apply:

Where the purchasing company has a terminal operation at the domicile of the employees of the seller, the employees of the selling company shall be placed on a master seniority list, and the purchasing company or companies shall hire, after recall of the purchasing company's employees from layoff, such employees as needed for regular employment within the first twelve (12) calendar months after purchase or acquisition of permits and/or rights, and they shall be dovetailed with full seniority.  If an employee refuses a bona fide offer of regular work opportunity with any of the purchasing companies, his/her name shall be removed from the list.  No employee hired under this provision shall be required to serve a probationary period.  After the expiration of the aforementioned twelve (12) calendar month period, the purchaser shall have no further obligation to the employees of the seller.

However, if the purchasing or acquiring company does not have and/or continue a terminal or operation at the domicile of the employees of the seller, resulting in their layoff, such Employer shall place the laid-off employees on a master seniority list and such Employer shall, if and when additional regular employees are required, within a twelve (12) - calendar month period after purchase or acquisition, and providing its employees on layoff have been recalled, offer employment to such laid-off employees at the terminal locations or operations to which the work has been transferred.  Any such laid-off employees accepting transfer shall be dovetailed in accordance with their terminal seniority for work purposes, including layoff, and holding company seniority for all fringes.  If an employee refuses a bona fide offer

ABF 003713

## Article 5, Section 2

of regular work opportunity with any of the purchasing companies, his/her name shall be removed from the list. No employee hired under this provision shall be required to serve a probationary period. After the expiration date of the aforementioned twelve (12) - calendar month period, the purchaser shall have no further obligation to the employees of the seller. The transferring employee shall be responsible for lodging and moving expenses.

## Exclusive Cartage Operations

(f) If in connection with the transactions described in these rules the successor Employer determines to discontinue the use of a local cartage company, the employees of that local cartage company who have worked exclusively on the pickup and delivery service which is retained by the successor Employer shall be given the opportunity to continue to perform such service as an employee of such successor Employer, and shall have their seniority "dovetailed" as described in the above rules.

## Committee Authority

(g) Area and/or State Committees created pursuant to Local Supplements which have previously established rules of seniority, not contrary to the provisions of such Supplements, and approved by the Joint Area Committee, may continue to apply such rules if such rules are reduced to writing.

## Section 3. Intent of Parties

(a) The parties acknowledge that the above rules are intended solely as general standards and further that many factual situations will be presented which necessitate different application, modification or amendment. Accordingly, the parties acknowledge that questions of the application of seniority rights may arise which require different treatment and it is anticipated and understood that the Employers and Unions jointly involved and/or the respective grievance committees may mutually agree to such disposition of questions of seniority which in their judgment is appropriate under the circumstances.

(b) In all instances, the disposition of questions involving the application of seniority rights made by the parties pursuant to this

**24**

Section may be presented to the appropriate grievance committees provided herein whose decisions shall be final and binding.

## Section 4. Equipment Purchases

(a) The Employer shall not require as a condition of continued employment, that an employee purchase truck, tractor and/or tractor and trailer or other vehicular equipment, or that any employees purchase or assume any proprietary interest or other obligation in the business, except as referred to in Article 6, Section 2. The requirements of this provision shall be maintained during the renegotiation of this Agreement unless either party has terminated the Agreement in the manner provided.

## Highest Rates Prevail

(b) If the minimum wage, hours and working conditions in the Company absorbed differ from those minimums set forth in this Agreement and Supplements thereto, the higher of the two shall remain in effect for the employees so absorbed.

## Cutting Seniority Board

(c) The Union reserves the right to cut the road seniority board when the average weekly earnings fall to seven hundred dollars ($700.00) or less. This is not to be construed as imposing a limitation on earnings. After the Union notifies the Employer to cut the board and in the event that Employer refuses, the Union shall immediately submit the matter to the grievance procedure. In determining whether average weekly earnings will fall to seven hundred dollars ($700.00) or less, only the earnings of the lower twenty-five percent (25%) of the drivers on the seniority board, counting from the bottom up, shall be considered. The average shall be calculated for the thirty (30) day period preceding the Union's original request. After such calculation is made, the average earnings of the drivers for the top seventy-five percent (75%) of the seniority board must also average more than seven hundred dollars ($700.00) per week, or layoff shall be made in accordance with seniority. The above provisions shall also apply to extra board for sleeper drivers exclusively.

ABF 003715

## Article 5, Section 4

### Posting Seniority List

(d) The Employer shall give the Local Union a seniority list at least every six (6) months. The Employer shall also post a seniority list at least once every six (6) months and shall maintain a current seniority roster at the terminal. Protest of any employee's seniority date or position on such list must be made in writing to the Employer within thirty (30) days after such seniority date or position first appears, and if no protests are timely made, the dates and positions posted shall be deemed correct. Any such protest which is timely made may be submitted to the grievance procedure.

## Section 5. Work Opportunity

Over-the-road employees, who are on letter of layoff, shall be given an opportunity to transfer to permanent over-the-road employment (prior to the employment of new hires) occurring at other over-the-road domiciles of the Employer located within the Regional area provided they notify the Employer in writing of their interest in a transfer opportunity. The offer of transfer will be made in the order of continuous over-the-road seniority of the laid-off drivers domiciled within the Regional area. The Employer shall be required to make additional offers of transfer to an employee who has previously rejected a transfer opportunity provided the employee again notifies the Employer in writing of his/her continued interest in additional transfer opportunities. However, the Employer will only be required to make one transfer offer in any six (6) calendar month period. Any employee accepting such offer shall be paid at the employee's applicable rate of pay and shall be placed at the bottom of the seniority board for bidding and layoff purposes, but shall retain company seniority for fringe benefits only. A transferring employee shall pay his/her own moving expenses and shall, upon reporting to such new domicile, be deemed to have relinquished his/her right to return with seniority to the domicile from which he/she transferred. The provisions of this Section shall not supersede an established order of call/hiring in the Supplemental Agreement.

ABF 003716

# ARTICLE 8.
## NATIONAL GRIEVANCE PROCEDURE

## Section 1.

All grievances or questions of interpretations arising under this National Master Freight Agreement or Supplemental Agreements thereto shall be processed as set forth below. If such Supplemental Agreements provide for arbitration of discharges, such procedure shall be continued.

(a) All factual grievances or questions of interpretation arising under the provisions of the Supplemental Agreement (or factual grievances arising under the National Master Freight Agreement), shall be processed in accordance with the grievance procedure of the applicable Supplemental Agreement.

If upon the completion of the grievance procedure of the Supplemental Agreement the matter is deadlocked, the case shall be immediately forwarded to both the Employer and Union secretaries of the National Grievance Committee, together with all pertinent files, evidence, records and committee transcripts.

Any request for interpretation of the National Master Freight Agreement shall be submitted directly to the Regional Joint Area Committee for the making of a record on the matter, after which it shall be immediately referred to the National Grievance Committee. Such request shall be filed with both the Union and Employer secretaries of the National Grievance Committee with a complete statement of the matter.

(b) Any matter which has been referred pursuant to Section 1 (a) above, or any question concerning the interpretation of the provisions contained in the National Master Freight Agreement, shall be submitted to a permanent National Grievance Committee which shall be composed of an equal number of employer and union representatives. The National Grievance Committee shall meet on a regular basis, for the disposition of grievances referred to it, or may meet at more frequent intervals, upon call of the chairman of either the Employer or Union representatives on the National Grievance Committee. The National Grievance Committee shall adopt rules of procedure which may include the reference of disputed matters to subcommittees for investigation and report, with the final deci-

**35**

ABF 003725

## Article 8, Section 1

sion or approval, however, to be made by the National Grievance Committee. If the National Grievance Committee resolves the dispute by a majority vote of those present and voting, such decisions shall be final and binding upon all parties.

Cases deadlocked by the National Grievance Committee shall be referred as provided in Section 2(b) below. Procedures relating to such referrals shall be included in the Rules of Procedure of the National Grievance Committee.

The Employer may request the co-chairmen of the National Grievance Committee to appoint and convene a joint Employer and Union Committee which shall have the authority to approve uniform dispatch procedures and rules which shall apply to the individual company's over-the-road operations.

No Employer signatory to this Agreement shall be permitted to have its own grievance procedure.

## Section 2.

(a) The National Grievance Committee by majority vote may consider and review all questions of interpretation which may arise under the provisions contained in the National Master Freight Agreement which are submitted by either the Chairman of TNFINC or the Executive Director of TMI. The National Grievance Committee by majority vote shall have the authority to reverse and set aside all resolutions of grievances by any lower level grievance committee, arbitration panel or review committee involving or affecting the interpretation(s) of Articles 1-39 of the National Master Freight Agreement, in which case the decision of the National Grievance Committee shall be final and binding. A failure by the National Grievance Committee to reach a majority decision on a question concerning interpretation or on a review of a decision by a lower level grievance committee, arbitration panel or review committee shall not be considered a deadlock and will not be referred to the National Review Committee. In case of a failure to reach a majority decision in reviewing the decision of a lower level grievance committee, arbitration panel, or review committee, the decision of the lower level grievance committee, arbitration panel, or review committee shall stand as final and binding.

**36**

ABF 003726

**Articl  3, Section 2**

(b) All grievances deadlocked at the National Grievance Committee shall be processed as set forth below.

1. All grievances shall be automatically referred to the National Review Committee, which shall consist of the Chairman of TNFINC, or his/her designee and the principal officer of TMI, or his/her designee. The National Review Committee shall have the authority to resolve any such deadlocked case either by review of the record presented to the National Grievance Committee or by rehearing the case. The decision of the Committee shall be final and binding.

2. In the event the National Review Committee is unable to resolve the deadlock, the case shall be referred to the National Dispute Resolution Panel whose decision shall be final and binding on all parties.

3. The National Dispute Resolution Panel shall consist of the Chairman of TNFINC or his/her designee and the the Employer Chairman of the National Grievance Committee, or his/her designee, and an impartial neutral with recognizable freight industry background, including experience in working under the National Master Freight Agreement. The procedures for the selection of the neutral for the National Dispute Resolution Panel and the cost of the proceedings shall be determined by the Rules of Procedure of the National Grievance Committee.

4. At the hearing before the National Dispute Resolution Panel, the Employer's case will be presented by a full-time employee of the Employer and/or Employer representative on the National Grievance Committee and the Union's case by a designee of the Chairman of TNFINC and the Rules of Procedure of the National Grievance Committee shall apply.

5. The National Dispute Resolution Panel shall issue a "bench decision" at the conclusion of the grievance hearing. Either party, however, may request a clarification or further explanation of a previous decision rendered by the National Dispute Resolution Panel.

6. No lawyers will be permitted to present cases at any step of the grievance procedure.

7. The decision of any grievance committee or panel shall be specifically limited to the matters submitted to it and the grievance

**37**

# Article 8, Section 2

committee or panel shall have no authority in any manner to amend, alter or change any provision of the Agreement.

8. If the Employer or Union challenges in court a decision issued by any arbitrator, arbitration or dispute resolution panel provided for under this Agreement, the cost of the challenge, including the court costs and attorneys' fees, shall be paid by the losing party.

## Section 3. Work Stoppages

(a) The parties agree that all grievances and questions of interpretation arising from the provisions of this Agreement shall be submitted to the grievance procedure for determination. Accordingly, no work stoppage, slowdown, walkout or lockout shall be deemed to be permitted or authorized by this Agreement except as provided in Section 3(b) and (c) below.

A "representation dispute" in circumstances under which the Employer is not required to recognize the Union under this Agreement is not subject to the grievance procedure herein and the provisions of this Article do not apply to such dispute.

(b) In the event an Employer is delinquent in its health & welfare or pension payments in the manner required by the applicable Supplemental Agreement, the Local Union shall have the right to take whatever action it deems necessary until such delinquent payments are made. The Local Union shall give the Employer a seventy-two (72) hour, (excluding Saturdays, Sundays, and holidays), prior written notice of the Local Union's authorization of strike action which notice shall specify the failure to make health & welfare or pension payments providing the basis for such strike authorization. In no event shall the Union have the right to strike over a dispute concerning the eligibility and/or payment of health & welfare or pension contributions by an Employer on behalf of specific individuals, and such disputes shall be subject to the grievance procedure.

(c) Failure to comply with a decision rendered by a grievance committee, panel or arbitrator. The Local Union shall give the Employer a seventy-two (72) hour (excluding Saturday, Sunday and holidays) prior written notice of the Local Union's authorization of strike action, which notice shall specify the basis for the compliance failure. If the Employer believes that it is in compliance or

**38**

ABF 003728

**Articl 3, Section 3**

that there is a clarifcation needed in order to comply, the matter of compliance and/or clarification shall be submitted to the grievance committee, panel or arbitrator that decided the case. The question of compliance or clarification shall be determined by the grievance committee, panel or arbitrator within forty-eight (48) hours after receipt of the Employer request. The forty-eight (48) hour period for the grievance committee, panel or arbitrator to determine the question of compliance or clarification shall run concurrently with the seventy-two (72) hour notice prior to a strike. The grievance committee, panel or arbitrator may meet telephonically to consider and decide questions of compliance or clarification.

## Section 4.

(a) It is mutually agreed that the Local Union will, within two (2) weeks of the date of the signing of this Agreement, serve upon the Employer a written notice listing the Union's authorized representatives who will deal with the Employer, make commitments for the Local Union generally and, in particular, those individuals having the sole authority to act for the Local Union in calling or instituting strikes or any stoppages of work which are not in violation of this Agreement. The Local Union may from time to time amend its listing of authorized representatives by certified mail. The Local Union shall not authorize any work stoppages, slowdown, walkout, or cessation of work in violation of this Agreement. It is further agreed that in all cases of an unauthorized strike, slowdown, walkout, or any unauthorized cessation of work which is in violation of this Agreement the Union shall not be liable for damages resulting from such unauthorized acts of its members.

In the event of a work stoppage, slowdown, walkout or cessation of work, not permitted by the provisions of Article 8, Section 3(a), alleged to be in violation of this Agreement, the Employer shall immediately send a wire or fax to the Freight Coordinator in the appropriate Regional Area and to the Chairman of TNFINC to determine if such strike, etc., is authorized.

No strike, slowdown, walkout or cessation of work alleged to be in violation of this Agreement shall be deemed to be authorized unless notification thereof by telegram has been received by the Employer and the Local Union from such Regional Area. If no response is received by the Employer within twenty-four (24) hours after request,

**39**

ABF 003729

## Article 8  Section 4

excluding Saturdays, Sundays, and holidays, such strike, etc., shall be deemed to be unauthorized for the purpose of this Agreement.

In the event of such unauthorized work stoppage or picket line, etc., in violation of this Agreement, the Local Union shall immediately make every effort to persuade the employees to commence the full performance of their duties and shall immediately inform the employees that the work stoppage and/or picket line is unauthorized and in violation of this Agreement. The question of whether employees who refuse to work during such unauthorized work stoppages, in violation of this Agreement, or who fail to cross unauthorized picket lines at their Employer's premises, shall be considered as participating in an unauthorized work stoppage in violation of this Agreement may be submitted to the grievance procedure, but not the amount of suspension herein referred to.

It is specifically understood and agreed that the Employer during the first twenty-four (24) - hour period of such unauthorized work stoppage in violation of this Agreement, shall have the sole and complete right of reasonable discipline, including suspension from employment, up to and including thirty (30) days, but short of discharge, and such employees shall not be entitled to or have any recourse to the grievance procedure. In addition, it is agreed between the parties that if any employee repeats any such unauthorized strike, etc., in violation of this Agreement, during the term of this Agreement, the Employer shall have the right to further discipline or discharge such employee without recourse for such repetition. After the first twenty-four (24) - hour period of an unauthorized stoppage in violation of this Agreement, and if such stoppage continues, the Employer shall have the sole and complete right to immediately further discipline or discharge any employee participating in any unauthorized strike, slowdown, walkout, or any other cessation of work in violation of this Agreement, and such employees shall not be entitled to or have any recourse to the grievance procedure. The suspension or discharge herein referred to shall be uniformly applied to all employees participating in such unauthorized activity. The Employer shall have the sole right to schedule the employee's period of suspension.

The International Brotherhood of Teamsters, the Teamsters National Freight Industry Negotiating Committee, Joint Councils and Local

**40**

ABF 003730

**Article 8, Section 4**

Unions shall make immediate efforts to terminate any strike or stoppage of work as aforesaid which is not authorized by such organizations, without assuming liability therefor. For and in consideration of the agreement of the International Brotherhood of Teamsters, Teamsters National Freight Industry Negotiating Committee, Joint Councils and Local Unions affiliated with the International Brotherhood of Teamsters to make the aforesaid efforts to require Local Unions and their members to comply with the law or the provisions of this Agreement, including the provisions limiting strikes or work stoppages, as aforesaid, the Associations and Employers who are parties hereto agree that they will not hold the International Brotherhood of Teamsters, the Teamsters National Freight Industry Negotiating Committee, Joint Councils and Local Unions liable or sue them in any court or before any administrative tribunal for undertaking such efforts to terminate unauthorized strikes or stoppages of work as aforesaid or for undertaking such efforts to require Local Unions and their members to comply with the law or the provisions of this Agreement, or for taking no further steps to require them to do so. It is further agreed that signator Associations and Employers will not hold the International Brotherhood of Teamsters, Teamsters National Freight Industry Negotiating Committee, Joint Councils or Local Unions liable or sue them in any court or before any administrative tribunal for such unauthorized work stoppages alleging condonation, ratification or assumption of liability for undertaking such efforts to terminate strikes or stoppages of work, or requiring Local Unions and their members to comply with the law or the provisions of this Agreement.

The provisions of this Article shall continue to apply during that period of time between the expiration of this Agreement and the conclusion of the negotiations or the effective date of the successor Agreement, whichever occurs later, except as provided in Article 39. It is understood and agreed that failure by the International Brotherhood of Teamsters, Teamsters National Freight Industry Negotiating Committee, and/or Joint Councils to authorize a strike by a Local Union shall not relieve such Local Union of liability for a strike authorized by it and which is in violation of this Agreement.

(b) The question of whether the International Union, Teamsters National Freight Industry Negotiating Committee, Joint Council or

**41**

ABF 003731

## Article 8, Section 4

Local Union have met its obligation set forth in the immediately preceding paragraphs, or the question of whether the International Union, Teamsters National Freight Industry Negotiating Committee, and Joint Council or the Local Union, separately or jointly, participated in an unauthorized work stoppage, slowdown, walkout or cessation of work in violation of this Agreement by calling, encouraging, assisting or aiding such work stoppage, etc., in violation of this Agreement, or the question of whether an authorized strike provided by Article 8, Section 3(b) or (c) is in violation of this Agreement, or whether an Employer engaged in a lockout in violation of this Agreement, shall be submitted to the grievance procedure at the national level, prior to the institution of any damage suit action. When requested, the co-chairmen of the National Grievance Committee shall immediately appoint a subcommittee to develop a record by collecting evidence and hearing testimony, if any, on the questions of whether the International Union, Teamsters National Freight Industry Negotiating Committee, Joint Council or Local Union have met its obligations as aforesaid, or of Union participation or Employer lockout in violation of this Agreement. The record shall be immediately forwarded to the National Grievance Committee for decision. If a decision is not rendered within thirty (30) days after the co-chairmen have convened the National Grievance Committee, the matter shall be considered deadlocked.

A majority decision of the National Grievance Committee on the questions presented as aforesaid shall be final and binding on all parties. If such majority decision is rendered in favor of one (1) or more of the Union entities, or the Employer, in the case of lockout, no damage suit proceedings on the issues set forth in this Article shall be instituted against such Union entity or such Employer. If, however, the National Grievance Committee is deadlocked on the issues referred to in this subsection 4(b), the issues must be referred to the National Dispute Resolution Panel for resolution prior to either party instituting damage suit proceedings. If the National Dispute Resolution Panel decides that a strike was unlawful, it shall not have the authority to assess damages. Except as provided in this subsection 4(b), agreement to utilize this procedure shall not thereafter in any way limit or constitute a waiver of the right of the Employer or Union to commence damage suit action. However, the use of evidence in this procedure shall not waive the right of the Employer or Union to use such evidence in any litigation relating to the strike or lockout, etc., in violation of this Agreement. There

**42**

ABF 003732

shall not be any strike, slowdown, walkout, cessation of work or lockout as a result of a deadlock of the National Grievance Committee on the questions referred to under this subsection 4(b) and any such activity shall be considered a violation of this Agreement.

(c) In the event that an Employer, party to this Agreement, commences legal proceedings against the Union after the Union's compliance with the provisions of Article 8, Section 3(b) or (c), the Employer Associations will cooperate in the presentation to the court of the applicable majority grievance committee decision.

(d) Nothing herein shall prevent the Employer or Union from securing remedies granted by law except as specifically set forth in subsection 4(b).

## Section 5.

(a) In the event of strikes, work stoppages, or other activities authorized by Article 8, Section 3(b) or (c) of this Agreement, no interpretation of this Agreement or any Supplement thereto relating to the Employer's obligation to make health & welfare and/or pension contributions by any tribunal shall be binding upon the Union or affect the legality or lawfulness of the strikes unless the Union stipulates to be bound by such interpretation, it being the intention of the parties to resolve all questions of interpretation by mutual agreement.

(b) It is the intention of the parties to resolve all grievances and requests for interpretation arising under this Agreement through the grievance procedure. However, it is understood and agreed that nothing herein shall prevent the Employer or Union from securing remedies in those circumstances where the application of this Agreement is contrary to law.

## Section 6. Change of Operations

## Change of Operations Committee

(a) Present terminals, breaking points or domiciles shall not be transferred, changed or modified without the approval of an appropriate Change of Operations Committee. Such Committee shall be

43

ABF 003733

## Article 8,   Section 6

appointed in each of the Regional Areas, equally composed of Employer and Union representatives. The Change of Operations Committee shall have the authority to determine the seniority of the employees affected and such determination shall be final and binding.

In the event a proposed change of operations includes the establishment of either a new or satellite terminal as a "combination" facility with a common city driver and dock seniority roster, when such change of operations results in the relocation or movement of city drivers and dock employees from an existing terminal recognizing separate (split) seniority rosters for city drivers and dock employees, the Change of Operations Committee shall have the authority to determine the conditions under which such a combination facility may be established, including but not limited to, the number of city drivers and dock employees who qualify, be allowed to follow the work to the new or satellite combination terminal, the implementation of training programs to qualify dock employees as city drivers and the seniority right of affected employees to either return to the "mother" terminal and/or claim additional driving positions at the satellite terminal within reasonable time periods following the establishment of such combination terminal, as determined by the Committee. Existing terminals that recognize separate city driver and dock seniority rosters (split terminals) shall not be converted to "combination" terminals unless and until such time as a majority of those affected employees agree to such conversion, in which case the Change of Operations Committee shall have the authority to determine the conditions under which such conversion shall be implemented.

Such Committee, however, shall observe the Employer's right to designate domiciles and the operational requirements of the business. Where the Union raises the question as to whether or not certain proposed runs of excessive length can be made, the Employer must be prepared to submit objective evidence including DOT certification or logs and tapes that such runs have been tested and were made within the DOT hours of service regulations. Individual employees shall not be redomiciled more than once during the term of this Agreement as the result of an approved change of operations unless a merger, purchase, sale, acquisition or consolidation of employers is involved, or unless there is proven economic need as determined

ABF 003734

by the Change of Operations Committee based on factual evidence presented.

Pension and health & welfare contributions paid on behalf of a redomiciled employee shall be paid to the Funds to which the contributions were made prior to the employee's change of domicile, and the decisions of the Change of Operations Committee shall so specify. This Section does not apply to employees who voluntarily transfer to new domiciles, unless such transfer is a result of a Change of Operations Committee decision. Any dispute concerning the appropriate fund for an Employer's contribution on behalf of a redomiciled employee, pursuant to a Change of Operations Committee decision, shall be referred to the National Grievance Committee. The decision of the National Grievance Committee shall to the extent permitted by law, be final and binding on all affected parties, including the Trust Funds.

The Change of Operations Committee shall also have jurisdiction for a period of twelve (12) months following the opening of a new terminal to consider the redomicile of employees who are laid off as a direct result of such opening of a terminal. The Committee shall also have jurisdiction over the closing of a terminal in regard to seniority, as well as to determine the conditions under which freight may or may not be interlined into the area of a vacated operations when necessary to retain major customers, including mandating the use of union carriers where available. In no event will the Employer be granted the authority to vacate a facility and interline the freight on a non-union subsidiary of the parent company.

The above shall not apply within a twenty-five (25)-mile radius.

The Change of Operations Committee shall have the authority to require a definition of primary and shared lanes, where applicable.

The Change of Operations Commttee shall not grant the Employer authority to relocate U.S. operations, work, or terminals to Mexico.

## Change of Operations Committee Procedure

(b) The National Grievance Committee shall adopt Rules of Procedure concerning the application and administration of this Article.

**45**

ABF 003735

## Article 8, Section 6

The Employer shall notify all affected Local Unions of the proposed change of operations at least twenty (20) calendar days prior to the hearing at the Regional Joint Area Committee, and the Employer and the Local Unions involved shall have a mutual responsibility to inform the employees subject to redomicile prior to such hearing in accordance with the practice and procedures agreed to in the respective Area Committee. Any exception or waiver of the aforesaid twenty (20) day period shall be mutually agreed to between the Employer and the Local Unions involved and approved by the Regional Area Change of Operations Committee.

## Moving Expenses

(c) Where an employee is required to transfer to another domicile in order to follow employment as a result of a change of operations, the Employer shall move the employee and assume the responsibility for proven loss or damage to household goods due to such move, including insurance against loss or damage. Should any employee possess household items of unusual or extraordinary value which will be included in the move, such items shall be declared and an appraised value determined prior to the move. The Employer shall provide packing materials for the employee's household goods when requested or at the employee's request pay all costs and expenses of moving such household goods, including packing.

The Employer shall pay reasonable expenses to demount and remount an employee's mobile home, if used as his/her residence and in such instance shall pay normal expenses to move such mobile home, including the use of other modes of transportation where required by law.

An employee shall have a maximum of one (1) year to move in accordance with the provisions of an approved change of operations unless, prior to the expiration of such year, he/she requests, in writing, an extension for a reasonable period of time due to an unusual or special problem. The Employer shall provide lodging for the employee at the point of redomicile, not to exceed ninety (90) calendar days, and in addition, shall reimburse the employee thirty-five cents (35¢) per mile to transport one (1) personal automobile to the new location.

ABF 003736

Article 8, Section 6

The Employer shall not be responsible for moving expenses if the employee changes his/her residence as a result of voluntary transfer.

None of the Employer obligations set forth in this Subsection (c) - Moving Expenses shall apply to transfers of domiciles within a fifty (50) - mile radius.

## Change of Operations Seniority

(d) The Change of Operations Committee established herein shall have the sole authority to determine questions of the application of seniority in those situations presented to it and in connection therewith the following general rules shall apply, subject, however, to modification as provided by Section 6(g) below:

## Closing, Partial Closing of Terminals-Transfer of Work

(1)a. When branches, terminals, divisions or operations (hereinafter "terminal(s)") are closed or partially closed and the work of such terminal(s) is transferred, in whole or in part, to another terminal(s), the active employees (excluding those employees on letter of layoff) at the closed or partially closed terminal(s) shall have the right to bid into a master seniority roster (road or city) comprised of bidders from the active seniority rosters of closed or partially closed terminal(s) in the order of their continuous classification (road or city) seniority. Continuous classification seniority shall be defined as that seniority which the employee is currently exercising and has not been broken in the manner provided by Article 5, Section 1, or by voluntary changes in domicile not directed, approved or ordered by a Change of Operations Committee. Employees shall bid from the combined master seniority roster into openings at the terminal(s) into which work is being transferred. Employees so transferring shall be "dovetailed" into the appropriate active seniority roster at the new terminal(s) in the order of their continuous classification seniority. Such transfers shall be permitted prior to the recall of laid-off employees at such gaining terminal(s). If and when additional employees are required in excess of those who formed the combined active roster at the point of redomicile, employees on letter of layoff at that location shall be

**47**

ABF 003737

## Article 8, Section 6

recalled. If recalled, such employees shall be "dovetailed" with their continuous classification seniority.

In addition, the inactive seniority rosters (employees who are on letter of layoff) at the terminal(s) from which employees are being redomiciled shall be "dovetailed" into a master "laid off" seniority roster and such employees shall have the same opportunities to transfer to terminal(s) within the area of the Supplemental Agreement which are afforded to employees covered by the provisions of subparagraph 2(b) below. These inactive employees at the losing terminal(s) shall also be offered first work opportunity, in seniority order, at terminals into which work was transferred within the regional area where such employees were employed. Such inactive employees shall gain active seniority in accordance with the provisions of the applicable supplemental agreement. The use of such employees shall be subject to the order of call of the supplement. The employees' seniority date for bidding and layoff purposes shall be the date which they gain active status. The employee shall retain company seniority for fringe benefits only as of that date.

The senior driver voluntarily laid off at a losing domicile will be restored to the active board each time foreign drivers or casuals (where applicable) make ten (10) trips (tours of duty) within any thirty (30) calendar day period on a primary run of such domicile, not affected by a Change of Operations.

b. The following seniority bidding procedures are to be applied in all change of operations cases that involve master pool bidding:

1. The Change of Operations Committee shall have the authority to establish a date for purposes of determining active and inactive (on letter of layoff or the equivalent thereof) employees at both gaining and losing locations.

2. Affected employees at losing locations shall be allowed to bid onto an active master pool seniority list on a dovetailed seniority basis.

3. At the time of the original bid, an employee on the active master pool seniority list shall be afforded the opportunity to bid any available position for which he/she is qualified at a gaining location in accordance with his/her seniority on the master pool seniority list. In the event the active employees at any given location elect

**48**

not to bid the number of positions being lost at that particular location, inactive employees at that location, in accordance with their seniority, shall then be afforded the opportunity to bid as an active employee until the number of positions being lost at that particular location are filled.  An employee who elects to "hold" as set forth in paragraph 4 below shall not be considered as filling a losing position.  A successful bidder shall be dovetailed on the seniority list at the location he/she bids into.  The number of successful bidders from any losing location shall not exceed, at the time of the original bid, the number of positions lost at that location as approved by the Change of Operations Committee.

4. An employee on the active master pool seniority list who does not have seniority to bid the location he/she desires in the initial bid may hold for such desired location and remain at his/her present domicile in such status as his/her bidding seniority will allow. Should an opening occur during the window period as set forth in the Change of Operations decision at the location to which he/she desired to transfer, he/she shall be afforded transfer opportunity in line with his/her bidding seniority.  A successful bidder under this provision shall be dovetailed on the applicable seniority list at the location into which he/she bids and his/her moving expenses shall be paid in accordance with other transferring employees.  The transfer provisions of this Section shall apply only during the window period as set forth in the Change of Operations decision.

5. An employee who elects to hold as set forth in Paragraph 4 above may hold for only one (1) location and must designate that location at the time of the original bid and may hold only for a position within the classification the employee has seniority to bid.  If an employee refuses to accept an opportunity to claim a position he/she is holding for, the employee shall have no further claim to a position that may become available during the window period.

6. An employee who elects to hold, shall also be entitled to exercise seniority to claim a voluntary move under the provisions of Article 5, Section 5 herein, and in the event the employee accepts such a voluntary move, he/she shall retain his/her hold position at his/her home domicile during the remainder of the window period but shall forfeit any other seniority rights at his/her home domicile. Should a position become available at the location such employee is holding for and which the employee has seniority to successful-

ABF 003739

## Article 8, Section 6

ly claim, moving expenses set forth in Article 8, Section 6(c) shall be computed from the employee's original home domicile.

7. There shall be a maximum one hundred twenty (120) calendar day window period from the date of implementation in all Changes of Operations only when the number of positions offered at gaining terminals do not equal the number of positions lost at the losing terminals.

(a)  Any openings which may occur at a gaining terminal during the window period shall be offered to those employees on the Master Pool Seniority list who have not been offered transfer opportunity under the provisions of Article 8, Section 6 before they are offered to employees who may have elected to "hold" as set forth in paragraph 4 above.

(b)  The window period established by the Change of Operations decision shall close if either of the following conditions is met: (a) the number of days and/or months of the window period as set forth in the Change of Operations decision has expired; or (b) all employees on the Master Pool Seniority list have been offered work opportunities pursuant to Article 8, Section 6.

(c)  However, with respect to those who bid to "hold", it is understood that such bids must remain open and any job opportunities that are clearly identifiable as a direct result of the Change of Operations must be offered, by seniority, to those qualified employees who bid to hold for that specific location for the length of the window period(s) (road/cartage) set forth in the Change of Operations decision even if the window period is closed as set forth in paragraph (b) above.

(d)  The Company shall determine whether an additional job opportunity is the direct result of the Change of Operations at the specific gaining domicile for which the employee is "holding". The Company shall so notify the employee's current Local Union and the gaining Local Union. The Company shall have the burden of proof in establishing whether or not an additional job opportunity is clearly the direct result of the Change of Operations at the specific gaining domicile for which the employee is "holding". Any grievance filed regarding the Company's decision to permit or deny a "hold" transfer shall be filed with the appropriate Regional Joint Area

ABF 003740

Committee to be heard by the Multi-Region Change of Operations Committee that held jurisdiction.

8. Employees who are qualified bidders on Long-Term Disibility (LTD) at the time of bid shall be allowed to bid. If successful LTD bidders are unable to claim their bid on the date of implementation, a hold-down bid will be allowed. This hold-down bid will be offered to those remaining active employees at the LTD's current location, by classification, who have not been offered transfer opportunity under the Change of Operations. The successful hold-down bidder shall be dovetailed. When the LTD employee returns to work and claims his/her bid, the hold-down employee may either remain at the hold-down location with a bidding seniority date consistent with the date of transfer under the Change of Operations or return to his/her original location with his/her original bidding seniority date. The hold-down employee may not return to a location where the classification from which he/she bid has been eliminated. The Company shall not be responsible for the moving expense of the employee filling the hold-down bid, unless and until such time as it is determined that the employee on LTD will never be able to claim his bid and the hold-down bidder becomes a regular permanent employee at the hold-down location.

## Closing of Terminals-Elimination of Work

(2)a. When a terminal(s) is closed and the work of such terminal(s) is eliminated, an employee who was formerly employed at another terminal shall have the right to return to such former terminal and exercise his/her continuous classification (road or city) seniority, provided he/she has not been away from such former terminal for more than a five (5)-year period.

## Layoff

b. When a terminal(s) is closed and the work of such terminal (s) is eliminated, employees who are laid-off thereby shall be given first (1st) opportunity for available regular employment in the classification in which they are employed at the time of such layoff (prior to the employment of new hires but subject to the order of call/hiring of the Supplemental Agreement) occurring at any other terminal(s) of the Employer within the area of the Supplemental Agreement where such employee was employed provided they noti-

ABF 003741

## Article 8, Section 6

fy the Employer in writing of their interest in a transfer opportunity. The offer of transfer will be made in the order of continuous classification seniority of the laid off employees within the area of the Supplemental Agreement. The Employer shall be required to make additional offers of transfer to an employee who has previously rejected a transfer opportunity provided the employee again notifies the Employer in writing of his/her continued interest in additional transfer opportunities. However, the Employer will only be required to make one transfer offer in any six (6) calendar month period. The obligation to offer such employment shall continue for a period of five (5) years from the date of closing. Any employee accepting such offer shall be employed at his/her applicable rate of pay and shall be placed at the bottom of the seniority board for bidding and layoff purposes, but shall retain company seniority for fringe benefits only. A transferring employee shall pay his/her own moving expenses.

## Opening of Terminals

(3) When a new terminal(s) is opened (except as a replacement for existing operations or a new division in a locality where there are existing operations), the Employer shall offer to those employees, if any, affected thereby the opportunity to transfer to regular positions in the new terminal(s) in the order of such employee's continuous classification (road or city) seniority date as defined herein. Upon arrival at such new location, such employees shall be "dovetailed" with their continuous classification (road or city) seniority date together with other employees so transferring.

This provision is not intended to cover situations where there is replacement of an existing operation or where a new division is opened in a locality where there is an existing terminal. In these latter situations, those employees laid off at the existing facilities shall have first (1st) opportunity for employment at the new operation in accordance with their continuous classification (road or city) seniority date, and upon arrival shall be similarly "dovetailed." If all regular full-time positions are not filled in this manner, then the provisions of the preceding paragraph shall apply.

(4) When a Company which has an established Local Cartage Operation, which has been cleared by system OTR drivers, seeks to establish a new OTR domicile there, the Company shall first file for

52

ABF 003742

a Change of Operations giving transfer opportunity, with regard to the initial complement, to OTR drivers from those system OTR domiciles that previously serviced such Local Cartage Operation with reasonable regularity. Such transfer opportunity shall remain in effect for any additions to the initial complement for a period of not less than 120 calendar days, after which further additions to such complement shall be hired at the locality where such new OTR domicile was established.

(5) Any employee redomiciled by an approved change of operations to another domicile shall upon reporting to such new domicile be deemed to have relinquished his/her right to return, with seniority, to the domicile from which he/she was transferred, except under another approved change of operations. Employees who avail themselves of the transfer privileges because they are on layoff at their original terminal may exercise their seniority rights if work becomes available at their original terminal during the five (5) year layoff period allowed them at their original terminal.

(6) When an Employer's proposed Change of Operations offers a specific number of road positions at a gaining domicile, the Employer shall be required to make every good faith effort and use all practical means to hire qualified applicants to fill such offered positions that are left vacant because other employees affected by the Change have elected not to bid into that gaining domicile. The Employer's duty to hire under this provision is to use every reasonable means to advertise for qualified applicants and to meet with the affected Local Union(s) to seek qualified applicants. Nothing in this provision shall be contrued to create an obligation that the Employer maintain or otherwise guarantee a specific number of employees at a gaining domicile. Any grievance concerning any issue which may arise under this provision shall be filed directly with the Multi-Region Change of Operations Committee.

In the event it is determined by the Multi-Region Change of Operations Committee that the Employer has not made every good faith effort and used all practical means to hire qualified applicants for road positions as required under this provision, the Committee may require the Employer to hire qualified applicant(s) as outlined above.

ABF 003743

## Article 8, Section 6

### Definition of Terms

(e) The term "continuous classification seniority" as used in this Agreement is defined as that seniority which the employee is currently exercising and has not been broken in the manner provided in Article 5, Section 1, or by voluntary changes in domicile not directed, approved or ordered by a Change of Operations Committee.

### Qualifications and Training

(f) Employees, who are presently non-CDL qualified and elect to bid to transfer to a gaining terminal that requires CDL qualified employees, shall be provided a sixty (60) day training period in order to become CDL qualified. The training period shall commence from the date the employee becomes a successful bidder and the Company shall furnish training personnel and equipment at the location where the employee is currently domiciled or otherwise as mutually agreed to. If the employee fails to qualify during such sixty (60) day period, the employee shall forfeit his/her right to fill the bid and shall remain on the seniority list of the current domicile.

### Intent of Parties

(g) The parties acknowledge that the above rules are intended solely as general standards and further that many factual situations will be presented which necessitate different application, modification or amendment. Accordingly, the parties acknowledge that questions of the application of seniority rights may arise which require different treatment and it is anticipated and understood that the Employers and Unions jointly involved and/or the respective grievance committees may mutually agree to such disposition of questions of seniority which in their judgment is appropriate under the circumstances.

The Change of Operations Committees, as provided herein or in the Supplemental Agreements, shall have the authority to determine the application of seniority in those situations presented to them. In all cases, the seniority decisions of the Joint Committees, including the Change of Operations Committees and subcommittees established by the National Master Freight Agreement and the respective Supplemental Agreements, shall be final and binding.

ABF 003744

## Section 7.

Any grievance committee or panel, as constituted under this Agreement, shall have the jurisdiction and power to decide grievances which arose under the preceding agreements and supplements thereto. In doing so, the committees or panels shall follow the grievance procedure set forth in the 1998-2003 Agreement, but apply the contract under which the grievance arose.

## Section 8.  Sleeper Cab Operations

Unless specifically addressed in this Section, the provisions of the applicable Supplemental Agreement relating to Sleeper Cab Operations remain in full force and effect.

A. Solo Driving

In cases where one driver is used to complete a sleeper cab trip, the drivers so used shall receive the full mileage rate of pay per unit mile traveled. In instances where such solo length of trip requires a rest period, as required by DOT hours of service, such driver shall be provided lodging for such rest period. However, in those instances where the driver is required to layover more then eight (8) hours to pick up sufficient hours to run, he will be paid for all time spent over eight (8) hours, provided such solo trip is not the result of sickness and/or accident.

B. Work Rules

The Local Union and Company shall meet and negotiate dispatch and/or work rules. If no agreement is reached, disputes shall be subject to the grievance machinery.

C. Lay Point and Layover

1. The layover provision of this Section shall apply at only one (1) away-from-home terminal, and all times spent at all other points touched on a round trip from the home terminal, exclusive of meal time, shall be paid for at the full hourly rate to each driver. On any dispatch from the home terminal, the destination point, at which the layover provisions of this Section shall apply, shall be designated at the time of departure and shall not be changed, unless otherwise mutually agreed to by the parties.

**55**

ABF 003745

# Article 8, Section 7

Drivers will be advised upon arrival whether they will turn or go to bed. If drivers are advised they are turning, the Company will have one (1) free hour at the lay point, in which to dispatch the drivers, provided there are safe, sanitary shower facilities, equipped with hot and cold water for showering. If the drivers are not dispatched within the above mentioned one (1) hour period, after arrival, they shall be paid for all time spent in excess of the one (1) hour free time at the applicable rate.

If the team is relieved of duty on arrival and signs for eight (8) hours off and then is recalled within four (4) hours, they shall be compensated for all time spent.

2. Where sleeper cab drivers are required to layover away from their home terminal, layover pay shall commence following the twelfth (12th) hour after the end of the run. If a driver is held over the twelfth (12th) hour, the driver shall be guaranteed two (2) hours' pay, in any event for layover time. If the driver is held over more than two (2) hours, the driver shall receive layover pay for each hour held over up to eight (8) hours in the first twenty (20) of layover period, commencing after the run ends. This pay shall be in addition to the pay to which the driver is entitled if the driver is put to work at any time within the twenty (20) hours after the run ends. The same principle shall apply to each succeeding eighteen (18) hours, and layover pay shall commence after the tenth (10th) hour.

D. Abuse of Free Time

Whenever any Employer arbitrarily abuses the free time allowed in this Section, then this shall be considered to be a dispute and the same shall be subject to being handled in accordance with the grievance procedure set forth in this contract.

E. Bedding and Linen

Bedding and fresh linen for sleeper cabs shall be furnished and maintained by the Employer in a clean and sanitary condition.

Complaints with respect to width, depth and condition of mattresses shall be subject to the grievance procedure.

F. Sleeper Cab Equipment

All sleeper cab equipment must be provided with air conditioning and heating appliances in accordance with Article 16, Section 6 of

ABF 003746

**Article 8, Section 7**

this Agreement. In the event of mechanical failure of such air conditioning and heating appliances, repairs shall be made at the first point of repair enroute where qualified service is offered but drivers will not receive breakdown pay for repairs to air conditioners enroute.

G. Sleeper Cab Occupants

Only two (2) drivers shall be permitted in sleeper cab equipment at any one time except in case of emergency, an Act of God, or where new type equipment is put into operation. In no event shall a master driver be in the cab in addition to the two (2) regular drivers for more than 300 miles or ten (10) hours.

H.

1. Mark-off Procedure for Sleeper Cab Drivers

In the event the Company and Local Union are unable to agree to a mark-off procedure, the following shall apply:

(a) For purposes of time off, 1200 miles equals one (1) sleeper trip.

(b) After completion of four (4) consecutive trips, the drivers will be entitled to forty-eight (48) hours off, plus an additional eight (8) hours DOT rest. The drivers may waive the forty-eight (48) hours off.

(c) After completion of six (6) consecutive trips, the drivers will be entitled to seventy-two (72) hours off, plus an additional eight (8) hours DOT rest. Where drivers fail to exercise time off privilege after six (6) trips, they shall forfeit such time off, and the cycle will revert back to subsection (b).

(d) Time off privileges may be exercised only at the completion of the fourth (4th), or sixth (6th) trips, or upon the drivers returning home.

(e) The only exception to the above is that the Employer shall provide in the dispatch rules and/or procedures for thirty-six (36) consecutive hours off duty at the home terminal at least once a week unless otherwise agreed to, provided the driver has been on the board and required to be available.

(f) Where only one driver of an established team marks off for any reason, other than (g) below, he shall remain off until his part-

**57**

ABF 003747

## Article 8, Section 7

ner returns to the home terminal, except as otherwise mutually agreed. In those instances where an extra board driver makes a combination of single operation and sleeper operation trips, the driver(s) will earn two (2) tours for a complete sleeper trip.

(g) Bid Team Drivers must take their earned time off at the same time as outlined in (b), (c) and (e).

2. Clearance Time Home Terminal

Sleeper drivers are entitled to ten (10) hours off duty at their home domicile upon completion of each round trip exclusive of the two (2) hour call.

3. Turning in the Yard - Home Terminal

When mutually agreed between the sleeper team and the Employer, sleeper teams may be allowed to turn in the yard at their home domicile provided the dispatch wheel is exhausted and/or there are no other sleeper teams rested and available for dispatch. When the Employer turns a sleeper team at their home domicile, any delay in excess of one (1) hour shall be compensable.

I. Method of Dispatch - Foreign Domiciles

Foreign Domiciled Sleeper teams shall be placed on a common rotating wheel at the time they arrive at a foreign domicile and shall be dispatched off that wheel on a first-in first-out basis; provided however, a team may be dispatched out of rotation when receiving a direct dispatch back to their home domicile. Such direct dispatch may include a drop and pick enroute. When more than one team from a common home domicile is on the foreign wheel, the first team in shall be the team dispatched out of rotation.

Sleeper teams who are put to bed at a foreign domicile shall be dispatched in accordance with the procedure herein; provided however, it shall not be a violation or the basis of a runaround claim, when a foreign team, whose home domicile is common to that of another team who is in bed at the foreign domicile, has been pre-dispatched on a via or to drop or pick through the foreign domicile in route to their home domicile. A foreign team may not however, be dispatched from a home domicile to a foreign domicile and then back to their home domicile (A-B-A) when another team from the same home domicile is in bed at the foreign domicile.

**58**

ABF 003748

J. Foreign Power Courtesy Dispatch

It shall not be a violation or the basis of a runaround claim when a sleeper team is dispatched on a VIA or drop and pick through a foreign domicile where other sleeper teams or single drivers are domiciled when continuing in motion over their designated sleeper lane, or being dispatched to their home domicile.

K. All sleeper teams must be sent to their home terminal on the third (3rd) dispatch unless otherwise mutually agreed to.

L. National Sleeper Cab Grievance Committee

The parties shall establish a National Sleeper Committee composed of four (4) Union representatives appointed by the Chairman of TNFINC and four (4) Employer representatives appointed by the Employer Chairman of the National Grievance Committee. The National Sleeper Committee shall establish rules of procedure to govern the manner in which proposed sleeper operations are to be heard, procedures for resolving sleeper issues and procedures for eastablishing prehearing guidelines. Any grievance concerning the application or interpretation of this Section shall be referred to the National Sleeper Committee for resolution. If the National Sleeper Committee is unable to reach a decision on an interpretation or grievance, the issue will be referred to the National Grievance Committee.

# ARTICLE 9.
# PROTECTION OF RIGHTS

## Section 1. Picket Lines: Sympathetic Action

It shall not be a violation of this Agreement, and it shall not be cause for discharge, disciplinary action or permanent replacement in the event an employee refuses to enter upon any property involved in a primary labor dispute, or refuses to go through or work behind any primary picket line, including the primary picket line of Unions party to this Agreement, and including primary picket lines at the Employer's places of business.

## Section 2. Struck Goods

It shall not be a violation of this Agreement and it shall not be cause for discharge, disciplinary action or permanent replacement if any

ABF 003749

## Article 9, Section 2

employee refuses to perform any service which his/her Employer undertakes to perform as an ally of an Employer or person whose employees are on strike and which service, but for such strikes, would be performed by the employees of the Employer or person on strike.

## Section 3.

Subject to Article 32 - Subcontracting, hereof, the Employer agrees that it will not cease or refrain from handling, using, transporting, or otherwise dealing in any of the products of any other Employer or cease doing business with any other person, or fail in any obligation imposed by the Motor Carriers Act or other applicable law, as a result of individual employees exercising their rights under this Agreement or under law, but the Employer shall, notwithstanding any other provision in this Agreement, when necessary, continue doing such business, including pickup or delivery to or from the Employer's terminal and to or from the premises of a shipper or consignee.

## Section 4.

The layover provision of the applicable Supplemental Agreement shall apply when the Employer knowingly dispatches a road driver to a terminal at which a primary picket line has been posted as a result of the exhaustion of the grievance procedure, or after proper notification of a picket line permitted by the collective bargaining agreement, or economic strikes occurring after the expiration of collective bargaining agreements, or to achieve a collective bargaining agreement. In such event and upon his/her request, a driver shall be provided first class public transportation to his/her home terminal, plus be paid a minimum of eight (8) hours or actual time spent while returning, whichever is greater. The Employer shall determine the mode of transportation to be utilized.

# ARTICLE 10.
# LOSS OR DAMAGE

## Section 1.

In the event loss, damage or theft of freight, equipment, materials, or supplies is incurred as a direct result of a willful gross negligent

ABF 003750

ers within a period of three (3) years from the date of his/her disability and is physically and mentally qualified to perform the work of his/her former position with his/her Employer shall be returned to that position or in the classification of work he/she performed at the beginning of his/her disability and in the seniority he/she held at that time.

## Section 3.

Overtime work shall be assigned as far as practicable to employees within their respective job classifications in accordance with the rules of seniority. In the application of overtime work, however, it is understood that the Employer is not required to assign 6th and 7th day work in seniority when it would result in a premium pay penalty; therefore, employees subject to straight-time pay may be assigned work before employees subject to 1 1/2 time pay, and employees subject to straight-time pay or 1 1/2 time pay may be assigned work before work is assigned to employees subject to double-time pay.

A senior employee will be afforded work opportunity before a junior employee until he/she has worked forty (40) straight time hours.

An employee that receives pay for a sick day, funeral leave, or jury duty, will be called in his/her seniority position along with other employees being called for a sixth punch or seventh punch, however, he/she will be paid in accordance with the provisions of this Agreement.

## Section 4.

When it becomes necessary to reduce the working force, the last employee on the seniority list shall be laid off first, and when the force is again increased, the employees shall be returned to work in the reverse order in which they were laid off providing they still maintain seniority as described herein; and further providing the employees retained at the time of layoff, or the employees recalled at the time of recall from layoff, must be qualified to perform the work required.

With respect to layoff affecting steward(s), the Employer and the Union agree that in the case of more than one steward per classification (not shift), the protection against layoff will only be applic-

**171**

ABF 003860

able to that individual steward so designated by the Local Union as the chief steward. In the absence of such designation by the Local Union, the Employer will recognize the protection against layoff to the most senior employee by classification (not shift), designated a steward by the Local Union.

When an employee has not been offered work opportunity for a period of three (3) consecutive weeks he/she shall be considered as laid off.

When laid off employees are used three (3) days per week for four (4) consecutive weeks, the senior laid off employee shall be recalled.

In the event of recall, the employees shall be given notice of recall by telegram, registered or certified mail, sent to the address last given the Employer by the employee. Within three (3) calendar days after tender of delivery of the Employer's notice, the employee must notify the Employer by telephone, telegram, registered letter, certified mail, of his/her intent to return to work and must actually report to work within seven (7) calendar days. In the event an employee is unable to report within the seven (7) calendar days, but notified the Company of his/her intent to return to work and gives them a reasonable time that he/she will report, said employees will not lose their seniority status. In the event the employee fails to comply with the above provisions, he/she shall lose all seniority rights under this Agreement and shall be considered as a voluntary quit.

## Section 5.

The Local Union Representative and the Employer shall mutually agree, in writing, on circumstances under which persons who leave the classification of work covered by this Agreement, but remain in the employ of the Employer in some other capacity, may retain seniority rights upon their return to their original unit. In the absence of such written agreement, such employee shall lose all seniority rights upon leaving.

## ARTICLE 43 - GRIEVANCE PROCEDURE

NOTE: The Local Union may waive the Joint Local City Grievance Committee, as hereafter described, for the life of this Agreement by

**172**

ABF 003861

be considered untimely, thereby waiving his/her rights under the provisions of Article 43. The Union shall, in it's sole discretion and judgment, determine whether grievances initiated by employees have sufficient merit to justify their submission through the grievance procedure established herein. The Union Representative or steward shall first endeavor to settle the matter by direct negotiations with the Employer, failure to resolve the matter, the grievance shall be submitted to the Joint Local City Grievance Committee within thirty (30) days of the date of the grievance.

In the event more than one employee initiates a grievance, all employees shall be named in the grievance. In cases of monetary claims, each named employee shall set forth his/her specific claim in the grievance.

(d) The Union may initiate grievances by setting forth its claim in writing, signed by a Union representative and filing the same with the Employer within ten (10) calendar days from the date of the occurrence of the matter. In the event the Union fails to comply with these provisions of paragraph (d) the grievance shall be considered untimely, thereby waiving their rights under the provisions of Article 43. The Union shall have the right to file and obtain adjustment of a grievance, notwithstanding the fact that it was or could have been the subject of an employee's grievance which was not filed by an employee.

(e) The Employer may initiate grievances by setting forth his/her claim, in writing, signed by an authorized representative and filing the same with the Union within ten (10) calendar days from the date of the occurrence of the matter.  In the event the Employer fails to comply with those provisions of paragraph (e) the grievance shall be considered untimely, thereby waiving their rights under the provisions of Article 43. The rights and privileges of the Employer under this paragraph shall be the same as the rights and privileges of the Union under paragraph (d) hereof.

(f) The parties shall attempt to meet and settle a grievance within a period of seven (7) days from the date of filing of the grievance. Should the parties to any grievance be unable to settle, resolve or adjust the matter within the period prescribed above, or any extended period, which shall have been agreed upon between the Union and the Employer, then either the Union or the Employer shall have

ABF 003863

submitting written request to the Secretary of the Joint Area Grievance Committee. Local Unions who waive the Joint Local City Grievance procedure may have cases of continuing liability submitted to the Secretary for scheduling between regular meetings of the Joint Area Grievance Committee. The panel for the special hearings will consist of three (3) representatives for the Employer and/or Employer Association, where applicable and three (3) representatives for the Local Unions.

## Section 1. - Joint Local City Grievance Committee

(a) For the purpose of settling grievances and disputes which may arise under this Agreement between the parties hereto, each Local Union shall establish a Grievance Committee, consisting of two (2) persons; and the Employer and/or Employer Association, where applicable, operating within the jurisdiction of each Local Union, shall also establish a Grievance Committee consisting of two (2) persons. The Grievance Committees of the Union and of the Employer and/or Employer Association, where applicable shall be constituted as the Joint Local City Grievance Committee and shall conduct their meetings within the framework of the "Rules of Procedure" as adopted by the Joint Area Grievance Committee. If the Joint Local City Grievance Committee demonstrates an inability to act within the framework of the Joint Area Grievance Committee "Rules of Procedure", such Joint Local Committee shall be subject to specific rules of procedure as adopted by the Joint Area Grievance Committee. The expenses incurred by the Joint Local City Grievance Committee shall be borne equally by the Union and Employer and/or Employer Association, where applicable.

(b) It is agreed that in the handling of grievances before a Joint Local City Grievance Committee, the parties to the grievances in issue, including the employee filing the grievance, another employee of the same Employer or a representative of the Employer, are prohibited from serving as Committee members.

(c) Employees initiating grievances shall set forth their claim, in writing, to the Employer with a duplicate copy to the steward and/or the Union Representative within seven (7) calendar days after he/she returns to his/her home terminal or seven (7) calendar days from the occurrence of the matter. In the event the employee fails to comply with these provisions of paragraph (c) the grievance shall

**173**

ABF 003862

representatives of the Employer and/or Employer Association, where applicable and the representative or alternate from each of the Local Union Nos. 229, 401, 429, 430, 764, 771, 773, 776. The expenses incurred by the Joint Area Grievance Committee shall be borne equally by all the Local Union, Employer and/or Employer Association, where applicable, members who are parties to this Agreement. This Section may be modified by the Committee's Rules of Procedure.

(b) The efficient operation of the Committee including those matters related to but not limited to the selection and duties of the Secretary, the preparation of the agenda, the scheduling and hearing of cases and the expenses of the Committee shall be governed by the Committee "Rules of Procedure".

The Secretary, if not a member of the Joint Area Grievance Committee, shall have no voice in making decisions and shall perform only the duties assigned to him/her by the Joint Area Grievance Committee.

The Secretary shall attend the meetings to prepare and keep the minutes and provide copies of the minutes to the members of the Committee and shall also provide copies of the decisions of the Joint Area Grievance Committee to all Employer and/or Employer Association, where applicable, members and Local Unions who are party to cases heard.

(c) A grievance to be heard by the Joint Area Grievance Committee must be in writing and submitted to the Secretary on the agreed-to submission forms seven (7) days prior to the meeting of the Joint Area Grievance Committee. It is agreed there shall always be equal representatives of the Local Unions and Employer and/or Employer Association, where applicable, members on the Joint Area Grievance Committee and the decision of the majority of the Committee members present at the meeting shall be final and binding on all parties with no further appeal.

(d) It is understood and agreed the Employer and the Local Union involved in a proceeding before the Committee will be ineligible to act as a member of the Joint Area Grievance Committee during that proceeding.

(e) When the Joint Area Grievance Committee fails to reach a majority decision, the case shall be considered deadlocked and referred to the Eastern Region Joint Area Committee.

ABF 003865

the right to submit the grievance to the Joint Local City Grievance Committee.

A Joint Local City Grievance Committee shall have the jurisdiction of all grievances referred to it, except as set forth in paragraph (g) hereof. The majority decision of the Committee shall be final and binding on all parties, with no further appeal.

(g) The Joint Local City Grievance Committees shall not have jurisdiction over or authority to decide any grievance which,

(i) involves a discharge, the uniform construction, application, operation or interpretation of this Agreement,

(ii) pertains to a matter, the decision as to which would involve more than one Local Union, a party to this Agreement.

(iii) involves claims for delinquent contributions to Health and Welfare Funds (Article 49) and/or Pension Fund (Article 50). Such claims shall be heard and resolved as provided in Section 5.

Grievances which are within the scope of (i), (ii) or (iii) above shall be referred to and decided by the Joint Area Grievance Committee. A decision and an award by a Joint Local City Grievance Committee which is within the scope of (i), (ii) or (iii) above shall be null and void.

The Joint Area Grievance Committee shall hear and decide a grievance when any party hereto contends:

1. the Joint Local City Grievance Committee has no jurisdiction or authority to hear and decide a matter because it is within the scope of (i), (ii) or (iii) above;

2. a decision and an award of a Joint Local City Grievance Committee is null and void because the issue decided is within the scope of (i), (ii) and (iii) above.

(h) When a majority of a Joint Local City Grievance Committee fails to reach a decision or agree upon a settlement the matter shall be submitted to the Secretary of the Joint Area Grievance Committee.

## Section 2. - Joint Area Grievance Committee

(a) The Joint Area Grievance Committee shall be composed of the

ABF 003864

Welfare Fund and/or Pension Fund, created under this Agreement, in accordance with the rules and regulations of the Trustees of such Funds, and after the proper official of the Local Union has given seventy-two (72) hours' notice, excluding Saturday, Sunday, and holidays, to the Employer of such delinquency in Health and Welfare or Pension Fund payments, the employees or their representatives shall have the right to take such action as may be necessary until such delinquent payments are made, and it is further agreed that in the event such action is taken, the Employer shall be responsible to the employees for losses resulting therefrom. Action for delinquent contributions may be instituted by either the Local Union, or the Conference.

Any delinquent Employer must also pay all attorney's fees and costs of collection.

## Section 6. - National Grievance Committee

All questions of interpretation involving any Article in the National Master Agreement not specifically covered in this Agreement shall be promptly referred to the National Grievance Committee by the Joint Area Grievance Committee.

## ARTICLE 44 - DISCHARGE OR SUSPENSION

The Employer shall not discharge nor suspend any employee without just cause but in respect to discharge or suspension shall give at least one (1) warning notice of the complaint against such employee to the employee, in writing, and a copy of the same to the Union affected, except that no warning notice need be given to any employee before he/she is suspended or discharged if the cause of such suspension or discharge is dishonesty, proven theft, drunkenness, drinking alcoholic beverages, or while under the influence of alcoholic beverages, or drug intoxication as provided in Article 35, Section 3, the use of narcotics (as described in the Federal Pure Food and Drug Act), barbiturates, or amphetamines, or the possession of narcotics named above during a tour of duty, refusal to submit to a sober-meter, other sobriety or alcohol test, recklessness resulting in a serious accident while on duty, failure to report an accident, unprovoked assault on an Employer or management supervisor, carrying of unauthorized passengers, willful abuse

**178**

ABF 003867

Discharge cases which have been deadlocked by the Eastern Region Joint Area Committee, shall be referred back to the Central Pennsylvania Negotiating Committee for resolution. Failure of the Central Pennsylvania Negotiating Committee to resolve the issue, it shall be submitted to final and binding arbitration as set forth in the Central Pennsylvania Joint Area Grievance Committee Rules of Procedure.

(f) A pay award of the Grievance Committee referred to above, or a pay claim resolved between the Local Union and the Employer, shall be paid no later than the 2nd regular pay day after the Employer has received notice of the decision and award from the Grievance Committee, or agreed to such pay claim settlement in writing. Consistent abuse of this provision may subject the Employer to penalty pay.

The term "regular pay day" means the next regular pay day for the week in which the Employer receives notice of the decision and award from the Committee.

(g) Questions involving interpretations of this Agreement will be referred to the Negotiating Committee for a decision.

(h) Changes of Operation involving Local Unions bound by the terms and provisions of this Agreement will be filed directly with the Central Pennsylvania Joint Area Grievance Committee.

## Section 3. - Examination of Records

The Local Union, Joint Local City Grievance Committee or Joint Area Grievance Committee shall have the right to examine time sheets and any other records pertaining to the computation of compensation of any individual or individuals whose pay is in dispute or records pertaining to a specific grievance.

## Section 4. - Right to Institute Legal Proceedings

Nothing herein shall prohibit legal proceedings by any party heretofor a breach of the provisions of Article 53, Strikes and Lockouts.

## Section 5. - Claim for Delinquent Contributions to Health and Welfare and Pension Funds

It is agreed that in the event any Employer is delinquent at the end of a period in the payment of his/her contribution to the Health and

**177**

ABF 003866

Ex. 6

1

1  IN THE UNITED STATES DISTRICT COURT
   FOR THE MIDDLE DISTRICT OF PENNSYLVANIA
2
   CASE NO. 1:CV-00-878
3  JUDGE SYLVIA H. RAMBO
   - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x
4  JEFFERY D. ALBRIGHT, NORMAN T.         :
   BOIRE, GARY M. DIETZ, WILLIAM H.       :
5  ERDMAN, MICHAEL W. FRITZ,              :
   A. RONALD FROMBAUGH, RALPH A.          :
6  HARRIS, ALLEN W. LANDIS, LOWELL        :
   MCGUIRE, WALTER R. MINICH,             :
7  RAYMOND C. NEVINS, STANLEY L. NYE,     :
   VINCENT RAMIREZ, JR., KEITH E.         :
8  SGRIGNOLI, RAY G. SNYDER, JR., and     :
   LAWRENCE D. WELKER,                    :
9             Plaintiffs,                 :
                                          :
10      -vs-                              :
                                          :
11 DANIEL A. VIRTUE, Business Agent of    :
   the International Brotherhood of       :
12 Teamsters; INTERNATIONAL BROTHERHOOD   :
   OF TEAMSTERS; LOCAL 776, INTERNATIONAL :
13 BROTHERHOOD OF THE TEAMSTERS; ABF      :
   FREIGHT SYSTEM, INCORPORATED,          :
14            Defendants.                 :
   - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x
15 ─────────────────────────────────────────

16      Deposition Testimony of LEON EDENBO

17 ─────────────────────────────────────────
18 417 Walnut Street              October 4, 2002
   Harrisburg, PA                 10:15 a.m.

19
        IT IS HEREBY STIPULATED and agreed that
20 the sealing of the within transcript is waived;
        IT IS FURTHER STIPULATED and agreed that
21 all objections except as to the form of the
   question are reserved to the time of trial.

22 ─────────────────────────────────────────
23            LEARY REPORTING
        112 West Main Street, Ste. 200
24    Mechanicsburg, Pennsylvania  17055

25    (717) 233-2660    Fax (717) 691-7768

142

1          A      As far as I know, yes.

2          Q      And did they become ABF employees at

3    that time?

4          A      Yes.

5          Q      Did you meet with any of the

6    plaintiffs in this case when they came to ABF in

7    the late 1998-1999 time frame?

8          A      I was responsible for the driver

9    orientation.  So I met with each one of them to

10   go through the orientation.

11         Q      So you met with all 16 plaintiffs

12   that are listed on this Complaint in front of

13   you?

14         A      Yes.

15         Q      Did you have any discussion with the

16   drivers when they came to ABF about their

17   seniority?

18         A      Oh, yes.

19         Q      And what was that discussion?

20         A      Well, they asked me specifically

21   about the seniority issue.  And I explained to

22   them what I knew, that under the 5.5 rule they

23   would not have seniority, that they would go to

24   the bottom of the extra board -- on the bottom of

25   the seniority list.

Ex. 7

1

1  UNITED STATES DISTRICT COURT
   FOR THE MIDDLE DISTRICT OF PENNSYLVANIA
2
   Civil Action No. 1:CV-00-878
3  ----------------------------------------x
   JEFFREY A. ALBRIGHT,   NORMAN T.        :
4  BOIRE, GARY M. DIETZ, WILLIAM H.        :
   ERDMAN, MICHAEL W. FRITZ,               :
5  A. RONALD FROMBAUGH, RALPH A.           :
   HARRIS, ALLEN W. LANDIS, LOWELL         :
6  MCGUIRE, WALTER R. MINICH,              :
   RAYMOND C. NEVINS, STANLEY L. NYE,      :
7  VINCENT RAMIREZ, JR., KEITH E.          :
   SGRIGNOLI, RAY G. SNYDER. JR., and      :
8  LAWRENCE D. WELKER,                     :
                                           :
9                       Plaintiffs,        :
                                           :
10           - vs -                        :
                                           :
11 DANIEL A. VIRTUE, Business Agent of     :
   the International Brotherhood of        :
12 Teamsters; INTERNATIONAL BROTHERHOOD    :
   OF TEAMSTERS; LOCAL 776,                :
13 INTERNATIONAL BROTHERHOOD OF            :
   TEAMSTERS; ABF FREIGHT SYSTEM           :
14 INCORPORATED,                           :
                                           :
15                      Defendants.        :
   ----------------------------------------x
16

17  _____

        Deposition Testimony of DAVID QUIDORT
18  _____

19  417 Walnut Street              October 25, 2002
    Harrisburg, PA                 10:00
20  _____

21      IT IS HEREBY STIPULATED and agreed that the
    reading, sealing, and signing of the within
22  transcript are waived;
        IT IS FURTHER STIPULATED and agreed that all
23  objections except as to the form of the question
    are reserved to the time of trial.
24  _____

25          LEARY REPORTING, (717) 233-2660

116

1    EXAMINATION BY MS. WEISS:

2          Q     Mr. Quidort, you testified that at

3    the terminal level hearings the company, ABF,

4    took the position that the grievances were

5    untimely.  Am I correct?

6          A     If I remember, those that were --

7    some of them we took that position.

8          Q     Did the union agree with ABF's

9    position?

10         A     No.  They said we'll argue it.

11               MS. WEISS:  No further questions.

12               MR. WEINSTOCK:  Nothing.

13               COURT REPORTER:  And you would like

14   a copy?

15               MS. WEISS:  Yes.

16               COURT REPORTER:  Copy?

17               MR. WEINSTOCK:  Yes.

18               MR. MIRIN:  And I would like a copy.

19

20               (Deposition adjourned 4:26 p.m.)

21

22

23

24

25



Ex. 8

**EASTERN REGION JOINT AREA COMMITTEE**
**Embassy Suites**
**Myrtle Beach, South Carolina**
**Tuesday, April 27, 1999**

RECEIVED
MAR 26 2002

**COMMITTEE B**

R-39-99    Local 776 v. ABF Freight System, Inc.
            On behalf of Norman Runk (Pilot #89002), Union alleges violation of
            Article 5, timeliness issue.

UNION PANEL:            Ron Jenkins
                        Herman Volpe
                        Keith Noll



EXHIBIT
Snyder 11
85-02 KB

EMPLOYER PANEL:         Dan Schmidt, Chairman
                        Dan Wachhaus
                        Don Rucker

<u>Dan Schmidt, Chairman</u>: Company point of order. Identify your parties and present your case.

<u>Dan Virtue, Local 776</u>: Again, Mr. Chairman, we're here on a point of order and the point of order only.

<u>Schmidt</u>: State your name for the record.

<u>Virtue</u>: Dan Virtue, Business Agent. The Company and Union agree that we're here on the point of order only.

<u>Steve Froias, ABF Freight</u>: Froias for the Company, that's correct.

<u>Schmidt</u>: So noted.

<u>Froias</u>: To my right, Dave Quidort. The Union is claiming a violation of Article 5, Section 2 of the NMFA. Specifically, that the grievant's seniority date of December 11, 1998 is incorrect.

The grievant requested transfer opportunity under Article 5, Section 5 on November 30, 1998. He was offered and accepted transfer on December 3, 1998. He reported and worked his first day on December 11, 1998. The grievance was given to the Company on December 26, 1998.

The Central PA Over-the-Road and Local Cartage Supplemental Agreement, Article 43, Section 1© reads in part: "Employees initiating grievances shall set forth their claim, in writing, to the Employer with a duplicate copy to the steward and/or Union

Representative within seven calendar days after he/she returns to his/her home terminal or seven calendar days from the occurrence of the matter."

Attached to my brief, is a copy of a letter from the grievant to ABF Freight System: "Gentlemen: Please consider me for rehire for road driver in Carlisle, PA under Article 5, Section 5 of the Master Freight Agreement. Very truly yours, Norman Runk."

The next exhibit, dated December 9th, certified mail #P433236208, Mr. Norman Runk. "Dear Mr. Runk: In accordance with Article 5, Section 5 of the National Master Freight Agreement, on December 3, 1998, you were contacted and offered an opportunity to transfer to permanent employment in your classification at Erie, PA, Carlisle, PA or Winston-Salem, NC. This letter is to confirm that you elected to accept the job offer at Carlisle, PA. Please contact the line driver supervisor at that location to determine your reporting date if you have not done so. Very truly yours, Gordon Ringberg."

The next exhibit is a copy of the grievance. It was given to the Company and initialed on December 26th. I believe you can read that even though it's highlighted.

Next I have a copy of the language I read to you from Article 43, Section 1©. Also attached is a transcript of the tape of the job offer to transfer to Mr. Runk. I'd like to read it into the record:

Ringberg: Yes, sir, I'm trying to get ahold of Norman Runk, please
Runk: Yes, that is who you are talking to.
Ringberg: It is? Norman, my name is Gordon Ringberg.
Runk: Oh.
Ringberg: I'm with ABF Freight System.
Runk: How are you doing?
Ringberg: I'm doing good. How are you doing?
Runk: OK.
Ringberg: You sent a letter into the Company requesting work opportunity under Article 5, Section 5 of the contract.
Runk: Yes.
Ringberg: I'm making a call to you to make that offer right now but before I do, I need to ask you a couple of questions, if I can, please.
Runk: OK.
Ringberg: Your current status, are you driving for somebody, drawing your pension, or what are you doing?
Runk: I'm driving.
Ringberg: Who are you driving for?
Runk: Consolidated Freight.
Ringberg: Consolidated Freightways?
Runk: Yes.
Ringberg: And what is your seniority date with them?
Runk: Gosh, 96, I have to think a minute. March, I think March of, March 16 of 96, I believe.

2

Ringberg:  Three of 96 is good enough.

Runk:  Yeah, don't hold me to that exact date.

Ringberg:  Well, 1996 is the key in this issue.  OK, with that in mind, I need to, here is your job opportunities.  We have Carlisle, Erie and Winston-Salem.

Runk:  Carlisle, please.

Ringberg:  You want to go to Carlisle?

Runk:  Yes.

Ringberg:  Are you going to accept Carlisle?

Runk:  Yes.

Ringberg:  I'm writing, just a minute.  OK, do you have a pencil?

Runk:  Yes.

Ringberg:  You need to call Gary Drake or Lee Edenbo.

Runk:  OK.  I know both of them.

Ringberg:  And that phone number is 717/245-0384 and they will set up with you to get your physical updated, orientation, and all of that to get you on the road.  They are waiting on you.

Runk:  OK.

Ringberg:  They are ready for you to truck.

Runk:  OK, and that is starting at 100% with Company seniority?

Ringberg:  No, you don't have Company seniority.  You keep your Company seniority for fringe benefits, meaning vacation.

Runk:  Vacation, yes.

Ringberg:  But you go on the bottom of the seniority list at full rate of pay.

Runk:  Yes.

Ringberg:  At the rate, golly, you have a seniority date of what, 1901, no, 1984.  And so you will be at the full rate of pay, but you will be at the bottom of the list.

Runk:  OK, I understand that.

Ringberg:  And there is, I think they are being placed on there as soon as they get there, so I think it would be advantageous to you to get there as soon as you can.

Runk:  OK.

Ringberg:  All right?

Runk:  I appreciate it.

Ringberg:  OK.  Good luck to you.

Runk:  Thank you.

Ringberg:  Thank you.  Goodbye, now.

Runk:  Goodbye.


Back to the brief.  We respectfully submit this grievance is untimely and improper before the Committee.  I'll hold for summation and rebuttal, Mr. Chairman.


Schmidt:  Union, identify your parties and present your case.


Virtue:  Dan Virtue for the Local Union.  (Norm Runk and various names introduced.)  Again, Mr. Chairman, Mr. Runk, when he sent that letter in, he sent the letter to get accepted, to go to work.  When he did finally get to work, he started work, again, if you look at my brief, under Exhibit 1, Article 5, Section 4(d), Posting Seniority List, I will go



over it with the Panel. It's very clear, it's the National language, and Mr. Runk has thirty days from the posting of the seniority list, which he did file. As soon as the seniority list was posted, he filed a grievance within thirty days.

Every person sitting in this room that has a grievance here did exactly the same thing. They filed a grievance within thirty days of the posting of the seniority list. Each person sitting in this room also did send a letter so they can get a job opportunity and get to work. That's what they did. As soon as they got there, when the seniority list went up, they filed a grievance timely.

Do any of you guys have something you want to say.

<u>William Erdman</u>: You stated that we were offered transfers, right?

<u>Virtue</u>: No, his statement was letters were sent . . . .

<u>Erdman</u>: He stated that we were offered transfers to Carlisle, Erie or Winston-Salem.

<u>Virtue</u>: I guess in this letter he's talking . . . .

<u>Erdman</u>: Correct. I mean Carlisle.

<u>Jenkins</u>: In the tape that he read off with Runk, it said he was offered Carlisle, Erie or Winston-Salem, NC. That's where . . . .

<u>Erdman</u>: Transferred to. We never transferred anywhere, we were staying in Carlisle (not clear).

<u>Ray Snyder</u>: I don't know where he got all the conversations here, but I know I was not offered a conversation like that. I'd like to hear a tape with me on it. All is, I was called and offered Carlisle or Erie, and I took the Carlisle, he says to get ahold of Gary Drake or Lee. I mean, you're saying he said it was Article 5. We weren't aware of all this stuff you're saying in this letter. I was not told all that. Maybe Norm was. I can't say what Norm was told and what you have on the paper there. But I know I wasn't told all this.

As far as the seniority number, up until April of this year, I did not have a seniority number. All my slips had on it, it says extra. That's all I have to say.

<u>Virtue</u>: The point of the matter is that the whole case is this. Whether they have it on transcript, whether they don't, whether someone sends a letter, the contract's pretty clear on the thirty days of filing a grievance. The seniority list was posted, they all filed timely under the contract. Everyone of them filed timely, as far as Article 5, Section 4(d), Posting of Seniority List.

**Schmidt**:  Is that your case, Union?  Anything else you guys want to add? Company, sum up and rebut.

**Froias**:  The grievants requested transfer under Article 5, Section 5, they accepted transfer under Article 5, Section 5, and they reported under Article 5, Section 5.  I have copies of the letters we received from each of the grievants requesting transfer opportunity under Article 5, Section 5.  I have copies of the certified letters that they were all sent after they accepted transfer under Article 5, Section 5.  I'll leave them with the Committee for your perusal.

You have the facts, Mr. Chairman.

**Schmidt**:  Union, sum up and rebut.

**Virtue**:  You have the case.  Basically, it's our position that each one of these persons filed a grievance timely.  Under the contract they filed a grievance within thirty days per the National Master Freight Agreement and it was timely filed.

I think as far as the letters, I don't think that's an issue in the case.  I think the issue is was the grievance filed timely or not, and it was filed timely.  That's all I have.

**Jenkins**:  I think the gentleman over there has something to say.  State your name.  If you all got something to say, you can do that.

**Schmidt**:  State your name for the record.

**Michael Fritz**:  I just wanted to say we did not transfer, we did not transfer, we stayed in Carlisle.  Thank you.

**Jenkins**:  Is there anything anybody else would like to say on the record?

**Vinnie Ramirez**:  Yeah.  We did file the grievances timely.  We did exactly according to the Master Freight.  For thirty days of posting, we filed a grievance.  And we're right. We're not untimely.  Another thing, Article 5, Section 5 shouldn't even be discussed in this matter.  We're discussing an untimely matter.

**Jenkins**:  Anybody else?  Gentlemen, if you got something to say, you can say it.

**Charley Albright**:  Just to mirror what Vinny said, that we are just here to hear a timely issue and that I think we all did file our grievances in a timely manner.

**Volpe**:  What was your first name, Mr. Albright?

**Albright**:  Charles.

5

<u>Schmidt</u>: Questions from the Panel. Hearing none, Executive Session.

**DECISION:**  The Panel, in executive session, motion made, seconded and carried that since the grievances knew their seniority positions on the day they reported, the Company's point of order is upheld.  Cost Union.

6

AUG. -05' 02(MON) 09:04    MORGAN, LEWIS 14    TEL:14066    P. 002    EX. 9

## Eastern Region Joint Area Committee

Established in accordance with the terms and conditions of the National Master Freight Agreement and the ___C PA___ Supplemental Agreement, entered into by and between the Local Union and carriers engaged in City Pickup and Delivery and/or Over-the-Road Freight Operations.

Docket No. __R-39-99__

ABF# 042-031-AP-99

IN THE MATTER OF THE DISPUTE BETWEEN

Teamsters Local(s) No. __776__

__Harrisburg, PA__
City _____ State

and                                        Submission

EXHIBIT

Snyder 14
8-5-02 KB

__ABF Freight System, Inc.__
Name of Employer

We, the undersigned, parties to the National Master Freight Agreement and the _____ C PA _____ Supplemental Agreement, hereby agree to submit the dispute to arbitration under the Rules of Procedure prescribed by the Eastern Region Joint Area Committee, by virtue of its authority, as set forth in Article __43__ and ___ of the __C PA__ Supplemental Agreement, the following:

> On behalf of Norman Runk (Pilot #89002), Union alleges violation of Article 5, timeliness issue.

The undersigned further agree that a majority decision of the Eastern Region Joint Area Committee in the above dispute will be final, conclusive and binding with no appeal and, further, that neither party will attempt through any overt acts, to void the decision rendered.

The undersigned also agree that failure to comply with the decision of a majority of the Committee within ten (10) days of the date of the decision will result in the loss of all contract rights, privileges and benefits due them under Article __43__ of the ___C PA___ Supplemental Agreement.

Date __April 27, 1999__

Employer __ABF Freight System, Inc.__        Local Union(s) __776__

Signed by __Steven J. Froias__               Signed by __Daniel A. Virtue__

Title __Dir., Ind. Rels.__                   Title __Bus. Agent__

### DECISION

> The Panel, in executive session, motion made, seconded and carried that since the grievants knew their seniority positions on the day they reported, the Company's point of order is upheld. Cost to Union.

__R. L. Schaeffer__                          __Nicholas Picarello__
Employer Co-Secretary                        Union Co-Secretary
__April 27, 1999__                           __April 27, 1999__
(Date)

ABF 003158

AUG 05 2002 09:20    14066    PAGE.02

Ex. 10

PHIL FERRANTE
VICE PRESIDENT
BRAD LINDSAY
RECORDING SECRETARY
BILL DUNHAM
TRUSTEE
MIKE HOYD
TRUSTEE
THOMAS VINSON
TRUSTEE

# CHAUFFEURS, TEAMSTERS AND HELPERS
# LOCAL UNION NO. 776

"AFFILIATED WITH THE INTERNATIONAL BROTHERHOOD OF TEAMSTERS"

2552 JEFFERSON STREET, HARRISBURG, PA 17110-2505

THOMAS B. GRIFFITH
PRESIDENT AND BUSINESS AGENT

JOHN L. FOGLE, II
SECRETARY TREASURER AND BUSINESS AGENT

BUSINESS AGENTS

CARLOS N. RAMOS, II
CHARLES SHUGHART
ROBERT J. SNYDER, JR.
RUSSELL A. STEPP
DANIEL A. VIRTUE

April 13, 1999

CERTIFIED MAIL
Z 569 115 448

Ray Snyder, Jr.
138 Linda Drive
Mechanicsburg PA 17055

EXHIBIT
Snyder 10
8-5-02 KB

Dear Ray:

The grievance you filed for seniority at ABF will be heard on Tuesday, April 27, 1999 at the Eastern Region Joint Area Grievance Committee, at the following location:

Embassy Suites
9800 Lake Drive
Myrtle Beach, South Carolina
(843) 449-0006

You must be present at 9:00 a.m. on Tuesday, April 27th. If you are going to attend, you should contact Dan Virtue at the Local Union no later than Tuesday, April 20, 1999, so that a letter may be sent to the Company excusing you for Union Business. You will be required to pay your own expenses to and from the hearings, as well as any overnight accommodations.

The only issue before the Eastern Region Joint Area Grievance Committee is whether the grievance is timely or untimely. If the claim of the Union is upheld, the case will be heard in July 1999 at the Eastern Region Joint Area Grievance Committee meeting.

Fraternally,

Daniel A. Virtue
Business Agent

DAV/bs

TELEPHONE (717) 233-8766
(800) 692-6280
FAX (717) 233-6023

Ex. 11

TEAMSTERS LOCAL 776

-vs-

ABF FREIGHT SYSTEMS

Case No. R-39-99

Grv. No. 89002
Norman Runk



**EXHIBIT**
Snyder 13
8-5-02 ICB

Pilot case for 90651, 90657, 90652, 85053, 89077, 89095, 89093, 88917, 89009, 89835

On the Point of Order

Exhibit 1 is Article 5, Section 4,d posting seniority list that I will go over with the Panel.

> The Employer shall give the Local Union a seniority list at least every six (6) months. The Employer shall also post a seniority list at least once every six (6) months and shall maintain a current seniority roster at the terminal. **Protest of any employee's seniority date or position on such list must be made in writing to the Employer within thirty (30) days after such seniority date or position first appears, and if no protests are timely made, the dates and positions posted shall be deemed correct.** Any such protest which is timely made may be submitted to the grievance procedure. (Emphasis added)

Therefore, based on the facts presented, the Union respectfully requests that the Company's Point of Order be denied.

Respectfully submitted,

Daniel A. Virtue
Business Agent

Ex. 12

**TEAMSTERS LOCAL 776**

-vs-

**ABF FREIGHT SYSTEMS**

Case No. R-38-99

Grv. No. 89012
Stan Nye

Pilot case for grievance nos. 85060, 89096,
57610, 89076, 90680, 89098 and 89837

```
┌─────────────────┐
│    EXHIBIT      │
│   szugnali 12   │
└─────────────────┘
```

On the Point of Order

Exhibit 1 is Article 5, Section 4,d posting seniority list, that I will go over with the Panel.

The Employer shall give the Local Union a seniority list at least every six (6) months. The Employer shall also post a seniority list at least once every six (6) months and shall maintain a current seniority roster at the terminal. **Protest of any employee's seniority date or position on such list must be made in writing to the Employer within thirty (30) days after such seniority date or position first appears, and if no protests are timely made, the dates and positions posted shall be deemed correct.** Any such protest which is timely made may be submitted to the grievance procedure. (Emphasis added)

Therefore, based on the facts presented, the Union respectfully requests that the Company's Point of Order be denied.

Respectfully submitted,

Daniel A. Virtue
Business Agent

Ex. 13

**EASTERN REGION JOINT AREA COMMITTEE**
**Embassy Suites**
**Myrtle Beach, South Carolina**
**Tuesday, April 27, 1999**

**COMMITTEE  B**

EXHIBIT

*Sgrguli 11*

R-38-99        <u>Local 776 v. ABF Freight System, Inc.</u>
On behalf of Stan Nye (Pilot #89012), Union alleges violation of Article 5, Section 5, timeliness issue.

**UNION PANEL:**            Ron Jenkins
Herman Volpe
Keith Noll

**EMPLOYER PANEL:**        Dan Schmidt, Chairman
Dan Wachhaus
Don Rucker

<u>Dan Schmidt, Chairman</u>:  Danny, identify your parties and . . . .

<u>Steve Froias, ABF Freight</u>:  Mr. Chairman, the Company has a point of order.

<u>Schmidt</u>:  OK.  Steve, identify your parties and tell us about your point of order.

<u>Froias</u>:  Froias for the Company and to my right, Dave Quidort.

<u>Dan Virtue, Local 776</u>:  Excuse me, to put it on the record, we're here to hear the point of order and the point of order, alone, and the Company and the Union agreed that we're here just on the point of order.

<u>Schmidt</u>:  OK.  That's fine, regardless of what we do here?

<u>Virtue</u>:  That's correct.

<u>Schmidt</u>:  OK.

<u>Froias</u>:  Froias for the Company.  The Union is claiming a violation of Article 5, Section 5 of the National Master Freight Agreement.   Specifically, that the seniority date of February 27, 1999 is incorrect.  The grievant requested transfer opportunity under Article 5, Section 5 on February 22, 1999.  He was offered and accepted transfer on February 22, 1999.  He reported and worked his first day on February 27, 1999.

The grievance was given to the Company on March 9, 1999.  Central PA and Over-the-Road and Local Cartage Supplemental Agreement, Article 43, Section 1©, reads in part: "Employees initiating grievances shall set forth their claim, in writing, to the Employer

with a duplicate copy to the steward and/or the Union Representative within seven (7) calendar days after he/she returns to his/her home terminal or seven (7) calendar days from the occurrence of the matter."

Also attached to my brief, I handed out, is a letter dated February 22nd, to Connie Vaughan, from Stanley Nye, Re: Road Driver Laid Off from ABF:   Request for consideration the right to transfer to any ABF, pursuant to the provisions of the decision in Case No. MR-CO-38-9/95:   I, Stanley Nye, road driver, laid off from ABF in Baltimore, MD, hereby notify you in writing of my desire to transfer and invoke my right to transfer under Article 5, Section 5 of the National Master Freight Agreement, as extended in the above-captioned case.

Also attached to that, dated February 25th, certified mail #Z093697089, Mr. Stanley Nye: "Dear Mr. Nye:  In accordance with Article 5, Section 5 of the NMFA, on February 22, 1999, you were contacted and offered opportunity to transfer to permanent employment in your classification at Erie, PA, Carlisle, PA or Winston-Salem, NC.  This letter is to confirm that you elected to accept the job offer at Carlisle, PA.  Please contact the line driver supervisor at that location to determine your reporting date if you have not done so.  Very truly yours, Gordon Ringberg."

We respectfully submit this grievance is untimely and improper before the Committee. I'll hold for summation and rebuttal, Mr. Chairman.

Schmidt:  Union, identify the parties and present your case.

Virtue:  Dan Virtue, give your names for the record.  The names given are Larry Walker, Keith Sgrignoli, Ron Hicks.

First, gentlemen, before I go into the point of order, these two gentlemen, the other gentleman, the grievances are in this packet, contacted the Company with a letter, stating they wanted to go on to 5.5.  At that time, they didn't realize what 5.5 was.  Then, they took the job opportunity, came to Carlisle, PA, and at that time, went to work and then each one filed a grievance after the seniority list was posted at the Carlisle terminal.  If you look at my brief, Exhibit 1 is Article 5, Section 4(d), Posting Seniority List which I'll go over with the Panel.  This is National language and each grievant filed a grievance timely under the National language which says they have thirty days from the posting of the seniority list.  They did that timely and feel the case is timely and should be referred back to the parties on its merits.  Their position is it was all done timely under the National Master Freight Agreement under Article 5, Section 4(b), Posting Seniority List.

We'll hold for rebuttal.

Schmidt:  Company, rebut.

2

**Froias**: Mr. Chairman, all these employees requested transfer opportunity under Article 5, Section 5. I'll read a portion of that into the record: "Any employee accepting such offer shall be employed as a new hire and shall be placed at the bottom of the seniority board for bidding and layoff purposes and shall retain Company seniority for fringe benefits only."

They were aware of it when they requested Article 5, Section 5. They were aware of it when they accepted transfer under Article 5, Section 5, and they were aware of it when they reported to work under Article 5, Section 5. You have the facts.

**Schmidt**: Union, sum up and rebut.

**Virtue**: Like I said, their position is they weren't aware of it under 5.5, they did send a letter in to get the job opportunity, they waited for the posting of the seniority list. Under the National Master Freight Agreement, at that time, they filed a grievance in a timely manner.

**Larry Walker**: I called down in Ft. Smith, AR, and she told me what I needed to do was fax down everything, my name and everything, to renew employment under Article 5, Section 5 of the Master Layoff List, which I was on, according to the contract, which I did, and she called me back and told me that I was to call Gary Drake or Lee Edenbo to set up an appointment to go in and see them and I did exactly what I was told and that after I found out, I did everything they told me to do, and then I filed a grievance on it, because I didn't know the seniority was up. I was laid off through ABF.

**Schmidt**: Any other rebuttal from the Union?

**Sgrignoli**: I agree with him, except, I agree with Larry, we were contacted that there was job opportunities. We sent all the information down to Ft. Smith as they requested. They called us and offered us two positions to move back and we picked what we wanted and we moved back in. I waited until the seniority list was posted, like he said the Master Freight Agreement, and I filed my grievance because I found out then that whoever was hired before me or with me that we were not in the right slot.

**Schmidt**: Is that your rebuttal? Questions.

**Ron Jenkins**: Has anybody got a seniority list with them?

**Froias**: I don't.

**Schmidt**: Any other questions? Hearing none, Executive Session.

**DECISION**: The Panel, in executive session, motion made, seconded and carried that since the grievants knew their seniority positions on the day they reported, the Company's point of order is upheld. Cost Union.

3

Ex. 14
a 11-

## Eastern Region Joint Area Committee

Established in accordance with the terms and conditions of the National Master Freight Agreement and the ___C PA___ Supplemental Agreement, entered into by and between the Local Union and carriers engaged in City Pickup and Delivery and/or Over-the-Road Freight Operations.

Docket No. __R-38-99__

IN THE MATTER OF THE DISPUTE BETWEEN

Teamsters Local(s) No. ___776___

___Harrisburg, PA___
City                    State

and

___ABF Freight System, Inc.___
Name of Employer

RECEIVED
MAY 1 0

Submission

1

We, the undersigned, parties to the National Master Freight Agreement and the _____C PA_____ Supplemental Agreement, hereby agree to submit the dispute to arbitration under the Rules of Procedure prescribed by the Eastern Region Joint Area Committee, by virtue of its authority, as set forth in Article __43__ and ___ of the ___C PA___ Supplemental Agreement, the following:

On behalf of Stan Nye (Pilot #89012), Union alleges violation of Article 5, Section 5, timeliness issue.

The undersigned further agree that a majority decision of the Eastern Region Joint Area Committee in the above dispute will be final, conclusive and binding with no appeal and, further, that neither party will attempt through any overt acts, to void the decision rendered.

The undersigned also agree that failure to comply with the decision of a majority of the Committee within ten (10) days of the date of the decision will result in the loss of all contract rights, privileges and benefits due them under Article __43__ of the ___C PA___ Supplemental Agreement.

Date _____April 27, 1999_____

Employer ___ABF Freight System, Inc.___
Signed by ___Steven J. Frolas___
Title ___Dir., Ind. Rels.___

Local Union(s) _____776_____
Signed by ___Daniel A. Virtue___
Title ___Bus. Agent___

### DECISION

The Panel, in executive session, motion made, seconded and carried that since the grievants knew their seniority positions on the day they reported, the Company's point of order is upheld. Cost to Union.

EXHIBIT
Spignoli 13

___R. L. Schaeffer___
Employer Co-Secretary
___April 27, 1999___
(Date)

___Nicholas Picarello___
Union Co-Secretary
___April 27, 1999___
(Date)

Ex. 15

# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

JEFFREY D. ALBRIGHT, NORMAN T. :
BOIRE, GARY M. DEITZ, WILLIAM H. :
ERDMAN, MICHAEL W. FRITZ, :
A. RONALD FROMBAUGH, RALPH A. :
HARRIS, ALLEN W. LANDIS,  LOWELL :
McGUIRE, WALTER R. MINICH, :
RAYMOND C. NEVINS, STANLEY L. NYE, :
VINCENT RAMIREZ, JR., KEITH E. :
SGRIGNOLI, RAY G. SNYDER, JR., and :
LAWRENCE WELKER, :
 :
        Plaintiffs :
 :
    v.     :   NO. 1:CV-00-0878
 :   (Judge Rambo)
 :
DANIEL A. VIRTUE, Business Agent of the :
International Brotherhood of Teamsters; :
INTERNATIONAL BROTHERHOOD OF :
TEAMSTERS; LOCAL 776, :
INTERNATIONAL BROTHERHOOD OF :
TEAMSTERS; ABF FREIGHT SYSTEM, :
INCORPORATED, :
 :
        Defendants :

## AFFIDAVIT OF DANIEL A. VIRTUE

COMMONWEALTH OF PENNSYLVANIA :
 :  ss
COUNTY OF DAUPHIN :

   Before me, the undersigned authority, personally appeared Daniel A. Virtue, who, being first

duly sworn by me according to law, did depose and state as follows:

1.  I am, and have been at all times relevant to the issues raised in Plaintiffs' Amended Complaint.

   the Business Agent for Teamsters Local Union No. 776.

2.  Each of the above-named Plaintiffs worked at Carolina Freight's Carlisle facility at all times

relevant to the issues raised in Plaintiffs' Complaint.

3.     On May 23, 1995, Carolina Freight closed its Carlisle facility, but remained in operation at other Carolina Freight facilities.

4.     The employees covered by the Collective Bargaining Agreement, including all of the above-named Plaintiffs, at Carolina Freight's Carlisle facility were either laid off, or were offered employment at one of Carolina Freight's other facilities.

5.     ABF's parent company subsequently purchased Carolina Freight and on September 25, 1995, merged its operations with other companies owned by the parent company.

6.     Article 43, Section 1(c) of the Central Pennsylvania Supplemental Agreement (Collective Bargaining Agreement) states, in relevant part, "Employees initiating grievances shall set forth their claim, in writing, to the Employer with a duplicate copy to the Steward and/or Union Representative within seven (7) calendar days after he/she returns to his/her home terminal or seven (7) calendar days from the occurrence of the matter. In the event the employee fails to comply with these provisions of paragraph (c) the grievance shall be considered untimely, thereby waiving his/her rights under the provisions of Article 43." (See Exhibit A accompanying the Local's Brief in Support of Motion to Dismiss).

7.     Article 5 Section 5 of the National Master Freight Agreement states:

Over-the-road employees, who are on letter of layoff, shall be given an opportunity to transfer to permanent over-the-road employment (prior to the employment of new hires) occurring at other over-the-road domiciles of the Employer located within the Regional area provided they notify the Employer in writing of their interest in a transfer opportunity. The offer a transfer will be made in the order of continuous over-the-road seniority of the laid-off drivers domiciled within the Regional area. The Employer shall be required to make additional offers of transfer to an employee who has previously rejected a transfer opportunity provided the employee again notifies

-2-

the Employer in writing of his/her continued interest in additional transfer opportunities. However, the Employer will only be required to make one transfer offer in any six (6) calendar month period. Any employee accepting such offer shall be paid at the employee's applicable rate of pay and shall be placed at the bottom of the seniority board for bidding and layoff purposes, but shall retain company seniority for fringe benefits only. A transferring employee shall pay his/her own moving expenses and shall, upon reporting to such new domicile, be deemed to have relinquished his/her right to return with seniority to the domicile from which he/she transferred. The provisions of this Section shall not supersede an established order of call/hiring in the Supplemental Agreement. (See Exhibit B accompanying the Local's Brief).

### Plaintiff Jeffrey D. Albright

8.  Plaintiff Jeffrey D. Albright, was at all times relevant to the issues raised in Plaintiffs' Amended Complaint, a member of Teamsters Local Union No. 776.

9.  Plaintiff Jeffrey D. Albright was employed by Carolina Freight and was laid off from that employment on May 23, 1995.

10. Teamsters Local Union No. 776 represented certain employees of Carolina Freight, including the Plaintiff, and represents certain employees of ABF, including the Plaintiff.

11. Following Plaintiff's lay-off, Carolina Freight was purchased by ABF's parent company.

12. Plaintiff notified ABF that he was interested in working at an ABF facility on December 4, 1998. (See Exhibits C and D accompanying the Local's Brief).

13. On December 14, 1998, Plaintiff Jeffrey D. Albright began working at ABF Freight Systems, Inc. Carlisle facility, and has worked at the Carlisle facility continuously ever since. (See Exhibit E accompanying the Local's Brief).

14. Plaintiff was notified, at the time he began working at ABF's Carlisle facility, that he was returning to work under Article 5, §5, and would be placed at the bottom of the seniority

roster.  (See Exhibit D accompanying the Local's Brief).

15.    Plaintiff did not file a grievance regarding his seniority within seven (7) days of beginning
work at the Carlisle facility.

16.    Prior to April 27, 1999, Plaintiff Jeffrey D. Albright's seniority date was posted at the Carlisle
facility.

17.    Prior to April 27, 1999, Plaintiff Jeffrey D. Albright filed a grievance regarding his seniority
date, as posted at the Carlisle facility.

18.    The relevant terms of the Collective Bargaining Agreement applicable to Plaintiff's grievance,
Article 43(c), which the Company raised as a Point of Order in the grievance process,
requires employees to file a grievance within seven (7) days.  (See Exhibit F accompanying
the Local's Brief).

19.    The relevant terms of the Collective Bargaining Agreement applicable to Plaintiff Jeffrey D.
Albright's grievance, Article 5, §4d, which the Company raised as a Point of Order in the
grievance process states:

> The Employer shall give the Local Union a seniority list at lease every
> six (6) months.  The Employer shall also post a seniority list at least
> once every six (6) months and shall maintain a current seniority roster
> at the terminal.  **Protest of any employee's seniority date or**
> **position on such list must be made in writing to the Employer**
> **within thirty (30) days after such seniority date or position first**
> **appears, and if no protests are timely made, the dates and**
> **positions posted shall be deemed correct**.  Any such protest which
> is timely made may be submitted to the grievance procedure.
> (Emphasis added).  (See Exhibit G accompanying the Local's Brief).

20.    Plaintiff Jeffrey D. Albright did not protest his seniority date in writing to the Employer within
thirty (30) days after the date his seniority date first appeared on the seniority roster.

21.   Plaintiff Jeffrey D. Albright did not file his grievance within thirty (30) days of the date his seniority date first appeared on the seniority roster.

22.   The Local processed Jeffrey D. Albright's grievance pursuant to the grievance process by taking the grievance to the Eastern Region Joint Area Committee, where the Company raised the above-mentioned Points of Order, arguing that the grievance was not timely.

23.   In a decision dated April 27, 1999, the Eastern Region Joint Area Committee sustained the Company's Points of Order and ruled that the Plaintiff's grievance was untimely. (See Exhibit H accompanying the Local's Brief).

24.   The Eastern Region Joint Area Committee found that "the grievants knew their seniority positions on the day they reported" to work at ABF. (*Id.*).

25.   The Union received the Eastern Region Joint Area Committee's decision on May 10, 1999. (*Id.*).

26.   The Union notified Plaintiff Jeffrey D. Albright, in writing, of the Eastern Region Joint Area Committee's decision on May 11, 1999, and enclosed a copy of the decision with the written notification.

27.   Plaintiff Jeffrey D. Albright was aware of the terms of the collective bargaining agreement regarding his seniority at ABF before May 11, 1999.

28.   Plaintiff Jeffrey D. Albright did not file suit in Federal Court, nor in any other Court, regarding his seniority date until May 16, 2000, when he filed a Complaint, subsequently supplemented by an Amended Complaint filed on May 26, 2000.

29.   Each time a new seniority roster is posted pursuant to the Collective Bargaining Agreement,

Plaintiff files the same grievance regarding his seniority date.

## Plaintiff Norman T. Boire

30.   Plaintiff Norman T. Boire, was at all times relevant to the issues raised in Plaintiffs' Amended Complaint, a member of Teamsters Local Union No. 776.

31.   Plaintiff Norman T. Boire was employed by Carolina Freight and was laid off from that employment on May 23, 1995.

32.   Teamsters Local Union No. 776 represented certain employees of Carolina Freight, including the Plaintiff, and represents certain employees of ABF, including the Plaintiff.

33.   Following Plaintiff's lay-off, Carolina Freight was purchased by ABF's parent company.

34.   Plaintiff notified ABF that he was interested in working at an ABF facility on December 9, 1998.  (See Exhibits C and I accompanying the Local's Brief).

35.   On January 8, 1999, Plaintiff Norman T. Boire began working at ABF Freight Systems, Inc. Carlisle facility, and has worked at the Carlisle facility continuously ever since.  (See Exhibit E accompanying the Local's Brief).

36.   Plaintiff was notified, at the time he began working at ABF's Carlisle facility, that he was returning to work under Article 5, §5, and would be placed at the bottom of the seniority roster.  (See Exhibit I accompanying the Local's Brief).

37.   Plaintiff did not file a grievance regarding his seniority within seven (7) days of beginning work at the Carlisle facility.

38.   Prior to April 27, 1999, Plaintiff Norman T. Boire's seniority date was posted at the Carlisle facility.

-6-

39.   Prior to April 27, 1999, Plaintiff Norman T. Boire filed a grievance regarding his seniority date, as posted at the Carlisle facility.

40.   The relevant terms of the Collective Bargaining Agreement applicable to Plaintiff's grievance, Article 43(c), which the Company raised as a Point of Order in the grievance process, requires employees to file a grievance within seven (7) days.  (See Exhibit F accompanying the Local's Brief).

41.   The relevant terms of the Collective Bargaining Agreement applicable to Plaintiff Norman T. Boire's grievance, Article 5, §4d, which the Company raised as a Point of Order in the grievance process states:

> The Employer shall give the Local Union a seniority list at lease every six (6) months.  The Employer shall also post a seniority list at least once every six (6) months and shall maintain a current seniority roster at the terminal.  **Protest of any employee's seniority date or position on such list must be made in writing to the Employer within thirty (30) days after such seniority date or position first appears, and if no protests are timely made, the dates and positions posted shall be deemed correct.**  Any such protest which is timely made may be submitted to the grievance procedure.  (Emphasis added).  (See Exhibit G accompanying the Local's Brief).

42.   Plaintiff Norman T. Boire did not protest his seniority date in writing to the Employer within thirty (30) days after the date his seniority date first appeared on the seniority roster.

43.   Plaintiff Norman T. Boire did not file his grievance within thirty (30) days of the date his seniority date first appeared on the seniority roster.

44.   The Local processed Norman T. Boire's grievance pursuant to the grievance process by taking the grievance to the Eastern Region Joint Area Committee, where the Company raised the above-mentioned Points of Order, arguing that the grievance was not timely.

45.    In a decision dated April 27, 1999, the Eastern Region Joint Area Committee sustained the Company's Points of Order and ruled that the Plaintiff's grievance was untimely. (See Exhibit H accompanying the Local's Brief).

46.    The Eastern Region Joint Area Committee found that "the grievants knew their seniority positions on the day they reported" to work at ABF. (*Id.*).

47.    The Union received the Eastern Region Joint Area Committee's decision on May 10, 1999. (*Id.*).

48.    The Union notified Plaintiff Norman T. Boire, in writing, of the Eastern Region Joint Area Committee's decision on May 11, 1999, and enclosed a copy of the decision with the written notification.

49.    Plaintiff Norman T. Boire was aware of the terms of the collective bargaining agreement regarding his seniority at ABF before May 11, 1999.

50.    Plaintiff Norman T. Boire did not file suit in Federal Court, nor in any other Court, regarding his seniority date until May 16, 2000, when he filed a Complaint, subsequently supplemented by an Amended Complaint filed on May 26, 2000.

51.    Each time a new seniority roster is posted pursuant to the Collective Bargaining Agreement, Plaintiff files the same grievance regarding his seniority date.

### Plaintiff Gary M. Deitz

52.    Plaintiff Gary M. Deitz, was at all times relevant to the issues raised in Plaintiffs' Amended Complaint, a member of Teamsters Local Union No. 776.

53.    Plaintiff Gary M. Deitz was employed by Carolina Freight and was laid off from that

employment on September 25, 1995.

54.    Teamsters Local Union No. 776 represented certain employees of Carolina Freight, including the Plaintiff, and represents certain employees of ABF, including the Plaintiff.

55.    Following Plaintiff's lay-off, Carolina Freight was purchased by ABF's parent company.

56.    Plaintiff notified ABF that he was interested in working at an ABF facility on November 16, 1998.  (See Exhibits C and J accompanying the Local's Brief).

57.    On November 20, 1998, Plaintiff Gary M. Deitz began working at ABF Freight Systems, Inc. Carlisle facility, and has worked at the Carlisle facility continuously ever since.  (See Exhibit E accompanying the Local's Brief).

58.    Plaintiff was notified, at the time he began working at ABF's Carlisle facility, that he was returning to work under Article 5, §5, and would be placed at the bottom of the seniority roster.  (See Exhibit J accompanying the Local's Brief).

59.    Plaintiff did not file a grievance regarding his seniority within seven (7) days of beginning work at the Carlisle facility.

60.    Prior to April 27, 1999, Plaintiff Gary M. Deitz's seniority date was posted at the Carlisle facility.

61.    Prior to April 27, 1999, Plaintiff Gary M. Deitz filed a grievance regarding his seniority date, as posted at the Carlisle facility.

62.    The relevant terms of the Collective Bargaining Agreement applicable to Plaintiff's grievance, Article 43(c), which the Company raised as a Point of Order in the grievance process, requires employees to file a grievance within seven (7) days.  (See Exhibit F accompanying

the Local's Brief).

63.    The relevant terms of the Collective Bargaining Agreement applicable to Plaintiff Gary M. Deitz's grievance, Article 5, §4d, which the Company raised as a Point of Order in the grievance process states:

> The Employer shall give the Local Union a seniority list at lease every six (6) months.  The Employer shall also post a seniority list at least once every six (6) months and shall maintain a current seniority roster at the terminal.  **Protest of any employee's seniority date or position on such list must be made in writing to the Employer within thirty (30) days after such seniority date or position first appears, and if no protests are timely made, the dates and positions posted shall be deemed correct**.  Any such protest which is timely made may be submitted to the grievance procedure. (Emphasis added).  (See Exhibit G accompanying the Local's Brief).

64.    Plaintiff Gary M. Deitz did not protest his seniority date in writing to the Employer within thirty (30) days after the date his seniority date first appeared on the seniority roster.

65.    Plaintiff Gary M. Deitz did not file his grievance within thirty (30) days of the date his seniority date first appeared on the seniority roster.

66.    The Local processed Gary M. Deitz's grievance pursuant to the grievance process by taking the grievance to the Eastern Region Joint Area Committee, where the Company raised the above-mentioned Points of Order, arguing that the grievance was not timely.

67.    In a decision dated April 27, 1999, the Eastern Region Joint Area Committee sustained the Company's Points of Order and ruled that the Plaintiff's grievance was untimely. (See Exhibit H accompanying the Local's Brief).

68.    The Eastern Region Joint Area Committee found that "the grievants knew their seniority positions on the day they reported" to work at ABF.  (*Id.*).

– 10 –

69.  The Union received the Eastern Region Joint Area Committee's decision on May 10, 1999. (*Id.*).

70.  The Union notified Plaintiff Gary M. Deitz, in writing, of the Eastern Region Joint Area Committee's decision on May 11, 1999, and enclosed a copy of the decision with the written notification.

71.  Plaintiff Gary M. Deitz was aware of the terms of the collective bargaining agreement regarding his seniority at ABF before May 11, 1999.

72.  Plaintiff Gary M. Dietz did not file suit in Federal Court, nor in any other Court, regarding his seniority date until May 16, 2000, when he filed a Complaint, subsequently supplemented by an Amended Complaint filed on May 26, 2000.

73.  Each time a new seniority roster is posted pursuant to the Collective Bargaining Agreement, Plaintiff files the same grievance regarding his seniority date.

**Plaintiff William H. Erdman**

74.  Plaintiff William H. Erdman, was at all times relevant to the issues raised in Plaintiffs' Amended Complaint, a member of Teamsters Local Union No. 776.

75.  Plaintiff William H. Erdman was employed by Carolina Freight and was laid off from that employment on May 23, 1995.

76.  Teamsters Local Union No. 776 represented certain employees of Carolina Freight, including the Plaintiff, and represents certain employees of ABF, including the Plaintiff.

77.  Following Plaintiff's lay-off, Carolina Freight was purchased by ABF's parent company.

78.  Plaintiff notified ABF that he was interested in working at an ABF facility on December 15,

1998. (See Exhibits C and K accompanying the Local's Brief).

79. On February 11, 1999, Plaintiff William H. Erdman began working at ABF Freight Systems, Inc. Carlisle facility, and has worked at the Carlisle facility continuously ever since. (See Exhibit E accompanying the Local's Brief).

80. Plaintiff was notified, at the time he began working at ABF's Carlisle facility, that he was returning to work under Article 5, §5, and would be placed at the bottom of the seniority roster. (See Exhibit K accompanying the Local's Brief).

81. Plaintiff did not file a grievance regarding his seniority within seven (7) days of beginning work at the Carlisle facility.

82. Prior to April 27, 1999, Plaintiff William H. Erdman's seniority date was posted at the Carlisle facility.

83. Prior to April 27, 1999, Plaintiff William H. Erdman filed a grievance regarding his seniority date, as posted at the Carlisle facility.

84. The relevant terms of the Collective Bargaining Agreement applicable to Plaintiff's grievance, Article 43(c), which the Company raised as a Point of Order in the grievance process, requires employees to file a grievance within seven (7) days. (See Exhibit F accompanying the Local's Brief).

85. The relevant terms of the Collective Bargaining Agreement applicable to Plaintiff William H. Erdman's grievance, Article 5, §4d, which the Company raised as a Point of Order in the grievance process states:

> The Employer shall give the Local Union a seniority list at lease every six (6) months. The Employer shall also post a seniority list at least

once every six (6) months and shall maintain a current seniority roster at the terminal. **Protest of any employee's seniority date or position on such list must be made in writing to the Employer within thirty (30) days after such seniority date or position first appears, and if no protests are timely made, the dates and positions posted shall be deemed correct**. Any such protest which is timely made may be submitted to the grievance procedure. (Emphasis added). (See Exhibit G accompanying the Local's Brief).

86.    Plaintiff William H. Erdman did not protest his seniority date in writing to the Employer within thirty (30) days after the date his seniority date first appeared on the seniority roster.

87.    Plaintiff William H. Erdman did not file his grievance within thirty (30) days of the date his seniority date first appeared on the seniority roster.

88.    The Local processed William H. Erdman's grievance pursuant to the grievance process by taking the grievance to the Eastern Region Joint Area Committee, where the Company raised the above-mentioned Points of Order, arguing that the grievance was not timely.

89.    In a decision dated April 27, 1999, the Eastern Region Joint Area Committee sustained the Company's Points of Order and ruled that the Plaintiff's grievance was untimely. (See Exhibit H accompanying the Local's Brief).

90.    The Eastern Region Joint Area Committee found that "the grievants knew their seniority positions on the day they reported" to work at ABF. (*Id.*).

91.    The Union received the Eastern Region Joint Area Committee's decision on May 10, 1999. (*Id.*).

92.    The Union notified Plaintiff William H. Erdman, in writing, of the Eastern Region Joint Area Committee's decision on May 11, 1999, and enclosed a copy of the decision with the written notification.

– 13 –

93.   Plaintiff William H. Erdman was aware of the terms of the collective bargaining agreement regarding his seniority at ABF before May 11, 1999.

94.   Plaintiff William H. Erdman did not file suit in Federal Court, nor in any other Court, regarding his seniority date until May 16, 2000, when he filed a Complaint, subsequently supplemented by an Amended Complaint filed on May 26, 2000.

95.   Each time a new seniority roster is posted pursuant to the Collective Bargaining Agreement, Plaintiff files the same grievance regarding his seniority date.

**Plaintiff Michael W. Fritz**

96.   Plaintiff Michael W. Fritz, was at all times relevant to the issues raised in Plaintiffs' Amended Complaint, a member of Teamsters Local Union No. 776.

97.   Plaintiff Michael W. Fritz was employed by Carolina Freight and was laid off from that employment on May 23, 1995.

98.   Teamsters Local Union No. 776 represented certain employees of Carolina Freight, including the Plaintiff, and represents certain employees of ABF, including the Plaintiff.

99.   Following Plaintiff's lay-off, Carolina Freight was purchased by ABF's parent company.

100.   Plaintiff notified ABF that he was interested in working at an ABF facility on November 4, 1998.  (See Exhibits C and L accompanying the Local's Brief).

101.   On November 21, 1998, Plaintiff Michael W. Fritz began working at ABF Freight Systems, Inc. Carlisle facility, and has worked at the Carlisle facility continuously ever since.  (See Exhibit E accompanying the Local's Brief).

102.   Plaintiff was notified, at the time he began working at ABF's Carlisle facility, that he was

returning to work under Article 5, §5, and would be placed at the bottom of the seniority roster. (See Exhibit L accompanying the Local's Brief).

103.  Plaintiff did not file a grievance regarding his seniority within seven (7) days of beginning work at the Carlisle facility.

104.  Prior to April 27, 1999, Plaintiff Michael W. Fritz's seniority date was posted at the Carlisle facility.

105.  Prior to April 27, 1999, Plaintiff Michael W. Fritz filed a grievance regarding his seniority date, as posted at the Carlisle facility.

106.  The relevant terms of the Collective Bargaining Agreement applicable to Plaintiff's grievance, Article 43(c), which the Company raised as a Point of Order in the grievance process, requires employees to file a grievance within seven (7) days. (See Exhibit F accompanying the Local's Brief).

107.  The relevant terms of the Collective Bargaining Agreement applicable to Plaintiff Michael W. Fritz's grievance, Article 5, §4d, which the Company raised as a Point of Order in the grievance process states:

> The Employer shall give the Local Union a seniority list at lease every six (6) months. The Employer shall also post a seniority list at least once every six (6) months and shall maintain a current seniority roster at the terminal. **Protest of any employee's seniority date or position on such list must be made in writing to the Employer within thirty (30) days after such seniority date or position first appears, and if no protests are timely made, the dates and positions posted shall be deemed correct.** Any such protest which is timely made may be submitted to the grievance procedure. (Emphasis added). (See Exhibit G accompanying the Local's Brief).

108.  Plaintiff Michael W. Fritz did not protest his seniority date in writing to the Employer within

– 15 –

thirty (30) days after the date his seniority date first appeared on the seniority roster.

109. Plaintiff Michael W. Fritz did not file his grievance within thirty (30) days of the date his seniority date first appeared on the seniority roster.

110. The Local processed Michael W. Fritz's grievance pursuant to the grievance process by taking the grievance to the Eastern Region Joint Area Committee, where the Company raised the above-mentioned Points of Order, arguing that the grievance was not timely.

111. In a decision dated April 27, 1999, the Eastern Region Joint Area Committee sustained the Company's Points of Order and ruled that the Plaintiff's grievance was untimely. (See Exhibit H accompanying the Local's Brief).

112. The Eastern Region Joint Area Committee found that "the grievants knew their seniority positions on the day they reported" to work at ABF. (*Id.*).

113. The Union received the Eastern Region Joint Area Committee's decision on May 10, 1999. (*Id.*).

114. The Union notified Plaintiff Michael W. Fritz, in writing, of the Eastern Region Joint Area Committee's decision on May 11, 1999, and enclosed a copy of the decision with the written notification.

115. Plaintiff Michael W. Fritz was aware of the terms of the collective bargaining agreement regarding his seniority at ABF before May 11, 1999.

116. Plaintiff Michael W. Fritz did not file suit in Federal Court, nor in any other Court, regarding his seniority date until May 16, 2000, when he filed a Complaint, subsequently supplemented by an Amended Complaint filed on May 26, 2000.

– 16 –

117.    Each time a new seniority roster is posted pursuant to the Collective Bargaining Agreement, Plaintiff files the same grievance regarding his seniority date.

### Plaintiff A. Ronald Frombaugh

118.    Plaintiff A. Ronald Frombaugh, was at all times relevant to the issues raised in Plaintiffs' Amended Complaint, a member of Teamsters Local Union No. 776.

119.    Plaintiff A. Ronald Frombaugh was employed by Carolina Freight and was laid off from that employment on May 23, 1995.

120.    Teamsters Local Union No. 776 represented certain employees of Carolina Freight, including the Plaintiff, and represents certain employees of ABF, including the Plaintiff.

121.    Following Plaintiff's lay-off, Carolina Freight was purchased by ABF.

122.    Plaintiff notified ABF that he was interested in working at an ABF facility on November 3, 1998.  (See Exhibits C and M accompanying the Local's Brief).

123.    On November 12, 1998, Plaintiff A. Ronald Frombaugh began working at ABF Freight Systems, Inc. Carlisle facility, and has worked at the Carlisle facility continuously ever since. (See Exhibit E accompanying the Local's Brief).

124.    Plaintiff was notified, at the time he began working at ABF's Carlisle facility, that he was returning to work under Article 5, §5, and would be placed at the bottom of the seniority roster.  (See Exhibit M accompanying the Local's Brief).

125.    Plaintiff did not file a grievance regarding his seniority within seven (7) days of beginning work at the Carlisle facility.

126.    Prior to April 27, 1999, Plaintiff A. Ronald Frombaugh's seniority date was posted at the

Carlisle facility.

127. Defendant Teamsters Local Union No. 776 has no record that Mr. Frombaugh ever filed a grievance regarding his placement on the seniority roster.

128. The relevant terms of the Collective Bargaining Agreement applicable to Plaintiff's claims in this litigation, Article 43(c), which the Company raised as a Point of Order in the grievance process, requires employees to file a grievance within seven (7) days. (See Exhibit F accompanying the Local's Brief).

129. The relevant terms of the Collective Bargaining Agreement applicable to Plaintiff A. Ronald Frombaugh's claim in this litigation, Article 5, §4d, which the Company raised as a Point of Order in the grievance process states:

> The Employer shall give the Local Union a seniority list at lease every six (6) months. The Employer shall also post a seniority list at least once every six (6) months and shall maintain a current seniority roster at the terminal. **Protest of any employee's seniority date or position on such list must be made in writing to the Employer within thirty (30) days after such seniority date or position first appears, and if no protests are timely made, the dates and positions posted shall be deemed correct**. Any such protest which is timely made may be submitted to the grievance procedure. (Emphasis added). (See Exhibit G accompanying the Local's Brief).

130. Plaintiff A. Ronald Frombaugh did not protest his seniority date in writing to the Employer within thirty (30) days after the date his seniority date first appeared on the seniority roster.

131. Plaintiff A. Ronald Frombaugh did not file any grievance within thirty (30) days of the date his seniority date first appeared on the seniority roster, nor within seven (7) days of the date he began working at ABF's Carlisle facility.

132. A decision dated April 27, 1999, the Eastern Region Joint Area Committee sustained the

– 18 –

Company's Point of Orders, raised in claims identical to the claims Mr. Frombaugh is raising in this litigation ruled that the grievances filed more than seven days after the employee returned to work at the Carlisle facility were untimely, and failure to protest placement on the seniority roster within thirty (30) days of commencing employment with ABF were untimely as the employees knew their placement on the seniority roster when the commenced work at ABF.

133.   The Committee's decision is applicable to the claims Mr. Frombaugh is raising in this litigation.

134.   Plaintiff A. Ronald Frombaugh did not file suit in Federal Court, nor in any other Court, regarding his seniority date until May 16, 2000, when he filed a Complaint, subsequently supplemented by an Amended Complaint filed on May 26, 2000.

### Plaintiff Ralph A. Harris

135.   Plaintiff Ralph A. Harris, was at all times relevant to the issues raised in Plaintiffs' Amended Complaint, a member of Teamsters Local Union No. 776.

136.   Plaintiff Ralph A. Harris was employed by Carolina Freight and was laid off from that employment on September 25, 1995.

137.   Teamsters Local Union No. 776 represented certain employees of Carolina Freight, including the Plaintiff, and represents certain employees of ABF, including the Plaintiff.

138.   Following Plaintiff's lay-off, Carolina Freight was purchased by ABF's parent company.

139.   Plaintiff notified ABF that he was interested in working at an ABF facility on November 16, 1998.  (See Exhibits C and N accompanying the Local's Brief).

140.   On December 7, 1998, Plaintiff Ralph A. Harris began working at ABF Freight Systems, Inc. Carlisle facility, and has worked at the Carlisle facility continuously ever since. (See Exhibit E accompanying the Local's Brief).

141.   Plaintiff was notified, at the time he began working at ABF's Carlisle facility, that he was returning to work under Article 5, §5, and would be placed at the bottom of the seniority roster. (See Exhibit N accompanying the Local's Brief).

142.   Plaintiff did not file a grievance regarding his seniority within seven (7) days of beginning work at the Carlisle facility.

143.   Prior to April 27, 1999, Plaintiff Ralph A. Harris's seniority date was posted at the Carlisle facility.

144.   Prior to April 27, 1999, Plaintiff Ralph A. Harris filed a grievance regarding his seniority date, as posted at the Carlisle facility.

145.   The relevant terms of the Collective Bargaining Agreement applicable to Plaintiff's grievance, Article 43(c), which the Company raised as a Point of Order in the grievance process, requires employees to file a grievance within seven (7) days. (See Exhibit F accompanying the Local's Brief).

146.   The relevant terms of the Collective Bargaining Agreement applicable to Plaintiff Ralph A. Harris's grievance, Article 5, §4d, which the Company raised as a Point of Order in the grievance process states:

> The Employer shall give the Local Union a seniority list at lease every six (6) months. The Employer shall also post a seniority list at least once every six (6) months and shall maintain a current seniority roster at the terminal. **Protest of any employee's seniority date or**

– 20 –



**position on such list must be made in writing to the Employer within thirty (30) days after such seniority date or position first appears, and if no protests are timely made, the dates and positions posted shall be deemed correct**. Any such protest which is timely made may be submitted to the grievance procedure. (Emphasis added). (See Exhibit G accompanying the Local's Brief).

147.   Plaintiff Ralph A. Harris did not protest his seniority date in writing to the Employer within thirty (30) days after the date his seniority date first appeared on the seniority roster.

148.   Plaintiff Ralph A. Harris did not file his grievance within thirty (30) days of the date his seniority date first appeared on the seniority roster.

149.   The Local processed Ralph A. Harris's grievance pursuant to the grievance process by taking the grievance to the Eastern Region Joint Area Committee, where the Company raised the above-mentioned Points of Order, arguing that the grievance was not timely.

150.   In a decision dated April 27, 1999, the Eastern Region Joint Area Committee sustained the Company's Points of Order and ruled that the Plaintiff's grievance was untimely. (See Exhibit H accompanying the Local's Brief).

151.   The Eastern Region Joint Area Committee found that "the grievants knew their seniority positions on the day they reported" to work at ABF. (*Id.*).

152.   The Union received the Eastern Region Joint Area Committee's decision on May 10, 1999. (*Id.*).

153.   The Union notified Plaintiff Ralph A. Harris, in writing, of the Eastern Region Joint Area Committee's decision on May 11, 1999, and enclosed a copy of the decision with the written notification.

154.   Plaintiff Ralph A. Harris was aware of the terms of the collective bargaining agreement

regarding his seniority at ABF before May 11, 1999.

155.    Plaintiff Ralph A. Harris did not file suit in Federal Court, nor in any other Court, regarding his seniority date until May 16, 2000, when he filed a Complaint, subsequently supplemented by an Amended Complaint filed on May 26, 2000.

156.    Each time a new seniority roster is posted pursuant to the Collective Bargaining Agreement, Plaintiff files the same grievance regarding his seniority date.

### Plaintiff Allen W. Landis

157.    Plaintiff Allen W. Landis, was at all times relevant to the issues raised in Plaintiffs' Amended Complaint, a member of Teamsters Local Union No. 776.

158.    Plaintiff Allen W. Landis was employed by Carolina Freight and was laid off from that employment on September 25, 1995.

159.    Teamsters Local Union No. 776 represented certain employees of Carolina Freight, including the Plaintiff, and represents certain employees of ABF, including the Plaintiff.

160.    Following Plaintiff's lay-off, Carolina Freight was purchased by ABF's parent company.

161.    Plaintiff notified ABF that he was interested in working at an ABF facility on December 3, 1998.  (See Exhibits C and O accompanying the Local's Brief).

162.    On January 15, 1999, Plaintiff Allen W. Landis began working at ABF Freight Systems, Inc. Carlisle facility, and has worked at the Carlisle facility continuously ever since.  (See Exhibit E accompanying the Local's Brief).

163.    Plaintiff was notified, at the time he began working at ABF's Carlisle facility, that he was returning to work under Article 5, §5, and would be placed at the bottom of the seniority

roster.  (See Exhibit O accompanying the Local's Brief).

164.    Plaintiff did not file a grievance regarding his seniority within seven (7) days of beginning

work at the Carlisle facility.

165.    Prior to April 27, 1999, Plaintiff Allen W. Landis's seniority date was posted at the Carlisle

facility.

166.    Prior to April 27, 1999, Plaintiff Allen W. Landis filed a grievance regarding his seniority

date, as posted at the Carlisle facility.

167.    The relevant terms of the Collective Bargaining Agreement applicable to Plaintiff's grievance,

Article 43(c), which the Company raised as a Point of Order in the grievance process,

requires employees to file a grievance within seven (7) days.  (See Exhibit F accompanying

the Local's Brief).

168.    The relevant terms of the Collective Bargaining Agreement applicable to Plaintiff Allen W.

Landis's grievance, Article 5, §4d, which the Company raised as a Point of Order in the

grievance process states:

> The Employer shall give the Local Union a seniority list at lease every
> six (6) months.  The Employer shall also post a seniority list at least
> once every six (6) months and shall maintain a current seniority roster
> at the terminal.  **Protest of any employee's seniority date or
> position on such list must be made in writing to the Employer
> within thirty (30) days after such seniority date or position first
> appears, and if no protests are timely made, the dates and
> positions posted shall be deemed correct.**  Any such protest which
> is timely made may be submitted to the grievance procedure.
> (Emphasis added).  (See Exhibit G accompanying the Local's Brief).

169.    Plaintiff Allen W. Landis did not protest his seniority date in writing to the Employer within

thirty (30) days after the date his seniority date first appeared on the seniority roster.

170.   Plaintiff Allen W. Landis did not file his grievance within thirty (30) days of the date his
       seniority date first appeared on the seniority roster.

171.   The Local processed Allen W. Landis's grievance pursuant to the grievance process by taking
       the grievance to the Eastern Region Joint Area Committee, where the Company raised the
       above-mentioned Points of Order, arguing that the grievance was not timely.

172.   In a decision dated April 27, 1999, the Eastern Region Joint Area Committee sustained the
       Company's Points of Order and ruled that the Plaintiff's grievance was untimely. (See Exhibit
       H accompanying the Local's Brief).

173.   The Eastern Region Joint Area Committee found that "the grievants knew their seniority
       positions on the day they reported" to work at ABF. (*Id.*).

174.   The Union received the Eastern Region Joint Area Committee's decision on May 10, 1999.
       (*Id.*).

175.   The Union notified Plaintiff Allen W. Landis, in writing, of the Eastern Region Joint Area
       Committee's decision on May 11, 1999, and enclosed a copy of the decision with the written
       notification.

176.   Plaintiff Allen W. Landis was aware of the terms of the collective bargaining agreement
       regarding his seniority at ABF before May 11, 1999.

177.   Plaintiff Allen W. Landis did not file suit in Federal Court, nor in any other Court, regarding
       his seniority date until May 16, 2000, when he filed a Complaint, subsequently supplemented
       by an Amended Complaint filed on May 26, 2000.

178.   Each time a new seniority roster is posted pursuant to the Collective Bargaining Agreement,

Plaintiff files the same grievance regarding his seniority date.

### Plaintiff Lowell McGuire

179.   Plaintiff Lowell McGuire, was at all times relevant to the issues raised in Plaintiffs' Amended

Complaint, a member of Teamsters Local Union No. 776.

180.   Plaintiff Lowell McGuire was employed by Carolina Freight and was laid off from that

employment on May 23, 1995.

181.   Teamsters Local Union No. 776 represented certain employees of Carolina Freight, including

the Plaintiff, and represents certain employees of ABF, including the Plaintiff.

182.   Following Plaintiff's lay-off, Carolina Freight was purchased by ABF's parent company.

183.   Plaintiff notified ABF that he was interested in working at an ABF facility on January 8, 1999.

(See Exhibits C and P accompanying the Local's Brief).

184.   On February 11, 1999, Plaintiff Lowell McGuire began working at ABF Freight Systems, Inc.

Carlisle facility, and has worked at the Carlisle facility continuously ever since.  (See Exhibit

E accompanying the Local's Brief).

185.   Plaintiff was notified, at the time he began working at ABF's Carlisle facility, that he was

returning to work under Article 5, §5, and would be placed at the bottom of the seniority

roster.  (See Exhibit P accompanying the Local's Brief).

186.   Plaintiff did not file a grievance regarding his seniority within seven (7) days of beginning

work at the Carlisle facility.

187.   Prior to April 27, 1999, Plaintiff Lowell McGuire's seniority date was posted at the Carlisle

facility.

188. Prior to April 27, 1999, Plaintiff Lowell McGuire filed a grievance regarding his seniority date, as posted at the Carlisle facility.

189. The relevant terms of the Collective Bargaining Agreement applicable to Plaintiff's grievance, Article 43(c), which the Company raised as a Point of Order in the grievance process, requires employees to file a grievance within seven (7) days. (See Exhibit F accompanying the Local's Brief).

190. The relevant terms of the Collective Bargaining Agreement applicable to Plaintiff Lowell McGuire's grievance, Article 5, §4d, which the Company raised as a Point of Order in the grievance process states:

> The Employer shall give the Local Union a seniority list at lease every six (6) months. The Employer shall also post a seniority list at least once every six (6) months and shall maintain a current seniority roster at the terminal. **Protest of any employee's seniority date or position on such list must be made in writing to the Employer within thirty (30) days after such seniority date or position first appears, and if no protests are timely made, the dates and positions posted shall be deemed correct**. Any such protest which is timely made may be submitted to the grievance procedure. (Emphasis added). (See Exhibit G accompanying the Local's Brief).

191. Plaintiff Lowell McGuire did not protest his seniority date in writing to the Employer within thirty (30) days after the date his seniority date first appeared on the seniority roster.

192. Plaintiff Lowell McGuire did not file his grievance within thirty (30) days of the date his seniority date first appeared on the seniority roster.

193. The Local processed Lowell McGuire's grievance pursuant to the grievance process by taking the grievance to the Eastern Region Joint Area Committee, where the Company raised the above-mentioned Points of Order, arguing that the grievance was not timely.

– 26 –

194.    In a decision dated April 27, 1999, the Eastern Region Joint Area Committee sustained the

Company's Points of Order and ruled that the Plaintiff's grievance was untimely. (See Exhibit

H accompanying the Local's Brief).

195.    The Eastern Region Joint Area Committee found that "the grievants knew their seniority

positions on the day they reported" to work at ABF. (*Id.*).

196.    The Union received the Eastern Region Joint Area Committee's decision on May 10, 1999.

(*Id.*).

197.    The Union notified Plaintiff Lowell McGuire, in writing, of the Eastern Region Joint Area

Committee's decision on May 11, 1999, and enclosed a copy of the decision with the written

notification.

198.    Plaintiff Lowell McGuire was aware of the terms of the collective bargaining agreement

regarding his seniority at ABF before May 11, 1999.

199.    Plaintiff Lowell McGuire did not file suit in Federal Court, nor in any other Court, regarding

his seniority date until May 16, 2000, when he filed a Complaint, subsequently supplemented

by an Amended Complaint filed on May 26, 2000.

200.    Each time a new seniority roster is posted pursuant to the Collective Bargaining Agreement,

Plaintiff files the same grievance regarding his seniority date.

**Plaintiff Walter R. Minich**

201.    Plaintiff Walter R. Minich, was at all times relevant to the issues raised in Plaintiffs' Amended

Complaint, a member of Teamsters Local Union No. 776.

202.    Plaintiff Walter R. Minich was employed by Carolina Freight and was laid off from that

– 27 –

employment on September 25, 1995.

203.    Teamsters Local Union No. 776 represented certain employees of Carolina Freight, including the Plaintiff, and represents certain employees of ABF, including the Plaintiff.

204.    Following Plaintiff's lay-off, Carolina Freight was purchased by ABF's parent company.

205.    Plaintiff notified ABF that he was interested in working at an ABF facility on November 3, 1998.  (See Exhibits C and Q accompanying the Local's Brief).

206.    On December 13, 1998, Plaintiff Walter R. Minich began working at ABF Freight Systems, Inc. Carlisle facility, and has worked at the Carlisle facility continuously ever since.  (See Exhibit E accompanying the Local's Brief).

207.    Plaintiff was notified, at the time he began working at ABF's Carlisle facility, that he was returning to work under Article 5, §5, and would be placed at the bottom of the seniority roster.  (See Exhibit Q accompanying the Local's Brief).

208.    Plaintiff did not file a grievance regarding his seniority within seven (7) days of beginning work at the Carlisle facility.

209.    Prior to April 27, 1999, Plaintiff Walter R. Minich's seniority date was posted at the Carlisle facility.

210.    Prior to April 27, 1999, Plaintiff Walter R. Minich filed a grievance regarding his seniority date, as posted at the Carlisle facility.

211.    The relevant terms of the Collective Bargaining Agreement applicable to Plaintiff's grievance, Article 43(c), which the Company raised as a Point of Order in the grievance process, requires employees to file a grievance within seven (7) days.  (See Exhibit F accompanying

the Local's Brief).

212.    The relevant terms of the Collective Bargaining Agreement applicable to Plaintiff Walter R.

Minich's grievance, Article 5, §4d, which the Company raised as a Point of Order in the

grievance process states:

> The Employer shall give the Local Union a seniority list at lease every
> six (6) months.  The Employer shall also post a seniority list at least
> once every six (6) months and shall maintain a current seniority roster
> at the terminal.  **Protest of any employee's seniority date or
> position on such list must be made in writing to the Employer
> within thirty (30) days after such seniority date or position first
> appears, and if no protests are timely made, the dates and
> positions posted shall be deemed correct**.  Any such protest which
> is timely made may be submitted to the grievance procedure.
> (Emphasis added).  (See Exhibit G accompanying the Local's Brief).

213.    Plaintiff Walter R. Minich did not protest his seniority date in writing to the Employer within

thirty (30) days after the date his seniority date first appeared on the seniority roster.

214.    Plaintiff Walter R. Minich did not file his grievance within thirty (30) days of the date his

seniority date first appeared on the seniority roster.

215.    The Local processed Walter R. Minich's grievance pursuant to the grievance process by

taking the grievance to the Eastern Region Joint Area Committee, where the Company raised

the above-mentioned Points of Order, arguing that the grievance was not timely.

216.    In a decision dated April 27, 1999, the Eastern Region Joint Area Committee sustained the

Company's Points of Order and ruled that the Plaintiff's grievance was untimely. (See Exhibit

H accompanying the Local's Brief).

217.    The Eastern Region Joint Area Committee found that "the grievants knew their seniority

positions on the day they reported" to work at ABF. (*Id.*).

– 29 –

218.    The Union received the Eastern Region Joint Area Committee's decision on May 10, 1999.

(*Id.*).

219.    The Union notified Plaintiff Walter R. Minich, in writing, of the Eastern Region Joint Area

Committee's decision on May 11, 1999, and enclosed a copy of the decision with the written

notification.

220.    Plaintiff Walter R. Minich was aware of the terms of the collective bargaining agreement

regarding his seniority at ABF before May 11, 1999.

221.    Plaintiff Walter R. Minich did not file suit in Federal Court, nor in any other Court, regarding

his seniority date until May 16, 2000, when he filed a Complaint, subsequently supplemented

by an Amended Complaint filed on May 26, 2000.

222.    Each time a new seniority roster is posted pursuant to the Collective Bargaining Agreement,

Plaintiff files the same grievance regarding his seniority date.

### Plaintiff Raymond C. Nevins

223.    Plaintiff Raymond C. Nevins, was at all times relevant to the issues raised in Plaintiffs'

Amended Complaint, a member of Teamsters Local Union No. 776.

224.    Plaintiff Raymond C. Nevins was employed by Carolina Freight and was laid off from that

employment on September 25, 1995.

225.    Teamsters Local Union No. 776 represented certain employees of Carolina Freight, including

the Plaintiff, and represents certain employees of ABF, including the Plaintiff.

226.    Following Plaintiff's lay-off, Carolina Freight was purchased by ABF's parent company.

227.    Plaintiff notified ABF that he was interested in working at an ABF facility on January 11,

once every six (6) months and shall maintain a current seniority roster at the terminal. **Protest of any employee's seniority date or position on such list must be made in writing to the Employer within thirty (30) days after such seniority date or position first appears, and if no protests are timely made, the dates and positions posted shall be deemed correct**. Any such protest which is timely made may be submitted to the grievance procedure. (Emphasis added). (See Exhibit G accompanying the Local's Brief).

235.    Plaintiff Raymond C. Nevins did not protest his seniority date in writing to the Employer within thirty (30) days after the date his seniority date first appeared on the seniority roster.

236.    Plaintiff Raymond C. Nevins did not file his grievance within thirty (30) days of the date his seniority date first appeared on the seniority roster.

237.    The Local processed Raymond C. Nevins's grievance pursuant to the grievance process by taking the grievance to the Eastern Region Joint Area Committee, where the Company raised the above-mentioned Point of Orders, arguing that the grievance was not timely.

238.    In a decision dated April 27, 1999, the Eastern Region Joint Area Committee sustained the Company's Points of Order and ruled that the Plaintiff's grievance was untimely. (See Exhibit H accompanying the Local's Brief).

239.    The Eastern Region Joint Area Committee found that "the grievants knew their seniority positions on the day they reported" to work at ABF. (*Id.*).

240.    The Union received the Eastern Region Joint Area Committee's decision on May 10, 1999. (*Id.*).

241.    The Union notified Plaintiff Raymond C. Nevins, in writing, of the Eastern Region Joint Area Committee's decision on May 11, 1999, and enclosed a copy of the decision with the written notification.

– 32 –

242. Plaintiff Raymond C. Nevins was aware of the terms of the collective bargaining agreement regarding his seniority at ABF before May 11, 1999.

243. Plaintiff Raymond C. Nevins did not file suit in Federal Court, nor in any other Court, regarding his seniority date until May 16, 2000, when he filed a Complaint, subsequently supplemented by an Amended Complaint filed on May 26, 2000.

244. Each time a new seniority roster is posted pursuant to the Collective Bargaining Agreement, Plaintiff files the same grievance regarding his seniority date.

### Plaintiff Stanley L. Nye

245. Plaintiff Stanley L. Nye, was at all times relevant to the issues raised in Plaintiffs' Amended Complaint, a member of Teamsters Local Union No. 776.

246. Plaintiff Stanley L. Nye was employed by Carolina Freight and was laid off from that employment on September 25, 1995.

247. Teamsters Local Union No. 776 represented certain employees of Carolina Freight, including the Plaintiff, and represents certain employees of ABF, including the Plaintiff.

248. Following Plaintiff's lay-off, Carolina Freight was purchased by ABF's parent company.

249. Plaintiff notified ABF that he was interested in working at an ABF facility on February 22, 1999. (See Exhibits C and S accompanying the Local's Brief).

250. On February 27, 1999, Plaintiff Stanley L. Nye began working at ABF Freight Systems, Inc. Carlisle facility, and has worked at the Carlisle facility continuously ever since. (See Exhibit E accompanying the Local's Brief).

251. Plaintiff was notified, at the time he began working at ABF's Carlisle facility, that he was

– 33 –

returning to work under Article 5, §5, and would be placed at the bottom of the seniority roster. (See Exhibit S accompanying the Local's Brief).

252. Plaintiff did not file a grievance regarding his seniority within seven (7) days of beginning work at the Carlisle facility.

253. Prior to April 27, 1999, Plaintiff Stanley L. Nye's seniority date was posted at the Carlisle facility.

254. Prior to April 27, 1999, Plaintiff Stanley L. Nye filed a grievance regarding his seniority date, as posted at the Carlisle facility.

255. The relevant terms of the Collective Bargaining Agreement applicable to Plaintiff's grievance, Article 43(c), which the Company raised as a Point of Order in the grievance process, requires employees to file a grievance within seven (7) days. (See Exhibit F accompanying the Local's Brief).

256. The relevant terms of the Collective Bargaining Agreement applicable to Plaintiff Stanley L. Nye's grievance, Article 5, §4d, which the Company raised as a Point of Order in the grievance process states:

> The Employer shall give the Local Union a seniority list at lease every six (6) months. The Employer shall also post a seniority list at least once every six (6) months and shall maintain a current seniority roster at the terminal. **Protest of any employee's seniority date or position on such list must be made in writing to the Employer within thirty (30) days after such seniority date or position first appears, and if no protests are timely made, the dates and positions posted shall be deemed correct.** Any such protest which is timely made may be submitted to the grievance procedure. (Emphasis added). (See Exhibit G accompanying the Local's Brief).

257. Plaintiff Stanley L. Nye did not protest his seniority date in writing to the Employer within

– 34 –

thirty (30) days after the date his seniority date first appeared on the seniority roster.

258.    Plaintiff Stanley L. Nye did not file his grievance within thirty (30) days of the date his seniority date first appeared on the seniority roster.

259.    The Local processed Stanley L. Nye's grievance pursuant to the grievance process by taking the grievance to the Eastern Region Joint Area Committee, where the Company raised the above-mentioned Points of Order, arguing that the grievance was not timely.

260.    In a decision dated April 27, 1999, the Eastern Region Joint Area Committee sustained the Company's Points of Order and ruled that the Plaintiff's grievance was untimely. (See Exhibit H accompanying the Local's Brief).

261.    The Eastern Region Joint Area Committee found that "the grievants knew their seniority positions on the day they reported" to work at ABF. (*Id.*).

262.    The Union received the Eastern Region Joint Area Committee's decision on May 10, 1999. (*Id.*).

263.    The Union notified Plaintiff Stanley L. Nye, in writing, of the Eastern Region Joint Area Committee's decision on May 11, 1999, and enclosed a copy of the decision with the written notification.

264.    Plaintiff Stanley L. Nye was aware of the terms of the collective bargaining agreement regarding his seniority at ABF before May 11, 1999.

265.    Plaintiff Stanley L. Nye did not file suit in Federal Court, nor in any other Court, regarding his seniority date until May 16, 2000, when he filed a Complaint, subsequently supplemented by an Amended Complaint filed on May 26, 2000.



266. Each time a new seniority roster is posted pursuant to the Collective Bargaining Agreement, Plaintiff files the same grievance regarding his seniority date.

### Plaintiff Vincent Ramirez, Jr.

267. Plaintiff Vincent Ramirez, Jr., was at all times relevant to the issues raised in Plaintiffs' Amended Complaint, a member of Teamsters Local Union No. 776.

268. Plaintiff Vincent Ramirez, Jr. was employed by Carolina Freight and was laid off from that employment on May 23, 1995.

269. Teamsters Local Union No. 776 represented certain employees of Carolina Freight, including the Plaintiff, and represents certain employees of ABF, including the Plaintiff.

270. Following Plaintiff's lay-off, Carolina Freight was purchased by ABF's parent company.

271. Plaintiff notified ABF that he was interested in working at an ABF facility on November 4, 1998.  (See Exhibits C and T accompanying the Local's Brief).

272. On November 27, 1998, Plaintiff Vincent Ramirez, Jr. began working at ABF Freight Systems, Inc. Carlisle facility, and has worked at the Carlisle facility continuously ever since. (See Exhibit E accompanying the Local's Brief).

273. Plaintiff was notified, at the time he began working at ABF's Carlisle facility, that he was returning to work under Article 5, §5, and would be placed at the bottom of the seniority roster.  (See Exhibit T accompanying the Local's Brief).

274. Plaintiff did not file a grievance regarding his seniority within seven (7) days of beginning work at the Carlisle facility.

275. Prior to April 27, 1999, Plaintiff Vincent Ramirez, Jr.'s seniority date was posted at the

Carlisle facility.

276.    Prior to April 27, 1999, Plaintiff Vincent Ramirez, Jr. filed a grievance regarding his seniority

date, as posted at the Carlisle facility.

277.    The relevant terms of the Collective Bargaining Agreement applicable to Plaintiff's grievance,

Article 43(c), which the Company raised as a Point of Order in the grievance process,

requires employees to file a grievance within seven (7) days.  (See Exhibit F accompanying

the Local's Brief).

278.    The relevant terms of the Collective Bargaining Agreement applicable to Plaintiff Vincent

Ramirez, Jr.'s grievance, Article 5, §4d, which the Company raised as a Point of Order in the

grievance process states:

> The Employer shall give the Local Union a seniority list at lease every
> six (6) months.  The Employer shall also post a seniority list at least
> once every six (6) months and shall maintain a current seniority roster
> at the terminal.  **Protest of any employee's seniority date or
> position on such list must be made in writing to the Employer
> within thirty (30) days after such seniority date or position first
> appears, and if no protests are timely made, the dates and
> positions posted shall be deemed correct**.  Any such protest which
> is timely made may be submitted to the grievance procedure.
> (Emphasis added).  (See Exhibit G accompanying the Local's Brief).

279.    Plaintiff Vincent Ramirez, Jr. did not protest his seniority date in writing to the Employer

within thirty (30) days after the date his seniority date first appeared on the seniority roster.

280.    Plaintiff Vincent Ramirez, Jr. did not file his grievance within thirty (30) days of the date his

seniority date first appeared on the seniority roster.

281.    The Local processed Vincent Ramirez, Jr.'s grievance pursuant to the grievance process by

taking the grievance to the Eastern Region Joint Area Committee, where the Company raised

– 37 –

the above-mentioned Points of Order, arguing that the grievance was not timely.

282.   In a decision dated April 27, 1999, the Eastern Region Joint Area Committee sustained the Company's Points of Order and ruled that the Plaintiff's grievance was untimely. (See Exhibit H accompanying the Local's Brief).

283.   The Eastern Region Joint Area Committee found that "the grievants knew their seniority positions on the day they reported" to work at ABF. (*Id.*).

284.   The Union received the Eastern Region Joint Area Committee's decision on May 10, 1999. (*Id.*).

285.   The Union notified Plaintiff Vincent Ramirez, Jr., in writing, of the Eastern Region Joint Area Committee's decision on May 11, 1999, and enclosed a copy of the decision with the written notification.

286.   Plaintiff Vincent Ramirez, Jr. was aware of the terms of the collective bargaining agreement regarding his seniority at ABF before May 11, 1999.

287.   Plaintiff Vincent Ramirez, Jr. did not file suit in Federal Court, nor in any other Court, regarding his seniority date until May 16, 2000, when he filed a Complaint, subsequently supplemented by an Amended Complaint filed on May 26, 2000.

288.   Each time a new seniority roster is posted pursuant to the Collective Bargaining Agreement, Plaintiff files the same grievance regarding his seniority date.

### Plaintiff Keith E. Sgrignoli

289.   Plaintiff Keith E. Sgrignoli, was at all times relevant to the issues raised in Plaintiffs' Amended Complaint, a member of Teamsters Local Union No. 776.

– 38 –

290.    Plaintiff Keith E. Sgrignoli was employed by Carolina Freight and was laid off from that employment on September 25, 1995.

291.    Teamsters Local Union No. 776 represented certain employees of Carolina Freight, including the Plaintiff, and represents certain employees of ABF, including the Plaintiff.

292.    Following Plaintiff's lay-off, Carolina Freight was purchased by ABF's parent company.

293.    Plaintiff notified ABF that he was interested in working at an ABF facility on November 18, 1998.  (See Exhibits C and U accompanying the Local's Brief).

294.    On December 5, 1998, Plaintiff Keith E. Sgrignoli began working at ABF Freight Systems, Inc. Carlisle facility, and has worked at the Carlisle facility continuously ever since.  (See Exhibit E accompanying the Local's Brief).

295.    Plaintiff was notified, at the time he began working at ABF's Carlisle facility, that he was returning to work under Article 5, §5, and would be placed at the bottom of the seniority roster.  (See Exhibit U accompanying the Local's Brief).

296.    Plaintiff did not file a grievance regarding his seniority within seven (7) days of beginning work at the Carlisle facility.

297.    Prior to April 27, 1999, Plaintiff Keith E. Sgrignoli's seniority date was posted at the Carlisle facility.

298.    Prior to April 27, 1999, Plaintiff Keith E. Sgrignoli filed a grievance regarding his seniority date, as posted at the Carlisle facility.

299.    The relevant terms of the Collective Bargaining Agreement applicable to Plaintiff's grievance, Article 43(c), which the Company raised as a Point of Order in the grievance process,

– 39 –

requires employees to file a grievance within seven (7) days. (See Exhibit F accompanying the Local's Brief).

300. The relevant terms of the Collective Bargaining Agreement applicable to Plaintiff Keith E. Sgrignoli's grievance, Article 5, §4d, which the Company raised as a Point of Order in the grievance process states:

> The Employer shall give the Local Union a seniority list at lease every six (6) months. The Employer shall also post a seniority list at least once every six (6) months and shall maintain a current seniority roster at the terminal. **Protest of any employee's seniority date or position on such list must be made in writing to the Employer within thirty (30) days after such seniority date or position first appears, and if no protests are timely made, the dates and positions posted shall be deemed correct**. Any such protest which is timely made may be submitted to the grievance procedure. (Emphasis added). (See Exhibit G accompanying the Local's Brief).

301. Plaintiff Keith E. Sgrignoli did not protest his seniority date in writing to the Employer within thirty (30) days after the date his seniority date first appeared on the seniority roster.

302. Plaintiff Keith E. Sgrignoli did not file his grievance within thirty (30) days of the date his seniority date first appeared on the seniority roster.

303. The Local processed Keith E. Sgrignoli's grievance pursuant to the grievance process by taking the grievance to the Eastern Region Joint Area Committee, where the Company raised the above-mentioned Points of Order, arguing that the grievance was not timely.

304. In a decision dated April 27, 1999, the Eastern Region Joint Area Committee sustained the Company's Points of Order and ruled that the Plaintiff's grievance was untimely. (See Exhibit H accompanying the Local's Brief).

305. The Eastern Region Joint Area Committee found that "the grievants knew their seniority

– 40 –

positions on the day they reported" to work at ABF.  (*Id.*).

306.   The Union received the Eastern Region Joint Area Committee's decision on May 10, 1999.
       (*Id.*).

307.   The Union notified Plaintiff Keith E. Sgrignoli, in writing, of the Eastern Region Joint Area
       Committee's decision on May 11, 1999, and enclosed a copy of the decision with the written
       notification.

308.   Plaintiff Keith E. Sgrignoli was aware of the terms of the collective bargaining agreement
       regarding his seniority at ABF before May 11, 1999.

309.   Plaintiff Keith E. Sgrignoli did not file suit in Federal Court, nor in any other Court, regarding
       his seniority date until May 16, 2000, when he filed a Complaint, subsequently supplemented
       by an Amended Complaint filed on May 26, 2000.

310.   Each time a new seniority roster is posted pursuant to the Collective Bargaining Agreement,
       Plaintiff files the same grievance regarding his seniority date.

### Plaintiff Ray G. Snyder, Jr.

311.   Plaintiff Ray G. Snyder, Jr., was at all times relevant to the issues raised in Plaintiffs'
       Amended Complaint, a member of Teamsters Local Union No. 776.

312.   Plaintiff Ray G. Snyder, Jr. was employed by Carolina Freight and was laid off from that
       employment on May 23, 1995.

313.   Teamsters Local Union No. 776 represented certain employees of Carolina Freight, including
       the Plaintiff, and represents certain employees of ABF, including the Plaintiff.

314.   Following Plaintiff's lay-off, Carolina Freight was purchased by ABF's parent company.

315.    Plaintiff notified ABF that he was interested in working at an ABF facility on November 3, 1998. (See Exhibits C and V accompanying the Local's Brief).

316.    On November 27, 1998, Plaintiff Ray G. Snyder, Jr. began working at ABF Freight Systems, Inc. Carlisle facility, and has worked at the Carlisle facility continuously ever since. (See Exhibit E accompanying the Local's Brief).

317.    Plaintiff was notified, at the time he began working at ABF's Carlisle facility, that he was returning to work under Article 5, §5, and would be placed at the bottom of the seniority roster. (See Exhibit V accompanying the Local's Brief).

318.    Plaintiff did not file a grievance regarding his seniority within seven (7) days of beginning work at the Carlisle facility.

319.    Prior to April 27, 1999, Plaintiff Ray G. Snyder, Jr.'s seniority date was posted at the Carlisle facility.

320.    Prior to April 27, 1999, Plaintiff Ray G. Snyder, Jr. filed a grievance regarding his seniority date, as posted at the Carlisle facility.

321.    The relevant terms of the Collective Bargaining Agreement applicable to Plaintiff's grievance, Article 43(c), which the Company raised as a Point of Order in the grievance process, requires employees to file a grievance within seven (7) days. (See Exhibit F accompanying the Local's Brief).

322.    The relevant terms of the Collective Bargaining Agreement applicable to Plaintiff Ray G. Snyder, Jr.'s grievance, Article 5, §4d, which the Company raised as a Point of Order in the grievance process states:

The Employer shall give the Local Union a seniority list at lease every six (6) months. The Employer shall also post a seniority list at least once every six (6) months and shall maintain a current seniority roster at the terminal. **Protest of any employee's seniority date or position on such list must be made in writing to the Employer within thirty (30) days after such seniority date or position first appears, and if no protests are timely made, the dates and positions posted shall be deemed correct**. Any such protest which is timely made may be submitted to the grievance procedure. (Emphasis added). (See Exhibit G accompanying the Local's Brief).

323.  Plaintiff Ray G. Snyder, Jr. did not protest his seniority date in writing to the Employer within thirty (30) days after the date his seniority date first appeared on the seniority roster.

324.  Plaintiff Ray G. Snyder, Jr. did not file his grievance within thirty (30) days of the date his seniority date first appeared on the seniority roster.

325.  The Local processed Ray G. Snyder, Jr.'s grievance pursuant to the grievance process by taking the grievance to the Eastern Region Joint Area Committee, where the Company raised the above-mentioned Points of Order, arguing that the grievance was not timely.

326.  In a decision dated April 27, 1999, the Eastern Region Joint Area Committee sustained the Company's Points of Order and ruled that the Plaintiff's grievance was untimely. (See Exhibit H accompanying the Local's Brief).

327.  The Eastern Region Joint Area Committee found that "the grievants knew their seniority positions on the day they reported" to work at ABF. (*Id.*).

328.  The Union received the Eastern Region Joint Area Committee's decision on May 10, 1999. (*Id.*).

329.  The Union notified Plaintiff Ray G. Snyder, Jr., in writing, of the Eastern Region Joint Area Committee's decision on May 11, 1999, and enclosed a copy of the decision with the written

notification.

330.  Plaintiff Ray G. Snyder, Jr. was aware of the terms of the collective bargaining agreement regarding his seniority at ABF before May 11, 1999.

331.  Plaintiff Ray G. Snyder, Jr. did not file suit in Federal Court, nor in any other Court, regarding his seniority date until May 16, 2000, when he filed a Complaint, subsequently supplemented by an Amended Complaint filed on May 26, 2000.

332.  Each time a new seniority roster is posted pursuant to the Collective Bargaining Agreement, Plaintiff files the same grievance regarding his seniority date.

### Plaintiff Lawrence D. Welker

333.  Plaintiff Lawrence D. Welker, was at all times relevant to the issues raised in Plaintiffs' Amended Complaint, a member of Teamsters Local Union No. 776.

334.  Plaintiff Lawrence D. Welker was employed by Carolina Freight and was laid off from that employment on September 25, 1995.

335.  Teamsters Local Union No. 776 represented certain employees of Carolina Freight, including the Plaintiff, and represents certain employees of ABF, including the Plaintiff.

336.  Following Plaintiff's lay-off, Carolina Freight was purchased by ABF's parent company.

337.  Plaintiff notified ABF that he was interested in working at an ABF facility on October 30, 1998.  (See Exhibits C and W accompanying the Local's Brief).

338.  On November 27, 1998, Plaintiff Lawrence D. Welker began working at ABF Freight Systems, Inc. Carlisle facility, and has worked at the Carlisle facility continuously ever since. (See Exhibit E accompanying the Local's Brief).

– 44 –

339.    Plaintiff was notified, at the time he began working at ABF's Carlisle facility, that he was returning to work under Article 5, §5, and would be placed at the bottom of the seniority roster. (See Exhibit W accompanying the Local's Brief).

340.    Plaintiff did not file a grievance regarding his seniority within seven (7) days of beginning work at the Carlisle facility.

341.    Prior to April 27, 1999, Plaintiff Lawrence D. Welker's seniority date was posted at the Carlisle facility.

342.    Prior to April 27, 1999, Plaintiff Lawrence D. Welker filed a grievance regarding his seniority date, as posted at the Carlisle facility.

343.    The relevant terms of the Collective Bargaining Agreement applicable to Plaintiff's grievance, Article 43(c), which the Company raised as a Point of Order in the grievance process, requires employees to file a grievance within seven (7) days. (See Exhibit F accompanying the Local's Brief).

344.    The relevant terms of the Collective Bargaining Agreement applicable to Plaintiff Lawrence D. Welker's grievance, Article 5, §4d, which the Company raised as a Point of Order in the grievance process states:

> The Employer shall give the Local Union a seniority list at lease every six (6) months. The Employer shall also post a seniority list at least once every six (6) months and shall maintain a current seniority roster at the terminal. **Protest of any employee's seniority date or position on such list must be made in writing to the Employer within thirty (30) days after such seniority date or position first appears, and if no protests are timely made, the dates and positions posted shall be deemed correct**. Any such protest which is timely made may be submitted to the grievance procedure. (Emphasis added). (See Exhibit G accompanying the Local's Brief).

– 45 –

345.  Plaintiff Lawrence D. Welker did not protest his seniority date in writing to the Employer within thirty (30) days after the date his seniority date first appeared on the seniority roster.

346.  Plaintiff Lawrence D. Welker did not file his grievance within thirty (30) days of the date his seniority date first appeared on the seniority roster.

347.  The Local processed Lawrence D. Welker's grievance pursuant to the grievance process by taking the grievance to the Eastern Region Joint Area Committee, where the Company raised the above-mentioned Points of Order, arguing that the grievance was not timely.

348.  In a decision dated April 27, 1999, the Eastern Region Joint Area Committee sustained the Company's Points of Order and ruled that the Plaintiff's grievance was untimely. (See Exhibit H accompanying the Local's Brief).

349.  The Eastern Region Joint Area Committee found that "the grievants knew their seniority positions on the day they reported" to work at ABF. (*Id.*).

350.  The Union received the Eastern Region Joint Area Committee's decision on May 10, 1999. (*Id.*).

351.  The Union notified Plaintiff Lawrence D. Welker, in writing, of the Eastern Region Joint Area Committee's decision on May 11, 1999, and enclosed a copy of the decision with the written notification.

352.  Plaintiff Lawrence D. Welker was aware of the terms of the collective bargaining agreement regarding his seniority at ABF before May 11, 1999.

353.  Plaintiff Lawrence D. Welker did not file suit in Federal Court, nor in any other Court, regarding his seniority date until May 16, 2000, when he filed a Complaint, subsequently

– 46 –



supplemented by an Amended Complaint filed on May 26, 2000.

354.    Each time a new seniority roster is posted pursuant to the Collective Bargaining Agreement,

Plaintiff files the same grievance regarding his seniority date.

355.    Each of the averments contained in this Affidavit are based upon my direct personal

knowledge of the events in question.

DANIEL A. VIRTUE

SWORN and Subscribed to

and before me this 18th

day of August, 2000.

Notary Public

NOTARIAL SEAL
LINDA WITMER, Notary Public
Harrisburg, Dauphin County, PA
My Commission Expires 03-20-2004

– 47 –