IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| JEFFREY D. ALBRIGHT, NORMAN T. BOIRE, GARY M. DIETZ, WILLIAM H. ERDMAN, MICHAEL W. FRITZ, A. RONALD FROMBAUGH, RALPH A. HARRIS, ALLEN W. LANDIS, LOWELL MCGUIRE, WALTER R. MINICH, RAYMOND C. NEVINS, STANLEY L. NYE, VINCENT RAMIREZ, JR., KEITH E. SCRIGNOLI, RAY G. SNYDER, JR., and LAWRENCE D. WELKER,<br>　　　　　　　　　　Plaintiffs<br>　　　v.<br>DANIEL A. VIRTUE, Business Agent of the International Brotherhood of Teamsters; INTERNATIONAL BROTHERHOOD OF TEAMSTERS; LOCAL 776, INTERNATIONAL BROTHERHOOD OF TEAMSTERS; ABF FREIGHT SYSTEM, INCORPORATED,<br>　　　　　　　　　　Defendants | Case No. 1:CV-00-878<br>Judge Sylvia H. Rambo |

### PLAINTIFF'S RESPONSE TO DEFENDANDANT UNION'S STATEMENT OF MATERIAL FACTS

Defendant Local Union and the International Union, as well as Daniel Virtual, have, in support of their Motion for Summary Judgment, filed 108 "Statement of Undisputed Facts". Although the Local Rule 56.1 provides only disputed facts be enumerated in a response to a Statement of Undisputed Facts; for the Court's convenience, Plaintiff includes an indication as to each of the "facts" plead in the Unions' Statement of Material Facts. Furthermore, on occasion the "Undisputed Material Facts" are in plaintiffs view incomplete or for some other evidentiary reason inappropriate to be considered as "Undisputed and Material Facts".

By way of further observation, disputes of facts exist concerning may of the dates set forth in the Unions' Statement of Material Facts, as reflected in both the Discovery

Materials and the "Undisputed Material Facts" as enumerated and as set forth by the other party defendant ABF Freight System Incorporated. Many of these differences are nominal. However, there are disputes concerning the date of filing of grievances inasmuch as the Plaintiffs' records appear to be at variance with those asserted by Defendants.

Accordingly, Plaintiffs herewith submitted the following responses the Unions' Statement of Material Facts:

1.  Admitted

2.  Admitted

3.  It is admitted. However, while the purchase of Carolina Freight by ABF was ministerially accomplished on September 25, 1995 and the merger, was in fact agreed upon at an earlier date, which, the Defendants have not supplied (See Change of Operation – ABF's Ex- 4, page ABF 004213). To the extent that this variance affects the layoff status of any of Plaintiffs; it is respectfully submitted that the ministerial date of September 25, 1995 is immaterial and the operative date of agreement, in terms of the merger, is not established by Defendants submission to the Court. In addition, Plaintiffs believe that their grievances un-timelines status, under the National Master Freight Agreement, (hereinafter NMFA) and the Local Cartage Agreement is not established based upon Defendants' submissions. This supports Plaintiffs position that they were treated invidiously by Defendants from the inception of the events (May 21, 1995); which culminated in the layoff recall/grievance matters <u>sub judice.</u>

4.  It is admitted that, on or about September 19, 1995, a change of operation committee was convened under the terms and provisions of the then existing National Motor Freight Agreement. It is noted, however, that any ostensible "contract" changes,

upon which Defendants appear to rely, visa vis Plaintiffs status, were not communicated to Plaintiffs at any time. Further, the life of the change operation committee expired at least with the 1998 expiration of the National Master Freight Agreement, which covered the 1995 lay-off. (See Defendant ABF's exhibit Number 4 ABF, pg 4076). Furthermore, it is noted that in Defendants ABF's exhibit referenced above the change of operation order dated September 14, 1995 repeatedly mentions throughout seniority "dovetailing" of employees as distinguished from the end tailing, which is at issue in this particular case. (See ABF's Exhibit 1B, pages 4076 and 4077).

Significantly, ABF's exhibit 1C which arguably alters the layoff/recall scope and pay comes after the 1995 layoffs was not and could not have been communicated to any of the Plaintiffs. Plaintiffs took layoffs under the terms and provisions of the National Motor Freight Agreement and prevailing seniority practices governing layoff employees including those such as the Plaintiffs acquired in the merger. (See ABF's exhibit 1C, page 4077 and 4078), which appears to establish a one (1) year jurisdictional limit for the committee's authority as distinguished from the other provisions of the National Master Motor Freight and prevailing provisions, which provide for an absolute five (5) year right to recall from layoff (Article 5 Section 1- Plaintiff's Ex 1). Similarly, Defendants use of proposed seniority mechanism associated with the Change of Operation document, supports Plaintiffs view that any recall from layoff status should have been, but was not, accomplished on a seniority basis per Article 5 Section 5 by its own terms. The lack of administration surrounding Article 5 Section 5 and the layoff recall process, support Plaintiffs' view that the Defendants sought, for economic reasons, to avoid recalls. Recall of existing employees from layoff status was more expensive by almost 50 % than the new employee rate. Furthermore, Plaintiffs controvert the fact that the return from

layoff status, as indicated previously in the context of the Rule 12 Motion, were made on a seniority basis. Defendant ABF's Article 5.5 document was created after Plaintiffs' self initiated contract with the Local Union and ABF. This document is clearly not a master seniority list of laid off employees by seniority dates. In fact, Plaintiffs were offered nothing, but learned by word of mouth of possible reemployment at the Carlisle facility and through their own contact with the terminal. They obtained employment from layoff status as a consequence of their own efforts. This is significant inasmuch as that process involved supports Plaintiffs' contention that the process was invidiously avoided and there was no recall from the layoff status in the Collective Bargaining Agreement. To the contrary the economic distinction between recalled employees and new employees was such that the company and Daniel Virtue conspired to obviate and avoid the language of the NMFA covering the ABF, Carlisle terminal. Obviously, there is a material dispute in this regard.

5.      It is admitted that Article 5 Section 5 provides for recall from layoff status, but it is denied that the language of the provision compels the employee take action, periodic or otherwise, concerning recall from layoff. In their depositions both Daniel Virtue and Charles Shuggart erroneously indicated that their belief the Plaintiffs were required every six (6) month to provide address information pursuant to the provision. However, the clear language of article 5 does not do so.

6.      It is denied as stated. Plaintiffs contend, that upon recall from layoff status, they were ambiguously instructed concerning their seniority date. Subsequently, their grievances were filed when it became apparent to them that they were losing seniority permanently. In the over the road trucking industry at teamsters represented terminals, such as the ABF-Carlisle, which is in a break-bulk terminal consists of two (2)

components: a.) the over the road drivers and b.) the local or yard component involving the "dock" and local freight handling within the terminal and locally.

7. It is admitted that the procedure as described in the National Motor Freight Agreement is based upon the language of the Collective Bargaining Agreement generally governing grievances (Article 8, Plaintiffs Ex 1 and Ex.2 ). However, there is separate language governing seniority related grievances (Article 5, Section 4, Plaintiffs Ex 1 ). Simply stated, the parties have substantial dispute concerning the effect of that clear contractual language, which allows the filing of seniority related grievance within 30 days of notice of seniority issues. Thus, it is Plaintiffs position that the trigger for any seniority related grievances, such as those in issue here, was either the actual periodic posting of the Seniority list/board for the facility or the individuals conclusion that they appeared to be losing seniority based upon their individual experience; but no event later than thirty (30) days from the periodic posting following their reinstatement from layoff. Also, as noted by the Circuit Court. The finality of the Eastern Region Joint Committee determination is in dispute, based upon correspondence from Daniel Virtue on behalf of the Unions indicating that the Plaintiffs grievances concerning their seniority status, indicated that the Easter Region Joint Area Committee (ERJAC) determination <u>was under</u> review for appeal by the International Union in Washington, D.C. Based upon these acknowledged facts, in the record, reflecting Virtue's actual participation in the appeal process and the involvement of the International Union; it is asserted by the Plaintiffs belief that their inclusion, based upon actual conduct, under agency principles is appropriate and that the evidence establishes the status of Virtue and the International Union as appropriate parties to this lawsuit.

8.      It is admitted that during early summer of 1999 Daniel Virtue wrote letters to Plaintiffs concerning their seniority grievances, which had been consolidated under two pilot grievances. In addition to establishing Virtue's involvement and participation; the consolidation also supports Plaintiffs argument that each individual Plaintiff need not have filed a grievance in as much as a determination concerning the seniority mechanism, which would be uniformly applied.

9.      Admitted

10.     Admitted

11.     It is admitted, however, ERJAC was/is comprised of both employers and union representatives. It is not final and binding independent review process or arbitration of the action's of the employer. It is further noted that the unions' election not to pursue the grievances to the next step available under the National Master Freight Agreement. (National Level) is a component of evidence of conspiracy between Defendants.

12.     Admitted

13.     Admitted

14.     Denied, Plaintiff Albright returned to work at a Carlisle facility on or about December 14, 1998.

15.     Admitted

16.     Denied, Plaintiff Boire states in his affidavit his laid-off date as March 19, 1995.(Plaintiffs Ex 8)

17.     It is admitted, in part, that Plaintiff Biore wrote a letter confirming his interest in being recalled to ABF and it is denied in as much as the letter written by Plaintiff Boire is undated and it does not appear to have a legible intake stamp by the Defendants. (Defendants Ex 12)

18. Denied, Plaintiff Boire returned to work at a Carlisle facility on or about January 18, 1999.

19. It is admitted, in part, that Plaintiff Biore filed a grievance. It is denied in part because the grievance form filed by Plaintiff Boire is dated March 11, 1999 and it does not appear to have a legible intake stamp by the Defendants. (Defendants Ex 13)

20. Denied, Plaintiff Dietz stated in his affidavit that he was employed at the Carlisle terminal up to its closing of the Carlisle facility at which time he transferred to Allentown, Pennsylvania ( Plaintiffs Ex 8).

21. Admitted

22. Denied, Plaintiff Dietz returned to work at a Carlisle facility on or about November 20, 1998.

23. Admitted

24. Admitted

25. Admitted

26. Denied, Plaintiff Erdman returned to work at a Carlisle facility on or about February 11, 1999.

27. Admitted

28. Admitted

29. Admitted

30. Denied, Plaintiff Fritz returned to work at a Carlisle facility on or about November 21, 1998.

31. It is admitted, in part, that Plaintiff Fritz filed a grievance and it is denied in as much as the grievance of Plaintiff Fritz is not date stamped and it does not bear a legible intake stamp by the Defendants. (Defendants Ex 19)

32. Admitted

33. Admitted

34. Denied, Plaintiff Frombaugh returned to work at a Carlisle facility on or about November 12, 1998.

35. It is admitted. However the consolidation process under to pilot grievances supports Plaintiffs argument that each individual Plaintiff need not have filed a grievance in as much as a determination concerning the seniority mechanism, as to one, would govern as to all.

36. Denied, Plaintiff Harris was laid-off from employment at a Carlisle Facility on September 25, 1995.

37. Admitted

38. Denied, Plaintiff Harris returned to work at a Carlisle facility on or about December 7, 1998.

39. Admitted

40. Denied, Plaintiff Landis was laid-off from employment at the Carlisle Facility on September 25, 1995.

41. It is admitted, in part, in as much as Plaintiff Landis wrote a letter requesting to be recalled to ABF's Carlisle Facility and denied in as much as the letter written by Plaintiff Landis is not dated and it does not bear a legible intake stamp by the Defendants. (Defendants Ex 23)

42. Denied, Plaintiff Landis returned to work at a Carlisle facility on or about January 15, 1999

43. Admitted, in part, that Plaintiff Landis filed a grievance and denied in as much as the grievance of Plaintiff Landis is not dated and it does not bear a legible intake stamp by the Defendants. (Defendants Ex 24)

44. Admitted

45. Admitted

46. Denied, Plaintiff McGuire returned to work at a Carlisle facility on or about February 11, 1999.

47. It is admitted, in part, that Plaintiff McGuire filed a grievance and it is denied in as much as the grievance of Plaintiff McGuire is not dated and it does not bear a legible intake stamp of the Defendants. (Defendants Ex 26)

48. Admitted

49. Admitted

50. Denied, Plaintiff Minnich returned to work at a Carlisle facility on or about December 13, 1998.

51. It is admitted, in part, that Plaintiff Minnich filed a grievance and it is denied in as much as the grievance of Plaintiff Minnich is not dated and it bear a legible intake stamp by the Defendants. (Defendants Ex 28)

52. Denied, Plaintiff Nevins was laid-off from employment at the Carlisle Facility on September 25, 1995.

53. Admitted

54. Denied, Plaintiff Nevins returned to work at a Carlisle facility on or about February 10, 1999.

55. It is admitted in part that Plaintiff Nevins filed a grievance dated March 27, 1999 and it is denied in as much it does not bear a legible intake stamp by the Defendants to support the filing date stated as March 28, 1999. (Defendants Ex 30)

56. Denied, Plaintiff Nye was laid-off from employment at the Carlisle Facility on September 25, 1995.

57. Admitted

58. Denied, Plaintiff Nye returned to work at a Carlisle facility on or about February 27, 1999.

59. It is admitted, in part, that Plaintiff Nye filed a grievance dated March 5, 1999 and it is denied in part in as much as it does not bear a legible intake stamp by the Defendants to support the filing date of March 9, 1999. (Defendants Ex 32)

60. Admitted

61. Admitted

62. Denied, Plaintiff Ramirez returned to work at a Carlisle facility on or about November 27, 1998.

63. It is admitted, in part, that Plaintiff Ramirez filed a grievance and it is denied in part in as much as the grievance filed by Plaintiff Ramirez is not dated and it does not bear a legible intake stamp by the Defendants. In addition Plaintiff Ramirez filed grievance number 88962 dated February 9, 1999; grievance number 92810 dated September 29, 1999; grievance number 93077, which is not dated; grievance number 92864 dated June 15, 1999; grievance number 92817 dated June 8, 1999; grievance number 90605, which is not dated; grievance number 93445 dated June 29, 2002; grievance number 94900 dated April 29, 2000; grievance number 94577 dated March 2,

2000; grievance number 96316 dated July 26, 2000. (Defendants Ex 34 and Plaintiffs Ex 10)

64.  Denied, Plaintiff Sgrignoli was laid-off from employment at the Carlisle Facility on September 25, 1995.

65.  It is admitted, in part, in as much as Plaintiff Sgrignoli wrote a letter requesting to be recalled to ABF and it is denied in as much as the letter written by Plaintiff Sgrignoli is not dated and it does not bear a legible intake stamp by the Defendants. (Defendants Ex 35)

66.  Denied, Plaintiff Sgrignoli returned to work at a Carlisle facility on or about December 5, 1998.

67.  It is admitted, in part, that Plaintiff Sgrignoli filed a grievance and it is denied in part in as much as the grievance filed by Plaintiff Sgrignoli is not dated and it does not bear a legible intake stamp by the Defendants. (Defendants Ex 36)

68.  Admitted

69.  Admitted

70.  Denied, Plaintiff Snyder returned to work at a Carlisle facility on or about November 27, 1998.

71.  It is admitted, in part, that Plaintiff Snyder filed a grievance and it is denied in as much as the grievance filed by Plaintiff Snyder is not dated and it does not bear a legible intake stamp by the Defendants. (Defendants Ex 38)

72.  Admitted

73.  Admitted

74.  Admitted

75. It is admitted, in part, that Plaintiff Welker's filed a grievance dated December 18, 1999 and denied in part in as much as there does not bear a legible intake stamp by the Defendants to support the filing date of December 16, 1998. (Defendants Ex 40)

76. Admitted

77. It is admitted, however, a letter dated May 20, 1999 to Phil Young, Freight Director, International Brotherhood of Teamsters, from Daniel Virtue and forwarded to Charles Albright via certified mail indicates that the appeal was forwarded to Phil Young per Article 8, Section 2 of the NMFA.

78. Admitted

79. It is admitted, however, a letter dated May 20, 1999 to Phil Young, Freight Director, International Brotherhood of Teamsters, from Daniel Virtue and forwarded to Norman Boire via certified mail indicates that the appeal was forwarded to Phil Young per Article 8, Section 2 of the NMFA.

80. Admitted

81. It is admitted, however, a letter dated May 20, 1999 to Phil Young, Freight Director, International Brotherhood of Teamsters, from Daniel Virtue and forwarded to Gary Dietz via certified mail indicates that the appeal was forwarded to Phil Young per Article 8, Section 2 of the NMFA.

82. Admitted

83. It is admitted, however, a letter addressed to Plaintiff Erdman and dated August 10, 1999, from Daniel Virtue via certified mail states that a request for review had been forwarded to the National Review Committee per Article 8, Section 2 of the NMFA of the NMFA.

84. Admitted

85. Admitted, however, a letter dated May 20, 1999 to Phil Young, Freight Director, International Brotherhood of Teamsters, from Daniel Virtue and forwarded to Michael Fritz via certified mail indicates that the appeal was forwarded to Phil Young per Article 8, Section 2 of the NMFA.

86. Admitted

87. Admitted

88. Admitted

89. It is admitted, however, a letter dated May 20, 1999 to Phil Young, Freight Director, International Brotherhood of Teamsters, from Daniel Virtue and forwarded to Allen Landis via certified mail indicates that the appeal was forwarded to Phil Young per Article 8, Section 2 of the NMFA.

90. Admitted

91. Admitted

92. Admitted

93. Admitted

94. Admitted

95. Admitted

96. Admitted

97. Admitted

98. Admitted

99. It is admitted, however, a letter dated May 20, 1999 to Phil Young, Freight Director, International Brotherhood of Teamsters, from Daniel Virtue and forwarded to Vincent Ramirez via certified mail indicates that the appeal was forwarded to Phil Young per Article 8, Section 2 of the NMFA.

100. Admitted

101. It is admitted, however, a letter dated May 20, 1999 to Phil Young, Freight Director, International Brotherhood of Teamsters, from Daniel Virtue and forwarded to Keith Sgrignoli via certified mail indicates that the appeal was forwarded to Phil Young per Article 8, Section 2 of the NMFA.

102. Admitted

103. It is admitted, however, a letter dated May 20, 1999 to Phil Young, Freight Director, International Brotherhood of Teamsters, from Daniel Virtue and forwarded to Ray Snyder via certified mail indicates that the appeal was forwarded to Phil Young per Article 8, Section 2 of the NMFA.

104. Admitted

105. Admitted

[ As previously noted when responding to the Union submission of "Material Facts" reflects correspondence of Daniel Virtue advising Plaintiffs that their grievances had been forwarded to the International Union in Washington, D.C. for further consideration, evaluation and consideration.]

106. It is admitted, however, Defendant Local Union and the International Union reflect, in effect, admit both the active participation of Defendant Virtue and the International Union in the handling, status, disposition and appeal of Plaintiffs' return-from-layoff seniority and nuances.

107. It is admitted, however, the Plaintiffs assert that Unions' advocacy is pretextural invidious and a sham as reflected by the Unions acceptance of the ERJAC disposition and its handling of the appeal.

108  Admitted

Respectfully Submitted,

**Law Offices of Ahmad & Mirin**
2515 N. Front Street
Harrisburg, PA 17110
Phone: 717-909-4343

By: _____
Robert S. Mirin
Attorney ID No. 25305

# CERTIFICATE OF SERVICE

I, Robert S. Mirin, do hereby certify that on the ___20th___ day of December, 2002, I did forward a copy of the foregoing Answer to the following person(s) and in the following manner:

VIA FIRST-CLASS MAIL, POSTAGE PREPAID:

Jason Weinstock, Esquire
**Ira H. Weinstock, P.C.**
800 N. Second St., Suite 100
Harrisburg, PA 17102

Robyn Weiss, Esquire
**Morgan, Lewis & Bockius**
1111 Pennsylvania Avenue, NW
Washington D.C. 20004

James A. McCall, Esquire
International Brotherhood of Teamsters
25 Louisiana Avenue, N.W.
Washington, D.C. 20001

_____
Robert S. Mirin, Esquire