IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| JEFFREY D. ALBRIGHT, NORMAN T. BOIRE, GARY M. DIETZ, WILLIAM H. ERDMAN, MICHAEL W. FRITZ, A. RONALD FROMBAUGH, RALPH A. HARRIS, ALLEN W. LANDIS, LOWELL McGUIRE, WALTER R. MINICH, RAYMOND C. NEVINS, STANLEY L. NYE, VINCENT RAMIREZ, JR., KEITH E. SCRIGNOLI, RAY G. SNYDER, JR. and LAWRENCE D. WELKER,<br>    Plaintiffs<br><br>v.<br><br>DANIEL A. VIRTUE, Business Agent of the International Brotherhood of Teamsters; INTERNATIONAL BROTHERHOOD OF TEAMSTERS; LOCAL 776, INTERNATIONAL BROTHERHOOD OF TEAMSTERS; ABF FREIGHT SYSTEM, INCORPORATED,<br>    Defendants | NO. 1:CV-00-0878<br><br>(Judge Rambo) |

BRIEF IN OPPOSITION TO DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT

A.   Nature of the Action and Parties

Each of the Plaintiffs in this action are truck drivers who were employed by Carolina Freight, domiciled at a Carolina Freight, Carlisle facility in 1995. In September 1995, Carolina Freight merged with ABF. Each of the Plaintiffs is a member of Teamsters Local Union No. 776. Each of the Plaintiffs are covered by the Collective Bargaining Agreements between Teamsters, International and Local, Master Freight Agreement (negotiated by the International Union) and the Central Pennsylvania Over-The-Road and Local Cartage Agreement, which give

1

Plaintiffs extensive recall from layoff rights. The Plaintiffs' Affidavits and documents suggest that the current employer (ABF) and union failed to observe the applicable contractual provisions concerning recalls from layoff and seniority date assignments, which were in force during 1995 and currently.

During May of 1995, one group of Plaintiffs were laid off/transferred from Carolina Freight's Carlisle facility. During September 25, 1995, Carolina Freight's parent corporation was purchased by ABF's parent company. Prior to the September 25, 1995, change of operations, all of the Plaintiffs were laid off, or were offered employment at one of Carolina Freight's other facilities. All in the second category were subsequently laid off in September 1995, on the official date of the merger.

In violation of the relevant provisions of the Master Labor Agreement, none of the above listed Plaintiffs were contacted concerning recall. When the Plaintiffs heard "through the grapevine" that ABF was adding employees to the Board, and each Plaintiff, on his own individual initiative, contacted the Defendants. Upon recall to the Carlisle domicile, their rights under the relevant seniority provisions were disregarded. The Plaintiffs filed grievances prior to or as soon as the first seniority list was posted which listed them by seniority.

B.  Relevant Procedural History

Plaintiff filed a complaint on May 16, 2000, and an amended complaint on May 26, 2000. Defendants moved, under Rule 12, which they converted to a Rule 56 summary judgment to dismiss the complaint based on the applicable statute of limitations and failure to state a claim for relief. This Court granted Defendants' Motion to Dismiss under Rule 56, an appeal ensued and the Third Circuit Court of Appeals reversed and remanded this matter.

C.  Statement of Case

This litigation involves a hybrid *DelCostello v. International Brotherhood of Teamsters,* 462 U.S. 151 (1983) action brought by sixteen individual Plaintiffs in connection with the treatment of their seniority rights by Defendants Daniel A. Virtue; the International

Brotherhood of Teamsters Local #776 (#776); the International Brotherhood of Teamsters ("Teamsters"); and ABF Freight Systems, Inc. ("ABF").

Plaintiffs, upon return from layoffs, in excess of four years, complained that their seniority dates were improperly calculated and filed grievances with the local union [#776]. Two pilot grievances were selected, heard at the local level and forwarded to the Eastern Regional Grievance Committee (ERJAC- an interim step in the grievance process) which denied the grievances on a procedural ground of timeliness. This was and is contested by Plaintiffs, inter alia, in this litigation. Plaintiff Ray Snyder requested that the "pilot" grievances be appealed. On May 20, 1999, by letter from Defendant Virtue to the International Teamsters Union ("Teamsters"), Plaintiffs' appeals were forwarded to the national level to have the Eastern Regional Grievance Committee decisions reviewed, Plaintiffs learned of the referral when, on August 10, 1999, Defendant Virtue notified Plaintiffs that the Eastern Regional Grievance Committee decisions were being forwarded, by Defendant Virtue, to the National Review Committee per Article 8 of the National Master Freight Agreement.

On February 1, 2000 and again on March 13, 2000, Plaintiffs, by private counsel, inquired of the local union and the employer as to the status of their grievances. In the absence of any response, this litigation commenced on May 16, 2000 by way of summons and complaint.

An amended complaint was filed on May 26, 2000. On July 31, 2000, Defendant Virtue belatedly notified Plaintiffs that their grievances were being "withdrawn." On August 18, 2000, Defendants moved for dismissal of this litigation, under Fed.R.Civ.P. 12(b)(6), for failure to state a claim for relief, seeking to dismiss the complaint based upon a six (6) month statute of limitations, Defendants converted its motion to a Rule 56 motion through the submission of Defendant Daniel Virtue's statement and attached evidence. Plaintiffs responded with 16 affidavits and extensive attachments (Plaintiffs' Exhibit VIII, A-P). On November 13, 2000, the Honorable Judge Sylvia Rambo issued an order granting Defendants' motion to dismiss Plaintiffs' claim. Plaintiffs filed a motion for reconsideration on November 30, 2000. On December 4, 2000, this motion was denied as untimely pursuant to Middle District of

3

Pennsylvania Local Rule 7.10. It was from these orders, dismissing the Plaintiffs' complaint, that a successful appeal was taken; although the Circuit did not adopt Plaintiffs' counsel's argument as to the timeliness of its requested reconsideration, the Circuit remanded the matter, discovery ensued and the matter is before the Court for a second time in a summary judgment posture with Defendants seeking, again, dismissal.

D.      Statement of Facts

Until 1995, Plaintiffs had been employed as Carolina Freight drivers with recall rights covering a five year period. Plaintiffs were laid off various times between May and September, 1995 by Carolina Freight. Pursuant to a 1995 merger between Carolina Freight and ABF Freight Systems, Inc., Plaintiffs retained five years of recall rights under the controlling Collective Bargaining Agreement ("CBA"). Neither Defendant ABF, nor any representative of the Teamsters, contacted the individual Plaintiffs concerning recall. However, Plaintiffs learned by word of mouth, between late November of 1998 and February of 1999, that there were open positions available for over the road drivers at the ABF Carlisle "barn." During the period from late November 1998 through February of 2000, all sixteen Plaintiffs applied, separately and on their own, to exercise their contractual recall rights. All returned back to the ABF Carlisle facility. All had been employed at Carolina Freight's Carlisle facility. Upon their return to the facility, as indicated in their affidavits, their seniority status was reduced, treated ambiguously and initially they were told that they would not have a seniority number at the time.

In the trucking industry, over the road drivers are ranked by seniority and called out from a board in seniority order. At the time of their returns and between November 1998 until February 1999, upon their return, each of the sixteen Plaintiffs was placed at the bottom of the board without any seniority number. From time to time thereafter, as is the case in the industry, the employer periodically posted new "seniority lists" which reflected seniority status and set the board, which determines the order of work, by assigning a seniority date or designation.

Plaintiffs' grievances complained that their seniority dates were improperly calculated and filed grievances with the local union [#776]. Two pilot grievances were selected by the local

4

union and processed through the Eastern Regional Grievance Process, an intermediate step under the Collective Bargaining Agreement, available under the terms and provision of the National Master Freight Agreement and relevant local bargaining supplement.

Plaintiffs' seniority-related grievances which, formal pre-printed language on the form at the Eastern Conference form notwithstanding, were not disposed of in a final and binding fashion by the Eastern Region Joint Area Grievance Committee decision of April 27, 1999. Plaintiffs' employment rights are/were governed variously by a National Master Freight Agreement, a local Cartage Agreement, and ad hoc change of operations agreements between and among Defendants.

On May 16, 1999, Plaintiff Ray G. Snyder sent a written request to the Teamsters Local #776 as to the Carolina Freight drivers' seniority grievances. In that correspondence, Plaintiff Snyder requested that the Teamsters Local #776 Union undertake any and all appeals that were available to grievants as union members under the contract of the International Brotherhood of Teamsters. In addition, it should also be noted that the disposition of the Eastern Region Joint Area Grievance Committee did not address the merits of Plaintiffs' seniority grievances.

On May 20, 1999, at Plaintiff Ray Snyder's request, Defendant Daniel A. Virtue appealed the Eastern Region's dispositions to Phil Young, Freight Director of the International Brotherhood of Teamsters, stating in pertinent part,

> "...We are forwarding these appeal letter *sic* to you per Article 8, Section 2, as a request to have the decisions reviewed. If you need any additional information, please do not hesitate to contact me...."

On August 10, 1999, Plaintiffs were advised of the reference of their grievances to the national level. Article 8, Section 2 of the relevant Collective Bargaining Agreement ("CBA"), provides for grievance review at the national level and consideration for further handling and disposition of grievances decided at the regional level of the Union's complex appeal process.

5

On February 1, 2000 and March 13, 2000 respectively, Plaintiffs, by private counsel, inquired first of the local union and then of the employer as to the status of their grievances. In the absence of any response, this litigation commenced on May 16, 2000 by way of summons and complaint.

It was not until July 31, 2000, that Defendant Virtue notified any of the Plaintiffs that their seniority grievances had been "withdrawn" from processing which was after notice of this litigation. Defendant Virtue indicated to the grieving Carolina Freight drivers, for the first time, that the seniority grievances for Plaintiffs Snyder and Nye filed by the local union for the Carolina Freight drivers had been "...withdrawn" by the local union. [As noted above, two seniority grievances for returning Carolina Freight drivers (Plaintiffs) had been selected by the Union as pilot grievances covering the seniority grievances of all Carolina Freight Plaintiffs.] Thus, it was not until after the complaint, sub judice, had been filed, but service had not been perfected (although the Defendants had been notified by letter of the filing and the content of the complaint) that the Union indicated to the Plaintiffs that the processing of their seniority grievances, arising from periodically posted seniority lists, was concluded.

Plaintiffs contend that the factual record, before the Court below, was such that Plaintiffs, as the non-moving party, have established the existence of material disputed issues precluding summary judgment.

E.  General Discussion

Following is a summary of the issues and over all posture of the case, which makes granting the Defendants' Motions for Summary Judgment inappropriate:

1.  As established in the context of the prior 12(B) Rule 56 submission to this Court, on remand by the Third Circuit, the Local Union, Daniel Virtue's and The International Unions active participation and treatment of the status of Plaintiffs' grievances and the consignment of the grievances to an open ended appeal consideration from the Eastern Region artfully consigned them to defacto oblivion, at the International Union level in Washington, D.C. This is reflected in, and acknowledged by, Daniel Virtue's letter to the grievants indicating that the matter had

6

been referred to Washington, D.C. for further evaluation and processing. This open ended and ambiguous referral, Plaintiffs contend, is a part of the conspiracy between the union and the employer to evade and avoid the contractual recall process, which would have encouraged the hiring of more expensive employees from recall and the concomitant effort to make recall unattractive by limiting and reducing Plaintiffs' seniority status through the use of the revised seniority computation.

  2. The ad hoc contractually unsupported insistence of the International Union and the Local Union, that the employees needed to provide updated addresses to the local union every six (6) months; a procedure, which is clearly not provided for or required in Article 5.5 of The National Master Freight Agreement or the Local Cartage Agreement.

  3. Defendants unsupported insistence that the Change of Operation Committee, contrary to its own terms and provision and at odds with the methodology in force at the time the Change in Operations Committee was created, existed on an open ended basis when in fact the direct terms of the Change of Operation language provided that the Change of Operation Committee existed for no more then one (1) year.

  4. The failure of the Local and International Union to challenge the patently inappropriate assertion, of the employer, contrary to the seniority grievances provisions that a seniority grievance needed to be filed within seven days to be timely. In fact, it is Plaintiffs contention that the grievances could be filed any time up to thirty (30) days after the posting of a permanent seniority list, a list which was not posted until some time after the Plaintiffs reinstatement from layoff status. Plaintiffs further contend, as supported by a plain reading of the direct language of the contract, that the terms and conditions of Article 5.5 are temporary and provide "through the door status" pending the posting of the next permanent seniority list. Thus, at the latest, when the permanent seniority list is/was semiannually posted the assignment of an incorrect seniority date on a permanent bases, the posting triggered the employees' obligation to file a grievance within the thirty (30) days. In this context, the absence of any clear indication as to when the permanent seniority list was in fact posted following the reinstatement of Plaintiffs

7

between November 1998 and February 1999, the Plaintiffs' position is that the grievances were in fact timely. The issues of the proper assignment of a permanent seniority date and the trigger for the thirty (30) day period are a significant material disputes.

Also, the assertion that several of the similarly situated Plaintiffs appropriately relied on the pilot grievances for resolution of their identical issues, which would obviously control as to any employee recalled from layoff because seniority would be computed in the same fashion for all returning employees. This issue, at least indirectly also makes Summary Judgment inappropriate; given that the grouped grievances in question which were batched by the Union into two (2) pilot grievances. Thus, suggesting the similarity of content and need is consistent resolution under the terms of the collective bargaining agreement.

5. The fact that the process, in question, is not the product of final binding independent arbitration, unlike that process endorsed by the Supreme Court in other areas of National Labor Policy (*See Alexander v. Gardner Denver*) is significant. The process, at issue, involves an in house "horse-swapping" arrangement between employer(s) and the Unions to the derogation of employee rights and clean contractual language. The Defendants themselves, on an ad-hoc basis, horse trade grievances as opposed to being governed by the independent arbitrator's assessment of the terms and provisions of the relevant Collective Bargaining Agreement provisions.

6. The fact that Plaintiffs returning, as recalled employees, where more expensive then the newly hired employees.

7. Plaintiffs assert that ABF loaded up its seniority board at its Carlisle facility, shortly before the merger during the time frame when the merger was under discussion, by adding twenty-four (24) employees to its seniority board, thereby attempting to preclude the exercise of " guaranteed" contractual recall rights by Carolina employees. This process in the concomitant support generated for Daniel Virtue as the business agent for ABF, reflect an asserted invidious course of conduct in which the entire process from May of 1995 forward was handled by the employer, the Local Union and the International Union.

8

8.  The failure of the parties to apply the basic provisions of the National Master Freight Agreement, in terms of recall rights, as reflected by the fact that neither the Union or the employer made any effort to advise the employees of the availability of recall employment or to administer the recall from layoff status on a seniority basis is also significant. The evidence in the record, on this point, discloses that, in response to ad hoc individualized inquires by Plaintiffs, regardless of their seniority dates, the Plaintiffs were re-employed and cryptically advised that they were being brought back pursuant to Article 5, Section 5. However, nothing in the Local Unions initial letter, as issued by Charles Shuggart in 1995, nor the recall letters generated as a result of the individual drivers ad hoc contacts suggested either that the requests were untimely due to any failure of the drivers to supply an address every six (6) month; or any conduct of inaction at any time during the intervening period.

9.  In addition, the recall letter itself suggested the use of Article 5.5 was no more than an interim measure to return employees from a layoff status pending the next posting of the permanent seniority listing.

10. Also, the language of Article 5, Section 5 covers transfers to other facilities when in fact ABF's Carlisle facility was in effect a replacement for Carolina Freight facility next door.

11. In fact, the inclusion of an overall company seniority in Article 5.5 and the usage of Carolina Freights seniority for employees, who were employed directly by ABF, at the time of Carolina Freights shut down in the fall of 1995 establishes that Carolina Freight drivers, including laid-off drivers, became ABF drivers by operation of the collective bargaining agreement's terms and conditions. The use of an overall seniority measure, including Carolina Freight seniority, was the mechanism to be applied to employees when, after ad hoc recall from layoff, a permanent list was posted. Thus, as admitted by the Defendants, when employees were returned from layoff status on an ad hoc basis, the master board or seniority list was not recalculated for each separate recall.

12. Such recalculation was reserved for the periodic postings as required by the collective bargaining agreement, which mandated for permanent list posting.

9

13.     The fact that Plaintiffs were more expensive employees by almost 50 % when compared to the rate of new hires (new hires being hired at 70 % of the recalled employees rate) establishes an economic motive for the employer's position and arbitrary refusal to follow the terms of the labor agreement in terms of the timeliness of the seniority grievances.

14.     The failure to use the appropriate seniority measure, which should have been applied to any permanent position, the failure to administer the recall mechanism, the inappropriateness of the placement of Plaintiffs on the seniority list and the handling of their grievances throughout the process, involve the employer, the local union, the International Union, Daniel Virtue as well as the collective efforts to contrive documents creating an appearance of administration of Article 5.5 on the part of ABF. All are evidence supporting Plaintiffs position, which makes the Defendants' Summary Judgment inappropriate.

In the context of the Third Circuit's remand of this matter back to this Honorable Court, the Court made several specific conclusions which are, it is submitted, relevant for the summary judgment issue before this Honorable Court:

Judge Becker specifically noted the absence of clear guidance to Plaintiffs by the union and or management for the status of their grievances is/was inappropriate under Del Costello. In point of fact, the unclarity concerning the recall status, the lack of a seniority based lay-off mechanism, the status of Plaintiffs' seniority, and as previously noted by the Third Circuit, the lack of clarity concerning the status of the grievances, once the Eastern Region Joint Area Committee had reached its decision, presents a thread which runs throughout this case. It is submitted that the lack of clear guidance and the obfuscation by the defendants of the process is a clear factor at issue and is deserving of a full trial instead of summary judgment disposition.

Lest the Court view the matter as revisiting the statute of limitations issue, Plaintiffs believe that the authority cited by the Third Circuit: Vadino v. A. Valey Engineers, 903 F.2d 253 (3d Cir 1990), was controlling and is still applicable to the facts and circumstances of this case. Clearly, the assertions of the company concerning information provided to Plaintiffs as to seniority status at the time they returned and the averments to the contrary of all sixteen (16)

Plaintiffs, as well as the admission that the periodic seniority list, called for in the collective bargaining agreement, was not re-posted until sometime after Plaintiffs were recalled, create substantial and material disputes which further preclude summary judgment.

At least as considered by the Circuit previously, the Plaintiffs position that seniority and recall, in the first instance, were governed by Article 5, Section 1's provision relating to seniority provides protection for "… 5 years…from layoff."

Discovery developed the fact that the employers record keeping under Article 5, Section 5 was after the fact and triggered by the ad hoc inquiries of the drivers, rather than seniority driven, as mandated by the change of operation and by seniority principles as acknowledged in the Change of Operation of September 14, 1995 and the provisions of the controlling collective bargaining agreement. The absence of any seniority based mechanism or process, coupled with the union's clearly erroneous perception that employees had to provide current addresses every six months, further militate against the grant of summary judgment in this case.

Furthermore, as to the status of Daniel Virtue and the International as proper parties, versus the "pro forma" inclusion of individuals or locals. As there is evidence of actual conduct and/or agency by Virtue and complications by the International (ie. paper entries merely identifying a business agent or the international union) are different operative facts. The active participation reflected in the discovery in this case, under general agency principles as noted by the Circuit, alone preclude dismissal of Virtue or the International, at least until adjudication at a trial setting. Thus, it was Virtue and the International, who created the ambiguity, post ERJAC decision, concerning the status of the plaintiffs' grievances as batched under the two (2) pilot grievances. As noted by the Circuit, there continues to be an absence on the record, of any indication that the union, or the company for that matter, provided any information to Plaintiffs concerning the progress of their appeal/referral to Washington, D.C. beyond ERJAC level. Significantly, it should be noted that the Third Circuit, in its decision, did reference and apply the federal rules of evidence (801)(D)(2)(d) concerning the evidentiary value of a statement by an

11

agent of a party properly before the Court. If nothing else, Virtue and the International fit within that concept.

It is respectfully submitted that under the ratio descendii of the Third Circuit's decision, on remand, and the record presently before the Court is such that the grant of summary judgment as to any of the defendants is inappropriate at this time.

F.  Argument

In reviewing a motion to dismiss under Rule 12(b)(6) of the Federal Rules of Procedure, the dismissal is appropriate if it clearly appears that no relief can be granted under any set of facts that could be proved consistent with the Plaintiffs allegations. Here sixteen Plaintiffs, all aver materially different facts concerning the timing of their grievances, the applicable contract language and facts suggesting discrimination and bad faith; thus making Defendants' motion inappropriate. (See, *Del Costello v. Teamsters*, 462 US 151 (1983), *Teamster's v. Terry*, 494 US 558 (1990))

A motion for summary judgment shall be granted only if "there is no genuine issue as to any material fact and the moving party is entitled to judgement as a matter of law." Fed.R.Civ.P. No. 56(c). Summary judgment is only appropriate where the pleadings, depositions, answers to interrogatories and answers on file, together with affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law. Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). "A fact is material if it might affect the outcome of the suit under the governing law." Farmer v. Carlson, 685 F.Supp. 1335, 1339 (M.D. Pa. 1988).

An issue of material fact exists if evidence is such that a reasonable jury could return a verdict for the non-moving party. Anderson v. Liberty Lobby, Inc., 477 U.S. 242 (1986). In considering a motion for summary judgment, inferences to be drawn must be viewed in the light most favorable to the party opposing the motion. Matsushita Electric Industrial Co. v. Zenith Radio Corp., 475 U.S. 574. Where the moving party produces evidence that demonstrates that no genuine issue of material fact exists, the non-moving party must establish the existence of

12

each element of its case. J.F. Feeser, Inc. v. Serv-A-Portion, Inc., 909 F.2d 1524, 1531 (3rd Cir 1990), cert. denied, 499 U.S. 921 (1991) (citing Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986)). See also Reeves v. Sanderson Plumbing Products, Inc., ___ U.S.___ (No. 99-536, June 2000), Hunt, Governor of North Carolina, et.al. v. Cromaritie, et. al., ___ U.S.___ (No. 98-85, May 17, 1999).

The Plaintiffs, in this action, uniformly contend that they timely filed their grievances concerning their seniority issues within the prescribed time provision of their labor contract (Article 5 § 1, 5 § 2(c)(1) (2), 5 § 4(d) and Article 8 § 6(d)(1). Plaintiffs assert that they were lead to believe, by their local union representatives, including Daniel Virtue, that the seniority issues at the heart of the grievances would be further processed in July 1999. On August 10, 1999, Virtue informed the Plaintiffs that their request for review of their grievances had been forwarded to the National Review Committee per Article 8 of the National Master Freight Agreement. The Plaintiffs were lead to believe their grievances where on appeal, and in fact, they were not.

The Plaintiffs in this case were entitled to be represented by their union in upholding the collective bargaining agreement. The conduct of the Union, by its representative, Daniel Virtue, was "irrational". The nature of the grievances and the Union's failure to properly follow through with the review process and the continued refusal to acknowledge the rights of the Plaintiffs to file grievances under 5.2 are at issue:

> "..we think that another situation when the employee may seek judicial enforcement of his contractual rights arises if, as is true here, the union has sole power under the contract to invoke the higher stages of the grievance procedure, and if, as is alleged here, the employee-plaintiff has been prevented from exhausting his contractual remedies by the union's wrongful refusal to process the grievance. ... Vaca v. Sipes 386 US 171 (1967)

13

Because Defendants contend that "On May 23, 1995[1], Carolina Freight closed its Carlisle facility, but remained in operation at other Carolina Freight facilities" Plaintiffs somehow lost Article 5 seniority rights. This fails to address the fact that nine (9) of the Plaintiffs were not "laid off" until September of 1995 from Carolina Freight's Carlisle domicile and that, as to all Plaintiffs, Article 5's plain language is to the contrary. The Plaintiff's Affidavits and documents suggest that the union failed to provide meaningful representation to the Plaintiffs, under existing contract terms, in accordance with the labor agreement; that in itself is evidence of invidious behavior. The Unions, by and through Daniel Virtue and the employer, ABF, through the use of procedural artifice, failed to address the Plaintiffs' seniority issues.

Section 301 of the LMRA confers subject-matter jurisdiction over suits for violations of contracts between employer and a labor organization, one against the employer and/or one against the union(s). Coupled with federal question jurisdiction, Section 301 also establishes the jurisdiction of a federal court over hybrid duty of fair representation/breach of contract actions which includes both causes of action. The Supreme Court and the Circuit, on remand, has given a less mechanistic reading to section 301 in recognition of the wide-ranging authority of the federal courts with respect to labor contracts.[2] State and federal courts have concurrent jurisdiction over § 301 actions. (See, *Vaca v. Sipes*, supra; *Teamsters Local 174 v. Lucas Flour Co.*, 369 US 95, 49 LRRM 2717 (1962)) Federal and state courts also have concurrent jurisdiction over complaints by union members of violations of the Labor Management Reporting and Disclosure Act "Bill of Rights". (29 USC § 412) (See also, *Berg v. Watson*, 417 F Supp 806, 93 LRRM 2697 (SD NY, 1976)) Also, in 1989, in *Breininger v. Sheet Metal Workers*

---

[1] A reduction of Carolina Freights "Board" was announced on or about May 23, 1995. This reduction lead to a number of employees being placed on layoff status.

[2] 29 USC § 185. Section 301 provides in relevant part: "(a) Suits for violation of contracts between an employer and a labor organization representing employees in an industry affecting commerce as defined in this Act, or between any such labor organization, may be brought in any district court of the United States having jurisdiction of the parties, without respect to the amount in controversy or without regard to the citizenship of the parties."

14

*Local 6* [3], the Supreme Court explicitly decide that section 1337(a) confers jurisdiction over an action asserting a union's breach of duty of fair representation in the operation of a hiring hall under a collective bargaining agreement notwithstanding that no breach of the collective bargaining agreement was alleged against any employer.

Following the Supreme Court decision in *Air Line Pilots v. O'Neill*, 499 US 65, 136 LRRM 2721 (1991), district and appellant courts appear to be moving toward a wider view and greater consistency in defining the duty of fair representation. For example, in *Ooley v. Household Manufacturing, Schwitzer Division*, 961 F 2d 1293, 140 LRRM 2138 (CA 7), *cert.denied*, 506 US 872, 141 LRRM 2408 (1992), the Seventh Circuit acknowledged that *O'Neill* rejected its narrow interpretation of the duty of fair representation, which held that intentional misconduct was essential to a breach of the duty. Instead, according to the Seventh Circuit, *O'Neill* establishes a tripartite standard that requires an analysis of these issues: (1) whether the union acted arbitrarily, (2) whether it acted discriminatorily, or (3) whether it acted in bad faith. Plaintiffs evidence raises issues under all three prongs of *O'Neill* with regard to the issue of whether the union acted arbitrarily, while the Seventh Circuit described *O'Neill* as deferential to a union's judgment and requiring reasonableness that the action rises to the level of "irrational" or "arbitrary" conduct to constitute a violation of rights. [4] But, that is not the only issue. In *O'Neill*, for example, the Seventh Circuit found sufficient evidence of bad faith by the union in the *Ooley* case to survive summary judgment. Here all the factors are present.

In *Trnka v. Auto Workers Local 688*, 30 F3d 60, 146 LRRM 2790 (CA 7, 1994), the same court commented that to apply the bad faith or discrimination prongs of the standard, one must inquire into the subjective motivation behind the union action, but that in applying the arbitrariness prong, the inquiry concerns the objective adequacy of the union action. Both

---

[4] 961 F2d at 1302

15

aspects are present here: Virtue serviced ABF, not Carolina Freight, as a business agent and ABF stood to profit economically.

In *Garcia v. Zenith Electronics Corp.*, 58 F3d 1171, 149 LRRM 2740 (CA 7, 1995), the Seventh Circuit further defined the "arbitrary" prong of *O'Neill* in the grievance handling setting. The court noted that the union "must provide 'some minimal investigation of employees grievances', but the thoroughness of this investigation depends on the particular cases." An egregious disregard for the employee's rights would meet the standard. Plaintiffs believe the basic seniority rights have been egregious by disregard.

In a duty of fair representation case alleging sex discrimination, the Eighth Circuit appeared to adopt an interpretation similar to that of the Seventh Circuit in *Ooley*. While the district court had found that the union acted within a wide range of reasonableness, the Eighth Circuit concluded that the district court had confused the standard for discriminatory conduct with the standard for arbitrary conduct. It held that there was sufficient evidence of sex discrimination to survive a motion for summary judgment and that the question of whether or not the union acted within a wide range of reasonableness was irrelevant to an examination of whether the union's action was discriminatory. Again, this an issue raised by Plaintiffs Affidavits and documents.

The Sixth Circuit distinguished the three prongs of *O'Neill's* tripartite standard in *Black v. Ryder, et.a*l., 15 F3d 573, 145 LRRM 2387 (CA 6, 1994). It found that analysis of whether conduct is arbitrary to be more complex that the analysis of whether conduct is discriminatory or in bad faith. To establish arbitrariness requires actions outside a "wide range of reasonableness"; neither negligence nor poor judgment is sufficient. (This suggests Plaintiffs' right to, and need for, discovery prior to disposition here.) The court observed, however, that discrimination and bad faith are never reasonable, and that if either is shown, there is no need to consider whether the conduct fell outside a reasonableness.[5]

---

[5] For further discussion see also: *Dushaw v. Roadway Express*, 66 F3d 129, 150 LRRM 2397 (CA 6, 1995)

16

The Eighth Circuit concluded that while *O'Neill* protects a union's conduct unless it is sufficiently far outside of "a wide range of reasonableness" to be considered irrational, but this is so only if the union has acted in good faith. In order to establish a lack of good faith, according to the Eighth Circuit, there must be evidence of fraud, deceitful action, or dishonest conduct by the union.[6] Here, while EJRAC proceedings are open, the analysis and result are so cryptic as top be "secret".

The court found bad faith where the union deceived its membership by concealing the existence of side letters releasing all their claims against the employer and allowing the employer to complete its secret plan to reopen nonunion. The Second Circuit found that a union acted arbitrarily and in bad faith when it orally agreed to abrogate the contract's provisions requiring merger of seniority lists when equipment and operations were transferred. (See also, *Aguinaga v. Food & Commercial Workers*, 993 F2d 1463, 143 LRRM 2400, 2404-05 (CA 10, 1993) and *Lewis v. Tuscan Dairy Farms*, 25 F3d 1138, 146 LRRM 2601 (CA 2, 1994) for discussion of *O'Neill*.)

Also, in *Marquez v. Screen Actors Guild*, 124 F3d 1034, 156 LRRM 2129 (CA 9, 1997), the Ninth Circuit restated its test for arbitrariness for unintentional acts or omissions by union officials. According to the court, unintentional acts or omissions are arbitrary if: (1) they reflect reckless disregard for the rights of an individual employee, (2) they severely prejudice that injured employees, and (3) the policies underlying the duty of fair representation would not be served by shielding the union from liability. All of the above components are suggested by Plaintiffs' Affidavits and documents and mandate dismissal of these motions.

The record before the Court as fairly construed, raise issues under all three prongs of O'Neill, supra, not only arbitrary/irrational but it raises issues of discriminatory bad faith actions to the extent that the Plaintiffs contended that their prior grievances were was arbitrarily handled; the local unions actions and the subsequent status of the matter which is lodged, *sine die*, in the

---

[6] See also, Schmidt v. Electrical Workers (IBEW) Local 949, 980 F2d 1167, 141 LRRM 3004 (CA 8, 1992)

17

middle of the grievance procedure, raises question of bad faith as set forth in the remarks contained in the affidavits of the business agent, David Virtue, reflecting arbitrary and predisposed attitude adverse to the Plaintiffs which results in a blatant conduct ignoring their fundamental contractual right to be dovetailed in seniority status on the Carlisle Board.

Based upon the foregoing, Defendants' Motions for Summary Judgment must be denied.

Respectfully Submitted,

_____
Robert S. Mirin, Esquire
PA ID# 25305
AHMAD & MIRIN
2515 N. Front Street
Harrisburg, PA 17110
(717) 909-4343
Attorney for Plaintiffs

Dated: 20th of December, 2002

# CERTIFICATE OF SERVICE

I, Robert S. Mirin, do hereby certify that on the _20th_ day of December, 2002, I did forward a copy of the foregoing Brief and exhibits to the following person(s) and in the following manner:

VIA FIRST-CLASS MAIL, POSTAGE PREPAID:

    Jason Weinstock, Esquire
    **Ira H. Weinstock, P.C.**
    800 N. Second St., Suite 100
    Harrisburg, PA 17102

    Robyn Weiss, Esquire
    **Morgan, Lewis & Bockius**
    1111 Pennsylvania Avenue, NW
    Washington D.C. 20004

    James A. McCall, Esquire
    International Brotherhood of Teamsters
    25 Louisiana Avenue, N.W.
    Washington, D.C. 20001

Robert S. Mirin, Esquire