

86
2-13-03
MA

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

JEFFREY D. ALBRIGHT, *et al.*      :     CIVIL NO. 1:CV-00-0878

         Plaintiffs                :

v.                                       :

DANIEL A. VIRTUE, *et al.*,          :

         Defendant              :



## MEMORANDUM

Before the court are two motions for summary judgment filed pursuant to Federal Rule of Civil Procedure 56. One was filed by Defendant ABF Freight System, Inc. ("ABF"), the other by Defendants International Brotherhood of Teamsters ("IBT"); Local 776 of the International Brotherhood of Teamsters ("Local 776"); and Daniel Virtue (collectively, the "Union Defendants"). The parties have briefed the issues, and the motions are ripe for disposition.

I.      **Background**

The following facts are undisputed, except where noted. Defendant ABF is a national freight common carrier whose drivers and dock employees are represented by local unions affiliated with IBT, including Local 776 in central Pennsylvania. ABF and Local 776 are parties to the National Master Freight Agreement ("NMFA"), a national collective bargaining agreement. The NMFA, along with its area supplements, governs the terms and conditions of employment for all employees in the trucking industry who work for NMFA carriers.

Plaintiffs are currently employed as over-the-road drivers at Defendant ABF's facility in Carlisle, Pennsylvania. Plaintiffs had previously worked as over-

the-road drivers for Carolina Freight Carriers Corporation ("Carolina") prior to September of 1995. Carolina closed its Carlisle, Pennsylvania terminal in May of 1995. Prior to that facility's closure, Plaintiffs were given the opportunity to transfer to other Carolina facilities or accept layoff at Carlisle. Eight of the sixteen Plaintiffs transferred from Carlisle to another Carolina terminal prior to closure of the Carlisle terminal in May of 1995.[1] Carolina laid off the remaining eight Plaintiffs when the terminal closed in May of 1995.[2]

In July of 1995, ABF's parent company, Arkansas Best Corporation, announced that it was acquiring World Way Corporation, the parent company of Carolina. As a result of this acquisition, ABF and Carolina officially merged on September 25, 1995, with ABF being the surviving carrier.[3] As a result of the merger, all Plaintiffs who had chosen transfer to other terminals, instead of layoff at Carolina's Carlisle terminal, were laid off in September of 1995.

Both ABF and Carolina were parties to the NMFA, which contains provisions regarding changes in operations resulting from a combination of

---

[1]The eight Plaintiffs and their transfer locations are Gary Dietz – Kutztown, Ralph Harris – Baltimore, Allen Landis – Baltimore, Walter Minich – Baltimore, Raymond Nevins – Baltimore, Stanley Nye – Baltimore, Keith Sgrignoli – Kutztown, and Lawrence Welker – Baltimore.

[2]The eight Plaintiffs who chose layoff instead of transfer are Jeffrey Albright, Norman Borie, William Erdman, Michael Fritz, Ronald Frombraugh, Lowell McGuire, Vincent Ramirez, Jr., and Ray Snyder, Jr.

[3]Plaintiffs attempt to dispute the effective date of the Carolina and ABF merger. In their counter statement of facts, Plaintiffs state that they "believe that the acquisition . . . and ensuing merger were in process prior to the closure of the Carlisle Carolina Freight facility." (Pls. Resp. to Def. ABF Stat. Mat. Facts at ¶ 8.) However, nowhere do Plaintiffs present any facts which contradict that the merger was announced in July of 1995 and consummated in September of 1995. Accordingly, the court finds Plaintiffs attempted dispute is not genuine. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986) (holding that a factual dispute is "genuine" only if there is a sufficient evidentiary basis which would allow a reasonable fact-finder to return a verdict for the non-moving party).

terminals or over-the-road operations. Article 8, Section 6 of the NMFA requires that the change of operations must be approved by a Change of Operations Committee ("COC") comprised of union and employer representatives. The COC must determine the application of seniority for affected employees, and the COC's decisions are final and binding. The COC also has authority to hear and decide grievances arising from its decisions.

In August of 1995, a COC was appointed to consider the change of operations plan that ABF submitted following the merger [hereinafter "Committee"]. On September 14-15, 1995, the Committee held hearings during which Local 776, among other affected local unions, had the opportunity to comment on the proposed plan. Local 776 addressed ABF's position that laid off Carolina employees did not have recall rights with ABF, and Local 776 argued that they should have such rights under the NMFA.

On September 19, 1995, the Committee issued a decision in which it determined that "the seniority lists at domiciles and terminals affected by this change of operations shall be grouped by dovetailing[4] . . ." and "every facility whose work has been merged with the work of another facility must be grouped with that facility." (Def. ABF Stat. Mat. Facts at ¶ 11.) Defendant ABF asserts that "[b]ecause Carolina's terminal was closed [five months] prior to the Carolina/ABF merger, and there were no Carolina employees at Carlisle at the time of the merger, Carolina's Carlisle terminal was not merged with any ABF terminal." (*Id.* at ¶ 12.)

---

[4]The term "dovetailing" refers to the method of determining seniority where each employee of the two merged companies retain their seniority date based on their date of hire, without regard to the company which had previously been the employer. This is in contrast to the concept of "endtailing," whereby the employees of the company being merged are placed on the end of the seniority list below the employees of the surviving company.

3

Plaintiffs dispute this conclusion. Plaintiffs contend that "they were on layoff status from ABF Carlisle [as opposed to Carolina Carlisle]" because both Carolina and ABF laid off employees at the time of the merger. (Pls. Resp. to Def. ABF Stat. Mat. Facts at ¶ 12.)

The Committee decided that laid off Carolina employees, and the employees laid off as a result of the merger, had rights under Article 5, Section 5 of the NMFA. Article 5, Section 5 allows laid off over-the-road drivers an opportunity to transfer to another domicile within the same regional area, provided that they notify the company in writing of their interest in a transfer opportunity. An employee who transfers under Article 5, Section 5, "shall be placed at the bottom of the seniority board for bidding and layoff purposes, but shall retain company seniority for fringe benefits." (Def. ABF Ex. 3, Article 5, Section 5.)

The Committee, however, decided to expand the transfer rights under Article 5, Section 5 of the NMFA to all laid off Carolina employees for the life of the 1994-1998 NMFA. The Committee determined that Plaintiffs, amongst other laid off Carolina employees, would have transfer rights under Article 5, Section 5 to ABF terminals in the Central, Eastern and Southern regions, not just within the laid off employee's own region.

In October 1995, Local 776 sent a letter to all former Carolina employees, including Plaintiffs, informing them of transfer rights under Article 5, Section 5 of the NMFA.[5] ABF had a limited need for drivers from the time of the

---

[5] Plaintiffs attempt to dispute that this letter was sent. Plaintiffs state that "[i]t is acknowledged that the employer was able to produce an October 12, 1995, letter . . . however, this proof does not establish that the letter in question was actually sent to all Plaintiffs." (Pls. Resp. to Def. ABF Stat. Mat. Facts at ¶ 16.) Plaintiffs, however, produce no evidence to demonstrate that they did not

(continued...)

4

merger until late 1998 and early 1999. Between October 30, 1998 and February 22, 1999, ABF received Article 5, Section 5 transfer requests from each of the sixteen Plaintiffs. At least fourteen of the sixteen Plaintiffs specifically mentioned Article 5, Section 5 in their letters requesting recall.[6] All Plaintiffs received a letter confirming that they had accepted a job offer at Carlisle "[i]n accordance with Article 5, Section 5" of the NMFA.[7] (*See* Def. Union Exs. 9, 12, 14, 16, 18, 20, 21, 23, 25, 27, 29, 31, 33, 35, 37, 39.)

All Plaintiffs reported to work at ABF between November 12, 1998 and February 27, 1999. Leon Edenbo, Line Drive Supervisor for ABF, met with each Plaintiff on the day they reported to the ABF Carlisle facility. That day, Edenbo explained to Plaintiffs that under Article 5, Section 5, "they would go to the bottom . . . of the seniority list." (Def. ABF Stat. of Mat. Facts at ¶ 21.) Plaintiffs admit that they had discussions with Edenbo, but "controvert [] . . . that their status under

---

[5](...continued)
receive these letters. Plaintiffs do not state in their affidavits, or otherwise, that they did not receive these letters in 1995. They merely state that ABF did not contact them when it was aware that it needed drivers in 1998 and 1999. (*See* Pls. Exhibit 8(a) - (p).) Moreover, John Dale, former Vice President of Industrial Relations at ABF attests in his affidavit, under penalty of perjury, that these letters were sent to Plaintiffs. (Def. ABF Ex. 2, at ¶ 14.) Thus, the court finds that there is no genuine issue of fact that the letters were sent to Plaintiffs in 1995.

[6]Based on the record before the court, it is unclear whether Plaintiff Harris specifically requested work opportunities with ABF pursuant to Article 5, Section 5 because his letter requesting work was not attached to any of the exhibits. (*See* Union Defs. Ex. 21.) Furthermore, Plaintiff Srgignoli's letter specifically requests work opportunities under Article 5, but he does not mention any particular section. (*Id.* at Ex. 35.)

[7]Although exhibits 16 and 32 to Defendant Union's motion for summary judgment indicate that the confirmation letters sent to Plaintiffs Erdman and Snyder were returned to ABF, Plaintiffs Erdman and Snyder admit receiving these letters in response to Defendant ABF's motion for summary judgment. (*See* Pls. Resp. to Def. ABF Stat. Mat. Facts at ¶ 20.)

5

Article 5, Section 5 was clearly explained to them at the time they returned to work." (Pls. Resp. to Def. ABF Stat. Mat. Facts at ¶ 21.)

After returning to work at ABF, Plaintiffs were placed on the bottom of the seniority list for the purposes of bidding and retention, but maintained their previously issued seniority dates for purposes of fringe benefits. At various points after Plaintiffs had returned to work at ABF, they individually filed grievances challenging their seniority status. None of the sixteen Plaintiffs filed grievances contesting their seniority status within seven days of reporting to work at ABF.[8]

---

[8] Plaintiffs purport to contest this fact. Plaintiffs state that "several [Plaintiffs] filed within the seven day period." (Pls. Resp. to Def. ABF Stat. Mat. Facts at ¶ 24.) However, a review of the record indicates that this is not the case. The following is a list of Plaintiffs, the date they began to work at ABF's Carlisle facility, and the date on which they filed their grievance:

| Name | Reporting Date | Grievance Filed |
|---|---|---|
| (a) Jeffrey Albright | 12/14/98 | No Grievance filed |
| (b) Norman Boire | 1/8/99 | 3/17/99 |
| (c) Gary Dietz | 11/20/98 | 12/31/98 |
| (d) William Erdman | 2/11/99 | 3/11/99 |
| (e) Michael Fritz | 11/21/98 | 12/20/98 |
| (f) A. Ronald Frombaugh | 11/12/98 | No Grievance Filed |
| (g) Ralph Harris | 12/7/98 | 12/27/98 |
| (h) Allen Landis | 12/15/99 | 3/4/99 |
| (i) Lowell McGuire | 2/11/99 | 3/18/99 |
| (j) Walter Minich | 12/13/98 | 12/30/98 |
| (k) Raymon Nevins | 2/10/99 | 3/28/99 |
| (l) Stanley Nye | 2/27/99 | 3/9/99 |
| (m) Vincent Ramirez | 11/27/98 | 12/20/98 |
| (n) Keith Sgrignoli | 12/5/98 | 12/17/93 |
| (o) Ray Snyder | 11/27/98 | 12/17/98 |
| (p) Lawrence Welker | 11/27/98 | 12/16/98 |

(See Def. ABF Stat. Mat. Facts at ¶20(a) - (p).) Plaintiffs admitted that these were the correct dates. (See Pls. Resp. to Def. ABF Stat. Mat. Facts at ¶ 20.) Thus, the court fails to see how Plaintiffs can contend that several Plaintiffs filed their grievances within seven days.

6

The Union Defendants outline the following procedure for grievances falling under Articles 1 through 39 of the NMFA:

> Traditionally, the Union Representative or Steward meets with the Employer in an attempt to resolve the grievance. If the Employer and the Union Representative or Steward fail to resolve the matter, the grievance is submitted to the Eastern Region Joint Area Committee [hereinafter "ERJAC"]. The ERJAC will hear the grievance and either decide the matter or refer such grievances to the Change of Operations Committee. If the ERJAC decides the matter, said decision is final and binding.

(Union Defs. Stat. Mat. Facts at ¶ 7.) Plaintiffs contend that "the finality of the [ERJAC] determination is in dispute," based upon correspondence between Defendant Virtue and Plaintiffs. (Pl. Resp. to Union Defs. Stat. Mat. Facts at ¶ 7.)

Local 776 processed Plaintiffs' grievances and forwarded them to ABF. Because ABF and Local 776 could not resolve the grievances, they were referred to the ERJAC for a hearing on the issue of their timeliness. On April 13, 1999, Defendant Virtue, on behalf of Local 776, notified Plaintiffs that their grievances would be heard by the ERJAC on April 27, 1999. Defendant Virtue also informed Plaintiffs that the only issue before the ERJAC was whether the grievances were timely filed. Plaintiffs grievances were divided into two groups. One group, piloted by the Runk grievance, comprised the eight Plaintiffs who had taken layoff from Carolina in Carlisle in 1995 and had not transferred to another Carolina facility. The other group, piloted by the Nye grievance, included the remaining eight Plaintiffs who had transferred to other Carolina facilities prior to the 1995 Carolina/ABF merger.

At the ERJAC hearing, ABF took the position that all of the grievances were untimely because they were not filed within seven days of the Plaintiffs'

reporting to work as required by Article 43, Section 1(c) of the Central Pennsylvania Over-the-Road and Local Cartage Supplemental Agreement to the NMFA. In contrast, Local 776 took the position that all of the grievances were timely filed because they were covered by Article 5, Section 4(d) of the NMFA, which provides for a period of thirty days within which to file grievances related to the master seniority list. After hearing the position of both ABF and Local 776, the ERJAC panel found, in both grievance sets, that "since the grievants knew their seniority positions on the day they reported, [ABF's] point of order is upheld." This meant that the grievances were denied as untimely because they were not filed within seven days of Plaintiffs' reporting to work at ABF.[9] (*See* Def. ABF Exs. 9 & 14.)

On May 11, 1999, Local 776 notified Plaintiffs, in writing, of the ERJAC's decision on their grievances and enclosed a copy of the decision. Plaintiffs sent letters to Defendants Virtue and Local 776, requesting an appeal from the ERJAC decision. In response to these requests, Defendant Virtue forwarded the letters to the IBT and requested further review. The Union Defendants assert that Defendant Virtue and IBT "are not proper parties to the NMFA and, therefore, [they] are not proper parties to this action." (Union Defs. Stat. Mat. Facts at ¶ 106.) Plaintiffs respond that Defendants Daniel Virtue and IBT are "proper parties" because of their "active participation . . . in the handling, status, disposition and appeal of Plaintiffs' return-from-layoff seniority." (Pls. Resp. to Union Defs. Stat. Mat. Facts at ¶ 106.)

---

[9]Plaintiffs dispute "the suggestion that they knew their seniority position on the day they reported" to work. (Pls. Resp. to Def. ABF Stat. Mat. Facts at ¶ 33.) They do not appear, however, to dispute the fact that the ERJAC found that they knew their seniority status at the time they reported.

8

Plaintiffs filed the instant action on May 16, 2000. Plaintiffs' Amended Complaint alleges that ABF violated § 301(a) of the Labor Management Relations Act, 29 U.S.C. § 185 *et. seq.*, by not assigning the correct seniority status under the NMFA (Count I). Second, Plaintiffs allege that the Union Defendants breached their duty of fair representation by mishandling Plaintiffs' grievances and/or the arbitration proceedings (Count II).

II.     **Legal Standard: Motion for Summary Judgment**

Federal Rule of Civil Procedure 56 provides that summary judgment is proper when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."

A factual dispute is "material" if it might affect the outcome of the suit under the applicable law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A factual dispute is "genuine" only if there is a sufficient evidentiary basis which would allow a reasonable fact-finder to return a verdict for the non-moving party. *Id.* at 249. The court must resolve all doubts as to the existence of a genuine issue of material fact in favor of the non-moving party. *White v. Westinghouse Elec. Co.*, 862 F.2d 56, 59 (3d Cir. 1988).

Once the moving party has shown that there is an absence of evidence to support the claims of the non-moving party, the non-moving party may not simply sit back and rest on the allegations in the complaint; instead, it must "go beyond the pleadings and by [his] own affidavits, or by the depositions, answers to

9

interrogatories, and admissions on file, and designate specific facts showing that there is a genuine issue for trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986) (internal quotations omitted). Summary judgment should be granted where a party "fails to make a showing sufficient to establish the existence of an element essential to that party's case and on which that party will bear the burden at trial." *Id.*

### III.     Discussion

In a typical § 301 claim, an employee sues their union for breach of its duty of fair representation and the employer for breach of the collective bargaining agreement. *See DelCostello v. International Bhd. of Teamsters*, 462 U.S. 151, 164-65 (1983); *see also Vadino v. A. Valey Eng'rs*, 903 F.2d 253, 260 (3d. Cir 1990). Absent proof that the Union Defendants breached their duty of fair representation, ABF is entitled to rely on the finality of the decision of the ERJAC that the grievances were untimely. *See Hines v. Anchor Motor Freight, Inc.*, 424 U.S. 554, 567 (1976); *Humphrey v. Moore*, 375 U.S. 335, 350-51 (1964) (upholding a joint committee decision resolving a seniority dispute where the evidence failed to show a breach by the union of its duty of fair representation).

Thus, the court need not address the underlying merits of whether Plaintiffs' grievances were timely filed, if there has not been a breach of the duty of fair representation by the Union Defendants. Moreover, absent proof of a breach of the Union Defendants' duty of fair representation, the court need not even examine Plaintiffs breach of contract claim against Defendant ABF. *See Johnson v. United*

*Steelworkers of America*, 843 F. Supp. 944, 949 (M.D. Pa. 1994). Accordingly, the court will first address the Union Defendants motion for summary judgment.

### A. Union Defendants' Motion

Plaintiffs contends that Defendants IBT, Local 776, and Virtue breached their duty of fair representation to Plaintiffs "by mishandling the ensuing grievance or arbitration proceedings." (Amend. Compl. at Count II, ¶ 27.) These Defendants move for summary judgment on the following grounds: (1) Defendant Virtue is not a proper party for a duty of fair representation claim; (2) Defendant IBT is not a proper Defendant for a duty of fair representation claim; and (3) no duty of fair representation has been breached. For the reasons that follow, the court finds that there has not been a breach of the duty of fair representation. Therefore, the court need not address whether Defendants Virtue and IBT are proper Defendants.

It is well settled that "[t]he duty of fair representation requires a union to serve the interests of all members without hostility or discrimination toward any, to exercise its discretion with complete good faith and honesty, and to avoid arbitrary conduct." *Marquez v. Screen Actors Guild*, 525 U.S. 33, 44 (1998) (citing *Vaca v. Sipes*, 386 U.S. 171, 177 (1967)). "In other words, a union breaches the duty of fair representation when its conduct toward a member of the bargaining unit is arbitrary, discriminatory, or in bad faith." *Id.*, 525 U.S. at 44. A union's actions are arbitrary only if "in light of the factual and legal landscape" they are "so far outside the range of reasonableness as to be irrational." *Air Line Pilots v. O'Neill*, 499 U.S. 65, 67 (1991); *accord Johnson*, 843 F. Supp. at 946. Poor judgment on the part of the union, even that which rises to the level of negligence, is insufficient to

support a claim of unfair representation. *Bazarte v. United Transportation Union*, 429 F.2d 868, 872 (3d Cir. 1980).

Plaintiffs make conclusory and circumlocutious assertions regarding the Union Defendants' failure to properly represent them. Plaintiffs, however, make no specific references to evidence in the record to support their contentions. In contrast, there is ample evidence that Defendant Virtue represented Plaintiffs' interests throughout the grievance process.

After Local 776 received Plaintiffs' grievances, Defendant Virtue notified each Plaintiff that their grievances had been forwarded to ABF. Defendant Virtue informed each Plaintiff of the date and time of the ERJAC hearing. Prior to the ERJAC hearing, ABF raised a point of order with regard to the timeliness of Plaintiffs' grievances. Defendants Virtue and Local 776 responded to that point of order in their brief before the ERJAC. Additionally at the ERJAC hearings on the Nye pilot grievance, Defendant Virtue made the following statement:

> [Plaintiffs'] contacted the company with a letter, stating that they wanted to go on 5.5. At the time, they didn't realize what 5.5 was. Then they took the job opportunity, came to Carlisle, PA, and at that time, went to work and then each one filed a grievance after the seniority list was posted at the Carlisle terminal. If you look at my brief, Exhibit 1 is Article 5, Section 4(d), Posting Seniority List which I'll go over with the Panel. This is [NMFA] language and each grievant filed a grievance timely under the [NMFA] language which says that they have thirty days from the posting of the seniority list. They did that timely and feel the case is timely and should be referred back to the parties on its merits. Their position is it was all done timely under the [NMFA] under Article 5, Section 4(b) [sic], Posting Seniority List.
>
> . . .
>
> Their position is they weren't under 5.5, they did send a letter in to get the job opening, they waited for the posting of the seniority list. Under the NMFA, at that time, they filed a grievance in a timely manner.

12

(Union Defs. Ex. 55, Nye Grievance at pp. 2-3.) At the ERJAC hearing on the Runk pilot grievances Defendant Virtue stated:

> It's very clear, it's the [NMFA] language, and Mr. Runk has thirty days from the posting of the seniority list [to file]. . . . As soon as the seniority list was posted, he filed a grievance within thirty days.
>
> Every person sitting in this room that had a grievance here did exactly the same thing. They filed a grievance within thirty days of the posting of the seniority list.

(*Id.*, Ex. 55, Runk Grievance at 4.) In addition to Defendant Virtue, several Plaintiffs spoke on their own behalf at the ERJAC hearing.[10]

After these hearings, the ERJAC concluded that Plaintiffs knew their seniority positions on the day that they reported and, thus, upheld ABF's point of order. Put simply, the ERJAC held that the grievances were untimely. Defendant Virtue notified all sixteen Plaintiffs, in writing, of the ERJAC decisions. Finally, after receiving several requests to appeal the ERJAC decisions, Defendant Virtue forwarded those letter to the IBT and requested that the ERJAC decisions be reviewed.

Plaintiffs assert that "they were led to believe, by their local union representatives, including Daniel Virtue, that the seniority issues at the heart of the grievances would be further processed in July 1999." (Pls. Br. in Resp. to Defs. Mots. for Sum. J. at 13.) Plaintiffs also respond with a series allegations that Defendants had invidious motives and "arbitrary and predisposed attitude[s] adverse to the Plaintiffs" (*Id.* at 18.) However, Plaintiffs fail to present any record evidence

---

[10] Plaintiffs Erdman, Fritz, Ramirez, Sgrignoli, Snyder and Welker all made statements at one of the two ERJAC hearings. (*See* Union Defs. Ex. 55.)

13

in support of their allegations. The court supposes that Plaintiffs' first assertion relates to Plaintiffs allegation that it was not until July 31, 2000, that Defendant Virtue "notified . . . Plaintiffs that their seniority grievances had been 'withdrawn' from processing which was after notice of this litigation." (*Id.* at 6.) Plaintiff states that this is important because, on at least two prior occasions – February 1, 2000 and March 13, 2000 – Plaintiffs had contacted Defendant Virtue and inquired about the status of their appeal. (*Id.*) Plaintiffs allege that Defendant Virtue did not return those calls. (*Id.*) Plaintiff cites no evidence in the record to support these assertions.

However, even assuming that it is true that Defendant Virtue did not return Plaintiffs calls on two occasions, the court fails to see how this rises to the level of conduct that is "so far outside the range of reasonableness as to be irrational." *Air Line Pilots*, 499 U.S. at 67; *accord Johnson*, 843 F. Supp. at 946. Rather, at most, it was an exercise of poor judgment on the part of Defendant Virtue. Even if the court were to find that is rises to the level of negligence, this is insufficient to support a claim of unfair representation. *See Bazarte,* 429 F.2d at 872; *see also Whitten v. Anchor Motor Freight, Inc.,* 521 F.2d 1335, 1341 (6th Cir. 1975) ("The Union may have acted negligently or exercised poor judgment in failing to keep [Plaintiff] informed of the status of his grievance, but this is not sufficient to support a claim of unfair representation.").

Viewing all of the facts in the light most favorable to Plaintiffs, no reasonable finder of fact could determine that the Union Defendants failed "to serve the interests of [Plaintiffs] without hostility or discrimination toward [them], to exercise [their] discretion with complete good faith and honesty," and acted arbitrarily. *Marquez,* 525 U.S. at 44. In other words, The Union Defendants

conduct was not "so far outside the range of reasonableness as to be irrational." *Air Line Pilots*, 499 U.S. at 67; *accord Johnson*, 843 F. Supp. at 946. Accordingly, the court will grant Defendants IBT, Local 776, and Virtue's motion for summary judgment.

### B.  Defendant ABF's Motion

Plaintiffs' claim is a hybrid suit in which they contend that the Union Defendants breached their duty of fair representation, and ABF breached the collective bargaining agreement. In *DelCostello,* the Supreme Court discussed hybrid suits:

> Such a suit, as a formal matter, comprises two causes of action. The suit against the employer rests on § 301 [of the Labor Management Relations Act], since the employee is alleging a breach of the collective bargaining agreement. The suit against the union is one for breach of the union's duty of fair representation, which is implied under the scheme of the National Labor Relations Act. Yet the two claims are inextricably interdependent. To prevail against either the company or the Union, . . . [Plaintiffs] must not only show that their discharge was contrary to the contract but must also carry the burden of demonstrating a breach of duty by the Union.

462 U.S. 151, 164-65 (1983) (quoting *United Parcel Service, Inc. v. Mitchell*, 451 U.S. 56, 66-67 (1981)); *see also Albright v. Virtue*, 273 F.3d 564, 576 (3d Cir. 2001) ("A breach of the duty of fair representation claim is a 'necessary condition precedent' to the [] claim [against the employer]; in hybrid suits where the employee sues both the employer and the union.")

Thus, according to *DelCostello*, in order to prevail against Defendant ABF, Plaintiffs must prove *both* that the Union Defendants breached their duty of fair representation *and* that ABF breached the collective bargaining agreement. The court has already determined that the Union Defendants did not breach their duty of

15

fair representation. Thus, the court need not determine whether ABF violated the collective bargaining agreement. *See Johnson*, 843 F. Supp. at 949. In any event, the court must defer to the finding of the ERJAC on the issue of timeliness because the Union Defendants did not breach their duty of fair representation before that committee. *See Griesmann v. Chemical Leaman Tank Lines, Inc.*, 776 F.2d 66, 74 (3d Cir. 1985) (stating that a district court must defer to a joint committee decision unless the union breached its duty of fair representation before the committee.) Accordingly, the court will grant summary judgment in favor of Defendant ABF as well.

## IV.    Conclusion

The court finds that there are no material issues of fact as to whether Defendants IBT, Local 776 or Virtue breached the duty of fair representation that they owed Plaintiffs. As this is an element that must be proved to prevail against any Defendants in this action, the court will grant the pending motions for summary judgment. An appropriate order will issue.

SYLVIA H. RAMBO
United States District Judge

Dated: February 13, 2003